WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                               :
**In re**                                      :          **Chapter 11**
                                               :
**EVERGREEN GARDENS MEZZ LLC,** *et al.*,      :          **Case No. 21-10335 (MG)**
                                               :
            **Debtors.**[1]                    :          **(Joint Administration Pending)**
                                               :
---------------------------------------------------------------X

## DECLARATION OF ASAF RAVID PURSUANT
## TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF
## SUBSIDIARY DEBTORS' CHAPTER 11 PETITIONS AND RELATED RELIEF

I, Asaf Ravid, pursuant to section 1746 of title 28 of the United States Code, hereby declare

that the following is true and correct to the best of my knowledge, information, and belief:[2]

1.       On March 4, 2021, I was retained as the Chief Executive Officer ("**CEO**") and

Chief Restructuring Officer ("**CRO**") of All Year Holdings Limited ("**All Year Holdings**"[3] and,

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782).  The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]  Capitalized terms used herein but not otherwise defined have the meaning ascribed to them in the Plan (as defined below).

[3]  All Year Holdings was established and incorporated on September 17, 2014, as a BVI Business Company under the laws of the British Virgin Islands.  All Year, itself and together with partners, owns approximately 120 properties (including properties under development), consisting of approximately 2,000 residential units, 94 commercial units

together with its direct and indirect subsidiaries, collectively "**All Year**"), a company organized as a BVI Business Company under the laws of the British Virgin Islands.  Among All Year Holdings' direct and indirect subsidiaries are Evergreen Gardens Mezz LLC (the "**Initial Debtor**" or "**EGM**"), Evergreen Gardens I LLC ("**EG I**"), and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**").

2.      Prior to my current position at All Year Holdings, I served as an official representative of All Year Holdings' Series B, C, D and E bondholders.  Before this position, I was the managing director of CGI Strategies ("**CGI**"), a domestic development real estate company focused on developing and operating multi-family units, condominiums, and commercial properties in California, the South East, and the North East.  In this capacity, I managed the operations of CGI's New York office by overseeing the full real estate development cycle from acquisitions, construction, sales and marketing, and financing and refinancing.  Prior to this role, I served as a managing director of Aura Investments, Ltd, a global investment company specializing in real estate development and property management from 2007-2012.  Before that I was a co-founder and attorney of Raveh-Ravid & Co., a leading Israeli law firm specializing in real estate and commercial law.

3.      On February 22, 2021 (the "**Initial Debtor Petition Date**"), the Initial Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  On the date hereof (the "**Subsidiary Debtor Petition Date**"), the Subsidiary Debtors commenced their own voluntary cases under the Bankruptcy Code.

---

and 183 hotel rooms in Brooklyn, New York.  All Year was founded by Mr. Yoel Goldman ("**Mr. Goldman**"), who is All Year Holdings' sole economic shareholder.

Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their three chapter 11 cases (the "**Chapter 11 Cases**") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Bankruptcy Rule (the "**Bankruptcy Rules**").

4.      I am knowledgeable and familiar with the Debtors' businesses and financial affairs. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of All Year working under my supervision, or my opinion based upon experience, knowledge, and information concerning the Debtors and All Year.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") to apprise the Court and other parties in interest of the circumstances that compelled the commencement of the Subsidiary Debtors' Chapter 11 Cases and in support of (i) the Subsidiary Debtors' chapter 11 petitions, and (ii) the motions and applications that the Debtors have filed with the Court, including, but not limited to, the "first-day motions" (the "**First-Day Pleadings**").  I am authorized to submit this Declaration as an authorized signatory and representative of the Debtors.

6.      This Declaration is intended to provide a summary overview of the Subsidiary Debtors and their Chapter 11 Cases, and is organized as follows: Section I describes the business and operations of the Subsidiary Debtors; Section II describes the Subsidiary Debtors' prepetition capital structure; Section III describes the key events that led to the commencement of the Chapter 11 Cases; Section IV describes the relief sought pursuant to the First-Day Pleadings; and Section V attaches and identifies the schedules of information required by Local Bankruptcy Rule 1007-2.

**Introduction**

7.      Following a robust and comprehensive marketing process, the Debtors have secured the support and commitment, pursuant to an executed restructuring support agreement, dated August 31, 2021 (as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, and together with all exhibits and schedules thereto, the "**RSA**"), of their senior, secured Series E Noteholders and their Mezzanine Lender (each as defined below).  Copies of the RSA and the Purchase Agreement (as defined below) are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

8.      These key creditor constituencies support, subject to the terms of the RSA, a value-maximizing chapter 11 plan that will implement a sale (the "**Sale**") of substantially all of the Subsidiary Debtors' assets to ACI VI Denizen LLC, an affiliate of Atlas Capital Group, LLC (the "**Purchaser**"), pursuant to the terms of a signed purchase and sale agreement (as amended on August 19, 2021 and September 1, 2021, and as may be further modified, amended, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Purchase Agreement**").  The Sale provides for the purchase of the Denizen (as defined below) for total cash consideration of $506 million as well as the assumption of certain of the Subsidiary Debtors' liabilities, as set forth in the Purchase Agreement, and the retention of all employees without interruption.

9.      The Denizen is one of the crown jewels of All Year Holdings' portfolio and is comprised of two adjacent residential apartment properties each separately owned by the Subsidiary Debtors – The Denizen X, located at 123 Melrose Street, which is 100% owned by EG I (the "**Denizen X**"), and the Denizen Y, located at 54 Noll Street, which is 100% owned by EG II (the "**Denizen Y**" and together with Denizen X, the "**Denizen**").  The Denizen is an amenity rich residential unit that was adversely impacted by the ongoing COVID-19 pandemic, which

21-11609-mg   Doc 3   Filed 09/14/21   Entered 09/14/21 14:14:42   Main Document
Pg 5 of 474


resulted in below average occupancy rates at the Denizen, thereby forcing EG I and EG II to provide generous concessions to increase occupancy and generate cash flow. These events ultimately precipitated the need for EGM, EG I's direct parent, to commence a proceeding under the Bankruptcy Code on an emergency basis on the Initial Debtor Petition Date.[4]

10.     Since that time, the Subsidiary Debtors have engaged in an extensive sale and marketing effort for the Denizen (the "**Sale Process**"). The Sale Process, which has been led by professionals at Meridian Capital Group ("**Meridian**"), was broad and comprehensive – and involved, among other things, (i) approximately 2,000 parties being contacted by Meridian, on behalf of the Subsidiary Debtors, as part of a large-scale marketing effort of the Denizen, (ii) approximately 125 parties executing non-disclosure agreements and being granted access to a data room and certain financial and operational information, (iii) approximately fifteen (15) first round bids and initial indications of interest being submitted, and (iv) approximately six (6) bids being selected to move on to a second round of bidding before the Subsidiary Debtors ultimately determined to proceed with the Purchaser's bid that was documented and agreed to in the Purchase Agreement.

11.     In accordance with the Purchase Agreement and the RSA, the Subsidiary Debtors are proposing to implement the Sale to the Purchaser pursuant to a joint chapter 11 plan (as may be amended, modified, or supplemented from time to time in accordance with the terms thereof and the RSA, and together with all exhibits and schedules thereto, the "**Plan**"). The Debtors filed the Plan with the Court contemporaneously hereto together with a proposed disclosure statement (as may be amended, modified, or supplemented from time to time, and together with all exhibits

---

[4] For additional background on the circumstances leasing up to the commencement of the Initial Debtor's Chapter 11 Case see *Declaration of Joel Biran Pursuant to Local Bankruptcy Rule 1007-2*, Case No. 21-bk-10335 [Docket No. 3] (the "**Biran Declaration**").

and schedules thereto, the "**Disclosure Statement**").  Pursuant to the Plan, and consistent with the

terms of the RSA, proceeds from the Sale will be allocated according to the following allocation

(the "**Sale Transaction Allocation Proportion**"): 50.75% to EG I, on account of the Denizen X

(the "**EG I Sale Proceeds**"), and 49.25% to EG II, on account of the Denizen Y (the "**EG II Sale**

**Proceeds**").  Meridian's broker's fees and any other direct closing or transaction costs for the Sale

will be allocated between EG I and EG II in accordance with the Sale Transaction Allocation

Proportion and paid out of EG I Sale Proceeds and EG II Sale Proceeds, as applicable.  The balance

of the EG I Sale Proceeds and the EG II Sale Proceeds will be distributed in accordance with the

Plan and consistent with the terms of the RSA.

12.     As explained in further detail below, the Sale will result in the payment in full and

unimpairment of all holders of claims against, and interests in, EG I.  The proceeds of the Sale

remaining at EG I after payment pursuant to the terms of the Plan of all allowed claims against EG

I as well as allowed administrative and priority expenses of EGM shall be used to satisfy the

Mezzanine Loan Claim (as defined below).  With respect to EG II, the EG II Sale Proceeds will

result in significant recoveries to holders of Series E Secured Claims (as defined below) with any

residual unencumbered value to be distributed pro rata to holders of allowed General Unsecured

Claims.  Specifically, the Plan classifies claims against, and interests in, each of the Debtors, and

provides for the treatment of each class as follows:[5]

---

[5] This summary is for ease of reference only and shall not limit, modify, or amend the proposed treatment set forth in the Plan, which, in the event of any inconsistency, shall govern.

### Claims against and Interests in EG I

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against EG I agrees to a less favorable treatment, in full and final satisfaction, settlement and release of such Allowed Priority Non-Tax Claim, at the sole option of the Plan Administrator:  (i) each such holder shall receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | JPM Secured Claims | The JPM Secured Claims shall be Allowed in the amount of $170,000,000, plus any and all accrued and unpaid interest, including premiums, fees and reasonable and documented expenses thereon, and shall not be subject to any avoidance, reductions, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person. | Unimpaired | No (Presumed to accept) | 100% |
| 3 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account and in full satisfaction of such Allowed Claim, at the sole option of the Plan Administrator:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) return of the applicable collateral or the proceeds thereof in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 4 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim against EG I agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed General Unsecured Claim, at the sole option of the Plan Administrator: (i) each such holder shall receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such General Unsecured | Unimpaired | No (Presumed to accept) | 100% |

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed General Unsecured Claim Unimpaired. | | | |
| 5 | Intercompany Claims | Except to the extent that EG II, the Mezzanine Lender, and the Series E Notes Trustee agree to less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Class 5 Allowed Intercompany Claims:<br><br>(i)    EG II shall not receive any distribution on the Effective Date on account of the EG I Affiliate Intercompany Claim. Instead, the distribution that would otherwise be payable to EG II on account of the EG I Affiliate Intercompany Claim shall be retained by EG I and utilized by EG I to partially pay the 2020 PSA Claim, as provided under the RSA, and any remaining amounts owed to EG I on account of the EG I Affiliate Intercompany Claims shall be waived and deemed satisfied, settled and released in full by EG II and its Estate;<br><br>(ii)    The BVI Intercompany Claim shall be treated by the parties in accordance the RSA and shall not be Allowed or paid by EG I or the Plan Administrator, until the earlier to occur of (A) the written consent by the Mezzanine Lender; or (B) the entry of a Final Order requiring such payment; and<br><br>(iii)    The EG I Operating Expense Claim shall have been paid in full by EG I to EG II, without setoff, recoupment, or deduction, or reduction in anyway, from the proceeds of the DIP Loan, in accordance with the DIP Budget, and such amounts shall constitute Allowed DIP Claims of the DIP Lender. | Unimpaired | No (Presumed to accept) | 100% |
| 6 | Equity Interests | On or as soon as reasonably practicable after the Effective Date, following the payment of all Allowed Claims against EG I, all of the Assets of EG I, including all Cash, Avoidance Actions, and other Causes of Action of EG I, shall be transferred to EGM , in full and final satisfaction, compromise, settlement, release, and discharge of the Allowed Equity Interests, and all Equity Interests in EG I shall be cancelled and extinguished and EG I shall be deemed dissolved under applicable non-bankruptcy law; provided, however, that Post-Effective Date EGM shall | Unimpaired | No (Presumed to accept) | 100% |

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | continue to maintain the EG I Disputed Claims Reserve for the benefit of holders of Disputed Claims against EG I. | | | |

### Claims against and Interests in EG II

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against EG II agrees to a less favorable treatment, in full and final satisfaction, settlement and release of such Allowed Priority Non-Tax Claim, at the sole option of the Plan Administrator:  (i) each such holder shall receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Series E Secured Claims | Except to the extent that a holder of an Allowed Series E Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Series E Secured Claim (but not the Series E Notes Deficiency Claims), on or as soon as practicable after the Effective Date, each holder of an Allowed Series E Secured Claim shall receive its Pro Rata Share of the Series E Secured Claim Distribution. | Impaired | Yes | 93% |
| 3 | Other Secured Claims[6] | Except to the extent that a holder of an Allowed Series E Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement and release of such Allowed Series E Secured Claim (but not the Series E Deficiency Claims), on or as soon as practicable after the Effective Date, each holder of an Allowed Series E Secured Claim shall receive its Pro Rata Share of the Series E Secured Claim Distribution. | Unimpaired | No (Presumed to accept) | 100% |
| 4 | Convenience Claims | Except to the extent that a holder of an Allowed Convenience Class Claim against EG II agrees in writing to less favorable treatment, on the Effective Date, each holder of an Allowed Convenience Claim shall receive payment in Cash in the amount of its Allowed | Unimpaired | No (Presumed to accept) | 100% |

---

[6] As discussed in further detail below, the Debtors do not believe there are any Other Secured Claims against EG II but have nevertheless accounted for them as a Class in the Plan.

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | Convenience Claim, in full and final satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed Convenience Class Claim. | | | |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim against EG II agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for the General Unsecured Claims of EG II (but not any Series E Noteholders' claims against the BVI Parent) each holder thereof shall receive its Pro Rata Share of the amounts recovered by the Plan Administrator, if any, from the prosecution of Avoidance Actions and other Causes of Action of Post-Effective Date EG II, to the extent such Avoidance Actions and Causes of Action do not constitute collateral of the Series E Noteholders under the Series E Indenture or the Cash Collateral Orders, net of fees and expenses associated with prosecuting such action.  The Plan Administrator shall make distributions to the holders of General Unsecured Claims against EG II from such proceeds as and when the Plan Administrator deems appropriate, after consultation with the Series E Notes Trustee.  The rights to such proceeds shall be nontransferable except by will, intestate succession, or operation of law. | Impaired | Yes | Uncertain, depending upon the results of litigation. |
| 6 | Intercompany Claims | The holders of Allowed Intercompany Claims against EG II shall not receive or retain any property under the Plan on account of such Claims. | Impaired | No (Deemed to reject) | 0% |
| 7 | Equity Interests | On or after the Effective Date, all Equity Interests in EG II shall be cancelled.  The existing holder of the Equity Interests in EG II shall neither receive nor retain any property of EG II or direct interest in property of EG II on account of such Equity Interest. | Impaired | No (Deemed to reject) | 0% |

### Claims Against and Interests in EGM

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against EGM agrees to a less favorable treatment, in full and final satisfaction, settlement and release of such Allowed Priority Non-Tax Claim, at the sole option of the Plan Administrator:  (i) each such holder shall receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably | Unimpaired | No (Presumed to accept) | 100% |

| Class | Designation | Treatment | Impaired or Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | practicable; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | | | |
| 2 | Mezzanine Loan Claim | Except to the extent that the holder of the Mezzanine Loan Claim agrees to a less favorable treatment, in settlement of such Mezzanine Loan Claim as against EGM, on or as soon as practicable after the Effective Date, the holder of the Allowed Mezzanine Loan Claims shall receive:<br><br>(iv)    the Excess EGM Cash;<br><br>(v)    its Pro Rata Share of the amounts recovered by the Plan Administrator of EGM, if any, from the prosecution of Avoidance Actions or other Causes of Action of EG I and EGM, net of fees and expenses associated with prosecuting such action.  The Plan Administrator shall make distributions to the holder of the Mezzanine Loan Claim from such proceeds as and when the Plan Administrator deems appropriate, after consultation with the Mezzanine Lender.  The rights to such proceeds shall be nontransferable except to an affiliate, or by will, intestate succession, or operation of law; and<br><br>(vi)    the remainder of the Disputed Claims Reserve after all Disputed Claim against EG I has been liquidated and paid, if applicable, in accordance with the Plan. | Impaired | Yes | 56% |
| 3 | Equity Interests | On or after the Effective Date, the Equity Interests in EGM shall be cancelled.  The existing holder of the Equity Interests in EGM shall neither receive nor retain any property of EGM or direct interest in property of EGM on account of such Equity Interest. | Impaired | No (Deemed to reject) | 0% |

13.    Prior to the date hereof, the Subsidiary Debtors commenced the process of soliciting votes from creditors in each of their impaired voting classes under the Plan following a vote in which the Series E Noteholders voted by approximately 90% in number and approximately 97% in amount to authorize and direct the Series E Notes Trustee to vote to approve the RSA and to vote both their secured claims and substantial unsecured deficiency claims to accept a chapter 11

plan that complies with the RSA.     Subject to completion of the ongoing voting process, the Debtors expect the Plan to be accepted by all classes of impaired voting creditors.  Consistent with their obligations under the RSA and the Purchase Agreement, the Debtors have filed a motion contemporaneously hereto requesting the Court, among other things, schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan and approve the Debtors' procedures for soliciting votes to accept or reject the Plan, so that they can expeditiously proceed with resolution of these Chapter 11 Cases and  move promptly to closing on the proposed sale transaction.

## I.      **The Subsidiary Debtors and the Denizen**

14.     As set forth above, the Denizen is comprised of two adjacent units which together have approximately 900 residential units.  The Denizen X is owned by EG I, and the Denizen Y is owned by EG II.  The Initial Debtor (EGM) owns 100% of the equity interests in EG I and is also EG I's member manager.  EG I has no officers but it has two independent directors, Mr. Anthony Palazzo and Ms. Beena Soiefer.  Evergreen Gardens Holdings II LLC owns the limited liability interests of EG II and is also EG II's member manager.  EG II does not have any officers or directors.  Evergreen Gardens Holdings II LLC is not a debtor in these Chapter 11 Cases.  An organizational chart of All Year Holdings, the Debtors (including the Subsidiary Debtors), and their direct and indirect parents and subsidiaries, as of the date hereof, is annexed hereto as **Exhibit C**.

15.     The Denizen offers approximately 900 modern studio, one and two bedroom apartments and is situated around an approximately 17,850 square foot courtyard. The Denizen affords its residents abundant greenspace, a public park and promenade, an on-site beer brewery, a community chef's kitchen, rooftop gardens, a dog park and spa, a cafe with co-working space, a curated art gallery, game room, and fitness centers.  The Denizen X and Denizen Y share facilities

and sit adjacent to each other. The mutual access to shared facilities provides for a wider range of residential amenities thereby making the Denizen a more desirable property and enhancing its value.

16.    The Subsidiary Debtors' operations are managed by Smart Management NY, Inc. (the "**Management Company**"), an unaffiliated third-party entity pursuant to which, the Management Company among other things, (i) leases and keeps leased to tenants spaces available for lease and (ii) maintains and operates the Denizen property through upkeep and repairs.[7]  The Subsidiary Debtors pay the Management Company a monthly fee of approximately $100,430.00 for the operation of the Denizen.  The Subsidiary Debtors do not have any employees.  Instead, the personnel and staff that operate the Denizen are employed pursuant to two separate agreements with PBS Facility Services Inc.  One of these agreements is with Service Employees International Union 32BJ, and the parties to that agreement are "PBS Facility Services, Inc., Platinum Amenity Services and Dynamic Building Services."  The other agreement is with Local 713 (a union), and the party to that agreement is "Dynamic Building Services."  The Subsidiary Debtors pay a total monthly fee of approximately $219,092 as reimbursement for staff wages and salaries.

## II.    The Subsidiary Debtors' Capital Structure

17.    Each of the Subsidiary Debtors has its own separate capital structure which is summarized below.[8]

---

[7] The Subsidiary Debtors' day to day operations were previously overseen by All Year Management, Inc., which was an affiliate of All Year Holdings and partially owned by Mr. Yoel Goldman, the sole economic shareholder of All Year Holdings Limited, and a third party.  Since that time, the day to day operations have been transitioned to the Management Company (Smart Management NY, Inc.), which, to the best of the Debtors' knowledge and belief, has no affiliation with Mr. Goldman.  Although the applicable contracts have not been updated to reflect the change in management, the Subsidiary Debtors pay a monthly fee to the unaffiliated Management Company.  Mr. Goldman is not involved in the management of the Denizen, and, to the best of their knowledge and belief, the Subsidiary Debtors do not pay funds to any entitled affiliated with Mr. Goldman in connection with the operations of the Subsidiary Debtors.

[8] EGM owns 100% of the equity interests in EG I.  EGM's sole outstanding funded debt obligations consist of a $65 million loan, pursuant to that certain Mezzanine Loan and Security Agreement, dated as of February 12, 2019 (as

A.    **EG I's Capital Structure**

18.    As of the date hereof, EG I's outstanding liabilities were comprised of (i) secured first lien property level mortgage debt held by JPM, (ii) asserted mechanic's, materialman's and similar lien claims, (iii) intercompany claims, and (iv) general unsecured claims, each of which is summarized below.

19.    JPM Secured Claim.    EG I is the borrower under that certain Loan and Security Agreement between EG I and the EG I Mortgage Lender, dated as of June 10, 2019 (as amended, modified, renewed, or supplemented from time to time, in accordance with the terms thereof and agreements ancillary thereto, the "**EG I Mortgage Loan Agreement**") in the principal amount of $170.0 million.  EG I's obligations under the EG I Mortgage Loan Agreement are secured by a first priority, valid, binding, and enforceable lien and security interest over, among other things, (i) the real property located at 123 Melrose Street (Denizen X) and all of the buildings, structures, fixtures, and other improvements, (ii) all easements and rights-of-way pertaining to the property, (iii) all equipment related to the property, (iv) all personal property, (v) all leases, subleases, licenses concessions or other agreements relating to the property, (vi) condemnation awards relating to the property, (vii) available insurance proceeds, (viii) refunds, rebates, and tax credits, (ix) all contracts and agreements relating to the property, (x) all tradenames and trademarks relating to the operation of the property, (xi) all escrows and reserves, and (xii) all water rights relating to the property. As of the date hereof, EG I owed approximately $185 million in

---

amended, modified, or supplemented, including pursuant to that certain First Amendment dated as of June 6, 2019) (the "**Mezzanine Loan**"), by and between EGM and MREF REIT Lender 9 LLC (the "**Mezzanine Lender**").  EGM's obligations under the Mezzanine Loan are secured by, among other things, a pledge of EGM's interest in EG I pursuant to that certain Amended and Restated Mezzanine Pledge and Security Agreement, dated as of June 10, 2019.  As of the Initial Debtor Petition Date, EGM owed approximately $73 million –including principal, accrued interest, default interest and a forbearance fee – in outstanding obligations under the Mezzanine Loan, as well as additional amounts for incurred fees and expenses.

outstanding obligations under the EG I Mortgage Loan Agreement, including principal, interest, fees, expenses, and other amounts.

20.     <u>Other Secured Claims</u>.   As of the date hereof, approximately $10.4 million in mechanic's, materialman's, and other similar lien claims had been asserted against the Denizen X and EG I.

21.     <u>Intercompany Claims</u>.   As of the date hereof, EG I owed approximately $4,719,953 in total aggregate amount to EG II and its non-Debtor affiliates, arising from (i) loans from EG II to EG I to fund operating expenses of EG I for the period from October 1, 2019 through December 11, 2020; (ii) loans from All Year Holdings[9] to EG I to fund operating expenses of EG I for the period from September 10, 2020 through August 10, 2021; and (iii) loans from EG II to EG I to fund operating expenses of EG I for the period from February 1, 2021 through August 25, 2021.

22.     <u>General Unsecured Claims.</u>   As of the date hereof, EG I owed approximately $7.7 million in trade payables and other general unsecured obligations.[10]

**B.     <u>EG II's Capital Structure</u>**

23.     As of the date hereof, EG II's outstanding liabilities were comprised of (i) secured first lien Series E Notes, (ii) asserted mechanic's, materialman's and similar lien claims, and (iii) general unsecured claims, each of which is summarized below.

---

[9] The Mezzanine Lender disputes this intercompany claim.

[10] This estimate includes amounts agreed to be paid by EG I and EG II as part of a settlement with a third party claimant to resolve a dispute arising out of a purported expired contract to purchase the Denizen entered into in January of 2020.  Pursuant to the 2020 PSA Settlement Agreement, the Subsidiary Debtors have agreed that the 2020 PSA Claimant will have an allowed $6 million claim against each of EG I and EG II to be paid in accordance with the Plan and RSA, and (ii) the $6 million liability will be allocated between the parties in accordance with the RSA.  The terms of the 2020 PSA Settlement Agreement were approved by the Series E Noteholders and Mezzanine Lender in connection with the RSA.  A further description of the 2020 PSA Settlement Agreement can be found in the RSA Term Sheet which is attached hereto as **<u>Exhibit A</u>**.

24.     <u>Series E Secured Claims</u>.  Pursuant to that certain Deed of Trust, dated  as of February 4, 2018 (as amended, modified, renewed, or supplemented from time to time, the "**Series E Deed of Trust**"), by and between All Year Holdings, as issuer, EG II, as co-borrower, and Mishmeret Trust Company Ltd. (the "**Series E Notes Trustee**"), All Year Holdings and EG II issued approximately $252.4 million in principal amount of secured, first lien notes (the "**Series E Notes**", the holders therefore, the "**Series E Noteholders**" and the secured claims of the holders thereof, the "**Series E Secured Claims**").  EG II's obligations on the Series E Notes under the Series E Deed of Trust are secured by a first priority lien and security interest on, among other things, (i) the real property located at 54 Noll Street (Denizen Y) and all buildings, structures, fixtures and other  improvements, (ii) all easements and rights-of-way pertaining to the property, (iii) all equipment related to the property, (iv) all awards or payments made with respect to the real property, (v) all leases, subleases, licenses, concessions or other agreements relating to the property, (vi) proceeds of any unearned premiums on any insurance policies covering the real property, (vii) all deposit accounts, securities accounts or other accounts maintained with the Series E Notes Trustee, (viii) all accounts receivable, contract rights, franchises, interests, estate or other claims relating to the real property, (ix) refunds, rebates and tax credits, (x) all agreements and contracts relating the property, (xi) all tradenames, trademarks, logos and copyrights relating to the property, and (xii) all claims with respect to any damage to the real property or its improvements or fixtures.  As of the date hereof, EG II owed approximately $271,788,150 in outstanding obligations under the Series E Notes, including principal, accrued interest, fees, expenses, and other amounts.

25.     <u>Asserted EG II Mechanic's and Materialman's Lien Claims</u>.  As of the date hereof, approximately $7.1 million in mechanic's, materialman's, and other similar lien claims had been

asserted against the Denizen Y and EG II.   The Series E Secured Claims are senior in priority to

any asserted mechanic's and materialman's lien claims.   As the proposed sale of the Denizen to

the Purchaser and allocation of EG II Sale Proceeds will not yield sufficient funds to pay the Series

E Secured Claims in full, the Subsidiary Debtors believe that any asserted mechanic's,

materialman's, or similar claims are wholly unsecured.

26.   General Unsecured Claims.   As of the date hereof, EG II owed approximately

$6,550,000 in trade payables and other general unsecured obligations.[11]   These general unsecured

claims are in addition to the mechanic's and materialman's claims asserted against EG II that the

Debtors believe to be wholly unsecured, as well as the unsecured deficiency claims of the Series

E Noteholders on account of their Series E Notes in the approximate amount of $20 million.[12]

## III.   The Need for Chapter 11 Relief and the Events Leading to the Subsidiary Debtors' Chapter 11 Filings

27.   The need for these restructurings stemmed from the severe negative economic

impact arising out of the COVID-19 pandemic.   In particular, because the Denizen's value is

derived from its rich amenities, the Debtors were disproportionately impacted when New York

State and New York City required the shutdown of amenities and shared spaces.

28.   As previously set forth in the Biran Declaration in connection with the

commencement of EGM's Chapter 11 Case, All Year Holdings had previously suspended interest

payments on its unsecured bonds in November 2020, after which it entered into an agreement with

the Series E Notes Trustee, dated December 10, 2020, pursuant to which All Year Holdings agreed

to, among other things, appoint Mr. Joel Biran as CRO and Mr. Ephraim Diamond, as Associate

---

[11] This estimate is inclusive of amounts owed by EG II in connection with the 2020 PSA Settlement Agreement.

[12] The EG II Sale Proceeds are approximately $249,205,000, and approximately $270,000,000 is owed to the Series E Noteholders on account of indebtedness owed under the Series E Deed of Trust, thereby resulting in a deficiency claim of not less than approximately $20,000,000.  Note that the deficiency claim is subject to final calculations of closing and similar transaction costs and therefore may increase as such costs and expenses are calculated.

Restructuring Officer (the "**ARO**").  Those retentions were approved by the Board of Directors of

All Year Holdings (the "**Board**") on December 30, 2020.[13]

29.    On February 19, 2021, Mr. Biran provided notice to All Year Holdings that he

would be resigning his positions as CEO and CRO, effective as of February 28, 2021. On March

4, 2021, I was appointed by the Board of Directors as the CEO and CRO of All Year Holdings.

Upon these appointments, All Year Holdings, with the assistance of its advisors, quickly moved

to engage the Series E Noteholders and other stakeholders of All Year Holdings in a collaborative

and cooperative process to explore potential restructuring alternatives for All Year Holdings.

30.    EGM was forced to commence its Chapter 11 Case on the Initial Debtor Petition

Date on an emergency basis to protect the value of its property and to stay a potential UCC

foreclosure sale by the Mezzanine Lender of EGM's 100% interest in EG I.

### A.    The Sale Process and the Purchase Agreement

31.    Following the commencement of EGM's Chapter 11 Case, the Subsidiary Debtors

commenced the Sale Process with the assistance of Meridian and their other professionals.

Meridian, on behalf of the Subsidiary Debtors, initiated contact with approximately 2,000 parties

to broadly market the Denizen and maximize the universe of potential bidders which encompassed

private investors, institutions, and domestic and international multifamily investors.  Meridian, on

behalf of the Subsidiary Debtors, continued to follow up with these potential bidders through

additional emails, video teleconferences, and telephone calls which resulted in approximately 125

investor groups executing confidentiality agreements, approximately 29 investor groups touring

---

[13] During All Year Holdings' prepetition negotiations with its secured and unsecured bondholders, it issued a Class A voting share to the CRO and the ARO. This share entitles the ARO and me to vote on appointment or removal of the directors of All Year Holdings, as the owner of each of its direct and indirect subsidiaries – including the Debtors – but confers no other voting rights. The voting rights are set to expire at 11:59 pm (Eastern Time) on January 4, 2022. The Class A share is entitled to $1.00 upon the liquidation of All Year Holdings but confers no right to participate in any dividend or other distribution of All Year Holdings at any time.

the Denizen properties, and all of those parties receiving access to a data room consisting of information sounding in past operating statements, staffing and payroll details, and applicable tax information.

32.     Of those parties, approximately fifteen (15) groups submitted first round bids and approximately six (6) groups were invited to participate in the sound round of the bidding process during which time they received access to additional diligence materials and were encouraged to provide comments to a draft purchase and sale agreement.  All bids received during the Sale Process contemplated a transaction to purchase the Denizen X and Denizen Y together.

33.     The Purchaser was among the parties who submitted a first round bid and was selected to participate in the second round bidding process.  In the Debtors' business judgement, the Purchaser's second round bid was most likely to achieve the Debtors' goal to maximize value for their estates through an efficient and consensual process.  Specifically, the Purchaser had: (i) completed all of its due diligence on the Denizen, (ii) committed funds needed to close the transaction, and (iii) obtained any necessary required internal approvals to consummate the purchase.  The only contingency included in the Purchaser's bid was that the Subsidiary Debtors consummate the transaction on the terms provided for under the Purchase Agreement through a pre-negotiated chapter 11 process and plan.  Accordingly, the Purchaser was selected as the winning bidder and worked with the Subsidiary Debtors and their professionals, as well as representatives of the Mezzanine Lender and the Series E Noteholders, to negotiate a final agreement governing the Denizen sale terms.

34.     Under the Purchase Agreement, the Denizen is to be sold for a total cash consideration of $506 million and the Purchaser's assumption of certain liabilities and obligations of the Subsidiary Debtors.  Importantly, the Purchaser has agreed to assume certain contracts

which would have the effect of retaining all employees[14] pursuant to and in accordance with their present terms of employment such that their employment will continue uninterrupted without loss of seniority, compensation, benefits or employment subject to the Union Agreements (as defined in the Purchase Agreement) and applicable law.  The Purchaser shall effectuate the foregoing by, among other things, either directly executing an agreement with the employees' current employers or by retaining a management company or agent and directing them to execute such agreements.

35.     The material terms of the Purchase Agreement, including the terms of the proposed break-up fee and expense reimbursement protections requested by the Purchaser, are set forth in the *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(b) and Fed. R. Bank. P. 2002, 6003, 6004 and 9014 for Entry of Interim and Final Orders (I) Authorizing and Approving Bid Protections and (II) Granting Related Relief*, which the Debtors have filed contemporaneously hereto.  In connection with that motion, the Debtors are seeking a hearing on shortened notice and interim approval of the Purchaser's bid protections.

**B.     Negotiations with Key Creditors and the RSA**

36.     As the parties commenced negotiations regarding the sale of the Denizen and the commencement of these Chapter 11 Cases, their discussions centered on sale proceeds allocation, treatment of intercompany loans existing among the Subsidiary Debtors, and assessment and allocation of liability regarding treatment of pre-petition contracts.  Good-faith negotiations and information sharing by and among the Subsidiary Debtors, the Mezzanine Lender, and the Series E Notes Trustee ultimately culminated in the execution of the RSA.  As set forth above, the parties entered into the RSA following a vote in which the Series E Noteholders voted by approximately

---

[14] The Debtors do not have any employees but instead the Subsidiary Debtors are parties to contracts with PBS Facility Services Inc., Platinum Amenity Services and Dynamic Building Services pursuant to which such entities employ the Denizen staff.  Through the Purchase Agreement, the Purchaser has agreed to honor these contracts to ensure that the Denizen staff's employment continues uninterrupted.

90% in number and approximately 97% in amount to authorize and direct the Series E Notes Trustee to vote to approve the RSA and to vote both their secured claims and substantial unsecured deficiency claims to accept a chapter 11 plan that complies with the RSAs.

37.     Pursuant to the RSA,[15] the Series E Noteholders and the Mezzanine Lender have agreed to, among other things, (i) use commercially reasonable efforts to support the Subsidiary Debtors' Restructuring Transaction, (ii) timely vote to accept the Plan, and (iii) negotiate in good faith with the Subsidiary Debtors the forms of definitive documentation regarding the Restructuring Transaction.  In return, the Debtors agreed to (i) act in good faith and take all reasonable actions necessary to consummate the Restructuring Transaction, (ii) timely satisfy milestones under the RSA and Purchase Agreement, and (iii) use commercially reasonable efforts to make, seek or receive any filings, notifications, permits, approvals or the like from any regulatory body having jurisdiction over the Debtors. The RSA also permits the Debtors to terminate the RSA in the event that they reasonably determine in good faith based upon the advice of outside counsel that continued performance under the RSA or pursuit of the Restructuring Transactions (as defined in the RSA) would be inconsistent with the exercise of their fiduciary duties under applicable law.

38.     The RSA established the following milestones for the Subsidiary Debtors' Chapter 11 Cases:

a)  Commencement of the Subsidiary Debtor Chapter 11 Cases by no later than September 14, 2021, at 11:59 p.m. (Prevailing Eastern Time);

b)  Filing by the Subsidiary Debtor of a motion establishing a deadline to file claims against the Debtors in the Chapter 11 Cases by no later than September 28, 2021, at 11:59 p.m. (Prevailing Eastern Time);

---

[15] The summary of the RSA set forth herein is qualified in all respects by the terms and conditions of the RSA which control.

c) Filing by the Subsidiary Debtors of the Plan, the Disclosure Statement, and the motion seeking approval of the Disclosure Statement and the Plan Solicitation Materials by no later than September 14, 2021, at 11:59 p.m. (Prevailing Eastern Time);

d) Entry of the Final Bid Protections Order (as defined in the Purchase Agreement) by the deadline provided in the Purchase Agreement;

e) Entry of an order confirming the Plan by no later than January 28, 2022, at 11:59 p.m. (Prevailing Eastern Time); and

f) The occurrence of the effective date of the Plan by no later than February 11, 2022, at 11:59 p.m. (Prevailing Eastern Time); *provided, however*, that such Plan Effective Date Deadline shall automatically be extended to coincide with the Closing Date (as defined in the Purchase Agreement as of the date hereof).

RSA, § 7(a).

39.     During the period of negotiating and finalizing the RSA, the Subsidiary Debtors commenced the process of preparing to file their Chapter 11 Cases. In addition to Weil, Gotshal & Manges LLP, as counsel, the Debtors retained CohnReznick LLP, to serve as financial advisor, and Donlin Recano Company, as claim, noticing and solicitation agent. Additionally, during this period, the Purchaser agreed to several amendments to the Purchase Agreement to extend the timeframe and related milestones for commencement of these Chapter 11 Cases to allow the parties time to continue the discussions that ultimately allowed for the successful negotiation and execution of the RSA. Having extended the deadline for commencement of the Chapter 11 Cases multiple times, the Purchaser (who had already funded its initial $2.5 million deposit) was unwilling to further extend that deadline beyond September 14, 2021. In addition, in light of the additional delays in the commencement of the cases, the parties collectively concluded that the most efficient way to maximize and expedite distributions to creditors was to proceed with a prepetition solicitation of the EG II Voting Classes to implement the sale transaction as expeditiously as possible.

40.     During that time, with the assistance of their professionals, the Subsidiary Debtors

negotiated and secured the consensual use of cash collateral from each of their senior, secured

lenders at EG I and EG II, as well as a commitment for a secured debtor-in-possession financing

loan from an affiliate of the Mezzanine Lender (the "**DIP Financing**") to be used to finance EG

I's operations and pay expenses in accordance with the approved budget on the terms set forth in

the documents governing the DIP Financing.  The proposed DIP Financing is for EG I only, and

EG II is neither a borrower under that facility nor will any of EG II's assets be used to secure the

obligations of EG I under the DIP Financing.  As of the date hereof, EG II had sufficient funds in

the form of cash on hand and forecasted receivables to fund its operations and expenses during the

Chapter 11 Cases.

### C.     Prepetition Solicitation of the Plan and the Commencement of the Subsidiary Debtors' Chapter 11 Cases

41.     In accordance with the timeline set forth in the Purchase Agreement and RSA, the

Debtors, together with representatives of the Purchaser, the Series E Notes Trustee, and the

Mezzanine Lender, negotiated and prepared the Plan and Disclosure Statement and related

solicitation materials.

42.     On September 14, 2021, the Subsidiary Debtors commenced the solicitation of

votes by each class of voting creditors on the Plan through their Disclosure Statement.  The process

by which the Debtors have, or intend to, commence solicitation of votes to accept or reject the Plan

from each of the impaired voting creditor classes is described below:[16]

---

[16] Further information regarding the solicitation is set forth in the *Motion of Debtors for Entry of an Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Debtors' Joint Chapter 11 Plan; (B) Establishing Procedures for Objection to Disclosure Statement and Chapter 11 Plan; (C) Approving Form, Manner, and Sufficiency of Chapter 11 Cases, and Section 341(a) Meeting of Creditors; (D) Approving the Solicitation Procedures; (E) Conditionally Approving the Disclosure Statement for Purposes of Soliciting the Mezzanine Lender; and (F) Granting Related Relief* filed contemporaneously hereto.

a) **EG I:**  As set forth above, all of the holders of Claims against and Interests in EG I are unimpaired and will be paid in full under the Plan and will therefore not be solicited.

b) **EG II:**  With respect to EG II, holders of claims in Class 2 (Series E Secured Claims) and Class 5 (General Unsecured Claims[17]) are the only impaired voting classes of creditors of EG II under the Plan and will be the only classes of creditors solicited.

c) **EGM:**  With respect to EGM, the Mezzanine Lender, as the holder of the Class 2 (Mezzanine Loan Claim), will be the only class solicited as it is the only known creditor of EGM and the only party entitled to vote under the Plan with respect to EGM.  Due to EGM's status as a debtor in possession, EGM will not commence solicitation of the Plan prior to the Court's approval of a disclosure statement in accordance with the applicable provisions of the Bankruptcy Code.

43.    The solicitation period for the Plan is proposed to remain open for all voting creditors for another 34 days until October 18, 2021.  With the solicitation on the Plan underway, the Subsidiary Debtors commenced their Chapter 11 Cases and the Debtors intend to promptly seek a joint hearing from the Court to consider the adequacy of their Disclosure Statement and confirmation of their Plan and to proceed promptly to closing on the proposed sale transaction in order to maximize value and expedite distributions to the holders of allowed claims.

## IV.    Summary of First Day Motions[18]

44.    As mentioned above, the Denizen is home to over 900 residential units and thus it is imperative that the Subsidiary Debtors make a seamless transition into chapter 11 to preserve their operations and maintain the loyalty and goodwill of their tenants, suppliers and employees. Accordingly, the Subsidiary Debtors have filed a number of First-Day Pleadings designed to facilitate their transition into these Chapter 11 Cases.  The Subsidiary Debtors anticipate that the

---

[17] As set forth above, in addition to trade and other general unsecured creditors, Class 5 (General Unsecured Claims) includes the deficiency claims of the Series E Noteholders and the claims of any parties that have asserted mechanic's, materialman's or other similar lien claims against EG II which the Debtors believe are wholly unsecured.

[18] Capitalized terms used but not defined in this Section have the meanings ascribed to them in the applicable First-Day Pleadings.

Court will conduct a hearing soon after the Subsidiary Debtor Petition Date during which the Court will hear and consider the First-Day Pleadings.

45.    I have reviewed each of the First-Day Pleadings with the Subsidiary Debtors' counsel, and I believe that the relief sought in each of the First-Day Pleadings is tailored to meet the goals described above and will be necessary and critical to the Subsidiary Debtors' ability to execute these Chapter 11 Cases.  I adopt and affirm the factual representations contained in each of the First-Day Pleadings and set forth below is a description of each pleading as well as the respective relief sought therein.

### A.    Administrative Motions

i.    Motion of the Subsidiary Debtors for Entry of an Order Directing Joint Administration of these Chapter 11 Cases (the "**Joint Administration Motion**")

46.    Pursuant to the Joint Administration Motion, the Debtors are requesting entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Bankruptcy Court maintain one file and one docket for all of the jointly administered cases under the case number assigned to the Initial Debtor.

47.    I believe joint administration of these Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Furthermore, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Southern District of New York and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases, as it will spare them from the time and effort of reviewing duplicative pleadings and papers.  I believe the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other

parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with the least disruption.

   ii. Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 342(a), and 521 and Fed. R. Bankr. P. 1007 and 2002(a)(1) for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs; and (II) Authorizing Debtors to (A) File a Consolidated List of Creditors and (B) Redact Certain Personal Identification Information for Tenants (the "**Schedules and Creditor Matrix Motion**")

   48. To prepare their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**"), the Subsidiary Debtors must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, suppliers and vendor arrangements, tenants and customer information, leases, intercompany transactions, and contracts in connection with the operation of their properties.  Given the amount of work entailed in completing the Schedules, and the competing demands on the Subsidiary Debtors' professionals to stabilize business operations during the initial postpetition period and provide continued support to the Subsidiary Debtors' efforts to maximize value through a strategic sale process, the Subsidiary Debtors likely will not be able to properly and accurately complete the Schedules within the required fourteen (14) day time period.  Accordingly, pursuant to the Schedules and Creditor Matrix Motion, the Subsidiary Debtors are requesting an additional fifteen (15) days, for a total of twenty-nine (29) days from the date hereof, to file their Schedules.  I believe an extension of the time to file the Schedules will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

   49. In addition, permitting the Debtors to maintain one single consolidated list of creditors for the Initial Debtor and the Subsidiary Debtors in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these Chapter 11 Cases and  will benefit

the Debtors and their estates by allowing the Subsidiary Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings. Furthermore, I believe it is critical that the Subsidiary Debtors be permitted to redact the apartment numbers from the addresses of the tenants because such information is sensitive and could be used to perpetrate identity theft.

### B.    Substantive Motions

i.    Motion of Debtors for Entry of Order (i) Authorizing Subsidiary Debtors to (a) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (b) Implement Changes to Cash Management System in the Ordinary Course of Business, and (ii) Granting Related Relief (the "**Cash Management Motion**")

50.    Pursuant to the Cash Management Motion, the Subsidiary Debtors are requesting entry of interim and final orders authorizing them to (i) continue their existing cash management system (the "**Cash Management System**"), including the continued maintenance of their existing bank accounts and business forms, (ii) implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts, and (iii) granted related relief.

51.    The Cash Management System is comprised of six (6) Bank Accounts at Capital One, and PNC that organize and track various forms of receipts and cash disbursements and safeguard tenant security deposits in accordance with applicable law. The Bank Accounts are comprised of two operating accounts maintained at Capital One (the "**Operating Accounts**"), two escrow accounts maintained at Capital One (the "**Escrow Accounts**"), and two lockbox accounts maintained at PNC (a "**Lockbox Account**"). The Operating Accounts and Escrow Accounts are held in the names of (1) Evergreen Gardens I LLC d/b/a Denizen X, and (2) Evergreen Gardens II LLC d/b/a Denizen Y. The Lockbox Accounts are maintained in the name of Evergreen Gardens

I LLC, as Borrower, for the benefit of JPMorgan, as Secured Party, under that certain Loan and

Security Agreement between EG I and the EG I Mortgage Lender, dated as of June 10, 2019.

52.     The Cash Management System operates to allow each Subsidiary Debtor to

separately receive cash, and approve expenses, and receipts, without commingling among them.

It is my understanding that cash and other receivables generated from the Subsidiary Debtors'

operations through tenants' rental payments are deposited into the respective Lockbox Account

for EG I rental receipts and the EG II Operating Account for EG II rental receipts.  Funds are

disbursed from the EG I Operating Account and EG II Operating Account, as applicable, as each

of the Subsidiary Debtors' expenses come due.  This disbursement is overseen by professionals at

the Management Company, which oversees the daily operations and management of the Denizen

as well as (i) the Chief Financial Officer ("**CFO**") and (ii) myself.

(a)     Cash Collection

53.     The Subsidiary Debtors generate and receive funds through their operation of the

Denizen and rental receipts received from tenants.  The Subsidiary Debtors utilize the services of

ManageGo, LLC, which acts as an on-line facilitator for tenants that wish to pay their rent online

("**ManageGo**").  I understand that approximately 80% of tenant rental payments are made through

ManageGo who, in turn, charges the tenants a fee for receipt of online rental payments.  This fee

is retained by ManageGo, and the gross rental receipts are then remitted upon receipt to either (i)

the respective Lockbox Account for rental payments due to EG I as required under the EG I

Mortgage Loan Agreement, or (ii) the EG II Operating Account for rental payments due to EG II.

The remaining 20% of tenant rental payments are made via the respective tenants' personal check,

which are transferred directly to the Management Company for deposit into either the (i) respective

Lockbox Account for rental payments due to EG I, or (ii) the EG II Operating Account for rental

payments due to EG II.  The Management Company collects checks on a weekly basis and deposits each week's checks together into the respective accounts.

      (b)     Escrowed Funds

54.     The Subsidiary Debtors generally require one (1) month of rental payments from tenants upon leasing a new unit.  These funds shall be collected by the Management Company and subsequently disbursed the one (1) month rental payment as a security deposit into the Subsidiary Debtors' respective Escrow Accounts.

      (c)     Cash Disbursements

55.     The Subsidiary Debtors use the funds in the Subsidiary Debtors' Operating Accounts to fund their separate ongoing operations and any expenses that come due.  Invoices submitted to the Subsidiary Debtors are received and processed by the Management Company to review for sign off and accuracy.  Following this approval process, a subsequent review and approval process is undertaken by the Management Company whereby a senior property manager reviews and approves the invoice.  A bookkeeper at the Management Company then enters the invoice into the respective property management software service and prints a check in the name of either EG I or EG II.  The checks are sent to and reviewed by myself or the CFO for each of their independent review and approval, after which the Management Company is authorized to disburse the funds from either EG I's or EG II's Operating Account to the proper recipient.[19]  However, going forward the Subsidiary Debtors will exclusively sign their respective checks; provided, however, that in emergency situations, the Management Company will be authorized to sign up to $25,000.

---

[19] Note that for EG II the checks printed by the Management Company are subject to review and approval by either myself or the CFO.

(d)     Cash Collateral Account

56.     The Lockbox Accounts hold cash collateral which secures EG I's obligations and indebtedness to the EG I Mortgage Lender under the EG I Mortgage Agreement.  As of the date hereof, the Lockbox Accounts did not have any funds as JPM previously exercised a sweep of the funds in the Lockbox Accounts for payment of interest as provided for under the EG I Mortgage Loan Agreement.

(e)     Intercompany Transactions and Claims

57.     Prior to the date hereof, in the ordinary course of business, the Subsidiary Debtors maintained business relationships with each other and, on a very limited basis, with their indirect parent, All Year Holdings.  Historically, any intercompany transactions (the "**Intercompany Transactions**") between the Subsidiary Debtors were limited and arose when cash balances in EG I's Operating Account were insufficient to fund its operating expenses.  I understand that current outstanding Intercompany Transactions have given rise to intercompany receivables and payables (the "**Intercompany Claims**").  As of the date hereof, EG I owed approximately $4,719,953 in total aggregate amount to its other Debtor and non-Debtor affiliates on account of such Intercompany Transactions.  The Subsidiary Debtors are not seeking authority, pursuant to the Cash Management Motion, to continue any Intercompany Transactions unless they are expressly authorized pursuant to the terms of the documents governing and orders approving the Subsidiary Debtors' proposed debtor-in-possession financing and the use of cash collateral (the "**Financing Documents and Orders**").[20]

---

[20] By agreement of the parties under the RSA, approximately $1.38 million in principal amount, plus applicable interest thereon, arising from loans from EG II to EG I to fund operating expenses of EG I for the period from February 1, 2021 through August 25, 2021 are to be repaid upon approval of the Financing Documents and Orders.  Creditors of EG I holding allowed claims are expected to be paid in full with EG I's sale proceeds and are unimpaired under the Subsidiary Debtors' proposed chapter 11 plan.  Accordingly, repayment of these operating expenses to EG II with

58.     The operation of the Subsidiary Debtors' businesses requires that the Cash

Management System continue during the pendency of these Chapter 11 Cases.  Requiring the

Subsidiary Debtors to adopt new, segmented cash management systems at this early and critical

stage of these cases would be extraordinarily disruptive and harmful to their operations and would

cause significant confusion and disruption to their tenants and the Subsidiary Debtors' ability to

collect rent payments.  Any such disruption would have a severe and adverse impact upon the

Subsidiary Debtors' chapter 11 estates.  Consequently, maintaining the existing Cash Management

System in accordance with the provisions set forth herein is in the best interests of all parties in

interest.

       ii.     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for
Authority to Continue the Subsidiary Debtors' Insurance Policies and Honor Obligations With
Respect Thereto (the "**Insurance Motion**")

59.     Pursuant to the Insurance Motion, the Subsidiary Debtors are requesting entry of

an order authorizing, but not directing, the Subsidiary Debtors to (a) maintain, amend, renew,

modify, supplement, extend, or replace, in their sole discretion, their various insurance policies

(the "**Insurance Policies**"), and (b) continue honoring all premiums and other obligations related

thereto, including any broker or advisor fees, assessments, taxes or other fees (collectively with

the Insurance Policies, the "**Insurance Obligations**") on a postpetition basis in the ordinary course

of business.

60.     The nature of the Subsidiary Debtors' business as the owner of properties with over

900 residential units makes it essential for them to maintain all Insurance Policies on an ongoing

and uninterrupted basis.  The Subsidiary Debtors are also required legally and contractually to

---

proceeds of the Subsidiary Debtors' debtor in possession financing merely accelerates the timing of these payments
and not the treatment of such allowed claims.

maintain certain of the Insurance Policies.  If any of the Subsidiary Debtors' Insurance Policies are terminated or lapse, the Subsidiary Debtors could be exposed to substantial liability to the detriment of all parties in interest.  Furthermore, as set forth above, under the terms of the Purchase Agreement, the Subsidiary Debtors are required to maintain the Insurance Policies in the ordinary course through the closing of the sale to Purchaser and failure to do so could jeopardize the transaction.  Additionally, the Subsidiary Debtors must maintain most of the Insurance Policies to comply with the Guidelines of the Office of the United States Trustee for Region 2.

61.    With respect to the continued assistance of the Insurance Broker and the payment of any amounts owed to the Insurance Broker in the ordinary course, the Insurance Broker is intimately familiar with the Subsidiary Debtors' Insurance Policies, and the Subsidiary Debtors believe that the loss of the Insurance Broker (or even a temporary disruption in its services) would be detrimental to the Subsidiary Debtors' chapter 11 estates because the Subsidiary Debtors would need to shift some of their focus from administering their estates to managing the Subsidiary Debtors' insurance policies and the claims arising thereunder.    Accordingly, the continuation of the Insurance Policies and the authority to pay, in the Subsidiary Debtors' discretion, all Insurance Obligations is essential to preserve the Subsidiary Debtors' business and the value of the Subsidiary Debtors' estates for all parties in interest.  The Subsidiary Debtors estimate that, as of the date hereof, there are no outstanding amounts owed on account of the Insurance Policies and accordingly are not seeking any interim relief on the first day with respect to the Insurance Motion.

iii.    Motion of Debtors Pursuant to 11 U.S.C. and 105(a) requesting entry of an Order (I) approving Form of Adequate Assurance Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service (the "**Utilities Motion**")

62.    Pursuant to the Utilities Motion, the Subsidiary Debtors are requesting entry of an order (i) approving the Subsidiary Debtors' proposed form of adequate assurance of payment to

utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing service on account of outstanding prepetition invoices. Accordingly, the Subsidiary Debtors are not seeking an interim relief on the first day with respect to the Utilities Motion.

63.    In the ordinary course of their businesses and to maintain the operations of the Denizen residential apartment complex, the Subsidiary Debtors incur utility expenses, including electricity, natural gas, water, sewage, and telecommunications to various utility providers (collectively, the "**Utility Providers**"). I believe that any interruption in the Subsidiary Debtors' utility services – even for a brief period of time – would seriously disrupt the Subsidiary Debtors' ability to continue their business operations, would adversely impact the Subsidiary Debtors' tenants, and is likely to result in a decline in the Subsidiary Debtors' revenues.

64.    With respect to ensuring continuing utility services, the Subsidiary Debtors are proposing to deposit into a segregated bank account a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider based on the average usage for the twelve (12) months prior to the Subsidiary Debtor Petition Date (collectively, the "**Adequate Assurance Deposit**"). As of the date hereof, the Subsidiary Debtors estimate that the Adequate Assurance Deposit will be approximately $68,012.00 in the total aggregate amount. The Adequate Assurance Deposit will be funded by EG I in the approximate amount of $37,406.60 and will be funded by EG II in the approximate amount of $30,605.40. Furthermore, the Subsidiary Debtors expect that cash flows from operations and the DIP Financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business. I believe the proposed relief in the Utilities Motion will ensure that the Subsidiary Debtors' utility services, which are essential to their operations, are continued without prejudicing the Utility Providers.

      iv.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expenses, and (B) Honor Tenant Obligations, and (II) Granting Related Relief (the "**Critical Vendor Motion**")

65.     Pursuant to the Critical Vendor Motion, the Subsidiary Debtors are seeking entry of interim and final orders (i) authorizing, but not directing, the Subsidiary Debtors to (a) pay the prepetition claims of certain vendors, suppliers, service providers, and other similar entities (the "**Critical Vendors**" and the prepetition claims of the Critical Vendors, the "**Critical Operating Expense Claims**") that are essential to maintaining the operations of the Denizen (as defined below) and the going concern value of the Subsidiary Debtors' businesses, and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits (the "**Tenant Obligations**"), and (ii) granting related relief.

66.     *Critical Vendors.*  The Subsidiary Debtors are seeking authority to pay certain prepetition obligations owed to the Critical Vendors encompassed in these categories because they are absolutely essential the ongoing day-to-day operations of the Denizen.

     a)   The Management Company.  The Denizen's day-to-day operations are managed by the Management Company, which is responsible for leasing and lease-related activities, rent collection, payment processing, staffing, selecting vendors and service providers, general building maintenance, the payment of operating expenses, maintaining the Subsidiary Debtors' books and records, and otherwise overseeing and managing the day-to-day operations of the Denizen on the Subsidiary Debtors' behalf.  To make payments for operating expenses and to return tenants' security deposits, the Management Company accesses the Subsidiary Debtors' respective operating accounts and, once approval is obtained, remits payment on their behalf.  This process is central to ensuring that the Denizen operates efficiently and seamlessly.

     b)   The Building Staff.  The Subsidiary Debtors have no employees.  The approximately twenty-two (22) building staff members at the Denizen are employed pursuant to two (2) separate agreements (the "**Staffing Agreements**") with PBS Facility Services Inc. (collectively, with its affiliates, the "**Building Staff Provider**").  One of these agreements is with Services Employees International Union 32BJ, and the parties to that agreement are "PBS

34

Facility Services, Inc., Platinum Amenity Services and Dynamic Building Services". The other agreement is with Local 713 (a union), and the party to that agreement is "Dynamic Building Services."

c) <u>Other Critical Vendors</u>. To perform its responsibilities and to keep the Denizen running efficiently and seamlessly, the Management Company relies on certain vendors and service providers who perform essential services related to the Denizen's operations and amenities. The Management Company pays these vendors and service providers, as well as other operational expenses, on the Subsidiary Debtors' behalf and through each of their respective operating accounts. In some instances, if the Subsidiary Debtors were required to suddenly change service providers, it would require a significant amount of time, capital, and other resources to locate qualified replacements (to the extent such replacements exist).

67.    I believe that each of these Critical Vendors perform essential services at both the Denizen X and Denizen Y given that the buildings are jointly operated, but are paid by EG I and EG II, respectively, in accordance with where such services are performed. No Critical Operating Expense Claims of EG I will be paid by EG II or vice versa.

68.    I believe that the authorization to pay Critical Operating Expense Claims and honor the Tenant Obligations (or directing the Management Company to honor or pay such obligations on behalf of the Subsidiary Debtors) is not only essential to avoid significant disruption to the Denizen's day-to-day operations, but also necessary to ensure that the value of their business as a going concern is preserved through the pendency of these Chapter 11 Cases. If the Subsidiary Debtors are not permitted to pay the Critical Operating Expense Claims, and if the vendors and service providers cease providing their services, the Denizen's day-to-day operations will essentially come to an immediate halt. It is vital that the Denizen's day-to-day operations continue uninterrupted so as to avoid the immediate and irreparable harm that the Subsidiary Debtors' estates, their creditors, and the tenants of the Denizen would surely suffer if a significant operational disruption were to occur.

69.     *Tenant Obligations*.   The Subsidiary Debtors are required to collect security deposits and maintain them in separate escrow accounts with Capital One, N.A. in accordance with applicable law.   The Management Company is also responsible for returning the tenants' security deposits in accordance with the terms of the tenant's respective leases and applicable law.   To avoid any disruption to the operations of the Debtors and the continued administration of tenant leases at the Denizen, the Subsidiary Debtors are requesting authority to continue to honor and perform any Tenant Obligations under their leases, including to continue honoring tenants' security deposits on behalf of the Subsidiary Debtors through the pendency of these Chapter 11 Cases.

## V.     Information Required by Local Bankruptcy Rule 1007-2

70.     In accordance with Local Bankruptcy Rule 1007-2, the schedules attached hereto provide certain information related to the Subsidiary Debtors.

71.     Pursuant to Local Bankruptcy Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Subsidiary Debtor Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

72.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 2** hereto lists the following information with respect to each of the holders of the Subsidiary Debtors' twenty (20) largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Subsidiary Debtors' accounts, the approximate amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

73.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Schedule 3** hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against the Subsidiary Debtors: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the approximate amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral, and whether the claim or lien is disputed.

74.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) assets and liabilities for the Subsidiary Debtors.

75.     Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Subsidiary Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Subsidiary Debtors that are held by the Subsidiary Debtors' directors and officers, and the amounts so held.

76.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Subsidiary Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

77.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Subsidiary Debtors operate their businesses.

78.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Subsidiary Debtors' substantial assets, the location of their books and records, and

the nature, location, and value of any assets held by the Subsidiary Debtors outside the territorial limits of the United States.

79.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Subsidiary Debtors or their property where a judgment against the Subsidiary Debtors or a seizure of their property may be imminent.

80.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise All Year Holding's existing senior management, their tenure with All Year Holdings, and a brief summary of their relevant responsibilities and experience.

81.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Subsidiary Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Subsidiary Debtors for the thirty (30) day period following the filing of the Subsidiary Debtors' chapter 11 petitions as the Subsidiary Debtors intend to continue to operate their businesses.

82.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Subsidiary Debtors' chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## VI.    <u>Conclusion</u>

83.     The above illustrates the factors that have precipitated the commencement of the Chapter 11 Case and the critical need for the Subsidiary Debtors to seek relief under the

Bankruptcy Code in order to consummate an efficient and orderly sale of the Denizen that

maximizes value for the estates, their creditors and other stakeholders.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

_____
Assaf Ravid

Authorized Signatory for the Subsidiary Debtors

## Schedule 1

### Committees

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Subsidiary Debtors' knowledge, belief, and understanding, no committee has been organized prior to the date hereof with respect to the Subsidiary Debtors.

## Schedule 2

### List of Largest Unsecured Claims (Excluding Insiders)

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), as of the date hereof, to the best of the Subsidiary Debtors' knowledge, belief, and understanding, the following is a list of creditors holding (i) the thirty (30) largest noncontingent, unsecured claims against Evergreen Gardens I LLC and (ii) the fifty (50) largest noncontingent, unsecured claims against Evergreen Gardens II LLC, in each case, excluding claims of insiders as defined in 11 U.S.C. § 101.

## Evergreen Gardens I LLC

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | MELROSE NOLL BROOKLYN LLC<br>TREFF & LOWY PLLC<br>481 WYTHE AVE<br>2ND FL<br>BROOKLYN NY 11249 | JOESEPH TREFF<br>JOE@TREFFLOWY.COM<br>Tel: 718-599-3500 EXT. 201<br>Fax: 718-387-6282 | Unpaid Settlement | ☑C<br>☐U<br>☐D | | | $6,000,000.00 |
| 2 | MPI PLUMBING CORP<br>670 MYRTLE AVE #234<br>BROOKLYN NY 11205 | billing@mpiplumbingcorp.com<br>Tel: 718-925-2400 | Trade Debt | ☐C<br>☐U<br>☐D | | | $609,577.45 |
| 3 | CON EDISON<br>4 IRVING PL RM 1875<br>NEW YORK NY 10003 | zuckermanr@coned.com;<br>weberm@coned.com;    franklinv@coned.com;<br>donnleyd@coned.com | Utility | ☐C<br>☐U<br>☐D | | | $263,515.75 |
| 4 | DYNAMIC BUILDING SERVICES INC<br>4403 15TH AVENUE, STE 409<br>BROOKLYN NY 11219 | Joel Berkovic<br>JB@PBSFACILITYSERVICE.COM<br>Tel: 718-484-1998<br>Fax: 718-484-1997 | Trade Debt | ☐C<br>☐U<br>☐D | | | $222,904.92 |
| 5 | BEYOND CONCRETE<br>36 INDUSTRIAL DR<br>KEYPORT NJ 07735 | sales@beyondconcrete.com<br>Tel: 732-441-2500<br>Fax: 732-441-3318 | Trade Debt | ☐C<br>☐U<br>☐D | | | $114,513.00 |
| 6 | LILY CONTRACTING/CONSULTING LLC<br>128 PARK ST<br>WOODMERE NY 11598 | Jhametz@gmail.com<br>Tel: 917-916-6255 | Trade Debt | ☐C<br>☐U<br>☐D | | | $101,265.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 | SMART MANAGEMENT NY INC. 735 BEDFORD AVE BROOKLYN NY 11205 | david@allyearmgt.com Tel: 718-623-9430 Fax: 718-623-9431 | Trade Debt | ☐ C ☐ U ☐ D | | | $51,480.00 |
| 8 | SUNBELT RENTALS 150 NASSAU AVE ISLIP NY 11751 | Joseph Pennachio pcm668@sunbeltrentals.com Tel: 631-224-5000 Fax: 631- 224-5180 | Trade Debt | ☐ C ☐ U ☐ D | | | $37,026.50 |
| 9 | KRAMER LEVIN NAFTALIS AND FRANKEL LLP 1177 AVE OF THE AMERICAS NEW YORK NY 10036-2714 | Adam Taubman ataubman@kramerlevin.com Tel: 212-715-9377 Fax: 212-715-8378 | Trade Debt | ☐ C ☐ U ☐ D | | | $34,163.59 |
| 10 | EXR GROUP COMPANIES LLC 160 HAVEMEYER ST STORE 7 BROOKLYN NY 11211 | J@EXRNY.COM Tel: 212-991-8983 | Trade Debt | ☐ C ☐ U ☐ D | | | $30,071.70 |
| 11 | B&S ENTERPRISES USA INC. 715 MYRTLE AVE BROOKLYN NY 11205 | Yoel Korenbly sales@buysaveappliances.com Tel: 718-855-8100 | Trade Debt | ☐ C ☐ U ☐ D | | | $29,673.88 |
| 12 | NYEG 100A BROADWAY STE 429 BROOKLYN NY 11249 | Moshe Cohen info@nyegcorp.com Tel: 347-406-2067 | Trade Debt | ☐ C ☐ U ☐ D | | | $28,630.84 |
| 13 | MPFP PLLC 120 BROADWAY FL 20 NEW YORK NY 10271 | accounting@mpfp.com Tel: 212-477-6366 Fax: 212-477-6548 | Trade Debt | ☐ C ☐ U ☐ D | | | $24,815.26 |
| 14 | PINE NEW YORK 222  BROADWAY FL19 NEW YORK NY 10038 | Avi Barkai avi@pineny.com Tel: 646-553-5888 Fax: 646-553-2979 | Trade Debt | ☐ C ☐ U ☐ D | | | $24,103.20 |
| 15 | DYNAMIC ELECTRICAL CONTRACTORS 1046 WINTHROP ST BROOKLYN NY 11212 | Dynamicnyc1@gmail.com Tel: 917-468-0261 | Trade Debt | ☐ C ☐ U ☐ D | | | $24,000.00 |
| 16 | THEPINBALLCOMPANY 6000 S SINCLAIR RD COLUMBIA MO 65203 | Nic Parks support@pinballco.com Tel: 573-234-2234 Fax: 573-234-2241 | Trade Debt | ☐ C ☐ U ☐ D | | | $22,640.59 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | CHUTES ENTERPRISES 1011 WESTWOOD AVE STATEN ISLAND NY 10314 | info@chutesenterprises.com Tel: 718-494-2247 Fax: 718-494-2257 | Trade Debt | ☐ C ☐ U ☐ D | | | $19,494.00 |
| 18 | METRO HIGH TECH STEEL AND BUILDERS 1087 FLUSHING AVE BROOKLYN NY 11237 | metsteelbuilders@gmail.com Tel: 917-681-7190 | Trade Debt | ☐ C ☐ U ☐ D | | | $17,957.20 |
| 19 | CARVART CNC INC 5606 COOPER AVE RIDGEWOOD NY 11385 | info@cncnewyork.com Tel: 917-549-6288 | Trade Debt | ☐ C ☐ U ☐ D | | | $16,460.13 |
| 20 | HOME TYLE 5816 NEW UTRECHT AVE BROOKLYN NY 11219 | Office@HomeTyles.com Tel: 718-215-5966 | Trade Debt | ☐ C ☐ U ☐ D | | | $12,460.75 |
| 21 | MIKE BRICK LAYER AND CONSTRUCTION 94 THOMAS ST BROOKLYN NY 11237 | Mikeconstruction47@yahoo.com Tel: 347-247-0822 | Trade Debt | ☐ C ☐ U ☐ D | | | $12,375.00 |
| 22 | PBS SVC INC 4403 15TH AVE BROOKLYN NY 11219 | info@pbsfacilityservice.com Tel: 718-484-1998 Fax: 718-484-1997 | Trade Debt | ☐ C ☐ U ☐ D | | | $11,666.70 |
| 23 | LOOTHROP ASSOCIATES LLP 333 WESTCHESTER AVE WHITE PLAINS NY 10604 | info@lothropassociates.com Tel: 914-741-1115 | Trade Debt | ☐ C ☐ U ☐ D | | | $11,331.74 |
| 24 | CP STEEL ERECTORS LLC 206 HINSDALE ST BROOKLYN NY 11207 | Silvio@cpsteelerectors.com Tel: 347-965-3458 | Trade Debt | ☐ C ☐ U ☐ D | | | $10,900.00 |
| 25 | ELITE POOL AND FITNESS MANAGEMENT, INC 129-09 26TH AVE STE 403 FLUSHING NY 11354 | Nick Chavez ContactUs@eliteamenity.com , nickchavez@eliteamenity.com Tel: 718-746-3720 Fax: 718-746-3726 | Trade Debt | ☐ C ☐ U ☐ D | | | $8,989.96 |
| 26 | CLASSIC TOUCH 183 WILSON #113 BROOKLYN NY 11211 | joelbiner@gmail.com Tel: 917- 941 -2747 | Trade Debt | ☐ C ☐ U ☐ D | | | $8,910.19 |
| 27 | CONSOLIDATED BRICK AND BUILDING SUPPLIES 650 BODWELL ST EXT AVON MA 02322 | pmeade@consolidatedbrick.com Tel: 800-321-0021 Fax: 508-559-8910 | Trade Debt | ☐ C ☐ U ☐ D | | | $7,765.39 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 28 | ABLE FENCING INC 59 COLLINS AVE SPRING VALLEY NY 10977 | office@ablefencing.net Tel: 845-371-2253 | Trade Debt | ☐ C ☐ U ☐ D | | | $7,666.00 |
| 29 | SAFETY FIRE SPRINKLER CORP 1070 38TH ST BROOKLYN NY 11219 | info@safetyfiresprinkler.com Tel: 718-633-3036 Fax: 718-633-4593 | Trade Debt | ☐ C ☐ U ☐ D | | | $7,400.00 |
| 30 | ROLLHUAS SEATING PRODUCTS, INC 43-10 21ST ST 2ND FL LONG ISLAND CITY NY 11101 | rollhausproducts@gmail.com Tel: 718-729-9111 | Trade Debt | ☐ C ☐ U ☐ D | | | $6,723.03 |

## Evergreen Gardens II LLC

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | MELROSE NOLL BROOKLYN LLC TREFF & LOWY PLLC 481 WYTHE AVE 2ND FL BROOKLYN NY 11249 | JOESEPH TREFF Joe@trefflowy.com Tel: 718-599-3500 EXT. 201 Fax: 718-387-6282 | Unpaid Settlement | ☑ C ☐ U ☐ D | | | $6,000,000.00 |
| 2 | EXR GROUP COMPANIES LLC 160 HAVEMEYER ST STORE 7 BROOKLYN NY 11211 | j@exrny.com Tel: 212-991-8983 | Trade debts | ☐ C ☐ U ☐ D | | | $337,900.04 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 3 | LILY CONTRACTING/CONSULTING LLC 128 PARK ST WOODMERE NY 11598 | Jhametz@gmail.com Tel: 917-916-6255 | Trade debts | ☐ C ☐ U ☐ D | | | $101,265.00 |
| 4 | DYNAMIC BUILDING SVC 4403 15th AVENUE, STE 409 BROOKLYN NY 11219 | Joel Berkovic jb@pbsfacilityservice.com Tel: 718-484-1998 Fax: 718-484-1997 | Trade debts | ☐ C ☐ U ☐ D | | | $82,910.48 |
| 5 | CON EDISON 4 IRVING PL RM 1875 NEW YORK NY 10003 | zuckermanr@coned.com; weberm@coned.com; franklinv@coned.com; donnleyd@coned.com Tel: 800-752-6633 | Utility | ☐ C ☐ U ☐ D | | | $55,504.55 |
| 6 | ISSEKS BROS INC 298 BROOME ST NEW YORK NY 10002 | Info@Isseks.com Tel: 212-267-2688 | Trade debts | ☐ C ☐ U ☐ D | | | $39,425.00 |
| 7 | ELITE POOL AND FITNESS MANAGEMENT, INC 129-09 26TH AVE STE 403 FLUSHING NY 11354 | Nick Chavez ContactUs@eliteamenity.com , nickchavez@eliteamenity.com Tel: 718-746-3720 Fax: 718-746-3726 | Trade Debt | ☐ C ☐ U ☐ D | | | $8,989.97 |
| 8 | TRI STATE FIRE SPRINKLERS 1237 39TH ST BROOKLYN NY 11218 | info@tristatefiresprinklers.com Tel: 718- 237-1100 | Trade debts | ☐ C ☐ U ☐ D | | | $5,215.00 |
| 9 | NATIONAL GRID CUSTOMER CORRESPONDENCE ONE METROTECH CTR 16TH FL BROOKLYN NY 11201 | Tel: 718-643-4050 | Trade debts | ☐ C ☐ U ☐ D | | | $5,150.46 |
| 10 | RELIABLE MASONRY CORP 5314 16TH AVE STE #251 BROOKLYN NY 11204 | jacob@reliablemasonrycorp.com Tel: 718-854-1150 | Trade debts | ☐ C ☐ U ☐ D | | | $4,984.24 |
| 11 | ROTAVELE ELEVATOR CONSTRUCTION INC ALAN ZARETSKY 414 SENECA AVE RIDGEWOOD NY 11385 | annp@contractor-services.net Tel: 718-386-3000 Fax: 718-386-4366 | Trade debts | ☐ C ☐ U ☐ D | | | $4,921.15 |
| 12 | SILVERMAN SHIN AND BYRNE PLLC GERARD J CROWE 88 PINE ST 22ND FL NEW YORK NY 10005 | gcrowe@silverfirm.com Tel: 212-779-8600 Fax: 212-779-8858 | Trade debts | ☐ C ☐ U ☐ D | | | $4,676.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui- dated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 13 | HOROWITZ, SARAH 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $4,200.00 |
| 14 | YANG, YI CHIEN 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $4,041.13 |
| 15 | BOUZAGLOU, ORIEL 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $4,000.00 |
| 16 | BILLY ENTERPRISES INC 36 CYPRESS AVE BROOKLYN NY 11237 | billyenterprisesinc@gmail.com Tel: 347-894-6557 and/or 914-648-5311 | Trade debts | ☐ C ☐ U ☐ D | | | $3,800.00 |
| 17 | CAO, YUXI 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,500.00 |
| 18 | BRYANT, PAUL 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,400.00 |
| 19 | DALISAY, ANGELO 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,400.00 |
| 20 | MCLOUGHLIN, MATTHEW 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,400.00 |
| 21 | MCDANIEL, KATHERINE 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,325.00 |
| 22 | TSANG, STELLA 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,325.00 |
| 23 | HENG, JAMES 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,300.00 |
| 24 | PAEZ, VICTORIA 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,250.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliqui-dated, or disputed | Amount of unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 25 | ALDANA, GABRIEL 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,225.00 |
| 26 | GARZA, RICHARDO 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,200.00 |
| 27 | NIEMEYER, JORDAN 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,200.00 |
| 28 | BLONDIE'S TREEHOUSE INC 431 FAYETTE AVE MAMARONECK NY 10543 | josh@blondiestreehouse.com Tel: 646-649-9298 | Trade debts | ☐ C ☐ U ☐ D | | | $3,183.51 |
| 29 | RACINE, PAMELA 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,100.00 |
| 30 | ROBINSON, BRODY 54 NOLL ST BROOKLYN NY 11206 | Telephone Number & E-mail Address on File | Former Tenant | ☐ C ☐ U ☐ D | | | $3,075.00 |
| 31 | HIVOLTS ELECTRICAL INC 185 SPENCER ST BROOKLYN NY 11205 | mail@hivoltselectrical.com Tel: 718-855-4346 | Mechanics Lien | ☑ C ☑ U ☐ D | | | $1,419,981.88* |
| 32 | BERRY'S COOLING AND HEATING LLC 15 MEADOW ST BROOKLYN NY 11206 | sales@berryscooling.com Tel: 718-782-9127 Fax: 718-782-5616 | Mechanics Lien | ☑ C ☑ U ☐ D | | | $956,219.59* |
| 33 | DYNAMIC BUILDING SVC 14403 15th AVENUE STE 409 BROOKLYN NY 11219 | Joel Berkovic jb@pbsfacilityservice.com Tel: 718-484-1998 Fax: 718-484-1997 | Mechanics Lien | ☑ C ☑ U ☐ D | | | $832,924.46* |
| 34 | UNITED PANEL TECHNOLOGIES CORP 611 OLD WILLETS PATH HAUPPAUGE NY 11788 | mcames@unitedpaneltech.com Tel: 631-232-1757 Fax: 631-232-1260 | Mechanics Lien | ☑ C ☑ U ☐ D | | | $800,113.46* |
| 35 | BIG APPLE DESIGNERS INC 694 MYRTLE AVE BROOKLYN NY 11205 | Shlomie Fader Pessy@bigappledesigners.com Tel: 718-853-6734 | Mechanics Lien | ☑ C ☑ U ☐ D | | | $746,979.03* |

* Claimant has asserted a mechanic's, materialman's or similar lien claim which is junior in priority to the secured claims of the Series E Noteholders. As the proposed sale of the Denizen to the Purchaser and allocation of EG II Sale Proceeds will not yield sufficient funds to pay the claims of the Series E Noteholders in full, the Subsidiary Debtors believe that any asserted mechanic's, materialman's, or similar claims are wholly unsecured.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 36 | SUPREME WOOD FLOORS INC 1072 MADISON AVE LAKEWOOD NJ 08701 | ar@supremeflooring.com Tel: 732-942-8021 Fax: 732-942-7329 | Mechanics Lien | ☑C ☑U ☐D | | | $570,493.81* |
| 37 | ROTAVELE ELEVATOR CONSTRUCTION INC 414 SENECA AVE RIDGEWOOD NY 11385 | Alan Zaretsky annp@contractor-services.net Tel: 718-386-3000 Fax: 718-386-4366 | Mechanics Lien | ☑C ☑U ☐D | | | $290,517.71* |
| 38 | PBS SVC INC 4403 15TH AVE BROOKLYN NY 11219 | info@pbsfacilityservice.com Tel: 718-484-1998 Fax: 718-484-1997 | Mechanics Lien | ☑C ☑U ☐D | | | $256,734.79* |
| 39 | AURA ELECTRICAL SUPPLY INC 1355 60TH ST BROOKLYN NY 11219 | richard@aura-electric.com Tel: 718-436-6000 Fax: 718-972-2657 | Mechanics Lien | ☑C ☑U ☐D | | | $249,067.98* |
| 40 | SAFETY FIRE SPRINKLER CORP 1070 38TH ST BROOKLYN NY 11219 | info@safetyfiresprinkler.com Tel: 718-633-3036 Fax: 718-633-4593 | Mechanics Lien | ☑C ☑U ☐D | | | $203,000.00* |
| 41 | 1 SEAL USA LLC 544 PK AVE BROOKLYN NY 11205 | info@1sealusa.com Tel: 212-302-6688 Fax: 718-858-7851 | Mechanics Lien | ☑C ☑U ☐D | | | $151,502.80* |
| 42 | MPI PLUMBING CORP 670 MYRTLE AVE #234 BROOKLYN NY 11205 | billing@mpiplumbingcorp.com Tel: 718-925-2400 | Mechanics Lien | ☑C ☑U ☐D | | | $134,265.61* |
| 43 | 20/20 INSPECTIONS INC 3716 FORT HAMILTON PKWY BROOKLYN NY 11218 | suriw@2020inspections.com Tel: 800-819-7788 | Mechanics Lien | ☑C ☑U ☐D | | | $125,303.99* |
| 44 | SECURITY SHIELD USA INC 314 PENN ST BROOKLYN NY 11211 | chany@security-shield.com Tel: 718-388-3725 Fax: 718-384-3831 | Mechanics Lien | ☑C ☑U ☐D | | | $119,397.00* |
| 45 | WORLDWIDE PLUMBING SUPPLY INC 4002 15TH AVE BROOKLYN NY 11218 | joel@wwps.co Tel: 718-853-3000 Fax: 718-853-3056 | Mechanics Lien | ☑C ☑U ☐D | | | $85,495.42* |
| 46 | E-J ELECTRIC INSTALLATION CO 4641 VERNON BLVD LONG ISLAND CITY NY 11101 | pcutrone@ej1899.com Tel: 718-392-3928 Fax: 718-392-3985 | Mechanics Lien | ☑C ☑U ☐D | | | $75,000.00* |

**\* Claimant has asserted a mechanic's, materialman's or similar lien claim which is junior in priority to the secured claims of the Series E Noteholders. As the proposed sale of the Denizen to the Purchaser and allocation of EG II Sale Proceeds will not yield sufficient funds to pay the claims of the Series E Noteholders in full, the Subsidiary Debtors believe that any asserted mechanic's, materialman's, or similar claims are wholly unsecured.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 47 | COMPLETE WINDOW TREATMENT 5217 20TH AVE BROOKLYN NY 11204 | eli@completewindowtreatmetn.com Tel: 718-887-4892 | Mechanics Lien | ☑C ☑U ☐D | | | $58,875.00* |
| 48 | HI-I LLC 65 CROTON PL PARAMUS NJ 07652 | ittai@hiiusa.com Tel: 201-503-0393 | Mechanics Lien | ☑C ☑U ☐D | | | $34,226.00* |
| 49 | POOL DOCS OF NJ 525 OBERLIN AVE S LAKEWOOD NJ 08701 | kait@pooldocs.com Tel: 732-300-2481 Fax: 732-276-2266 | Mechanics Lien | ☑C ☑U ☐D | | | $26,636.00* |
| 50 | THOMAS TILES INC 1438 OVINGTON AVE BROOKLYN NY 11219 | thomasny7@gmail.com Tel: 347-597-3176 | Mechanics Lien | ☑C ☑U ☐D | | | $1,906.25* |

**\* Claimant has asserted a mechanic's, materialman's or similar lien claim which is junior in priority to the secured claims of the Series E Noteholders. As the proposed sale of the Denizen to the Purchaser and allocation of EG II Sale Proceeds will not yield sufficient funds to pay the claims of the Series E Noteholders in full, the Subsidiary Debtors believe that any asserted mechanic's, materialman's, or similar claims are wholly unsecured.**

**Schedule 3**

**List of Holders of Five Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), to the best of the Subsidiary Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the date hereof, the five (5) largest secured, non-contingent claims against each of the Subsidiary Debtors, excluding claims of insiders as defined in section 101 of the Bankruptcy Code.

**Evergreen Gardens I LLC**

| No. | Creditor | Contact Mailing Address, Telephone Number/Fax Number, Email | Approximate Amount of Claim | Type of Collateral | Estimated Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| 1. | JPMorgan Chase Bank NA | Thomas Nicholas Cassino 383 Madison Ave. 31st Fl. New York, NY 10179 Tel: 212-834-5158 E-mail: thomas.cassino@jpmorgan.com<br><br>Gary Kaplan, Esq. and Michael Barker, Esq. Fried, Frank, Harris, Shriver & Jacobson LLP, 1 New York Plaza New York, New York 10004 Tel: 212-859-8000 Fax: 212-859-4000 E-mail:Gary.kaplan@friedfrank.com Michael.barker@friedfrank.com | $182,842,450.00 | Lien on the real property and other tangible and intangible assets of Evergreen Gardens I LLC. | TBD | No |
| 2. | Big Apple Designers Inc. | Shlomie fader 694 Myrtle Avenue Brooklyn, NY 11205 Tel: 718-853-6734 E-mail: Pessy@bigappledesigners.com | $2,857,315.21 | Real Property owned by Evergreen Gardens I LLC | TBD | Yes |
| 3. | Dynamic Building Services | Joel Berkovic 4403 15th Ave, Suite 409, Brooklyn, NY 11219 Tel: 718-484-1998 Fax: 718-484-1997 E-mail: jb@pbsfacilityservice.com | $906,742.91 | Real Property owned by Evergreen Gardens I LLC | TBD | Yes |
| 4. | BMW Plumbing Supplies | Burich Moses Weiss 307 Wallabout Street Brooklyn, NY 11205 Tel: 718-387-1887 E-mail:bmwpsupply@gmail.com bmwplumbingsupply@gmail.com pessy@bmwpsupply.com | $559,851.23 | Real Property owned by Evergreen Gardens I LLC | TBD | Yes |
| 5. | Magellan Concrete Structures 1 Corp / T Silva Inc. / Braga Corp. | Jonathan Rocchio 233 Powell Street Brooklyn, NY 11212 Tel: 718-552-2080 E-mail: Jonathan@magellanconcrete.com | $558,792.57 | Real Property owned by Evergreen Gardens I LLC | TBD | Yes |

**Evergreen Gardens II LLC**[1]

| No. | Creditor | Contact Mailing Address, Telephone Number/Fax Number, Email | Approximate Amount of Claim | Type of Collateral | Estimated Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| 1. | Mishmeret Trust Company Ltd | Jeffrey Zwick & Associates PC 266 Broadway Suite 403 Brooklyn, NY 11211 Tel: 718-513-2050 Fax: 718-513-2060 E-mail: office@jzlegal.com<br><br>Attn: Michael Friedman, Esq. and Aaron Krieger, Esq. Chapman & Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 Tel: 212-655-6000 Fax: 212-655-2509 E-mail: friedman@chapman.com akrieger@chapman.com | $267,606,792.76 | Lien on the real property and other tangible and intangible assets of Evergreen Gardens II LLC. | TBD | No |

---

[1]   Certain claimants have asserted various mechanic's, materialman's or similar lien claims which are junior in priority to the secured claims of the Series E Noteholders. As the proposed sale of the Denizen to the Purchaser and allocation of sale proceeds to EG II will not yield sufficient funds to pay the claims of the Series E Noteholders in full, the Subsidiary Debtors believe that any asserted mechanic's, materialman's, or similar claims are wholly unsecured.

## Schedule 4

**Evergreen Gardens I LLC and Evergreen Gardens II LLC Unaudited Balance Sheets[1]**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following provides a summary of the (unaudited) assets and liabilities for each of the Subsidiary Debtors.

## Data on the financial position

**Evergreen Gardens I LLC**

| Current Assets | |
| --- | --- |
| Cash and Cash equivalents | $105,862 |
| Restricted Cash | $500,323 |
| Deposits | $3,504,598 |
| Rent Receivable | $553,850 |
| **Non-Current Assets** | |
| Investment Property | $256,795,000 |
| **Total:** | $261,459,634 |

| Current Liabilities | |
| --- | --- |
| Short-Term Loan and Current Maturities | $170,000,000 |
| JP Morgan Interest | $16,001,656 |
| Intercompany Loans | $1,615,702 |
| Other Payables | $6,830,214 |
| Tenant Deposits | $733,315 |
| **Total Liabilities:** | $190,410,376 |

---

[1]   The JP Morgan Interest amount is as of September 14, 2021. All other amounts set forth herein in this Schedule 4 are as of June 30, 2021.

5

**Evergreen Gardens II LLC**

| Current Assets | |
|---|---|
| Cash and Cash equivalents | $2,181,621 |
| Rent Receivable | $234,534 |
| Intercompany Payable – Denizen X | $1,381,168 |
| **Non-Current Assets** | |
| Investment Property | $249,205,000 |
| **Total:** | $253,002,323 |

| Current Liabilities | |
|---|---|
| Obligations on Secured Bonds | $266,609,089 |
| Other Payables | $6,053,007 |
| Tenant Deposits | $1,213,877 |
| **Total Liabilities:** | $273,875,973 |

**Schedule 5**

**Publicly Held Securities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), to the best of the Subsidiary Debtors' knowledge, belief, and understanding, as of the date hereof, Evergreen Gardens II LLC issued approximately $252.4 million in principal amounts of secured, first lien Series E notes pursuant to that certain Deed of Trust, dated as of February 4, 2018, by and between All Year Holdings Limited, as issuer, Evergreen Gardens II LLC, as co-borrower, and Mishmeret Trust Company Ltd. The bonds were issued on the Tel Aviv Stock Exchange in New Israel Shekel but were de-listed and suspended from trading on January 3, 2021.

## Schedule 6

### Subsidiary Debtors' Property Not in the Subsidiary Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of the Subsidiary Debtors' knowledge, belief, and understanding, as of the date hereof, the property of the Subsidiary Debtors identified below is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

| Property | Location | Custodian |
|---|---|---|
| Lockbox Account | Treas Mgmt Client Care<br>One Financial Parkway<br>Locator Z1-Yb42-03-1<br>Kalamazoo MI 49009 | PNC Bank N.A. |

**Schedule 7**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the Subsidiary Debtors hold, own, and/or lease residential real estate properties in Brooklyn, New York.  Evergreen Gardens I LLC owns real property located at 123 Melrose Street in Brooklyn, New York and Evergreen Gardens II LLC owns real property located at 54 Noll Street in Brooklyn, New York.

**Schedule 8**

**Location of Subsidiary Debtors' Assets, Books, and Records**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Subsidiary Debtors' substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Subsidiary Debtors outside the territorial limits of the United States.

**Location of Subsidiary Debtors' Substantial Assets**

As of June 30, 2021, the Subsidiary Debtors had assets of approximately $514.5 million, as provided in Schedule 4, with substantial assets in real estate holding. Evergreen Gardens I LLC owns real property located at 123 Melrose Street in Brooklyn, New York and Evergreen Gardens II LLC owns real property located at 54 Noll Street in Brooklyn, New York.

**Books and Records**

The Subsidiary Debtors' books and records are located at 12 Spencer Street, 3rd Floor Brooklyn, NY 11205.

**Subsidiary Debtors' Assets Outside the United States**

The Subsidiary Debtors do not have significant assets located outside of the United States.

**Schedule 9**

**Litigation**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Subsidiary Debtors' knowledge, belief, and understanding, as of the date hereof, the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Subsidiary Debtors or its properties where a judgment against the Subsidiary Debtors or a seizure of their property may be imminent.

**Evergreen Gardens I**

| Action or Proceeding | Nature of Proceeding | Status of Proceeding |
|---|---|---|
| Everaldo Ferreira v. Magellan Concrete Structures Corp. et al | Personal Injury | Pending at Kings County Supreme Court |
| Gerald Pena v. Evergreen gardens I LLC et al. | Personal Injury | Pending at Bronx County Supreme Court |
| Luis Maldonado v. Evergreen Gardens I LLC | Personal Injury | Pending at Kings County Supreme Court |
| Master Lifting & Rigging LLC v. Evergreen Gardens I LLC et al. | Real Property – Mechanic Lien Foreclosure | Pending and Pre RJI at Kings County Supreme Court |
| Zenobio Olivera - v. - Evergreen Gardens I LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Jorge O. Vasconez Figueroa v. Evergreen Gardens I, LLC et al | Personal Injury, Labor Law and Premises Liability | Pending at Kings County Supreme Court |
| Ramon Duran v. Evergreen Gardens I LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Helio Verly Mendes v. Evergreen gardens I LLC et al. | Personal Injury and Premises Liability | Pending at Kings County Supreme Court |
| Blondie's Treehouse, Inc. v. Evergreen Gardens I LLC et al. | Mechanic's Lien and Breach of Contract | Pending at Kings County Supreme Court |
| Utica First Insurance Company v. Extreme Building LLC et al. | Personal Injury and Labor Law | Pending at Kings County Supreme Court |
| Marlon Maia Dutra v. Evergreen Gardens I LLC et al. | Personal Injury | Pending at Kings County Supreme Court |

**Evergreen Gardens II**

| Action or Proceeding | Nature of Proceeding | Status of Proceeding |
|---|---|---|
| Baba Goumaneh V. Evergreen Gardens II LLC et al. | Premises Liability | Pending at Bronx County Supreme Court |
| Fausto Dario Dominguez v. Evergreen Gardens II LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Glenwood Mason Supply Co. Inc. v. Reliable Masonry corp. et al. | Breach of Contract | Pending at Kings County Supreme Court |
| E-J Electric Installation Company v. Evergreen Gardens II, LLC et al | Real Property – Mechanic Lien Foreclosure | Pending at Kings County Supreme Court |
| Alan Cristian Romero v. Evergreen Gardens II LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Odiel De Almeida Moreira v. Brooklyn GC LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Melanie Hardy v. Evergreen Gardens II LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Felix Placencia Arias and Martiza Placencia Ariaset v. Evergreen gardens II LLC et al. | Personal Injury | Pending at Kings County Supreme Court |
| Harrison Lipton | Personal Injury | Threatened |

## Schedule 10

## Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Subsidiary Debtors' existing senior management as of the date hereof, a description of their tenure with the Subsidiary Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| **Asaf Ravid**[1] <br><br> *Chief Restructuring Officer and Chief Executive Officer* | On March 4, 2021, Mr. Ravid was retained as the Chief Executive Officer and Chief Restructuring Officer of All Year Holdings. <br><br> Mr. Ravid has been the managing director of CGI Real Estate Investment Strategies, a domestic developmental real estate company, since 2013. Prior to this, he served as a managing director of Aura Investments, Ltd, a global investment company specializing in real estate development and property management from 2007-2012. Mr. Ravid also has prior experience as an attorney of Yehudan Raveh & Co., a leading Israeli law firm specializing in commercial law, from 2005-2007, and as an attorney at Danziger, Klagsbald, Rosen & Co., an Israeli law firm specializing in antitrust, trade regulations and commercial law from 2004-2005. |
| **Ephraim Diamond** <br><br> *Associate Restructuring Officer* | In January 2021, Mr. Diamond was appointed as Associate Restructuring Officer of All Year Holdings. Mr. Diamond's responsibilities include assisting the board of directors with the restructuring of All Year. <br><br> Mr. Diamond is the founder and managing member of Arbel Capital Advisors LLC, an advisory firm providing restructuring and bankruptcy advisory and fiduciary services for the real estate, investable litigation and litigation funding industries. Mr. Diamond has approximately 20 years of experience in bankruptcy and restructuring. |
| **Yizhar Shimoni** <br><br> *Chief Financial Officer* | Yizhar Shimoni has served as Chief Financial Officer of All Year Holdings since 2016. <br><br> Prior to joining All Year, Mr. Shimoni served as Secretary and Director at U.S. Real Estate Representation Ltd., representing various United States real estate companies in Israel.  Prior to that, Mr. Shimoni was a Certified Public Accountant with Amit Halfon, a leading accounting firm in Israel. |

---

[1]    Joel Brian was the former Chief Restructuring Officer of All year Holdings. He was appointed in January 2021. On February 19, 2021, Mr. Biran provided notice to All Year Holdings that he would be resigning his position as Chief Restructuring Officer, effective as of February 28, 2021. Mr. Biran will continue to be engaged by, and provide services to, All Year Holdings going forward as a consultant.

## Schedule 11

### Payroll

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Subsidiary Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Subsidiary Debtors for the 30-day period following the filing of the chapter 11 petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $0[1] |
| **Payments to Officers, Stockholders, and Directors** | $0 |
| **Payments to Financial and Business Consultants** | $0[2] |

---

[1]     The Subsidiary Debtors do not have any employees but instead the Subsidiary Debtors are parties to contracts with PBS Facility Services Inc., Platinum Amenity Services and Dynamic Building Services pursuant to which such entities employ the Denizen staff.  Through the Purchase Agreement, the Purchaser has agreed to honor these contracts to ensure that the Denizen staff's employment continues uninterrupted.

[2]     Pursuant to the retention applications to be filed by these professionals, and the applicable Bankruptcy Rules and Local Bankruptcy Rules, the Subsidiary Debtors will not make any payments in the 30-day period following the filing of the chapter 11 petition.

14

**Schedule 12[1]**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | | |
|---|---|---|
| **Cash Receipts** | EG I: $495,122 | EG II: $2,968,053 |
| **Cash Disbursements** | EG I: $4,006,720 | EG II: $605,358 |
| **Net Cash Loss** | EG I: $(3,511,598) | EG II: $2,362,694 |
| **Unpaid Obligations** | EG I: $0 | EG II: $622,311 |
| **Uncollected Receivables** | EG I: $36,453 | EG II: $43,840 |

,

---

[1]      As of September 14, 2021.

## Exhibit A

**Restructuring Support Agreement**

**RESTRUCTURING SUPPORT AGREEMENT**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

This RESTRUCTURING SUPPORT AGREEMENT (this "*Agreement*"), is entered into as of August 31, 2021 (the "*Execution Date*"), by and among:

(i)   Evergreen Gardens I LLC, a Delaware limited liability company ("*EG I*"), and Evergreen Gardens II LLC, a New York limited liability company ("*EG II*"), and Evergreen Gardens Mezz LLC, a New York limited liability company ("*EGM*", and, together with EG I and EG II, the "*Company Parties*" and each, a "*Company Party*");

(ii)  Mishmeret Trust Services Company Ltd., as Trustee (the "*EG II Notes Trustee*") for the series E notes issued by All Year Holdings Limited (the "*Parent*") pursuant to that certain Deed of Trust (the "*Series E Deed of Trust*") by and between the Parent and the EG II Notes Trustee dated as of February 4, 2018 (the "*Series E Notes*" and the holders of such Series E Notes, the "*Series E Noteholders*"); and

(iii) MREF REIT Lender 9 LLC, a Delaware limited liability company, in its capacity as lender under that certain Mezzanine Loan and Security Agreement, between MREF REIT Lender 9 LLC and EGM, dated February 12, 2019 (the "*Mezzanine Lender*").

The Company Parties, the Mezzanine Lender, and the EG II Notes Trustee are referred to herein as the "*Parties*" and individually as a "*Party*."

**RECITALS**

**WHEREAS**, the Parties have agreed to the Restructuring Transactions (as defined below) consistent with the terms and subject to the conditions set forth herein, including in the term sheet annexed hereto as **Exhibit A** (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with the terms herein, the "*Term Sheet*"), to be implemented pursuant to the Plan, which are the product of arms-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS,** All Year issued those certain Series E Notes to the Series E Noteholders pursuant to the Series E Deed of Trust which are secured by the assets of EG II and which are in the aggregate outstanding principal amount of not less than $252.4 million as of the date hereof, plus accrued and accruing interest, fees, expenses and other amounts arising and payable under and in accordance with the Series E Deed of Trust, and which shall be determined

as of the EG II Petition Date as amounts outstanding as of such date denominated in New Israeli Shekels as converted to US dollars at the applicable exchange rate on such date;

WHEREAS, EGM is a special purpose entity that holds 100% of the issued and outstanding equity interests in EG I;

WHEREAS, Mezzanine Lender and EGM are party to that certain Mezzanine Loan and Security Agreement, dated February 19, 2019, pursuant to which Mezzanine Lender made a $65,000,000 secured mezzanine loan to EGM (the "*Mezzanine Loan*");

WHEREAS, the Mezzanine Loan is secured by a first-priority lien on 100% of EGM's equity interests in EG I;

WHEREAS, as of the date hereof, the Mezzanine Lender holds one hundred percent (100%) of the aggregate outstanding principal amount of the EGM Mezzanine Loan;

WHEREAS, on February 22, 2021, EGM, holding 100% of the issued and outstanding equity interests in EG I, commenced the EGM Chapter 11 Case;

WHEREAS, pursuant to the PSA, Purchaser has agreed to purchase the two adjacent properties located at 123 Melrose Street, Brooklyn, New York ("*Denizen X*"), owned by EG I, and 54 Noll Street, Brooklyn, New York ("*Denizen Y*", and together with the Denizen X, the "*Properties*"), owned by EG II, for an aggregate purchase price of $506.0 million;

WHEREAS, EG I and EG II will commence the Subsidiary Chapter 11 Cases in the Bankruptcy Court to implement the Restructuring Transactions in accordance with terms set forth herein;

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement and in the Term Sheet; and

WHEREAS, this Agreement supersedes and replaces that certain Restructuring Support Agreement dated as of August 25, 2021 among EG I, EG II and the EG II Notes Trustee, together with the term sheet referenced therein and all schedules, annexes and exhibits thereto (collectively, the "*Prior RSA*") in all respects, and from and after the Execution Date, the Prior RSA has no further force or effect.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      **Definitions.**

Capitalized terms used but not defined in this Agreement shall have the meaning ascribed to them in the Term Sheet.

As used in this Agreement, the following terms have the following meanings:

(a)     "***Allowed 2020 PSA Claim***" means the claims of the 2020 PSA Claimant to be Allowed as General Unsecured Claims against each of EG I and EG II in the maximum aggregate amount of $6,000,000 pursuant to the terms of that certain 2020 PSA Settlement Agreement.

(b)     "***Alternative Transaction***" means any plan, plan proposal, dissolution, winding up, liquidation, sale or disposition, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, financing (debt or equity), or restructuring of any of the Company Parties or their assets other than the Restructuring Transactions as set forth in the Term Sheet.

(c)     "***Disclosure Statement Motion***" means the motion seeking approval of the Disclosure Statement and the Plan Solicitation Materials and requesting that the Court schedule a hearing to consider confirmation of the Plan.

(d)     "***Disclosure Statement Order***" means an order of the Bankruptcy Court approving the Disclosure Statement and the Plan Solicitation Materials and scheduling the hearing to consider confirmation of the Plan.

(e)     "***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(f)     "***Governmental Authority***" means any federal, state, local or other governmental regulatory authority having jurisdiction over the Company Parties.

(g)     "***Governmental Approval***" means the approval of any Governmental Authority having jurisdiction over the Company Parties required in connection with the Restructuring Transactions.

(h)     "***Person***" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

(i)     "***Plan Supplement***" means the supplement to the Plan comprised of documents, forms of documents, schedules, and/or exhibits to be filed by the Company Parties with the Bankruptcy Court.

3

(j)    *"RSA Support Period"* means the period commencing on the Support Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated in accordance with Section 7 and (ii) the Plan Effective Date.

(k)    *"Support Effective Date"* means the date on which the counterpart signature pages to this Agreement have been executed and delivered by the Company Parties, the Mezzanine Lender, and the EG II Notes Trustee (following a vote of the Series E Noteholders to approve the EG II Notes Trustee entering into this Agreement); *provided, however,* with respect to EGM, its performance hereunder shall be subject to Bankruptcy Court approval.

## 2.    Recitals and Term Sheet.

The Recitals to this Agreement are expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring Transactions.  Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet (including the attachments thereto, as applicable), this Agreement shall control.

## 3.    Agreements of the Mezzanine Lender and the EG II Notes Trustee.

(a)    *Agreement to Support.*  Until such time as this Agreement is terminated in accordance with Section 7 hereof, subject to the terms and conditions hereof, the Mezzanine Lender and the EG II Notes Trustee each agree that it shall:

(i)    use commercially reasonable efforts to support the Restructuring Transactions, to act in good faith and to take any and all reasonable actions necessary to promptly consummate the Restructuring Transactions (including, without limitation, approval of the Disclosure Statement, confirmation and consummation of the Plan, and the closing of the Sale Transaction), in a manner consistent with this Agreement;

(ii)    subject to receipt of a Disclosure Statement and other solicitation materials approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code, timely vote or cause to be voted all of its Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iii)    to the extent the Mezzanine Lender or the EG II Notes Trustee is a party thereto, negotiate in good faith with the Company Parties the forms of the Definitive Documents and execute the Definitive Documents (and not unreasonably withhold any consents thereto);

(iv)    not change or withdraw its vote to accept the Plan (or cause or direct such vote to be changed or withdrawn);

4

(v)        timely vote (or cause to be voted) its Claims against any Alternative Transaction;

(vi)       not directly or indirectly seek, solicit, encourage, propose, file, assist, support, participate in the formulation of, or vote for, any Alternative Transaction or otherwise take any action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, impede, or postpone the consummation of the Plan;

(vii)      not directly or indirectly, through any Person, take any action, including initiating (or encouraging any other Person to initiate) any legal proceeding, that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring Transactions, including the approval of the Disclosure Statement, the solicitation of votes on, and confirmation and consummation of, the Plan, and the closing of the Sale Transaction;

(viii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(ix)       use commercially reasonable efforts to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like with or provide any documentation or information to any Governmental Authority having jurisdiction over the Company Parties, the Mezzanine Lender, or the EG II Notes Trustee, respectively;

(x)        support and take all reasonable actions necessary or reasonably requested by the Company Parties to effectuate the Restructuring Transactions, approval of the Disclosure Statement, confirmation and consummation of the Plan, and the closing of the Sale Transaction; and

(xi)       not take any other action inconsistent with its obligations under this Agreement.

(b)        _Transfers_.

(i)        The EG II Notes Trustee acknowledges that by entering into this Agreement (following an approval by the Series E Noteholders), notwithstanding any Transfer of Series E Notes after August 25, 2021, the EG II Notes Trustee, for and on behalf of itself and the Series E Noteholders, and each future Series E Noteholder, will continue to be bound by all of the terms of this Agreement (including the Term Sheet) applicable to the EG II Notes Trustee or the Series E Noteholders (including with respect to any and all Claims it or they already may hold against or in the Company Parties prior to such Transfer and the representations and warranties set forth in Section 6 of this Agreement).

(ii)       The Mezzanine Lender agrees that, for the duration of the RSA Support Period, the Mezzanine Lender shall not sell, transfer, loan, issue, participate,

5

pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein*, unless the transferee thereof, prior to such Transfer, agrees in writing for the benefit of the Parties to become bound by all of the terms of this Agreement (including the Term Sheet) applicable to the Mezzanine Lender (including with respect to any and all Claims it already may hold against or in the Company Parties prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (the "***Joinder Agreement***"), which shall include making the representations and warranties of the Mezzanine Lender set forth in Section 6 of this Agreement to each other Party to this Agreement, and delivering an executed copy thereof within two (2) business days of such execution, to each Party, in which event (x) the transferee shall be deemed to be a party hereunder to the extent of such Transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of and solely with respect to such transferred Claims (but not with respect to any other Claims or equity interests acquired or held by such transferor) (such Transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").  The Mezzanine Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company Parties shall have the right to enforce the voiding of such Transfer.

(c)      *Preservation of Rights*.  Notwithstanding the foregoing, nothing in this Agreement shall limit any of the Mezzanine Lender's, the EG II Notes Trustee's or the Series E Noteholders' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

**4.      Agreements of the Company Parties.**

(a)      *The Restructuring Transactions*.  Until such time as this Agreement is terminated in accordance with Section 7 hereof, subject to the terms and conditions hereof, each Company Party agrees that it shall:

(i)      use commercially reasonable efforts to support the Restructuring Transactions, to act in good faith and to take any and all reasonable actions necessary to promptly consummate the Restructuring Transactions, in a manner consistent with this Agreement *(*including, without limitation, approval of the Disclosure Statement, confirmation and consummation of the Plan, and the closing of the Sale Transaction);

---

[1] As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

6

(ii)      timely satisfy each milestone set forth herein or in the PSA;

(iii)      to the extent the Mezzanine Lender or the EG II Notes Trustee is a party thereto, negotiate in good faith with the Mezzanine Lender or the EG II Notes Trustee, as applicable, the forms of the Definitive Documents and execute the Definitive Documents;

(iv)      use commercially reasonable efforts to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like from or provide any documentation or information to any regulatory or self-regulatory bodies having jurisdiction over the Company Parties;

(v)      not enter into any stipulation or other agreement with any claimant liquidating any claim against EG I or EG II without the prior written consent of the Mezzanine Lender or the EG II Notes Trustee, respectively and as applicable (with such consent not to be unreasonably withheld);

(vi)      not amend, modify or terminate the 2020 PSA Settlement Agreement without the express written consent of Mezzanine Lender and the EG II Notes Trustee; and

(vii)      not take any other action inconsistent with its obligations under this Agreement.

For the avoidance of doubt, the Company Parties agree that the Definitive Documents shall be in all respects consistent with this Agreement and the Term Sheet.

(b)      _Bar Date_.  The Company Parties will file a motion in the Subsidiary Debtor Cases to establish a deadline for filing claims against the Debtors (the "***Bar Date Motion***") within fourteen (14) days after the earlier to occur of the EG I Petition Date and the EG II Petition Date, and such Bar Date Motion and accompanying order shall be in form and substance reasonably acceptable to Mezzanine Lender and the EG II Notes Trustee.

(c)      _Allocation Of Proceeds and Liability Between EG I and EG II_.  The Company Parties agree that the Definitive Documents will reflect, and all distributions made under the Plan will account for, the allocation splits set forth in the Term Sheet. Subject to any agreements contained herein or in the Term Sheet to the contrary, to the extent that any liabilities of either EG I or EG II cannot be timely paid in the Subsidiary Debtor Cases through either cash flow or DIP Loan proceeds, the Mezzanine Lender and the EG II Notes Trustee (on behalf of itself and the Series E Noteholders) hereby agree that their respective liabilities shall be funded through the portion of sale proceeds allocable to them.

(d)      _Disputing Claims_.  The Company Parties will use commercially reasonable efforts to dispute the following claims asserted against EG I and EG II that the Company Parties, in their business judgment (after reasonable consultation with the Mezzanine Lender with respect to such claims against EG I and the EG II Notes Trustee with respect

7

to such claims against EG II) have reason to dispute (the "***Disputed Claims***"), including without limitation:

(i)    EG I Priming Claims and Liens. The Disputed Claims include any liens and claims against EG I, including claims asserting mechanics' liens, that are, or purport to be, structurally senior to the rights of EGM or the Mezzanine Lender as the sole creditor of EGM, and are referred to herein as the "***EG I Priming Claims and Liens***". The Company Parties will reasonably consult with the Mezzanine Lender with respect to the settlement of and/or the prosecution of objections to EG I Priming Claims and Liens, and obtain the prior written consent from the Mezzanine Lender prior to settling any such claims (with such consent not to be unreasonably withheld). Notwithstanding anything to the contrary herein, upon the request of Mezzanine Lender, each of the Company Parties and the EG II Notes Trustee (on behalf of itself and the Series E Noteholders) shall consent to, and agree not to oppose or dispute, the Mezzanine Lender's right to raise or be heard on any issues relating to the EG I Priming Claims and Liens as of Claims Dispute Effective Date, either directly or via derivative standing in the Subsidiary Bankruptcy Cases, including, without limitation, the right to prosecute any objections or commence litigation relating to such EG I Priming Claims and Liens, in all respects, regardless of whether EG I in its business judgment believes it has reason to dispute such claims or liens;

(ii)    EG II Priming Claims and Liens.  The Disputed Claims include any claims asserting mechanics' liens or any other liens and claims that are, or purport to be, pari passu or senior to some or all of the claims of the Series E Noteholders or the liens securing the Series E Notes, and are referred to herein as the "***EG II Priming Claims and Liens***." The Company Parties will reasonably consult with the EG II Notes Trustee with respect to the prosecution of objections EG II Priming Claims and Liens and obtain the prior written consent from the EG II Notes Trustee prior to settling any such claims (with such consent not to be unreasonably withheld). Notwithstanding anything to the contrary, upon the request of the EG II Notes Trustee, each of the Company Parties and the Mezzanine Lender shall consent to, and agree not to oppose or dispute, the EG II Notes Trustee's right to raise or be heard on any issues relating to the EG II Priming Claims and Liens as of the Claims Dispute Effective Date, either directly or via derivative standing in the Subsidiary Bankruptcy Cases, including, without limitation, the right to prosecute any objections or commence litigation relating to such EG II Priming Claims and Liens, in all respects, regardless of whether EG II in its business judgment believes it has reason to dispute such claims or liens; and

(iii)    Excess 2020 PSA Claims.  The Company Parties shall oppose any Claims asserted by the 2020 PSA Claimant in excess of $6,000,000 or otherwise in contravention of the 2020 PSA Settlement Agreement, or that seek to apportion liability in respect of the 2020 PSA Claims in a manner that is contrary to the terms hereof.

(e)    *EG II to EG I Intercompany Claims*.  The Company Parties acknowledge and agree that EG II has valid intercompany claims against EG I, to be paid in accordance with the Term Sheet and Plan, including the following amounts (the "***Existing EG I Intercompany Claims***"):

8

(i)        principal in the amount of $1,173,406.12 for past expenses paid by EG II on behalf of EG I for the period from October 2019 through December 2020 (the "***EG I Affiliate Intercompany Claims***); and

(ii)        principal in the amount of $1,383,725.38 pursuant to that certain Amended and Restated Promissory Note dated August 25, 2021, for operating expenses paid by EG II on behalf of EG I for the period from February 2021 through August 2021, plus applicable interest thereon (the "***EG I Operating Expense Claims***").

Notwithstanding anything to the contrary herein, the Company Parties, the EG II Notes Trustee and the Mezzanine Lender have agreed that the Existing EG I Intercompany Claims shall be paid (or forgiven) in accordance with the Term Sheet, and that the Plan will reflect this agreement.

(f)        *BVI Intercompany Claims*.  The Parent has asserted intercompany claims against EG I in the aggregate amount of $2.2 million (the "***BVI Intercompany Claims***"), which amounts and claims are disputed by the Mezzanine Lender.  The Subsidiary Debtors shall promptly present to the Parent a proposal from the Mezzanine Lender seeking a dollar for dollar reduction of the BVI Intercompany Claims upon payment of the Maximum EG I 2020 PSA Liability, with the goal of reducing such claims to zero ($0). In the event that the BVI Intercompany Claims are not waived by the Parent or otherwise reduced in a manner acceptable to Mezzanine Lender in its sole discretion, as of the Claims Dispute Effective Date, the Mezzanine Lender shall be granted standing to raise or be heard on any issues relating to the BVI Intercompany Claims, either directly or via derivative standing in the Subsidiary Bankruptcy Cases, including, without limitation, the right to prosecute any objections or commence litigation relating to such BVI Intercompany Claims, to object to, seek to recharacterize, and/or otherwise dispute the BVI Intercompany Claims in the Subsidiary Debtor Cases, and to assert setoff rights and claims based upon, relating to, or arising as a result of the Parent's execution of the Expired Contract and its alleged use or diversion of the deposit paid by the 2020 PSA Claimant.  The BVI Intercompany Claims shall not be allowed in the Subsidiary Debtor Cases and/or paid by the Company Parties until the earlier to occur of (i) written consent by Mezzanine Lender, or (ii) entry of a bankruptcy court order requiring such payment.

(g)        *PSA Amendments or Adjustments*.  The Company Parties shall not agree to (i) any amendment or modification of the Purchase Price (as defined in the PSA), (ii) any other material amendment or modification of the PSA, or (iii) any adjustments or credits to the Purchase Price, including without limitation, the Material Breach Credit (as defined in the PSA) or any other adjustments or credits set forth in the PSA, in each case without the prior written consent of each of the EG II Notes Trustee and Mezzanine Lender.

(h)        *DIP Financing / Cash Collateral*.

(i)        Budget and Cash Collateral.  EG I and EG II shall each prepare a 13-week cash flow and budget through the date of the proposed sale and confirmation of

9

the Plan.  EG I's budget (the "**EG I Budget**") shall be in form and substance reasonably acceptable to Mezzanine Lender in its sole discretion and otherwise in accordance with the DIP Loan documents.  For the avoidance of doubt, each of EG I and EG II shall be responsible for its own operating and capital expenses through the closing of the Restructuring Transactions and confirmation of the Plan.  The Mezzanine Lender shall consent (which shall not be unreasonably withheld) to or otherwise obtain EG I Mortgage Lender's consent to the use of cash collateral by EG I to be used only with respect to the budged operating expenses of EG I as, and to the extent, set forth in the EG I Budget.  The Series E Noteholders shall consent, on terms and conditions reasonably acceptable to the EG II Notes Trustee, to the use of cash collateral by EG II to be used only with respect to the budgeted operating expenses of EG II as and to the extent set forth in the EG II budget (the "**EG II Budget**"), the terms and conditions of which cash collateral use shall be documented in an interim and final cash collateral order, reasonably acceptable in each case to the EG II Notes Trustee and entered by the Bankruptcy Court (the "**Cash Collateral Orders**").  Each of EG I and EG II acknowledge and agree that they shall in no event use cash collateral or proceeds of the DIP Loan except in accordance with the EG I Budget or the EG II Budget, respectively. In the event of a conflict between the terms of this Section 4(h)(i) and the Cash Collateral Orders, the Cash Collateral Orders shall govern.

(ii)     Debtor in Possession Financing.  Mezzanine Lender or EG I Mortgage Lender (the "**DIP Lender**") shall be authorized to provide debtor in possession financing (the "**DIP Loan**") to EG I on terms acceptable to Mezzanine Lender and the EG I, provided that, except as otherwise expressly provided in the DIP Loan documents, the proceeds from such DIP Loan shall only be used to fund EG I in accordance with the agreed EG I Budget.  Unless the Company Parties have the prior written consent of Mezzanine Lender and EG I Mortgage Lender (and such consent shall not be unreasonably withheld), EG I will not (i) consent to or seek approval of any DIP Loan or postpetition financing from any party other than Mezzanine Lender or EG I Mortgage Lender, (ii) take any action which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender, (iii) make or receive any intercompany loans, (iv) create, incur, assume or suffer to exist any material indebtedness or liens other than the DIP Loan and the liens securing the DIP Loan.  In the event of a conflict between the terms of this Section 4(h)(ii) and the DIP Loan documents, the DIP Loan documents shall govern.

(i)     *Certain Additional Chapter 11 Matters*.  Each Company Party, as the case may be, shall provide draft copies of the all material motions or applications and other documents any Company Party intends to file with the Bankruptcy Court to counsel for the Mezzanine Lender and the EG II Notes Trustee, if reasonably practicable, at least three (3) days prior to the date when the applicable Company Party intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such pleading or document.

10

5.    **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Subject to the terms and conditions herein, each Party hereby covenants and agrees to cooperate with each other Party in good faith in connection with, and to exercise commercially reasonable efforts with respect to, the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan. Subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by the other Party to carry out the purposes and intent of this Agreement and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

6.    **Representations and Warranties.**

Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof:

(a)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, all necessary consents to the execution and delivery of this Agreement have been obtained, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar actions on its part;

(b)    the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) except with regards to the Expired Agreement (as defined in the PSA), conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c)    the EG II Notes Trustee represents and warrants to the Company Parties that, as of the date hereof, it is the Trustee for the Series E Notes, and that the holders of 97% of the face amount of the Series E Notes, having the authority to direct the EG II Notes Trustee and bind the Series E Noteholders, have directed the EG II Notes Trustee to sign this Agreement and take all actions contemplated hereby; and

(d)    the Mezzanine Lender represents and warrants to the Company Parties that, as of the date hereof, it (i) is the beneficial owner of one hundred percent (100%) of the aggregate principal amount of the EGM Mezzanine Loan, and (ii) has, with respect to the EGM Mezzanine Loan, (A) sole investment or voting discretion with respect to the EGM Mezzanine Loan, and (B) full power and authority to vote on and consent to matters concerning the EGM Mezzanine Loan or to exchange, assign and transfer the EGM Mezzanine Loan.

11

### 7.    Termination of Agreement.

(a)    *Mezzanine Lender and EG II Notes Trustee Termination Events.* At any time after the occurrence and during the continuation of any of the following termination events, the Mezzanine Lender or the EG II Notes Trustee may deliver a written notice of termination to the Company Parties in accordance with <u>Section 15</u>. If such notice is sent, then this Agreement and the obligations of the Parties hereunder shall automatically terminate five (5) business days after delivery of such notice unless cured or waived in accordance with terms of this Agreement or otherwise agreed to by the Parties:

(i)    the breach in any material respect by any Company Party of any of the undertakings, representations, warranties or covenants of the Company Parties set forth herein which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Mezzanine Lender or the EG II Notes Trustee in accordance with <u>Section 17</u>;

(ii)    any Company Party (A) withdraws the Plan or makes any material changes to the Plan without the consent of the Mezzanine Lender and the EG II Notes Trustee (which consent shall not be unreasonably withheld), (B) publicly announces its intention not to support the Restructuring Transactions or the Plan, (C) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction, or (D) a "Termination Event" occurs under the terms of any debtor in possession financing that is not timely cured or waived;

(iii)    on September 14, 2021, at 11:59 p.m. (Prevailing Eastern Time), unless the Subsidiary Debtors have commenced the Subsidiary Chapter 11 Cases;

(iv)    on September 28, 2021, at 11:59 p.m. (Prevailing Eastern Time), unless the Subsidiary Debtors have filed the Bar Date Motion;

(v)    on September 14, 2021, at 11:59 p.m. (Prevailing Eastern Time), if the Company Parties have not filed the Plan, the Disclosure Statement, and the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Plan Solicitation Materials;

(vi)    on January 28, 2022, at 11:59 p.m. (Prevailing Eastern Time), if the Bankruptcy Court shall not have entered the Confirmation Order;

(vii)    on February 11, 2022, at 11:59 p.m. (Prevailing Eastern Time), if the Plan Effective Date has not occurred (the "***Plan Effective Date Deadline***"); *provided, however*, that such Plan Effective Date Deadline shall automatically be extended to coincide with the Closing Date (as defined in the PSA as of the date hereof);

(viii)    an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver is appointed in any of the Chapter 11 Cases, or any Debtor applies for, consents to, or acquiesces in, any such appointment;

12

(ix)    termination of the PSA or any reduction in the Purchase Price under the PSA that has not been agreed to by Mezzanine Lender and the EG II Notes Trustee;

(x)    any Company Party objects to or otherwise disputes (i) the EGM Mezzanine Lender Claims or the liens securing such claims, or if any part of such claims or liens are disallowed or if such claims are allowed in an aggregate principal amount of less than $65 million; or (ii) the EG II Secured First Lien Notes Claims (whether asserted by the Series E Noteholders or the EG II Notes Trustee) or the liens securing such claims, or if any part of such claims or liens are disallowed or if such claims are allowed in an aggregate principal amount of less than $252.4 million;

(xi)    the Subsidiary Debtor Cases are substantively consolidated or any of them dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor files a motion or other pleading seeking entry of such an order, or any Person files a motion or other pleading seeking entry of such an order and such motion or other pleading is not opposed by the Subsidiary Debtors;

(xii)    the Company Parties fail to enter into a settlement with 2020 PSA Claimant on or before the EG I Petition Date that liquidates the Expired Contract claims at $6,000,000 or less (the "*2020 PSA Settlement*");

(xiii)    the Expired Contract claims are allowed in an amount greater than $6,000,000;

(xiv)    EG I or EG II enters into any agreement for or seeks Bankruptcy Court approval for the use of cash collateral or postpetition financing that is not approved in writing by Mezzanine Lender or the EG II Notes Trustee, respectively and as applicable;

(xv)    any default or Event of Default under the DIP Loan Agreement that goes unremedied beyond any applicable cure period;

(xvi)    The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any respect that is materially adverse to the Mezzanine Lender or the Series E Noteholders;

(xvii)    the Purchaser fails to deposit any required amounts (including, without limitation, any Downpayments (as defined in the PSA)) required by, and within the deadlines provided in, the PSA;

(xviii)    the entry of the Final Bid Protections Order (as defined in the PSA) has not occurred by the deadline provided in the PSA, as such deadline may be extended pursuant to the terms of the PSA;

(xix)    Evergreen Gardens Holdings II LLC, the parent and holder of 100% of the equity interests of EG II, takes any direct or indirect action in contravention to this Agreement; and

13

(xx)    the Company Parties fail to deliver an amendment to the PSA  by September 13, 2021 that, among other things, incorporates the requirements that the Company Parties deliver an executed RSA with the Mezzanine Lender and the EG II Notes Trustee, with such amendment to the PSA reasonably satisfactory in form and substance to the Mezzanine Lender and the EG II Notes Trustee.

(b)    *Company Party Termination Events*. At any time after the occurrence and during the continuation of any of the following termination events, any of the Company Parties may deliver a written notice of termination to the Mezzanine Lender and the EG II Notes Trustee in accordance with Section 17:

(i)    the breach in any material respect by the Mezzanine Lender or the EG II Notes Trustee of any of the undertakings, representations, warranties or covenants of the Mezzanine Lender or the EG II Notes Trustee set forth herein which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from any Company Party in accordance with Section 17;

(ii)    the Mezzanine Lender or the EG II Notes Trustee directly or indirectly seeks, solicits, encourages, proposes, files, assists, supports, participates in the formulation of, or votes for, any Alternative Transaction or otherwise takes any action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, impede, or postpone the consummation of the Plan; or

(iii)    the board of directors, members, or managers (as applicable) of any Company Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement or pursuit of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties under applicable law.

(c)    *Mutual Termination*.   This Agreement may be terminated by mutual agreement of the Parties delivered in accordance with Section 17.

(d)    *Effect of Termination*.   Upon the termination of this Agreement in accordance with this Section 7, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided, however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(e)    *Automatic Stay*.   Each Company Party acknowledges that after the commencement of the Chapter 11 Cases, the giving of notice of termination by the Mezzanine Lender or the EG II Notes Trustee pursuant to this Agreement shall not be a

14

violation of the automatic stay of section 362 of the Bankruptcy Code; *provided that* nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 8.      Amendments and Waivers.

Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented, except with the prior written consent of all Parties, with such consent not to be unreasonably withheld.

## 9.      Effectiveness.

This Agreement shall become effective and binding upon all Parties on the Support Effective Date.

## 10.      Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)      This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)      Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal court in the Borough of Manhattan in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in the Borough of Manhattan in the State of New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 10(b)</u>

15

shall be brought in the Bankruptcy Court to the extent the Bankruptcy Court has jurisdiction over such proceedings.

(c)     *EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.*

### 11.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy for any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party hereby waives any requirement for the security or posting of any bond in connection with any Party seeking or obtaining such remedies.

### 12.    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

### 13.    Successors and Assigns; Severability.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, executors, administrators, and representatives. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

16

14.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

15.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof.

16.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

17.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, by overnight courier or by registered or certified mail (return receipt required) to the following addresses:

(1)    If to a Company Party, to:

c/o All Year Holdings Limited
199 Lee Avenue, #693,
Brooklyn, NY 11211
Attn: Mr. Asaf Ravid and Mr. Ephraim Diamond
Email: ravidasaf@gmail.com and ephraim@arbelcapital.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Gary T. Holtzer, Esq. and Matthew Goren, Esq.
Email: Gary.Holtzer@weil.com and Matthew.Goren@weil.com

(2)    If to the EG II Notes Trustee, to:

Mishmeret Trust Company Ltd.
48 Menachem Begin Road
Tel Aviv 6618001
Israel

17

with copies to:

Chapman and Cutler LLP
1270 Avenue of the Americas

New York, NY 10020

Attention:  Michael Friedman
Email: friedman@chapman.com

and


Chapman and Cutler LLP
111 West Monroe Street
Chicago, IL  60603
Attention:  Stephen Tetro
Email: stetro@chapman.com

(3)     If to the Mezzanine Lender:

MREF REIT Lender 9 LLC
c/o Mack Real Estate Group
60 Columbus Circle, 20th Floor
New York, New York 10023
Attention: Kevin Cullinan

with a copies to:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Attention: Diana Brummer, Esq., Kizzy Jarashow, Esq., and William
Weintraub, Esq.

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon transmission.

## 18.    No Solicitation; Representation by Counsel; Adequate Information.

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases or a solicitation to tender or exchange any debt. The acceptances of the Mezzanine Lender, the EG II Notes Trustee or Series E Noteholders with respect to the Plan will not be solicited until the Mezzanine Lender and the EG II

18

Notes Trustee have, respectively, received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)       Each Party acknowledges that it has had an opportunity to receive information from the Company Parties and that it has been, or is part of a group that has been, represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)       This Agreement does not constitute an offer to issue or sell securities to any Person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

### 19.    Interpretation; Rules of Construction; Representation by Counsel.

When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

19

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**EVERGREEN GARDENS I LLC**

By: Evergreen Gardens Mezz LLC, its sole member
By: All Year Holdings LLC, its sole member
By: All Year Holdings Limited, its sole member

By:_____
Name:  Asaf Ravid
Title:   Chief Restructuring Officer

By:_____
Name:  Ephraim Diamond
Title:   Associate Restructuring Officer

**EVERGREEN GARDENS II LLC**

By: Evergreen Gardens Holdings II LLC, its sole member
By: All Year Holdings Limited, its sole member

By:_____
Name:  Asaf Ravid
Title:   Chief Restructuring Officer

By:_____
Name:  Ephraim Diamond
Title:   Associate Restructuring Officer

**EVERGREEN GARDENS MEZZ LLC**

By: All Year Holdings LLC, its sole member
By: All Year Holdings Limited, its sole member

By:_____
Name:  Asaf Ravid
Title:   Chief Restructuring Officer

By:_____
Name:  Ephraim Diamond
Title:   Associate Restructuring Officer

*[SIGNATURE PAGE TO THE RESTRUCTURING SUPPORT AGREEMENT]*

**MISHMERET TRUST SERVICES
COMPANY LTD.**, as EG II Notes Trustee

**MREF REIT LENDER 9 LLC**, as Mezzanine
Lender

By: _____
Name: Ram Safety    Rami Katzan
Title:    VP        VP

By: _____
Name:
Title:

*[SIGNATURE PAGE TO THE RESTRUCTURING SUPPORT AGREEMENT]*

**MISHMERET TRUST SERVICES
COMPANY LTD.**, as EG II Notes Trustee

**MREF REIT LENDER 9 LLC**, as Mezzanine
Lender

By:_____
Name:
Title:

By:_____
Name:
Title:

*[SIGNATURE PAGE TO THE RESTRUCTURING SUPPORT AGREEMENT]*

## Exhibit A

**Term Sheet**

FINAL

---

**Restructuring Term Sheet**
**August 31, 2021**

---

THIS TERM SHEET IS AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY PARTIES (AS DEFINED BELOW).

---

This Term Sheet[1] sets forth the principal terms of the restructuring of Evergreen Gardens I LLC, as owner of that certain property known as Denizen X ("**EG I**"), Evergreen Gardens II LLC, as owner of that certain property known as Denizen Y ("**EG II**"), and Evergreen Gardens Mezz LLC ("**EGM**" and, together, with EG I and EG II, the "**Company Parties**") to be implemented pursuant to a joint chapter 11 of plan of reorganization, consistent with the terms set forth herein, in cases to be filed in the Bankruptcy Court.  This is the term sheet ("**Term Sheet**") referred to in, and appended to, the RSA.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.  THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING OR THE EXECUTION OF DEFINITIVE DOCUMENTATION WHICH SHALL BE IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.

---

[1]    Capitalized terms used but not otherwise herein defined have the meanings ascribed to them in Annex 1 attached hereto.  To the extent of any conflict between this Term Sheet and the RSA, the RSA will govern and control.

| Claims and Interests to be Restructured | |
|---|---|
| • **EG I Claims and Interests** | <u>EG I DIP Claims</u>:  Claims in the aggregate principal amount of up to $10,000,000 for debtor-in-possession financing provided to EG I by either the EG I Mortgage Lender or the Mezzanine Lender (each, a "**Permitted EG I DIP Lender**"), with the consent of EG I Mortgage Lender and Mezzanine Lender, solely to the extent Allowed (the "**EG I DIP Claims**" and the underlying loan, the "**EG I DIP Loan**") |
| | <u>EG I Secured First Lien Mortgage Claims</u>: Claims in the aggregate principal amount of not less than approximately $170.0 million issued under that certain Loan and Security Agreement between EG I, as borrower, and JPMorgan Chase Bank, N.A., as lender (the "**EG I Mortgage Lender**"), dated as of June 10, 2019 (as amended, modified, renewed, or supplemented from time to time, the "**EG I Mortgage Loan Agreement**"), plus interest, fees, expenses and other amounts arising and payable under, and in accordance with, the EG I Mortgage Loan Agreement, solely to the extent Allowed (the "**EG I Secured First Lien Mortgage Claims**"). |
| | <u>EG I Other Secured Claims</u>: Subject to the dispute and resolution of any such claims in accordance with the terms of the RSA, any Claim as of the EG I Petition Date asserting a valid and perfected Lien against EG I (including, without limitation, materialmen's, mechanic's or vendee Lien claims, but excluding the EG I Intercompany Claims), solely to the extent Allowed (the "**EG I Other Secured Claims**"). |
| | <u>EG I Administrative Claims</u>: Any cost or expense of administering EG I's Subsidiary Chapter 11 Case arising on or before the Plan Effective Date that is allowable against EG I under section 503(b) of the Bankruptcy Code and entitled to priority under sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, solely to the extent Allowed (the "**EG I Administrative Claims**"). |
| | <u>EG I Priority Tax Claim</u>: Any claim as of the EG I Petition Date of a Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) against EG I of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, solely to the extent Allowed (the "**EG I Priority Tax Claims**"). |
| | <u>EG I Priority Non-Tax Claim</u>: Any claim as of the EG I Petition Date against EG I, other than an EG I Administrative Expense Claim or an EG II Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code, solely to the extent Allowed (the "**EG I Priority Non-Tax Claims**"). |
| | <u>EG I Intercompany Claims</u>: The following Unsecured Claims as of the EG I Petition Date against EG I (collectively, the "**EG I Intercompany Claims**"): |

|  | 1. <u>EG I Affiliate Intercompany Claims</u>: Unsecured Claims against EG I held by EG II in the aggregate amount of $1.2 million, arising from loans from EG II to EG I to fund operating expenses of EG I for the period from October 1, 2019 through December 11, 2020, as reduced in accordance with the terms hereof and the Plan, and solely to the extent Allowed (the "**EG I Affiliate Intercompany Claims**").<br><br>2. <u>EG I BVI Intercompany Claims</u>: Unsecured Claims against EG I asserted by the Parent in the aggregate amount of $2.2 million, arising from amounts paid by Parent to fund operating expense of EG I for the period from September 10, 2020 through August 10, 2021, as reduced in accordance with the terms hereof and the Plan, and solely to the extent Allowed (the "**EG I BVI Intercompany Claims**"). The Mezzanine Lender disputes the EG I BVI Intercompany Claims.<br><br>3. <u>EG I Operating Expense Claims</u>: Unsecured Claims against EG I held by EG II in the aggregate amount not to exceed $1,383,758.38 in principal amount, plus applicable interest thereon, arising from loans from EG II to EG I to fund operating expenses of EG I for the period from February 1, 2021 through August 25, 2021, solely to the extent Allowed (the "**EG I Operating Expense Claims**").<br><br><u>EG I General Unsecured Claims</u>: Any Claim as of the EG I Petition Date against EG I that is not an EG I DIP Claim, EG I Secured First Lien Mortgage Claim, EG I Other Secured Claim, EG I Administrative Claim, EG I Priority Tax Claim, EG I Priority Non-Tax Claim, or EG I Intercompany Claim, solely to the extent Allowed (the "**EG I General Unsecured Claims**"). For the avoidance of doubt, the EG I General Unsecured Claims shall include claims relating to the 2020 PSA, not to exceed $6,000,000, solely to the extent Allowed (the "**Allowed EG I 2020 PSA Claim**").<br><br><u>EG I Equity Interests</u>: Any Interest in EG I immediately prior to the EG I Petition Date, including all equity, warrants, common stock, and preferred stock, solely to the extent Allowed ("**EG I Equity Interests**"). |
| • **EG II Claims and Interests** | <u>EG II Secured First Lien Notes Claims</u>: Claims arising from the series E notes issued under that certain Deed of Trust between the Parent, as issuer, EG II as co-Borrower and Mishmeret Trust Services Company Ltd., as trustee (the "**EG II Notes Trustee**"), dated as of February 4, 2018 (as amended, modified, renewed, or supplemented from time to time, the "**Series E Deed of Trust**"), which are in the aggregate outstanding principal amount of not less than US$252.4 million as of the date hereof plus accrued and accruing interest, fees, expenses and other amounts arising and payable under and in accordance with the Series E Deed of Trust, solely to the extent permitted under the Bankruptcy Code, and which shall be determined as of the EG II Petition Date as such amounts outstanding as of such date denominated in New Israeli Shekels |

as converted to US dollars at the applicable exchange rate on such date, solely to the extent Allowed (the "**EG II Secured First Lien Notes Claims**").

EG II Other Secured Claims: Any Claim as of the EG II Petition Date asserting a valid and perfected Lien against EG II (including, without limitation, materialmen's mechanic's or vendee Lien claims), solely to the extent Allowed under the Bankruptcy Code (the "**EG II Other Secured Claims**").

EG II Administrative Claims: Any cost or expense of administering EG II's Subsidiary Chapter 11 Case (including any administrative claims of and adequate protection granted to the EG II Notes Trustee or the EG II Noteholders in the EG II's Subsidiary Chapter 11 Case in connection with cash collateral use) arising on or before the Plan Effective Date that is allowable against EG II under section 503(b) of the Bankruptcy Code and entitled to priority under sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, solely to the extent Allowed (the "**EG II Administrative Claims**").

EG II Priority Tax Claim: Any Claim as of the EG II Petition Date of a Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) against EG II of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, solely to the extent Allowed (the "**EG II Priority Tax Claims**").

EG II Priority Non-Tax Claim: Any Claim as of the EG II Petition Date against EG II, other than an EG I Administrative Expense Claim or an EG II Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code, solely to the extent Allowed (the "**EG II Priority Non-Tax Claims**").

EG II Intercompany Claims: Any Claim as of the EG II Petition Date against EG II held by the Parent or any subsidiary thereof, including without limitation EG I or EGM, solely to the extent Allowed (the "**EG II Intercompany Claims**").

EG II General Unsecured Claims: Any Claim as of the EG II Petition Date against EG II that is not an EG II Secured First Lien Notes Claim, EG II Other Secured Claim, EG II Administrative Claim, EG II Priority Tax Claim, EG II Priority Non-Tax Claim, or EG II Intercompany Claim, solely to the extent Allowed (the "**EG II General Unsecured Claims**"), including any deficiency claims against EG II held by holders of EG II Secured First Lien Notes Claims.  For the avoidance of doubt, EG II General Unsecured Claims shall include claims relating to the 2020 PSA not to exceed $6,000,000, solely to the extent Allowed.

EG II Equity Interests:  Any Interest in EG II immediately prior to the EG II Petition Date, including all equity, warrants, common stock, and preferred stock, solely to the extent Allowed (the "**EG II Equity Interests**").

| | |
|---|---|
| • **EGM Claims and Interests** | <u>Mezzanine Lender Claims</u>:  Claims in the aggregate principal amount of not less than approximately $65.0 million (the "**Mezzanine Loan**") arising under that certain Mezzanine Loan and Security Agreement between EGM, as borrower, and MREF REIT Lender 9 LLC, as lender (the "**Mezzanine Lender**"), dated as of February 12, 2019 (as amended, modified, renewed, or supplemented from time to time, the "**Mezzanine Loan Agreement**") and that Mezzanine Pledge and Security Agreement between EGM, as pledgor, and Mezzanine Lender, as lender (as amended, modified, renewed, or supplemented from time to time, the "**Mezzanine Pledge**"), plus interest, fees, expenses, protective advances, and other amounts arising and payable under and in accordance with the Mezzanine Loan Agreement and Mezzanine Pledge solely to the extent Allowed (the "**EGM Mezzanine Lender Claims**").<br><br><u>EGM Administrative Claims</u>: Without duplication of any of the EG I Administrative Claims or the EG II Administrative Claims, and subject in all respects to the ability of Mezzanine Lender to dispute such claims, any cost or expense of administering the EGM Chapter 11 Case arising on or before the Plan Effective Date that is allowable against EGM under section 503(b) of the Bankruptcy Code and entitled to priority under sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, solely to the extent Allowed (the "**EGM Administrative Claims**").<br><br><u>EGM Priority Tax Claim</u>: Any Claim as of the EGM Petition Date of a Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) against EGM of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, solely to the extent Allowed (the "**EGM Priority Tax Claims**").<br><br><u>EGM Priority Non-Tax Claim</u>: Any Claim as of the EGM Petition Date against EGM, other than an EG I Administrative Expense Claim or an EG II Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code, solely to the extent Allowed (the "**EGM Priority Non-Tax Claims**").<br><br><u>EGM General Unsecured Claims</u>: Any Claim as of the EGM Petition Date against EGM that is not a Mezzanine Lender Claim, EGM Administrative Claim, EGM Priority Tax Claim, EGM Priority Non-Tax Claim, or EGM Intercompany Claim, including, for the avoidance of doubt, any deficiency claims of Mezzanine Lender arising from the Mezzanine Loan Agreement (the "**EGM General Unsecured Claims**").<br><br><u>EGM Equity Interests</u>:  Any Interest in EGM immediately prior to the EGM Petition Date, including all equity, warrants, common stock, and preferred stock ("**EGM Equity Interests**"). |

| Restructuring Overview | |
|---|---|
| **Implementation** | Pursuant to the PSA, Purchaser has agreed to purchase (the "**Sale Transaction")** the two adjacent properties located at 123 Melrose Street, Brooklyn, New York ("**Denizen X**") and 54 Noll Street, Brooklyn, New York ("**Denizen Y**", and together with the Denizen X, the "**Properties**") for an aggregate gross purchase price of $506.0 million (the "**Purchase Price**").    The Sale Transaction and the distribution of proceeds thereof shall be implemented pursuant to the Plan in accordance with the terms of the PSA, the RSA, and this Term Sheet. |
| **Sale Transaction Proceeds Allocation** | The Purchase Price for the Sale Transaction shall be allocated and distributed to EG I and EG II and used to fund Claims, fees and expenses, as follows (the "**Sale Proceeds Allocation Agreement**"): <ul><li>The Purchase Price shall be allocated to EG I and EG II in the following proportions (the "**Agreed Proportions**"):<br>    a. EG I: 50.75% (the amount so allocated, the "**EG I Sale Proceeds**")<br>    b. EG II: 49.25% (the amount so allocated, the "**EG II Sale Proceeds**").</li><li>Broker's Fees and Closing Costs: EG I and EG II agree that any Allowed Broker's Fees and closing costs (including, for the avoidance of doubt, any amounts due to Meridian Investment Sales in connection with the Sale Transaction) shall be allocated between EG I and EG II in accordance with the Agreed Proportions. EG I shall pay its proportionate liability with EG I Sale Proceeds, and EG II shall pay its proportionate liability with EG II Sale Proceeds;</li><li>2020 PSA Claim: The 2020 PSA Claims shall be allowed as General Unsecured Claims against each of EG I and EG II in the total aggregate amount of $6 million, to be paid in accordance with, and pursuant to, the Plan. After giving effect to the Plan, on the Plan Effective Date, the EG II Notes Trustee, on behalf of the EG II Noteholders, will pay to EG I, substantially contemporaneously with the payment of the 2020 PSA Claims, the amount necessary to ensure that EG I is responsible for no more than $3,636,000 on account of the 2020 PSA Claims (the "**Maximum EG I 2020 PSA Liability**"); provided, however, that such amounts to be paid by the EG II Notes Trustee shall in no event be greater than the maximum aggregate amount of $2,364,000. The EG II Notes Trustee shall pay such amounts to EG I from the distributions to be paid to the EG II Noteholders from the EG II Sale Proceeds on account of their EG II Secured First Lien Note Claims.</li><li>Property-Level Claims:  For the avoidance of doubt, EG I shall apply the EG I Sale Proceeds and EG II shall apply the EG II Sale Proceeds to pay Claims, to pay for costs and expenses associated with their respective properties (i.e., these Claims,</li></ul> |

|  | costs, and expenses will not be shared by EG I and EG II in the proportions set forth above, but each of EG I and EG II will be responsible for its own Claims, costs and expenses), including, to the extent Allowed or otherwise required: |
|--|--|
|  | a. Any Allowed DIP, secured, administrative, priority, general unsecured and/or equity claims against EG I or EG II, respectively; |
|  | b. Without duplication for amounts paid via the EG I Intercompany Claims, unpaid utilities and operating expenses of such property; |
|  | c. To the extent necessary to ensure compliance with applicable law, replenishment of security deposits related to such property; |
|  | d. Settlement and satisfaction of mechanics' liens relating to such property (subject to the Parties' ability to dispute such claims and liens); and |
|  | e. Legal fees incurred by the secured and mezzanine lenders in connection with the sale and bankruptcy proceeding to the extent such fees are required to be reimbursed or paid by the Subsidiary Debtors.<br><br>Consistent with the foregoing, the Plan shall clearly provide that, except as otherwise expressly set forth herein, in the Term Sheet or in the Plan, EG I shall have no liability for Claims against EG II, and EG II shall have no liability for Claims against EG I. |
| **Tenant Security Deposits** | EG I and EG II shall maintain separate trust fund accounts for security deposits related to their respective properties, and shall not commingle such funds or use such funds other than in accordance with its obligations to tenants and applicable law.  Neither of EG I nor EG II shall use security deposits to fund operations or pay expenses. |
| **Treatment of Claims and Interests** | |
| **EG I Claims and Interests** | |
| **EG I DIP Claims** | On or as soon as practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EG I DIP Claim agrees to less favorable treatment, each holder of an Allowed EG I DIP Claim shall receive Cash from the EG I Sale Proceeds in an amount equal to such holder's Allowed claim. |
| **EG I Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EG I Administrative Claim, EG I Priority Tax Claim, or EG I Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed EG I Administrative Claim, an Allowed EG I Priority Tax Claim or an Allowed EG I Priority |

| | |
|---|---|
| | Non-Tax Claim shall receive Cash from the EG I Sale Proceeds in an amount equal to such holder's Allowed claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **EG I Secured First Lien Mortgage Claims** | On or as soon as practicable after the Plan Effective Date, except to the extent that a holder of the EG I Secured First Lien Mortgage Claims agrees to less favorable treatment of such Claims, in full and final satisfaction, compromise, settlement, release, and discharge of the Allowed EG I Secured First Lien Mortgage Claims, the holder of the Allowed EG I Secured First Lien Mortgage Claims shall receive Cash from the EG I Sale Proceeds in an amount equal to such holder's Allowed EG I Secured First Lien Mortgage Claims. |
| **EG I Other Secured Claims**<br><br>Unimpaired, Presumed to Accept | On or as soon as practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EG I Other Secured Claim agrees to less favorable treatment, each holder of an Allowed EG I Other Secured Claim shall receive Cash from the EG I Sale Proceeds in an amount equal to such holder's Allowed EG I Other Secured Claim. |
| **EG I General Unsecured Claims**<br><br>Unimpaired, Presumed to Accept | On or as soon as reasonably practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EG I General Unsecured Claim agrees to less favorable treatment, each holder thereof shall receive Cash from the EG I Sale Proceeds in an amount equal to such holder's Allowed EG I General Unsecured Claim. |
| **EG I Intercompany Claims** | **1) EG I Affiliate Intercompany Claims**<br><br>The EG I Affiliate Intercompany Claim amount shall be reduced on a dollar-for-dollar basis upon payment by EG I of the last $1.2 million of the Allowed EG I 2020 PSA Claim. The balance of the EG I Affiliate Intercompany Claim, if any, remaining after such dollar-for-dollar reduction, shall be forgiven by EG II and associated Claims waived.<br><br>**2) EG I BVI Intercompany Claims**<br><br>Within five (5) Business Days of execution of the RSA, the Company Parties shall present to the Parent a proposal from the Mezzanine Lender seeking a dollar-for-dollar reduction of the EG I BVI Intercompany Claims in exchange for payment by EG I of any amount of the Allowed EG I 2020 PSA Claim in excess of $1.2 million. The Company Parties shall provide Mezzanine Lender with prompt notice of such request, regularly update Mezzanine Lender regarding progress of such discussions, and present Mezzanine Lender with a proposed settlement of the EG I BVI Intercompany Claims on or before the date that is twenty-one (21) days from the date of the RSA (the "**BVI Resolution Deadline**"). |

| | |
|---|---|
| | In the event that the EG I BVI Intercompany Claims are not voluntarily waived by Parent or otherwise reduced in a manner acceptable to Mezzanine Lender in its sole discretion by the BVI Resolution Deadline, as of the Claims Dispute Effective Date, Mezzanine Lender shall be granted direct and derivative standing to object to, seek to recharacterize, and/or otherwise dispute the EG I BVI Intercompany Claims, and the Parties hereto consent to, and agree to not oppose or dispute, such request for direct or derivative standing and/or the right of Mezzanine Lender in its capacity as such to raise or be heard on issues, pertaining to the EG I BVI Intercompany Claims or Parent, including the right to assert setoff rights and claims based upon, relating to, or arising as a result of Parent's execution of the 2020 PSA and its alleged use or diversion of the deposit paid by the 2020 PSA Claimant. The BVI Intercompany Claims shall not be Allowed and/or paid by EG I until such claims are liquidated and Allowed or disallowed (in whole or in part) upon the earlier to occur of (i) written consent by Mezzanine Lender, or (ii) entry of a bankruptcy court order determining the amount, allowance or disallowance of such Claim (the "**EG I BVI Intercompany Claims Liquidation Date**"). |
| | On or as soon as reasonably practicable after the EG I BVI Intercompany Claims Liquidation Date, except to the extent that a holder of an Allowed EG I BVI Intercompany Claim agrees to less favorable treatment, Parent shall receive Cash from the EG I Sales Proceeds in an amount equal to Parent's Allowed EG I BVI Intercompany Claim. |
| | **3) EG I Operating Expense Claims** |
| | The EG I Operating Expense Claims will be paid in full in Cash from proceeds of the DIP Loan, with the amounts so paid constituting Allowed EG I DIP Claims. |
| **EG I Equity Interests**<br><br>Unimpaired, Presumed to Accept | On or as soon as reasonably practicable after the Plan Effective Date, EGM shall receive (i) the EGM Cash Distribution, and (ii) an assignment of any claims or causes of action held by EG I that are not otherwise settled or released on or prior to the effective date of the Plan, including claims and causes of action against current or former direct or indirect equityholders of EG I (including Yoel Goldman), in full and final satisfaction, compromise, settlement, release, and discharge of the Allowed EG I Equity Interests, all of which are held by EGM. |
| **EG II Claims and Interests** | |
| **EG II Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EG II Administrative Claim, EG II Priority Tax Claim, or EG II Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall receive Cash from the EG |

|  | II Sale Proceeds in an amount equal to such holder's Allowed claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
|---|---|
| **EG II Secured First Lien Notes Claims**<br><br>Impaired, Entitled to Vote | On or as soon as practicable after the Effective Date, except to the extent that a holder of an allowed EG II Secured First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of such EG II Secured First Lien Notes Claims against the Debtors (but not EG II Secured First Lien Notes Claims or deficiency claims against any non-Debtors and not the deficiency claims of the holders of allowed EG II Secured First Lien Notes Claims against any Debtors), each holder of an allowed EG II Secured First Lien Notes Claim shall receive (i) Cash from the EG II Sale Proceeds in an amount equal to its pro rata share of the EG II Note Claim Distribution plus (ii) cash from the proceeds of any allowed EG I Intercompany Claims held by EG II, (iii) any cash remaining on EG II's balance sheet following the closing of the Sale Transaction, and (iv) an assignment of any claims or causes of action held by EG II that are not otherwise settled or released on or prior to the effective date of the Plan, including claims and causes of action against current or former direct or indirect equityholders of EG II (including Yoel Goldman), in each with respect to the preceding (ii)-(iv), solely to the extent such cash, claims, or causes of action (or the proceeds thereof) constitute valid and perfected collateral under the Series E Deed of Trust and subject to the treatment and satisfaction of any claims or liens granted as adequate protection in connection with the use of cash collateral or debtor in possession financing.<br><br>Notwithstanding the foregoing, each of EG II and the holders of the EG II Secured First Lien Notes Claim expressly disclaims any deficiency claims against EG I and EGM, and agrees not to assert any such claims against either EG I or EGM. |
| **Other EG II Secured Claims**<br>TBD | The holders of any Allowed EG II Other Secured Claims shall not receive or retain any property under the Plan on account of such Claims unless otherwise agreed to by EG II and the EG II Notes Trustee. |
| **EG II General Unsecured Claims**<br>TBD | The holders of any Allowed EG II General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims unless otherwise agreed to by EG II and the EG II Notes Trustee. |
| **EG II Intercompany Claims**<br><br>Impaired, Deemed to Reject | The holders of any Allowed EG II Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. |
| **EG II Interests**<br><br>Impaired, Deemed to Reject | The holders of any Allowed EG II Intercompany Interests shall not receive or retain any property under the Plan on account of such Interests. |

| EGM Claims and Interests | |
|---|---|
| **EGM Administrative, Priority Tax, and Priority Non-Tax Claims** | Without duplication of any of the EG I Administrative Claims or the EG II Administrative Claims, and subject in all respects to the ability of Mezzanine Lender to dispute such Claims, on or as soon as practicable after the Plan Effective Date, except to the extent that a holder of an Allowed EGM Administrative Claim, EGM Priority Tax Claim, or EGM Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall receive Cash from the EGM Cash Distribution in an amount equal to such holder's Allowed claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **EGM Mezzanine Lender Claims**<br><br>Impaired, Entitled to Vote | On or as soon as practicable after the Plan Effective Date, except to the extent that the holder of the EGM Mezzanine Lender Claims agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of the Allowed EGM Mezzanine Lender Claims, the holder of the Allowed EGM Mezz Lender Claims shall receive the EGM Mezz Lender Cash Distribution. |
| **EGM General Unsecured Claims**<br><br>Impaired, Deemed to Reject | The holders of any Allowed EGM General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims. |
| **EGM Intercompany Claims**<br><br>Impaired, Deemed to Reject | The holders of any Allowed EGM Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. |
| **EGM Equity Interests**<br><br>Impaired, Deemed to Reject | The holders of any Allowed EGM Equity Interests shall not receive or retain any property under the Plan on account of such Interests. |
| General Provisions | |
| **Compromise and Settlement** | The Plan will contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Disputed Claims Reserves** | The Plan will provide for the inclusion of one or more disputed claims reserves and a mechanism for the prompt distribution of cash proceeds from such reserves as claims are Allowed, disallowed, settled, or otherwise resolved in accordance with the Plan, in each case, with respect to claims against EG I, as reasonably acceptable to the |

| | Mezzanine Lender, and with respect to claims against EG II, as reasonably acceptable to the EG II Notes Trustee. |
|---|---|
| **Treatment of Executory Contracts and Unexpired Leases** | On the Plan Effective Date, except as otherwise determined by the Company Parties and the Purchaser in connection with the PSA, each of the Company Parties' executory contracts and unexpired leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected in accordance with Bankruptcy Code sections 365 and 1123 and any other applicable provisions of the Bankruptcy Code, *provided, however,* that the RSA shall not be deemed so rejected, and the obligations and benefits of the Parties under the RSA shall survive until termination thereof. |
| **Conditions Precedent to Confirmation and the Plan Effective Date** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company Parties, the Mezzanine Lender and the EG II Notes Trustee. |
| **Releases, Exculpation, and Injunction** | The Plan will contain standard and customary mutual release provisions, exculpation provisions, and injunction provisions that are mutually acceptable to the Company Parties, the Mezzanine Lender, and the EG II Notes Trustee, provided, however, that the Plan shall not contain any third party releases, debtor releases, or releases of Company Party claims for which the Mezzanine Lender or the EG II Notes Trustee may be granted direct or derivative standing as of the Claims Dispute Effective Date, including any claims against Parent; and provided, further, that the Plan shall not release any claims or causes of action against current and former direct or indirect equityholders of EG I or EG II (including Yoel Goldman). |
| **Definitive Documentation** | This Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet and the RSA. |
| **Tax Structure** | The terms of the Plan and the transactions contemplated therein shall, to the extent reasonably practicable, be structured in a tax efficient manner as determined by the Company Parties. |
| **Corporate Actions** | On the Plan Effective Date or as soon as reasonably practicable thereafter, the Company Parties, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. For the avoidance of doubt, obligations of any Company Party hereunder or under the RSA shall apply with equal force to the Reorganized Debtors upon the Plan Effective Date. |

| | |
|---|---|
| **Cost of Administering the Subsidiary Chapter 11 Cases** | All professional fees incurred in connection with the Subsidiary Chapter 11 Cases shall be borne by EG I and EG II in the Agreed Proportion, unless any such professional fees are incurred by EG I or EG II individually (including professional fees incurred in connection with disputing claims against EG I or EG II, respectively) in which case such professional fees shall solely be the responsibility of EG I or EG II, as applicable.  Subject to the terms and conditions of any Order governing the use of cash collateral or debtor-in-possession financing, the EG II Notes Trustee and the Mezzanine Lender agree not to object to the reasonableness of any Company Party professional fees incurred in connection with the administration of the Chapter 11 Cases, to the extent the fees and expenses are incurred in a manner not inconsistent with this Term Sheet and the RSA, *provided*, *however*, that each of Mezzanine Lender and the EG II Notes Trustee expressly retain the right to dispute how such professional fees are allocated between the Debtors. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the RSA. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters in the Chapter 11 Cases, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

## ANNEX 1

| Defined Terms | |
|---|---|
| **2020 PSA** | That certain Contract of Sale dated January 15, 2020, including that certain Memorandum of Contract dated as of the same, as amended by that certain Amendment to Contract of Sale dated as of January 17, 2020, between EG I, EG I and the 2020 PSA Claimant. |
| **2020 PSA Claimant** | Melrose Noll Brooklyn LLC, having an address at 301 Mill Road, Suite U5, Hewlett, New York 11557. |
| **2020 PSA Claims** | The 2020 PSA Claimants Claims in connection with the 2020 PSA. |
| **2020 PSA Settlement Agreement** | That certain settlement agreement between EG I, EG I and the 2020 PSA Claimant to settle the 2020 PSA Claims, dated on or about August 31, 2021, and circulated to the Parties on August 31, 2021. |
| **Administrative Expense Claim** | Any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the applicable Subsidiary Petition Date and through the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors (including any administrative claims or adequate protection granted in connection with cash collateral use or DIP financing); and (b) professional fee Claims. |
| **Allowed** | Means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the applicable Debtor in its Schedules as other than disputed, contingent or unliquidated and as to which such Debtor or any other party in interest has not filed an objection on or before the 120th day after the Plan Effective Date (or such date as is extended under the terms of the Plan or by order of the Bankruptcy Court); (b) a Claim that is set forth in a timely filed proof of claim as to which no objection has been timely filed; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed in any stipulation of amount and nature of Claim executed by the applicable Debtor and approved by the Bankruptcy Court; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of claim has been timely filed by the claimant before the applicable bar date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time, as applicable to the Chapter 11 Cases. |
| **Bankruptcy Court** | United States Bankruptcy Court for the Southern District of New York. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and the general, local and chambers rules of the Bankruptcy Court. |
| **Brokers' Fees** | Any fees, costs, or expenses owed to any broker in connection with the Sale Transaction, including, for the avoidance of doubt, such any such fees, costs, or expenses owed to Meridian Investment Sales. |

| Defined Terms | |
|---|---|
| **Cash** | Legal tender of the United States of America. |
| **Chapter 11 Cases** | Collectively, the EGM Chapter 11 Case and the Subsidiary Chapter 11 Cases. |
| **Claim** | Has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| **Claims Dispute Effective Date** | The earlier to occur of (i) the Plan Effective Date or (ii) solely in the event the Debtors or a third party seeks to have a claim liquidated or allowed prior to the Plan Effective Date, the date that is necessary for the EG II Notes Trustee or Mezzanine Lender to contest the payment and/or allowance of any such claims or liens, unless otherwise agreed to or allowed pursuant to the terms of the RSA. |
| **Company Parties** | Has the meaning set forth in the Preamble this to Term Sheet. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code. |
| **Debtors** | EG I, EG II, and/or EGM. |
| **Definitive Documents** | Any material documents (including any material related orders, agreements, instruments, schedules, or exhibits) that are described in or contemplated by this Term Sheet and the Plan, including (i) the RSA (including this Term Sheet), (ii) the PSA; (iii) the Plan, (iv) the Disclosure Statement, (v) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Plan Solicitation Materials, and (vi) the Confirmation Order.  Each of the Definitive Documents (other than the PSA) shall be in a form and substance reasonably satisfactory to the Mezzanine Lender and the EG II Notes Trustee. |
| **Disclosure Statement** | The disclosure statement with respect of the Plan, as supplemented from time to time, including all exhibits, schedules, supplements, modifications, annexes, and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| **Distribution** | Any initial or subsequent payment or transfer made under the Plan. |
| **EG I Administrative Expense Claim** | Any Administrative Expense Claims with respect to EG I. |
| **EG I Intercompany Claims** | The EG I Affiliate Intercompany Claims, the EG I BVI Intercompany Claims, and the EG I Operating Expense Claims. |
| **EG I Petition Date** | The date of the commencement of the Subsidiary Chapter 11 Case for EG I. |
| **EG I Sale Proceeds** | The gross Purchase Price allocated to EG I in accordance with the Sale Proceeds Allocation Agreement. |

| Defined Terms | |
|---|---|
| **EG II Administrative Expense Claims** | Any Administrative Expense Claims with respect to EG II. |
| **EG II Note Claim Distribution** | All Cash from the EG II Sale Proceeds less Cash in an amount necessary to pay in full all Allowed EG II Administrative Expense Claims, EG II Priority Tax Claims, and EG II Priority Non-Tax Claims. |
| **EG II Petition Date** | The date of the commencement of the Subsidiary Chapter 11 Case for EG II. |
| **EG II Sale Proceeds** | The gross Purchase Price allocated to EG II in accordance with the Sale Proceeds Allocation Agreement. |
| **EGM Chapter 11 Case** | The chapter 11 case of EGM titled *In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) currently pending before the Bankruptcy Court. |
| **EGM Cash Distribution** | All Cash from the EG I Sale Proceeds less Cash in an amount necessary to pay in full of all Allowed Claims against EG I asserted in EG I's Subsidiary Chapter 11 Case. |
| **EGM Mezz Lender Cash Distribution** | All available Cash from the EGM Cash Distribution less Cash in an amount necessary to pay in full all Allowed EGM Administrative Expense Claims, EGM Priority Tax Claims, and EGM Priority Non-Tax Claims. |
| **EGM Petition Date** | February 22, 2021. |
| **Estate(s)** | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| **Final Order** | An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, (i) which has not been reversed, vacated, stayed, modified or amended, (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived, and as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Plan Effective Date. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Parent** | All Year Holdings Limited (BVI). |

| Defined Terms | |
|---|---|
| **Parties** | The Company Parties, the Mezzanine Lender, and the EG II Notes Trustee. |
| **Petition Date** | The EGM Petition Date, the EG I Petition Date, or the EG II Petition Date, as applicable. |
| **Plan** | A chapter 11 plan for the Company Parties implementing the Restructuring Transactions, consistent with the RSA and the Term Sheet. |
| **Plan Effective Date** | The date that is the first business day on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof. |
| **Plan Solicitation Materials** | The ballots, notices, and other related materials to be distributed in connection with the solicitation of acceptances of the Plan. |
| **Purchaser** | ACI VI Denizen LLC |
| **PSA** | That certain Agreement for Purchase and Sale, dated as of August 2, 2021, between the Subsidiary Debtors and the Purchaser, including any exhibits or supplements thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof. |
| **RSA** | The Restructuring Support Agreement, dated as of August 31, 2021, by and among the Company Parties, the Mezzanine Lender, and the EG II Notes Trustee. |
| **Reorganized Debtors** | The Debtors following the Plan Effective Date. |
| **Restructuring Transactions** | All acts, events, and transactions contemplated by, required for, and taken to implement the sale of the Properties to Purchaser pursuant to the PSA (or any other transaction supported or proposed by the Company Parties that delivers no less consideration to the Mezzanine Lender and the holders of the EG II Secured First Lien Notes Claims than is contemplated hereunder, provided that the allocation between EG I and EG II of any cash proceeds shall be on the same basis as provided in the Sale Proceeds Allocation Agreement) and restructuring of the debts, claims, and obligations of EG I, EG II, and EGM pursuant to the Plan, this Agreement, and the other Definitive Documents, each in the singular and collectively, as applicable |
| **Sale Proceeds Allocation Agreement** | Has the meaning set forth in the section above titled "Sale Transaction Proceeds Allocation". |
| **Sale Transaction Proceeds** | The gross cash proceeds received by the Subsidiary Debtors pursuant to the Sale Transaction. |
| **Secured Claim** | A Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy |

| Defined Terms |
|---|
|  | Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **Subsidiary Chapter 11 Cases** | The chapter 11 cases of EG I and EG II to be commenced with the Bankruptcy Court in accordance with the terms of this Agreement. |
| **Subsidiary Debtors** | EG I and EG II. |

## <u>EXHIBIT B</u>

### FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Restructuring Support Agreement, dated as of August 31, 2021, by and among Evergreen Gardens I LLC, a Delaware limited liability company, Evergreen Gardens II LLC, a New York limited liability company, Evergreen Gardens Mezz LLC, a New York limited liability company (collectively, the "**Company Parties**"), Mishmeret Trust Services Company Ltd. (the "**EG II Notes Trustee**"), and MREF REIT Lender 9 LLC (together with their respective successors and permitted assigns, the "**Mezzanine Lender**") (as amended, supplemented or otherwise modified from time to time, the "**Agreement**") is executed and delivered by [●] (the "**Joining Party**") as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>**.  The Joining Party shall hereafter be deemed to be a "Mezzanine Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of the EGM Mezzanine Loan set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Mezzanine Lender set forth in <u>Section 6</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Below]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**Joining Party**


By: _____
Name:
Title:


Principal Amount Held:
Notice Address:


Acknowledged:

**EVERGREEN GARDENS I LLC**
By: Evergreen Gardens Mezz LLC, its sole member

By: All Year Holdings LLC, its sole member

By: All Year Holdings Limited, its sole member

**EVERGREEN GARDENS II LLC**
By: Evergreen Gardens Holdings II, its sole member

By: All Year Holdings Limited, its sole member


_____
Name:
Title:

_____
Name:
Title:


**EVERGREEN GARDENS MEZZ LLC**
By: All Year Holdings LLC, its sole member

By: All Year Holdings Limited, its sole member


_____
Name:
Title:

**<u>Exhibit B</u>**

**Purchase Agreement**

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement") made as of the 2nd day of August, 2021, by and among EVERGREEN GARDENS I LLC, a limited liability company ("Seller 1" as to the Melrose Street Property (as hereinafter defined)) and EVERGREEN GARDENS II LLC, a limited liability company ("Seller 2" as to the Noll Street Property (as hereinafter defined)), each having an address c/o All Year Holdings Limited, 199 Lee Avenue, Suite #693, Brooklyn, New York 11233 (Seller 1 and Seller 2 are each a "Seller"; and collectively, "Sellers") and ACI VI DENIZEN LLC, a Delaware limited liability company, having an address c/o Atlas Capital Group, LLC, 40 West 57th Street, 29th Floor, New York, New York 10019 ("Purchaser").

**W I T N E S S E T H :**

1.    Agreement to Sell and Purchase; Description of Properties.

Sellers agree to sell and convey to Purchaser, and Purchaser agrees to purchase from Sellers, upon the terms and conditions hereinafter contained, all right, title and interest of Sellers in and to (a) those certain lots, pieces or parcels of land located at 123 Melrose Street, in the Borough of Brooklyn, County of Kings, City and State of New York (Block 3152, Lot 48 on the Kings County Tax Map) (the "Melrose Street Parcel"), and 54 Noll Street, in the Borough of Brooklyn, County of Kings, City and State of New York (Block 3152, Lot 1 on the Kings County Tax Map) (the "Noll Street Parcel"; and together with the Melrose Street Parcel; collectively, the "Land"), as more particularly bounded and described in **Exhibits A-1 and A-2**, respectively, attached hereto and hereby made a part hereof, together with (i) the building(s) erected thereon (collectively, the "Building") and any and all other fixtures and improvements erected thereon (the Building and such other fixtures and improvements being hereinafter collectively referred to as the "Improvements"); (ii) the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (iii) any rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land

adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iv) any development rights appurtenant to the Land or any portion thereof and (v) any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land or any of the Improvements by reason of change of grade or closing of any street, road or avenue, (b) all fixtures, machinery, tangible personal property and equipment (excluding furniture, furnishings, equipment and other personal property of Tenants (as hereinafter defined)) used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements at the date hereof, including, without limitation, such fire protection, heating, plumbing, electrical and air conditioning systems as now exist thereat, (c) the interest of the landlord in and to all Leases (as hereinafter defined) of all or any portion of the Land and the Improvements, and all security deposits held by Sellers thereunder on the Closing Date (as hereinafter defined), and (d) to the extent assignable, permits and licenses, if any, held solely for use in connection with all or any portion of the Land and the Improvements.

The Melrose Street Parcel, together with all of the above enumerated rights and interests to be sold to Purchaser by Seller 1 pursuant to this Agreement (including, without limitation, the Improvements erected on the Melrose Street Parcel or any part thereof) are hereinafter sometimes collectively referred to as the "Melrose Street Property."  The Noll Street Parcel, together with all of the above enumerated rights and interests to be sold to Purchaser by Seller 2 pursuant to this Agreement (including, without limitation, the Improvements erected on the Noll Street Parcel or any part thereof) are hereinafter sometimes collectively referred to as the "Noll Street Property." The Melrose Street Property and the Noll Street Property are hereinafter sometimes each referred to as a "Property", and collectively as the "Properties."

2.    Exceptions to Title and Other Matters.

2.1   The Properties are sold and shall be conveyed subject to title and other matters as follows (the "Permitted Exceptions"):

2.1.1   All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the date of the Closing (as hereinafter defined), subject to adjustment as hereinbelow provided.

2.1.2   All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Properties, including, without limitation, all zoning variances and special exceptions, if any (collectively, "Laws and Regulations").

2.1.3   All covenants, restrictions and rights and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Properties (collectively, "Rights").

2.1.4   State of facts shown on (i) with respect to the Melrose Street Property, that survey dated  February 17, 2015 (last updated January 29, 2020) made by Leonard J. Strandberg and Associates, Consulting Engineers and Land Surveyors, P.C. and any subsequent state of facts which would be shown by an accurate updated survey of the Melrose Street Property (collectively, "Melrose Facts"); and (ii) with respect to the Noll Street Property, that survey dated February 17, 2015 (last updated January 30, 2019) made by Leonard J. Strandberg and Associates, Consulting Engineers and Land Surveyors, P.C. and any subsequent state of facts which would be shown by an accurate updated survey of the Noll Street Property (collectively, "Noll Facts"; and together with the Melrose Facts, collectively the "Facts").

2.1.5   Rights of tenants as tenants only, with no rights to purchase or rights

ACTIVE/111354839.1
5921483-2

of first refusal, (i) those tenants set forth on **Exhibit B-1 and Exhibit B-2**, respectively, attached hereto and made a part hereof, (ii) such other tenants pursuant to written lease agreements expressly permitted by Section 9.1.3 of this Agreement, and (iii) other occupants claiming by, through or under those tenants enumerated in subsections (i) and (ii) above (collectively, "Tenants"), and any leases pursuant to which such Tenants occupy portions of the Properties (collectively, "Leases").

2.1.6    All service, maintenance, supply, leasing and other contracts in connection with the Properties set forth on **Exhibit C-1 and Exhibit C-2**, respectively, attached hereto and made a part hereof, and all renewals, replacements, extensions of same or additional contracts that may hereafter be entered into in accordance with this Agreement (collectively, "Contracts"), including but not limited to that certain Marketing Agreement between Seller 1 and Verizon Services Corp. with an effective date of March 22, 2018, as amended.

2.1.7    All violations of building, fire, sanitary, environmental, housing, highway, sidewalk and all other Laws and Regulations with respect to the Properties, whether or not noted or issued on the date hereof or on the date of the Closing (collectively, "Violations").

2.1.8    Consents by Sellers or any former owner of the Properties for the erection of any structure or structures on, under or above any street or streets on which the Properties may abut.

2.1.9    Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Properties or any adjoining properties.

4

2.1.10  Variations between tax lot lines and lines of record title.

2.1.11   Standard conditions and exceptions to title contained in the form of title policy or "marked-up" title commitment employed by the Title Company (as hereinafter defined).

2.1.12 Any financing statements, chattel mortgages, encumbrances or mechanics' or other liens entered into by, or arising from, any financing statements filed on a day more than five (5) years prior to the Closing and any financing statements, chattel mortgages, encumbrances or mechanics' or other liens filed against property no longer on the Properties, provided that the Title Company (as hereinafter defined) will insure against collection or enforcement of same out of the Properties and will "omit" the same on Purchaser's mortgagee's title policy (provided that this Agreement does not contain a mortgage contingency and there is no mortgage condition intended by this provision).

2.1.13 Any lien or encumbrance (including, without limitation, any mechanics' and materialmen's lien) the removal of which is the obligation of a Tenant pursuant to such Tenant's Lease, so long as same does not exceed $200,000.00 in the aggregate; provided that if such lien(s) and/or encumbrance(s) exceed $200,000.00 in the aggregate then, in the event Purchaser elects not to proceed with this transaction by reason thereof and to proceed to close subject thereto with no adjustment to the Purchase Price (as hereinafter defined), Purchaser may terminate this Agreement in accordance with Section 35.1(b) and the effect of  such termination shall be as provided in Section 35.2.

2.1.14 The matters described in **Exhibit D-1 and Exhibit D-2**, respectively, attached hereto and made a part hereof.

2.1.15 Any    covenants,    conditions,    agreements,    reservations,

5

encroachments, easements and rights of way of record; and any other covenants, conditions, agreements, reservations, encroachments, easements and rights of way, provided that same neither prevent nor materially interfere with the current use of the present structures on the Properties.

   2.1.16 A certificate or certificates of occupancy, or no certificate or certificates of occupancy (or, if there be such certificate(s), that there exist any variances between such certificate(s) and the actual state or use(s) of a Property including, without limitation, the number of units in such Property).

   2.1.17 Evergreen Gardens Mezz LLC ("Mezz Borrower") owns a direct ownership interest in Seller 1. Mezz Borrower has filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and there is a proceeding pending in the United States Bankruptcy Court for the Southern District of New York before the Hon. Martin Glenn, U.S.B.J. (the "Bankruptcy Court"), bearing Case No. 1:21-bk-10335 (the "Mezz Bankruptcy Proceeding"). Seller 1 and Seller 2 shall also commence cases under the Bankruptcy Code to implement the sale of the Properties in accordance with the terms of this Agreement (the "Seller Bankruptcy Proceedings" and, together with the Mezz Bankruptcy Proceeding, the "Bankruptcy Proceedings").

   2.1.18 The "Series E Bondholder Approval", "Mezz Lender Approval" and the "Executed RSA," both as provided for and defined in Section 36 hereof.

   2.1.19 The Regulatory Agreement dated June 20, 2017 and recorded against the Properties as CRFN 2017000300445, as amended September 12, 2018, regarding the inclusionary housing bonus and the required affordable units and other restrictions on the ownership, management and operations of the Properties (together with all amendments thereto, collectively, the "Regulatory Agreement").

ACTIVE/111354839.1
5921483-2

2.1.20   The applicability of any benefits (including tax benefits and exemptions, if any), obligations, liabilities and rights, if any, pursuant to any 421-a exemption(s) affecting the Properties; provided that except as specifically set forth at Section 7.1.13, nothing herein shall be deemed a representation by Sellers as to the availability, inclusion or applicability of any such matter.

2.1.21   That Mapping Agreement dated May 20, 2018, recorded against the Properties on July 2, 2018, in the Office of the City Register of the City of New York, Kings County, as CRFN 2018000218656 (the "Mapping Agreement"), including but not limited to any and all remaining obligations of Sellers or any owners of the Properties thereunder.

2.1.22   (i) The Memorandum Agreement between PBS Facility Services Inc., Platinum Amenity Services and Dynamic Building Services (collectively, the "Employer") and the Service Employees International, Local 32-BJ dated July 6, 2020 (the "Memorandum Agreement") incorporating the 2020 NYC Independent Contractors Agreement (the "32-BJ CBA"), (ii) the Collective Bargaining Agreement dated November 1, 2018 between Dynamic Building Services and Local 713 I.B.O.T.U., e.m.d., ll.a, AFL-CIO (the "Local 713 CBA") and (iii) any pledge made by Sellers to maintain union status of the Properties as more fully described at Section 9.4 below (together with the Memorandum Agreement, incorporating the 32-BJ CBA and the Local 713 CBA, collectively, the "Union Agreements").

2.1.23   Any designations affecting the construction and/or redevelopment of the Properties, including but not limited to E-HazMat Designation and E-Designations for air and noise.

2.1.24   That certain Restrictive Declaration dated as of April 10, 2014 by 930 Flushing LLC and Stanev Associates LLC recorded against the Properties at CRFN

7

2014000163409 (the "<u>Restrictive Declaration</u>"), together with any and all obligations burdening the Properties and/or the owners thereof, including but not limited to the obligation to complete a public park between the Buildings on the Melrose Parcel and the Noll Parcel in accordance therewith.

2.1.25    The physical condition of the Properties, including, but not limited to, the conditions described in the report of JLL Merritt & Harris dated April 16, 2021 (the "<u>JLL Report</u>").

2.1.26    That certain Declaration of Restrictions to be recorded by Seller 2 against the Noll Street Parcel substantially in the form annexed hereto as **<u>Exhibit V</u>** (together with any other necessary documents ancillary thereto to cause the recordation; collectively the "<u>Fresh Declaration</u>") together with any and all obligations burdening the Noll Street Property  and/or the owners thereof

2.1.27    Any other matter which the Title Company may raise as an exception to title, provided that (i) the Title Company will insure against collection or enforcement of same out of the Properties and will "omit" the same on Purchaser's mortgagee's title policy, if any (provided that this Agreement does not contain a mortgage contingency and there is no mortgage condition intended by this provision), and/or (ii) no prohibition of present use or maintenance of the Properties will result therefrom, as may be applicable.

2.2    Purchaser has caused title to the Properties to be examined by Fidelity National Title Insurance Company (the "<u>Title Company</u>" and "<u>Escrow Agent</u>") and has received a title report together with true, legible and complete copies of all instruments set forth therein (the "<u>Title Report</u>").  A copy of the Title Report has been forwarded to Sellers' attorneys.  **<u>Exhibit D-3</u>** is a copy of Schedule B to the Title Report, marked with the words "except," "omit" or "for

information only."  Sellers shall be obligated prior to or at Closing to cause the Title Company to omit as exceptions those title exceptions set forth on **Exhibit D-3** marked "omit."  All other exceptions set forth in the Title Report shall be deemed "Permitted Exceptions."  Purchaser agrees that, not later than the date which is five (5) Business Days following Purchaser's receipt of any continuations to the Title Report, Purchaser shall furnish to Sellers' attorneys a writing (the "Title Report Objection Notice") specifying such exceptions to title set forth in such continuations which Purchaser believes are neither covered by the exceptions to title set forth in Section 2.1 hereof and this Section 2.2, nor subject to which Purchaser is required to accept title.  Purchaser's failure to deliver the Title Report Objection Notice to Sellers' attorneys on or prior to 5:00 pm New York City time on the date which is five (5) Business Days following Purchaser's receipt of any continuation shall constitute Purchaser's irrevocable acceptance of the continuation and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein. Provided Purchaser's Title Report Objection Notice is valid and in compliance with the terms of this Agreement, Sellers shall, within ten (10) days after receipt of the Title Report Objection Notice, notify Purchaser that Sellers either (a) intended to remove those exceptions delineated in the Title Report Objection Notice, or (b) do not intend to remove those title exceptions delineated in the Title Report Objection Notice, provided that Sellers shall satisfy the Required Removal Actions (as hereinafter defined).  In the event Sellers notify Purchaser that Sellers have elected not to remove those title exceptions listed in the Title Report Objection Notice (except for the Required Removal Actions, which Sellers shall undertake), then Purchaser shall have the right to terminate this Agreement in accordance with Section 35.1(b) by delivering written notice to Sellers within three (3) Business Days of Sellers' response to the Title Report Objection Notice and the effect of such termination shall be as provided in Section 35.2.  In the event the Title Company fails or

9

refuses to insure title for any reason or no reason, Sellers may substitute any other reputable title company licensed to do business in the State of New York that will provide such insurance, or a reputable abstract company writing through such a title company, in which event Sellers' substituted title company shall, for purposes of this Agreement, be the "Title Company."

2.3            If, on the Closing Date, Sellers fail or are unable to convey to Purchaser title to the Properties subject to and in accordance with the provisions of this Agreement and if such failure or inability is susceptible to cure within forty-five (45) days thereafter, Sellers or Purchaser may adjourn the Closing one or more times for a period not to exceed forty-five (45) days in the aggregate to enable Sellers to convey such title to the Properties. If Sellers or Purchaser do not elect to adjourn the Closing or if at the adjourned date Sellers are unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser may terminate this Agreement in accordance with Section 35.1(b) by written notice to Sellers and Escrow Agent (as hereinafter defined) delivered on or promptly after the date scheduled for the Closing and the effect of such termination shall be as provided in Section 35.2. If Purchaser or Sellers elect to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. Except as otherwise provided herein, Sellers shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Sellers therefor, at law or in equity. Notwithstanding the foregoing, (i) Sellers shall seek an order in the Seller Bankruptcy Proceedings that provides that the Properties are being sold to Purchaser free and clear of liens, claims and encumbrances, including, without limitation: (a) all mortgages encumbering the Properties, (b) Voluntary Liens (hereinafter defined),

10

(c) those mechanic's liens and judgments set forth on **Exhibit O** annexed hereto and made a part hereof ((a), (b), and (c), collectively, the "Enumerated Liens"), (d) liens, mortgages, judgments, and other encumbrances arising after the date of this Agreement (collectively, the "Post-Execution Liens"), and (e) liens other than the Enumerated Liens encumbering the Properties (including judgments, federal and state and municipal tax liens) which are not capable of being discharged from the Properties pursuant to court orders in the Bankruptcy Proceedings (the "Remaining Liens").  Sellers shall, subject to Sections 2.4 and 22 hereof, on or prior to the Closing, pay, discharge or remove, or cause to be paid, discharged or removed at Sellers' sole cost and expense, the Remaining Liens, provided, however, that the obligation of Sellers with respect to such Remaining Liens shall be limited to such liens which (i) are in liquidated amounts and which may be satisfied solely by the payment of money (including the preparation or filing of appropriate satisfaction instruments in connection therewith), and (ii) do not exceed in the aggregate ONE MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 ($1,250,000.00) DOLLARS. "Voluntary Liens" shall mean liens and other encumbrances (other than Permitted Exceptions) which Sellers have knowingly and intentionally placed (or allowed to be placed) on the Properties on or after the date hereof, but shall expressly exclude (I) judgments, (II) mechanic's liens, (III) federal, state and municipal tax liens and (IV) liens which are the responsibility of a Tenant (collectively, "Mandatory Cure Items"). For the avoidance of doubt, Sellers shall have complied with their obligations in accordance with this Section 2.3 with respect to any Enumerated Lien or any Post-Execution Lien if Sellers obtain an order or orders of the Bankruptcy Court in the Seller Bankruptcy Proceedings that the affected Property is being sold to Purchaser free and clear of such Enumerated Lien or Post-Execution Lien or, in the event that such order is not obtained, Seller shall elect (in their sole discretion) either to (A) cause such Enumerated Lien or Post-Execution

11

Lien to be bonded (so long as the conditions in (C) below are satisfied); or (B) deliver an escrow to the Title Company at or prior to Closing in an amount not less than 105% of the amount of the Enumerated Lien or Post-Execution Lien to permit Sellers to dispute the Enumerated Lien or Post-Execution Lien (so long as the conditions in (C) below are satisfied); or (C) otherwise cause the Title Company to insure Purchaser against collection thereof from or enforcement thereof against the applicable Property against which such Enumerated Lien of Post-Execution Lien is docketed and "omit" the same on Purchaser's mortgagee's title policy (provided that this Agreement does not contain a mortgage contingency and there is no mortgage condition intended by this provision.

        2.4     Notwithstanding anything in Section 2.3 above to the contrary, Purchaser may at any time accept such title as Sellers can convey provided Sellers satisfy the Enumerated Liens to the extent required hereunder in accordance with Section 2.3, without reduction of the Purchase Price (as hereinafter defined), provided that if Sellers fail to remove all Mandatory Cure Items, Purchaser may close title hereunder by applying the Purchase Price to payment of a portion or all of the Mandatory Cure Items not reduced by Sellers (in the remaining amount of such Mandatory Cure Items). The acceptance of the Deeds (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Sellers' part to be performed under this Agreement, except those agreements and obligations that expressly survive the Closing.

        2.5     The amount of any unpaid taxes, assessments and water and sewer charges which Sellers are obligated to pay and discharge, with interest and penalties, may at the option of Sellers be allowed to Purchaser out of the balance of the Purchase Price, if official bills therefor with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof.

12

2.6    If the Properties shall, at the time of the Closing, be subject to any liens such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes or any encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either (a) Sellers use all or a portion of the Purchase Price and deliver to Purchaser and/or the Title Company at the Closing instruments in recordable form sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments or (b) the Title Company will otherwise issue or bind itself to issue a policy which will insure Purchaser against collection thereof from or enforcement thereof against the Properties and will omit such exception from Purchaser's mortgagee's title policy (provided that this Agreement does not contain a mortgage contingency and there is no mortgage condition intended by this provision).  If a request is made, Purchaser agrees to provide at the Closing separate certified or official bank checks as requested aggregating the amount of the cash to be paid by Sellers to satisfy the aforesaid, to facilitate the satisfaction of any of such liens or other defects.

3.    <u>Purchase Price and Payment</u>

3.1    The purchase price payable to Sellers for the Properties is FIVE HUNDRED SIX MILLION AND 00/100 ($506,000,000.00) DOLLARS (the "<u>Purchase Price</u>"), subject to such apportionments, adjustments and credits as are provided in Sections 6, 11 and 25 hereof.

3.2    The Purchase Price shall be payable as follows:

3.2.1    TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000.00) DOLLARS (the "<u>Initial Downpayment</u>") within one (1) Business Day following the execution and delivery of this Agreement by federal funds wire transfer to an account at such bank or banks as designated by Escrow Agent, as set forth on **<u>Exhibit U</u>** annexed hereto.

13

3.2.2    SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 ($7,500,000.00) DOLLARS (the "First Additional Downpayment") within two (2) Business Days of notice to Purchaser that Sellers have received the Series E Bondholder Approval, Mezz Lender Approval and the Executed RSA, by federal funds wire transfer to an account of Escrow Agent. **Time shall be of the essence** as to Purchaser's timely payment of the First Additional Downpayment, and failure by Purchaser to timely make the First Additional Downpayment shall constitute a material default by Purchaser which shall entitle Sellers to terminate this Agreement and to receive from Escrow Agent the Initial Downpayment and to retain same, whereupon this Agreement will be terminated and the parties shall have no further obligations to the other except for those provisions specifically stated to survive the termination.

3.2.3    TEN MILLION AND 00/100 ($10,000,000.00) DOLLARS (the "Second Additional Downpayment") within two (2) Business Days of notice of entry of the Bid Protections Order (as defined herein) by federal funds wire transfer to an escrow account of Escrow Agent. **Time shall be of the essence** as to Purchaser's timely payment of the Second Additional Downpayment, and failure by Purchaser to timely make the Second Additional Downpayment shall constitute a material default by Purchaser, which shall entitle Sellers to terminate this Agreement and to receive from Escrow Agent the Initial Downpayment and to retain same, whereupon this Agreement will be terminated and the parties shall have no further obligations to the other except for those provisions specifically stated to survive the termination. The Initial Downpayment, the First Additional Downpayment, when made, and the Second Additional Downpayment, when made, are hereinafter collectively referred to as the "Downpayment." The Downpayment shall be held by Escrow Agent and disbursed in accordance with the terms and conditions of this Agreement. Any interest earned on the Downpayment shall be deemed to be part

14

of the Downpayment and shall be paid together with the principal portion of the Downpayment, it being understood and agreed that if the Closing occurs one-half (1/2) of the interest paid to Seller shall be credited to the Purchase Price (and one-half (1/2) of the interest paid to Seller shall not be credited to the Purchase Price).

3.2.4    The balance of the Purchase Price shall be paid to Sellers on the date of the Closing, subject to the apportionments, adjustments and credits referenced herein, simultaneously with the delivery of the Deed by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Sellers.

3.3    Purchaser expressly agrees and acknowledges that Purchaser's obligations hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise) to consummate the transaction contemplated hereby.

3.4    The parties hereto acknowledge and agree that the value of any tangible and/or intangible personal property being conveyed, transferred sold or assigned by Seller to Purchaser in accordance with this Agreement is *de minimis* and that no part of the Purchase Price is allocable thereto.

4.    Closing.

4.1    The closing of the transaction contemplated hereby (the "Closing") shall occur at 10:00 A.M., New York City Time, on the date which is one hundred fifty (150) days after the commencement of the Seller Bankruptcy Proceedings (such commencement date, the "Petition Date").  In the event that an order confirming the Chapter 11 Plan implementing the sale (the "Confirmation Order"; such plan, collectively the "Chapter 11 Plan") has not then been issued in each of the Seller Bankruptcy Proceedings and the effective date of the Chapter 11 Plan

15

implementing the sale has not yet occurred before the date which is 150 days from the Petition Date or the Confirmation Order has been entered but the conditions to the obligation of Purchaser or Sellers to Close have not been satisfied or waived by such date, either party will be entitled to adjourn the Closing for up to two (2) additional thirty (30) day periods [sixty (60) days in total], making an outside Closing date of two hundred ten (210) days after the commencement date of the Seller Bankruptcy Proceedings (as the same may be extended in accordance with Section 9.1.10, the "Outside Date"). If the Confirmation Order is not entered on or before the Outside Date, Purchaser or Sellers shall have the right to terminate this Agreement in accordance with Section 35.1(d) and the effect of such termination shall be as provided in Section 35.2.  Following entry of the Confirmation Order, Purchaser shall have the right to schedule the Closing Date for such Business Day selected by Purchaser by delivering not less than thirty (30) days' prior written notice to Sellers, but in no event shall the Closing Date be later than the Extended Outside Date.  The date for Closing set forth in this Section 4.1 is herein referred to as the "Closing Date".  **"Time shall be of the essence"** as to Purchaser's performance on the Closing Date.

4.2    The Closing will occur at the offices of Goldberg Weprin Finkel Goldstein LLP, located at 1501 Broadway, 22nd Floor, New York, New York 10036 or through an escrow and pursuant to escrow instructions consistent with the terms of this Agreement and otherwise mutually satisfactory to Sellers and Purchaser.

5.    AS IS.

5.1    Purchaser acknowledges that Purchaser will acquire the Properties based solely upon Purchaser's own investigation and inspection thereof and the representations, warranties and covenants of Sellers expressly set forth in this Agreement, if any.  Sellers and Purchaser agree that (I) the Properties shall be sold and Purchaser shall accept possession of the

16

Properties on the Closing Date "AS IS, WHERE IS, AND WITH ALL FAULTS" with no right of set-off or reduction in the Purchase Price; and (II) such sale shall be without representation or warranty of any kind (unless expressly set forth in this Agreement), whether expressed, implied, statutory or otherwise, including any warranty of income potential, operating expenses, uses, merchantability or fitness for a particular purpose, and Sellers hereby disclaim and renounce any such representation or warranty.  Purchaser further acknowledges and agrees that (A) Sellers shall be under no duty to make any affirmative disclosure regarding any matter which may be known to Sellers or any Seller Related Parties (as hereinafter defined), and that Purchaser is relying solely upon its own inspection of the Properties and not upon any representations made to it by any person whomsoever on Sellers' behalf; and (B) except as expressly set forth herein, Sellers shall have no obligation to make any repairs, replacements or improvements to the Properties.  Purchaser expressly agrees and acknowledges having reviewed the JLL Report and takes title to the Properties subject to each and every condition set forth therein.

        5.2     Purchaser, for itself and on behalf of any Purchaser's direct or indirect members, partners, shareholders, officers, directors, employees, representatives or agents (individually, a "<u>Purchaser Related Party</u>" and collectively, the "<u>Purchaser Related Parties</u>"), hereby waives, releases and forever discharges Sellers and any Seller's respective direct or indirect members, partners, shareholders, officers, directors, employees, representatives or agents (individually, a "<u>Seller Related Party</u>" and collectively, the "<u>Seller Related Parties</u>") from any and all damages, whether known or unknown, which Purchaser has or may have in the future arising out of or in connection with the Properties, including, without limitation, the physical, environmental, governmental, regulatory, economic or legal condition of the Properties (or any portion thereof) or the operation thereof (collectively, the "<u>Released Claims</u>").  Purchaser, for itself

17

and on behalf of each other Purchaser Related Party, specifically waives the provisions of any legal requirements, the intent of which is as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH

THE RELEASOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS

OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,

WHICH, IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

5.3     Purchaser for itself and on behalf of each other Purchaser Related Party, acknowledges that it or its attorneys or agents may hereafter discover claims or facts in addition to or different from those which it now believes to be true with respect to the subject matter of the Released Claims, but agrees that (i) it has taken such possibility into account in reaching this Agreement and (ii) the releases given herein shall be and remain in effect notwithstanding the discovery or existence of additional or different claims or facts, as to which Purchaser expressly assumes the risk, and (iii) notwithstanding the discovery or existence of additional or different claims or facts, it is nonetheless Purchaser's intention, for itself and on behalf of each other Purchaser Related Party, to fully, finally and forever settle and release all disputes and differences, known or unknown, suspected or unsuspected, as to the Released Claims.

5.4     Purchaser, for itself and on behalf of each other Purchaser Related Party, acknowledges that, except for copies of the Leases which have been made available to Purchaser: (i) all materials which have been provided by or on behalf of any Seller or any Seller Related Parties have been provided without any warranty or representation, expressed or implied as to their content, suitability for any purpose, accuracy, truthfulness or completeness; (ii) Purchaser shall not have any recourse against Sellers or any Seller Related Party or Seller Related Parties in the

ACTIVE/111354839.1
5921483-2

event of any errors therein or omissions therefrom; (iii) Purchaser hereby expressly disclaims any intent to rely on any such materials provided to it by any of the Seller Related Parties; and (iv) Purchaser shall rely solely on its own independently developed or verified information.

5.5    Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Properties.

5.6    Purchaser, for itself and on behalf of each other Purchaser Related Party, hereby covenants not to file or commence any claim or action against any of the Seller or Seller Related Parties in connection with or arising from any claim released hereunder (including but not limited to the Released Claims).

5.7    Sellers make no representation or warranty with respect to the presence of Hazardous Materials on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Properties. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause any Seller or any Seller Related Parties to be joined in any action brought under any Environmental Laws (as hereinafter defined). The term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes" and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon,

19

(g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and

(h) any other substance with respect to which any Environmental Law or governmental authority

requires environmental investigation, monitoring or remediation. The term "Environmental Laws"

shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter

in effect, in each case as amended or supplemented from time to time, including, without

limitation, all applicable judicial or administrative orders, applicable consent decrees and binding

judgments relating to the regulation and protection of human health, safety, the environment and

natural resources (including, without limitation, ambient air, surface, water, groundwater,

wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including,

without limitation, the Comprehensive Environmental Response, Compensation and Liability Act

of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as

amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as

amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42

U.S.C. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.),

the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control

Act, as amended (33 U.S.C. §§ 1251 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C.

§§ 300f et seq.), any state or local counterpart or equivalent of any of the foregoing, and all state

and federal common law, and any federal, state or local transfer of ownership notification or

approval statutes.    Purchaser acknowledges that (1) Purchaser has received copies of the

environmental reports listed on **Exhibit K** annexed hereto and made a part hereof without

representation or warranty, and (2) if Sellers deliver any additional environmental reports to

Purchaser, Purchaser will promptly upon receipt thereof acknowledge in writing that it has

received such reports without representation or warranty (those reports enumerated in subsections

20

(1) and (2), collectively the "<u>Environmental Reports</u>").  Sellers shall have no liability or obligation whatsoever for any inaccuracy contained in any Environmental Report.

5.8    The provisions of this Section 5 shall survive the termination of this Agreement or the Closing Date and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.  To the extent required to be operative, the disclaimers and warranties contained herein shall be deemed "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

6.    <u>Apportionments.</u>

6.1    At the Closing, the following items shall be apportioned between the parties as of 11:59 PM on the day preceding the Closing Date. Any errors in the apportionments pursuant to this Section 6 shall be corrected by appropriate re-adjustment between the applicable Seller and Purchaser post-closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to the applicable Seller or by the applicable Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined. Except as otherwise specifically provided for herein, all apportionments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other apportionments. The items to be apportioned are:

6.1.1    (a)    Rents payable by Tenants which are collected on or prior to the Closing in respect of the month (or other applicable collection period) in which the Closing occurs (the "<u>Closing Month</u>"), on a per diem basis, based upon the number of days in the Closing Month

prior to the Closing Date (which shall be allocated to the applicable Seller) and the number of days in the Closing Month on and after the Closing Date (which shall be allocated to Purchaser).

(b)     If, at the Closing rent is past due by any Tenant, Purchaser agrees that the first moneys received by Purchaser from such Tenant shall be received and held by Purchaser in trust, and shall be disbursed as follows:

(i)     First, to Purchaser and the applicable Seller in an amount equal to all rents owing by such Tenant in respect of the Closing Month, apportioned as set forth at Section 6.1.1(a);

(ii)    Next, to the applicable Seller, in an amount equal to all rents owing by such Tenant to such Seller in respect of the calendar month immediately preceding the Closing Month;

(iii)    Next, to Purchaser, in an amount equal to all other rent owing by such Tenant to Purchaser in respect of all periods after the Closing Month;

(iv)    Next, to the applicable Seller, in an amount equal to all other rent owing by such Tenant to such Seller in respect of all periods prior to the calendar month immediately preceding the Closing Month; and

(v)     The balance, if any, to Purchaser.

Each party agrees to remit reasonably promptly to the other the amount of such rents to which such party is so entitled and to account to the other party monthly in respect of same. Sellers shall have the right from time to time for a period of one hundred eighty (180) days following the Closing, on reasonable prior notice to Purchaser, to review Purchaser's rental records with respect to the Properties to ascertain the accuracy of such accountings. Purchaser shall have the right from time to time for a period of one hundred eighty (180) days following the Closing, on reasonable prior

22

notice to Sellers, to review Sellers' rental records with respect to the Properties to ascertain the accuracy of such accountings. The rent received by Sellers after the Closing shall be apportioned and remitted, if applicable, as hereinabove provided.

(c) (i) If the Closing shall occur prior to the time when any rental payments for fuel pass-alongs, so-called escalation rent or charges based upon impositions, operating expenses, labor costs, cost of living increases, percentage rents or other sums payable by the Tenant in addition to rent, or like items (collectively, "Overage Rent") is payable, then such Overage Rent for the applicable accounting period in which the Closing occurs shall be apportioned subsequent to the Closing. Purchaser agrees that it will pay over to the applicable Seller, within ten (10) days after Purchaser's receipt thereof, a prorated amount of such Overage Rent based upon the portion of such accounting period which occurs prior to the Closing (to the extent not theretofore collected by the applicable Seller on account of such Overage Rent prior to Closing). In addition, Purchaser agrees to receive any Overage Rent payable subsequent to the Closing with respect to an accounting period which expired prior to the Closing and pay, within ten (10) days after Purchaser's receipt thereof, the entire amount to the applicable Seller and shall account to such Seller monthly in respect of same, after retaining all of the rent owing by such Tenant to Purchaser in respect of all periods after the Closing Month, and shall account to such Seller monthly in respect of same. The applicable Seller shall furnish to Purchaser all information with respect to the period prior to the Closing reasonably necessary for the billing of such Overage Rent.

(ii) If, prior to Closing, a Seller shall collect any sums on account of Overage Rent or fixed rent for a year or other period, beginning prior but ending subsequent to the Closing, such sum shall be apportioned at the Closing as of the date of Closing.

23

(iii) To the extent any portion of Overage Rent is required to be paid monthly by Tenants on account of estimated amounts for the current period, and at the end of each calendar year (or, if applicable, at the end of each lease year or tax year or any other applicable accounting period to the extent specified in a Lease, or as billed and paid by Tenants), such estimated amounts are to be recalculated based upon the actual expenses, taxes and other relevant factors for that calendar, lease or tax year, with the appropriate adjustments being made with such Tenants, then such portion of the Overage Rent shall be prorated between the applicable Seller and Purchaser on the Closing Date based on such estimated payments (i.e., with (A) the applicable Seller entitled to retain all monthly installments of such amounts with respect to periods prior to the Closing Month, to the extent such amounts are as of the Closing Date estimated to equal the amounts ultimately due to Sellers for such periods), (B) Purchaser entitled to receive all monthly installments of such amounts with respect to periods following the Closing Month and (C) the applicable Seller and Purchaser prorating all monthly installments of such amounts with respect to the Closing Month.  At the time(s) of final calculation and collection from (or refund to) Tenants of the amounts in reconciliation of actual Overage Rent for a period for which estimated amounts have been prorated, there shall be a re-proration between the applicable Seller and Purchaser, with the net credit resulting from such re-proration, after accounting for amounts required to be refunded to Tenants, being payable to the appropriate party (i.e., to the applicable Seller if the recalculated amounts exceed the estimated amounts and to Purchaser if the recalculated amounts are less than the estimated amounts).

(d)     Other than with respect to Non-Cash Security Deposits (as hereinafter defined), all security deposits and advance rentals in the nature of security deposits made by Tenants under Leases, which are or should be held by Sellers under the Leases on the

24

date of the Closing shall be turned over to Purchaser at the Closing or credited against the Purchase Price, at Sellers' sole and exclusive direction, either (i) by direct assignment of the bank account(s) in which deposited, or (ii) by Sellers retaining its rights in the bank accounts and allowing Purchaser a credit at Closing in the amount of the cash security deposits to be transferred.  For any letters of credit security deposits or residential tenant security deposits represented by bonds or other insurance policies (each a "Non-Cash Security Deposit"; collectively, the "Non-Cash Security Deposits"), the applicable Seller shall (x) at Closing, deliver to Purchaser the then existing original letter of credit or other Non-Cash Security Deposit and an original executed assignment or transfer form, if assignable or transferable, with respect to same, and (y) thereafter, only if at de minimis cost to Sellers, cooperate with Purchaser as reasonably necessary to cause each such letter of credit or other Non-Cash Security Deposit to be transferred or reissued in favor of Purchaser. In the event that any letter of credit or other Non-Cash Security Deposit is not transferred at Closing, until such letter of credit or other Non-Cash Security Deposit has been transferred, the applicable Seller agrees that it shall, upon Purchaser's request, only if at de minimis cost to such Seller, reasonably cooperate with Purchaser in effecting a draw of such letter of credit or other Non-Cash Security Deposit if Purchaser, in its reasonable discretion, determines that it is entitled thereto in accordance with the terms of the applicable Lease, and shall pay to Purchaser any proceeds received by such Seller from such letter of credit or other Non-Cash Security Deposit promptly following its receipt thereof; provided that Purchaser shall indemnify, defend and hold such Seller harmless from and against any and all claims made by Tenants as a result of any such draws on letters of credit or other Non-Cash Security Deposits by such Seller.  All costs, fees and expenses incurred in connection with the transfer or reissuance of letters of credit or other Non-Cash Security Deposits to Purchaser shall be borne by Purchaser.  For the avoidance of doubt,

ACTIVE/111354839.1
5921483-2

Sellers' inability to effect the transfer of one or more Non-Cash Security Deposits shall not constitute grounds for either party to terminate this Agreement or adjourn the Closing, and the parties shall proceed with the post-Closing transfer of such Non-Cash Security Deposit in accordance with this Section 6.1.1(d).

(e)    Subsequent to the Closing, Purchaser agrees that it shall render bills for and shall exercise reasonable diligence in the collection of any rent due to Sellers pursuant to this Agreement, provided that Purchaser shall in no event be obligated to commence any action against a Tenant to collect the same. Purchaser's obligation to pay over to Sellers rents collected as provided in this subsection 6.1.1 shall be an independent covenant of Purchaser and such payments shall be made promptly without any set off or deduction whatsoever. Sellers shall have the right to assert separate and independent claims against Tenants owing rent to which Sellers may be entitled hereunder, with Purchaser's prior written consent, not to be unreasonably withheld or delayed.

6.1.2    Real estate taxes, unmetered water and sewer charges and vault charges, if any, and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Properties in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Year") on a per diem basis based upon the number of days in the Current Tax Year prior to the Closing Date (which shall be allocated to the applicable Seller) and the number of days in the Current Tax Year on and after the Closing Date (which shall be allocated to Purchaser). If the Closing shall occur before the tax rate for the Current Tax Year is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation. Promptly after the new tax rate is fixed for the fiscal period in which the Closing takes place, the

26

apportionment of real estate taxes shall be recomputed. Upon the Closing Date and subject to the adjustment provided above, Purchaser shall be responsible for real estate taxes and assessments levied or imposed upon the Properties payable in respect of the Current Tax Year and all periods after the Current Tax Year. In no event shall Sellers be charged with or be responsible for any increase in the real estate taxes or assessments levied or imposed upon the Properties resulting from the transfer of the Properties herein contemplated or from any improvements made or Leases entered into at any time or for any reason. In the event that any assessments levied or imposed upon the Properties are payable in installments, the installment for the Current Tax Year shall be prorated in the manner set forth above and Purchaser hereby assumes the obligation to pay any such installments due on and after the Closing Date.

6.1.3    Charges and fees due under contracts for the supply to the Properties of heat, steam, electric power, gas, light, and telephone, if any, in respect of the billing period of the related service provider in which the Closing Date occurs (the "Current Billing Period") on a per diem basis based upon the number of days in the Current Billing Period prior to the Closing Date (which shall be allocated to the applicable Seller) and the number of days in the Current Billing Period on and after the Closing Date (which shall be allocated to Purchaser) and assuming that all charges are incurred uniformly during the Current Billing Period (it being agreed that all deposits, if any, made by Sellers as security under any such public service contracts shall be credited to the applicable Seller if such amounts remain on deposit after the Closing for the benefit of Purchaser; provided, however, that Sellers shall be entitled in its sole discretion to receive a refund of such security deposits directly from any such service provider without credit to Purchaser).

6.1.4    Any charges or fees for transferable licenses and permits for the

Properties.

6.1.5    Any charges payable under any Contract on the basis of the period covered by such payments.

6.1.6    Wages, salaries, payroll benefits, contributions due to the building service 32-BJ, health, pension, training, legal and SRSP Funds, the I.B.O.D.U. Health & Welfare Fund, the Local 713 Annuity Fund and to any other pension, health or welfare fund in which the Employees (as hereafter defined) participate, and the union benefits of Employees, if any.

6.1.7    Fuel, if any, then stored at the Properties on the basis of Sellers' last cost therefor, including sales tax, as evidenced by a written statement of Sellers' fuel oil supplier, which statement shall be conclusive as to quantity and cost.

6.1.8    Administrative fees allowable by law on Tenant security deposits.

6.1.9    <u>Intentionally omitted</u>.

6.1.10   At Closing, (i) Sellers shall receive a prorated credit for any charges, fees, expenses or other monies paid pursuant to Paragraph 7.02 of the administrative agent agreement with HPDC (as such term is hereinafter defined) on the date of Closing; (ii) Sellers shall receive a prorated credit for any free rent provided to a Tenant in occupancy on the Closing Date; and (iii) Purchaser shall expressly assume any and all payment obligations due and owing under any such agreements to the extent that such obligations accrue on or after the Closing Date.

6.1.11   At Closing, Sellers shall receive a credit for any payments theretofore made by Sellers in connection with the Foodtown Lease (as hereinafter defined) including, but not limited to, brokerage, tenant inducement costs and other tenant fees as of the date hereof as set forth on **<u>Exhibit H-1</u>** annexed hereto.

6.1.12   <u>Intentionally omitted</u>.

28

6.1.13  All other items customarily apportioned in connection with sales of commercial buildings in the State and City of New York.

6.2     If there are water meters on the Properties, Sellers shall endeavor to furnish readings to a date not more than thirty (30) days prior to the Closing Date, and the unfixed meter charges and the unfixed sewer rents, if any, based thereon for the intervening time shall be apportioned on the basis of such last readings. If Sellers fail or are unable to obtain such readings, the Closing shall nevertheless proceed and the parties shall apportion the meter charges and sewer rents on the basis of the last readings and bills received by Sellers and the same shall be appropriately readjusted after the Closing on the basis of the next subsequent bills. Notwithstanding the foregoing, if any Tenant is obligated to pay water charges pursuant to such Tenant's Lease, any such unpaid water charges shall not be apportioned, Purchaser shall look solely to such Tenant(s) for the payment of same, Purchaser shall take title subject to any such unpaid water meter charges owing by such Tenant(s) and no such unpaid water charges shall be deemed an objection to title.

6.3     Sellers shall not be required to assign any policies of insurance in respect of the Properties to Purchaser and Purchaser shall be responsible for obtaining its own insurance as of the Closing Date. Purchaser shall take all necessary actions required to transfer all utility accounts to Purchaser as of the Closing Date.

The provisions of this Section 6 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under Section 6.1 above. Any corrected adjustment or proration shall be paid in wire transferred funds to the party entitled thereto.

7.      <u>Representations and Warranties of the Parties; Certain Covenants.</u>

29

7.1    Each Seller, representing and warranting solely as to such Seller and the Property being sold by such Seller, represents, warrants and covenants to and with Purchaser that the following are true and correct on the date hereof:

7.1.1    Each Seller is a limited liability company duly formed and in good standing under the laws of the state of its organization or formation and, upon approval of the Bankruptcy Court, shall have the requisite power and authority to enter into and to perform the terms of this Agreement.  Subject to entry by the Bankruptcy Court of (i) the Bid Protections Order (as defined below) approving the payment of the Break-Up Fee (as hereinafter defined), and (ii) the Confirmation Order, Sellers are not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. Subject to entry of (x) the Bid Protections Order and (y) the Confirmation Order, the execution and delivery of this Agreement, including any obligation to pay Purchaser the Break-Up Fee under Section 35.1(c), and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Sellers, and will be authorized by the Bankruptcy Court.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Sellers, when executed and delivered, shall constitute the legal, valid and binding obligation of Sellers enforceable against Sellers in accordance with its respective terms (subject to (a) entry of the orders of the Bankruptcy Court authorizing the transaction contemplated herein, and (b) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

7.1.2    No Seller is a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

30

7.1.3    Subject to entry of the Bid Protections Order and the Confirmation Order, neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Sellers to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Sellers.

7.1.4    The information concerning written Leases set forth on **Exhibits B-1 and B-2**, respectively attached hereto is accurate in all material respects.  Except as otherwise set forth on **Exhibits B-1 and B-2**, respectively, the Leases or elsewhere in this Agreement:

(a)    to Seller's knowledge, all of the Leases are in full force and effect;

(b)    no renewal or extension option has been granted to any Tenant, except as required by law or by recorded regulatory agreements;

(c)    no Tenant has an option to purchase all or any portion of the Properties;

(d)    **Exhibits B-3 and B-4**, respectively, set forth the amount of security deposits (both cash security deposits and Non-Cash Security Deposits) required to be held by Sellers pursuant to each Lease in effect as of the date set forth on the applicable exhibit; it being acknowledged that Sellers will provide a credit to Purchaser at Closing in the amount of all cash security deposits in such amounts as are required to be held by Sellers pursuant to the Leases and shall cooperate to transfer all Non-Cash Security Deposits in accordance with Section 6.1.1(d) above;

31

(e) all tenant improvement allowances and leasing commissions currently due and payable by Sellers as landlord under or in connection with the current terms of residential Leases have been paid in full;

(f) the brokerage, tenant improvement allowance and landlord's portion of the tenant improvement work under and by reason of the lease by and between Denizen Y LLC, as landlord, and 54 Noll LLC, as tenant, dated as of November 13, 2018 (the "Foodtown Lease") have not been fully paid by Sellers as set forth in **Exhibit H-1**; and it shall be the obligation of Purchaser to (i) reimburse Sellers at Closing for any payments made by such Sellers in accordance with **Exhibit H-1** and (ii) take subject to all obligations of Sellers under the Foodtown Lease.

7.1.5    No Seller has entered into any Contracts which will be binding on Purchaser after the Closing, except for (i) the Contracts set forth on **Exhibits C-1 and C-2**, respectively and (ii) such other Contracts which may be terminable by Purchaser following the Closing on not more than thirty (30) days' notice without penalty or other fee for such termination.

7.1.6    Annexed hereto and made a part hereof as **Exhibit J** is a list of the names, job titles, date of hire, wage rate and status of the present building service employees (including those on lay-off, furlough or a leave of absence) employed by Planned Building Services, Inc. and Dynamic Building Services Inc. at the Properties on the date hereof. There are no Employees at the Properties employed by Sellers.

7.1.7    Except as set forth in the Title Report, to each Seller's knowledge, as of the date of this Agreement, there is no pending action, suit or other proceeding against the Property owned by such Seller or against such Seller with respect to the Property owned thereby that if adversely determined would have a material adverse effect on such Seller's ability to

consummate the transactions contemplated hereby.

7.1.8    No Seller has entered into and is not otherwise subject to any agreements currently in effect pursuant to which such Seller has granted any purchase rights, rights of first refusal or options to purchase all or any part of the Properties, except for the agreement between Sellers and Melrose Noll Brooklyn LLC dated January 15, 2020 (the "Expired Agreement"), and Sellers shall dispute any claim as to the enforceability of the Expired Agreement in the Seller Bankruptcy Proceedings.

7.1.9    No Seller has received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Properties.

7.1.10   No Seller nor, to such Seller's knowledge, any of its equity owners nor any of their respective employees, officers, or directors, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control of the Department of the Treasury ("OFAC") (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any similar statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other similar governmental action.

7.1.11   No Seller has initiated any proceedings for refunds or adjustments of real estate taxes and assessments levied, assessed or pending against the Property or to reduce the assessed valuation of the Property, except as set forth on **Exhibit P** annexed hereto.

7.1.12   On the date hereof there are no rent strikes by the residential Tenants affecting the Properties.  For the purposes of this representation 7.1.12, a "rent strike" shall mean the concerted effort by not less than ten percent (10%) of the Tenants to withhold rent in order to

ACTIVE/111354839.1
5921483-2

obtain certain work or concessions from the Sellers, acting in concert.

7.1.13  To Sellers' knowledge, Sellers have not received written notice from any governmental agency cancelling, revoking, challenging or withdrawing the 421-a tax benefit presently applicable to the Properties.

7.1.14  To Sellers' knowledge, Sellers have made available to Purchaser true and complete copies of the Leases.

Any and all uses of the phrase "to Seller's (or Sellers') knowledge" or words of similar import in this Agreement shall mean the actual knowledge of Asaf Ravid (the "Seller Knowledge Individual").  Without limiting the foregoing, Purchaser acknowledges that the Seller Knowledge Individual has not performed and is not obligated to perform any investigation or review of any files or other information in the possession of Sellers or to make any inquiry of any persons or to take any other actions in connection with the representations and warranties set forth in this Agreement.  Neither the actual knowledge of any other individual or entity or the constructive knowledge of the Seller Knowledge Individual, or any other individuals or entities shall be imputed to the Seller Knowledge Individual.  Sellers represent that the Seller Knowledge Individual is a person affiliated with Sellers with knowledge of the operation of the Properties.

Subject to Sections 7.1 and 11.3, it shall be a condition to Purchaser's obligation to close hereunder that the representations and warranties of Section 7.1 are true and correct in all material respects on the Closing Date, except to the extent that the facts and circumstances underlying such representations and warranties may have changed subsequent to the date of this Agreement for any reason other than a breach by Sellers of their obligations under this Agreement (a "Non-breach Rep Change").  For the avoidance of doubt, Purchaser shall remain obligated to

ACTIVE/111354839.1
5921483-2

close hereunder (without adjournment of the Closing Date or abatement of the Purchase Price) in the event of a Non-breach Rep Change.

The representations and warranties of Sellers set forth in Section 7.1 are subject to the following limitations: (i) Sellers do not represent or warrant that any particular Lease or Contract will be in force or effect as of the Closing, or that the Tenants or service providers, as the case may be, will not be in default thereunder; (ii) to the extent that Sellers have delivered or made available to Purchaser any Leases, Contracts or other documents or information with respect to the Properties at any time prior to the date hereof (or any such documents are of public record or otherwise made available to Purchaser in the Bankruptcy Proceedings) and such Leases, Contracts or other documents or information contain provisions inconsistent with any of such representations and warranties, then such representations and warranties shall be deemed modified to conform to such provisions and Purchaser shall be deemed to have knowledge thereof; and (iii) in the event that, prior to the Closing, Sellers shall deliver notice to either Jeffrey A. Goldberger or Andrew B. Cohen (each, a "Purchaser Knowledge Individual") that is contradictory to, and would constitute the basis of a breach of, any representation or warranty or failure to satisfy any condition on the part of Sellers, and Purchaser finds such misrepresentation or information objectionable (individually or collectively, as applicable, a "Breach"), then within five (5) Business Days thereafter and in all events prior to Closing (the "Breach Claim Period"), Purchaser shall deliver to Sellers a Claim Notice (as defined in Section 11.3) with respect to such Breach.  The rights and obligations of the parties with respect to any such Breach and Claim Notice are governed by this Section 7.1 and Section 11.3.  If Purchaser does not find such misrepresentation or information to be objectionable, or Purchaser fails to give a Claim Notice to Sellers within the Breach Claim Period (**time being of the essence**), then Purchaser shall be deemed to have irrevocably waived

the right to bring a Claim Notice based hereon, or bring any action based thereon.  Without limiting

the generality of the foregoing, Purchaser shall be deemed to know that any representation or

warranty contained herein is untrue, inaccurate or breached to the extent that (1) either Purchaser

Knowledge Individual has knowledge of any fact or information which is inconsistent with such

representation or warranty or (2) this Agreement or any Leases or other  documents information

with respect to the Properties delivered or made available to Purchaser (or of public record or

otherwise available to Purchaser in a Bankruptcy Proceeding) contains provisions inconsistent

with any of such representations and warranties.  Until Closing, Sellers shall endeavor to update

any representation or warranty in this Agreement to correct any mistake and/or to reflect any matter

which arises subsequent to the date of this Agreement and Sellers shall endeavor to remedy any

misrepresentation, but the failure to do so shall not be a default by Sellers.

The representations and warranties of Sellers set forth in Section 7.1 and elsewhere

in this Agreement shall not survive the Closing.

7.2     Purchaser warrants, represents and covenants to and with Sellers that the

following are true and correct on the date hereof:

7.2.1     Purchaser is a limited liability company duly organized or formed

and in good standing under the laws of the state of its organization or formation and has the

requisite power and authority to enter into and to perform the terms of this Agreement. Purchaser

is not subject to any law, order, decree, restriction, or agreement which prohibits or would be

violated by this Agreement or the consummation of the transactions contemplated hereby. The

execution and delivery of this Agreement and the consummation of the transactions contemplated

hereby have been duly authorized by all requisite action of Purchaser. This Agreement constitutes,

and each document and instrument contemplated hereby to be executed and delivered by

36

Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2.2    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

7.2.3    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.2.4.    Purchaser is not a person and/or entity with whom Sellers are restricted from doing business under the Internal Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq.; the Trading With The Enemy Act, 50 U.S.C. App. Section 5; the U.S.A. Patriot Act of 2001; any executive orders promulgated thereunder, any implementing regulations promulgated thereunder by the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC") (including those persons and/or entities named on OFAC's List of Specially Designated Nationals and Blocked Persons); or any other applicable law of the United States.

The representations set forth in this Section 7.2 shall survive the Closing.

7.3    Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Sellers nor any of the Seller Related Parties, nor Broker nor any agent nor any representative nor any purported agent or representative of Sellers or any of the Seller Related

37

Parties or Broker have made, and neither Sellers nor any of the Seller Related Parties nor Broker are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Properties or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Sellers, the Seller Related Parties and Broker have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the current or future real estate tax liabilities, assessments or valuations of the Properties, (b) the potential qualification of the Properties for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Properties, in their current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Properties' non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Properties from any source, including, but not limited to, any state, city or Federal government or any institutional lender, (e) the current or future use of the Properties, including but not limited to the Properties' use for commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Properties and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the Regulatory Agreement and the compliance of the Properties therewith, (h) the Mapping Agreement and the compliance of the Properties therewith, (i) the Union Agreements, (j) the CBA, (k) the Union Assumption Agreement (as hereinafter defined), (l) any management agreements and/or master leases affecting any portion of the Properties and the effect of their termination by Sellers at Closing, (m) any administrative agent

38

agreement with HDFC or HDC regarding the Properties; (n) the Restrictive Declaration and any and all matters relating thereto (including but not limited to the status of compliance with any obligations thereof), (o) the Sellers' Construction Obligations Indemnification Agreement (as hereinafter defined) and any matters relating or ancillary thereto, (p) the Fresh Declaration and any and all matters relating or ancillary thereto, (q) the ownership or state of title of any personal property on the Properties, (r) the presence or absence of any Laws and Regulations or any Violations, (s) the ability to relocate any Tenant (including but not limited to any Employee) or to terminate any Lease, and (t) the layout, leases, rents, income, expenses, operation, agreements, licenses, easements, instruments, Contracts or documents of or in any way affecting the Properties. Further, Purchaser acknowledges and agrees that neither Sellers nor any of the Seller Related Parties nor Broker are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Properties furnished by Sellers, any of the Seller Related Parties or Broker or any broker, employee, agent, consultant or other person representing or purportedly representing Sellers, any of the Seller Related Parties or Broker. The provisions of this Section 7.3 shall survive the Closing.

8.    <u>Closing Deliveries.</u>

8.1    At or prior to the Closing, each Seller shall, with respect only to the Property being sold by such Seller, make, have made or caused to be made, the following deliveries:

8.1.1    Each Seller shall execute, acknowledge and deliver to Purchaser a bargain and sale deed without covenants against grantor's acts, sufficient to convey fee title to the Properties subject to and in accordance with the provisions of this Agreement, in the form attached hereto as **<u>Exhibit E</u>** and made a part hereof (each a "<u>Deed</u>"; collectively, the "<u>Deeds</u>").

39

8.1.2    Each Seller shall execute, acknowledge and deliver (or cause Denizen X LLC or Denizen Y LLC, whichever is the applicable landlord under the Leases to execute, acknowledge and deliver) to Purchaser an assignment of all of such Seller's right, title and interest as landlord or otherwise under each of the Leases in respect of the Property owned by such Seller, and of any security deposits required to be held by such Seller on the Closing Date, in the form attached hereto as **Exhibit F** and made a part hereof (the "Assignment of Leases").

8.1.3    Each Seller shall execute and deliver to Purchaser notices to the Tenants under the Leases advising them of the sale of such Seller's Property and that all rents are to be paid to Purchaser (or as Purchaser directs).

40

8.1.4    Each Seller shall execute, acknowledge and deliver to Purchaser a bill of sale, conveying and transferring to Purchaser all right, title and interest of such Seller, if any, in and to all fixtures, machinery, equipment, articles of personal property and improvements in the nature of personal property attached or appurtenant to, or located on, or used in connection with the use or operation of, or used or adapted for use in connection with the enjoyment or occupancy of such Seller's Property, including, without limitation, all assignable (without third party consent(s)) licenses, permits, warranties and guarantees and plans and specifications held by Sellers in connection with the Properties, specifically excluding, however, any personal property of Tenants (the "Bill of Sale") in the form attached hereto as **Exhibit G** and made a part hereof.

8.1.5    Each Seller shall deliver to Purchaser all keys, cards and access codes to all portions of such Seller's Property, to the extent in such Seller's possession or control.

8.1.6    Each Seller shall deliver to Purchaser a certificate, duly executed and acknowledged by such Seller, in accordance with Section 1445 of the Code.

8.1.7    Each Seller shall execute, acknowledge and deliver a Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 in respect of such Seller's Property (the "State Transfer Tax Return").

8.1.8    Each Seller shall execute, acknowledge and deliver a New York City Department of Finance Real Properties Transfer Tax Return in respect of such Seller's Property (the "City Transfer Tax Return").

8.1.9    Each Seller shall execute, acknowledge and deliver Form RP-5217-NYC in respect of such Seller's Property (the "Equalization Form").

8.1.10   Purchaser shall either retain Planned Building Services, Inc. and Dynamic Building Services Inc., which retention shall include maintaining all of the Employees

41

employed by said entities on behalf of and for the benefit of the Properties, or Purchaser shall hire one or more other managing agents or management companies to employ all of the Employees on terms and conditions as presently in effect, to avoid any liability to Sellers to such Employees or under and pursuant to the collective bargaining agreements affecting such Employees.  Sellers or Sellers' agent shall provide at least sixty (60) days' notice by registered mail to Local 713 of its intent to terminate the Local 713 CBA upon its expiration on October 31, 2021 as required under Article XXXVI of the Local 713 CBA, in the form of **Exhibit T** annexed hereto.  If required to avoid any liability to Sellers on account of the Employees or collective bargaining agreements, Sellers shall deliver to Purchaser the Union Assumption Agreement in the form of **Exhibit L** annexed hereto.

        8.1.11  Intentionally omitted.

        8.1.12  Intentionally omitted.

        8.1.13  Each Seller shall deliver to Purchaser to the extent in such Seller's possession, original leases, or if not available, copies of all the Leases together with all other lease files in such Seller's or its agent's possession.

        8.1.14  Each Seller shall deliver to the Title Company a limited liability company resolution of such Seller authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder, and an affidavit of title in the form of **Exhibit Q** annexed hereto.

        8.1.15  Each Seller shall execute and deliver to Purchaser an assignment of all of such Seller's right, title and interest in and to the Contracts set forth on **Exhibit C-1** and **C-2** (as applicable), to the extent same are assignable, and all other Contracts entered into after the date hereof, to the extent permitted pursuant to this Agreement, in the form attached hereto

ACTIVE/111354839.1
5921483-2

as **Exhibit I** and made a part hereof (the "Assignment of Contracts").

   8.2  Reasonably promptly following the issuance of the Bid Protections Order, Sellers shall request that the tenants under the Foodtown Lease (the "Foodtown Lease Tenant") and the coffee shop tenant (the "Coffee Shop Tenant") execute and deliver estoppel certificates substantially in the form attached hereto as **Exhibit H** and made a part hereof (the "Foodtown Estoppel Certificate" and the "Coffee Estoppel Certificate"). Sellers have advised Purchaser that in connection with the Foodtown Lease, there remains open completion of landlord's obligations for tenant work and/or for payment of landlord's portion of tenant's improvement work, as disclosed on **Exhibit H-1** attached hereto. In the event Sellers fail to deliver the Foodtown Estoppel Certificate or the Coffee Estoppel Certificate within thirty (30) days following request therefor, Sellers will contact the applicable Tenant and request the Foodtown Estoppel Certificate and/or Coffee Estoppel Certificate. The delivery of the Foodtown Estoppel Certificate or the Coffee Estoppel Certificate shall not be a condition to Purchaser's obligation to close and such failure shall not constitute a failure of a condition of any kind, and Purchaser shall nevertheless be obligated to close hereunder. In the event Sellers fail to deliver the Foodtown Estoppel Certificate and the Coffee Estoppel Certificate prior to the Closing, Sellers shall execute and deliver to Purchaser an applicable owner's estoppel certificate in the form of **Exhibit H-2** annexed hereto (the "Owner's Estoppel Certificate"), which certificate will not survive the Closing and will not result in any liability to Sellers whatsoever. The final sentence of this Section 8.2 shall survive the Closing.

   8.3  At or prior to the Closing, Purchaser or its agents shall make, have made or caused to be made, the following deliveries:

     8.3.1  Purchaser shall pay to Sellers the balance of the Purchase Price

43

required pursuant to Section 3.2.4 hereof, and shall deliver notice as may be required by Escrow Agent to pay the Downpayment to Sellers.

8.3.2    Purchaser shall deliver to Sellers a consent of Purchaser's members required under its operating or similar agreement to the transactions contemplated herein.

8.3.3    Purchaser shall execute, acknowledge and deliver to Sellers a counterpart of the Assignment of Leases.

8.3.4    Purchaser shall execute, acknowledge and deliver to Sellers a counterpart of each of the State Transfer Tax Returns.

8.3.5    Purchaser shall execute, acknowledge and deliver to Sellers a counterpart of each of the City Transfer Tax Returns.

8.3.6      Purchaser shall execute, acknowledge and deliver to Sellers a counterpart of each of the Equalization Forms.

8.3.7    Purchaser shall acknowledge receipt of copies of the Leases and lease files delivered by Sellers.

8.3.8    Purchaser shall execute and deliver to Sellers a counterpart of each of the Assignments of Contracts.

8.3.9    If required to avoid any liability to Sellers on account of the Employees or collective bargaining agreements, Purchaser shall execute and deliver to Sellers the Union Assumption Agreement in the form of **Exhibit L** annexed hereto.

8.3.10  Purchaser shall execute and deliver to Sellers the RD Assumption Agreement in the form of **Exhibit M** annexed hereto.

8.3.11  Intentionally omitted.

8.3.12 If executed by Sellers prior to Closing, Purchaser shall execute and

44

deliver to Sellers counterparts of any documents necessary to cause the assignment and assumption of any agreement with HDFC or HDC regarding the Properties in accordance with this Agreement.

8.4    Sellers and Purchaser, at the Closing, shall prepare, execute and deliver to each other, subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments and material monetary terms of the transaction contemplated hereby and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement.  Sellers shall endeavor to deliver to Purchaser two (2) Business Days in advance of the Closing a proposed closing statement (which may contain estimates or blanks for numbers not then known to Sellers; but the failure to provide same shall not delay or affect the Closing hereunder).

9.    Interim Responsibilities and Other Property Matters.

9.1    Sellers agree that during the period between the date hereof and the Closing Date:

9.1.1  Sellers will manage and, subject to Section 9.1.3, lease the Properties or will cause the Properties to be managed and, subject to Section 9.1.3, leased under policies substantially similar to those existing prior to the date hereof, provided that Sellers shall have no obligation to make any capital improvements or replacements to the Properties or any portion thereof.

9.1.2    Without limiting Section 9.1.1, Sellers may terminate the Lease of any Tenant that is in default in its obligations pursuant to such Lease, provided that in no event may Sellers apply any security deposits of a Tenant except in compliance with and pursuant to the provisions of HSATPA of 2019 and unless such Tenant has vacated the Properties and its Lease has been terminated.

45

9.1.3    Except as otherwise provided herein, Sellers shall not enter into new Leases for space in a Building which is presently vacant or which may hereafter become vacant or modify an existing Lease.  Sellers shall not enter into Leases for residential space in a Building which is presently vacant and has never been occupied (each, an "Initial Lease"), without the consent of Purchaser, not to be unreasonably conditioned, withheld or delayed, provided that such New Lease is on market rate terms and otherwise satisfies the conditions under a Qualified Lease (as defined below).  Sellers may enter into renewals of existing residential Leases or rent units which become vacant and are not Initial Leases (together, a "Lease Renewal") so long as the same are "Qualifying Leases" (as hereinafter set forth) and Purchaser consents to the same (such consent not to be unreasonably withheld, conditioned or delayed).  A "Qualifying Lease" is lease for a residential unit (i) for a term not less than one (1) year and not to exceed two (2) years, (ii) at the maximum lawful rental rate, with legal escalations, with tenants who qualify under the Building credit/income requirements and with concessions that are prevailing in the market of comparable units, but in no event not more than three months; (iii) are in the appropriate form (including all applicable riders) in the form attached hereto as **Exhibit S** (or with respect to those residential units subject to affordable housing restrictions, in such form as may be required by applicable law or regulatory agreement including, without limitation, 421-a rules and regulations), and (iv) not to a Seller Related Party or family member thereof.  Purchaser's leasing representative shall meet with Sellers' leasing representative at regular intervals (anticipated to be weekly) for the purpose of analyzing and addressing changes to the leasing criteria set forth in this Section 9.1.3, and Purchaser and Sellers shall use commercially reasonable efforts to agree upon the applicable standards for a Qualifying Lease.  Sellers will consider all reasonable suggestions made by Purchaser's representative, provided that Sellers' failure or refusal to accept any suggestion made

46

by Purchaser's representative shall not be a default hereunder nor shall same afford Purchaser any right to delay the Closing, terminate this Agreement or receive an abatement of the Purchase Price. Except as set forth above, Sellers shall not permit occupancy or enter into any Initial Lease or Lease Renewal without first giving Purchaser written notice (which may be by email transmission to Jay Fehskens at jfehskens@atlas-cap.com) ("Sellers' Leasing Notice") of the identity of the proposed tenant or the proposed Initial Lease or Lease Renewal, together with a summary of the terms thereof, and (b) a statement of the amount of Leasing Costs (as hereafter defined), if any, in connection therewith and the terms of payment thereof.  Purchaser shall respond to Sellers by written notice (which may be by email transmission to such person as Seller shall hereafter designate) regarding an Initial Lease or Lease Renewal within one (1) Business Day following Purchaser's receipt of Sellers' Leasing Notice.   If Purchaser denies its consent to any Initial Lease or Lease Renewal, then Sellers shall not enter into such Initial Lease or Lease Renewal and, if such Lease Renewal (but not an Initial Lease) is a Qualifying Lease, commencing on the rent commencement date of such proposed Lease Renewal through the Closing Date, Purchaser shall pay to Sellers the rent and additional rent that would have been payable under such Lease Renewal. At Closing, Purchaser shall pay to Sellers all accrued and unpaid rent and additional rent otherwise due to Sellers in accordance with the prior sentence.   If Purchaser fails to respond to Sellers' Leasing Notice within the time period specified above, such failure shall be deemed to be Purchaser's consent.  All Leasing Costs shall be prorated over the term of the applicable Initial Lease or Lease Renewal and apportioned at Closing.  All Initial Leases and Lease Renewals shall be substantially in the form of the applicable lease (with those applicable and necessary rider(s)) annexed hereto as **Exhibit S**.  Notwithstanding the foregoing, Sellers shall have the right to enter

ACTIVE/111354839.1
5921483-2

into Lease Renewals as required by the Regulatory Agreement without the consent of Purchaser, so long as the same are at rates and in the form required by applicable law.

9.1.4    For the avoidance of doubt, between the date hereof and the Closing Date, Sellers shall not be obligated to undertake, remedy, attempt to remedy or take any other action (including but not limited to expending any monies, costs and/or expenses) with respect to any of those issues enumerated on **Exhibit H-1**, and at Closing (unless expressly stated herein to the contrary) Purchaser shall expressly assume each such obligation and indemnify Sellers and the Seller Related Parties for any and all loss, obligation, damage, liability, costs, expenses and fees (including reasonable attorneys' fees actually incurred) with respect to each and every one of such items. The provisions of this Section 9.1.4 shall survive the Closing.

9.1.5    Sellers will maintain property and liability insurance coverage in the ordinary course of Sellers' business with respect to the Properties from the date hereof through the Closing Date or earlier termination of this Agreement.

9.1.6    Sellers will not grant any lien or cause any instrument to be recorded that would further encumber the Properties in any manner.

9.1.7    Within fourteen (14) days after the execution of this Agreement by all of the parties hereto, each of the Sellers shall obtain the Series E Bondholder Approval and Mezz Lender Approval, each defined below, which will be documented in the Executed RSA, defined below, consenting to the sale to Purchaser pursuant to the terms of this Agreement and to the execution by MREF REIT Lender 9 LLC and Mishmeret Trust Services, Limited, in its capacity as Trustee on behalf of the holders of the Series E Bonds to that certain assignment agreement among such parties and Purchaser, attached hereto as Exhibit W (the "Assignment Agreement").  Within the later of one (1) Business Day thereafter or fourteen (14) days following

48

the date hereof, each of the Sellers shall commence the Seller Bankruptcy Proceedings, and simultaneously, shall file a motion seeking an order approving the payment of the Break-Up Fee and the Expense Reimbursement (as hereinafter defined), in a form substantially similar to Exhibit R attached hereto (the "Bid Protections Order").  The fourteen (14) day period referenced above may be extended by Sellers by seven (7) days provided within seven days following the date hereof (a)  the RSA and the Assignment Agreement have been agreed upon by all of the parties thereto and in execution form and (b) the Series E Bondholder meeting for voting scheduled.  Within two (2) Business Days of the notice to Purchaser of the entry of the Bid Protections Order, Purchaser shall cause to be deposited with Escrow Agent the Additional Downpayment as set forth at Section 3.2.2.  If the Bid Protections Order is not entered within twenty-one (21) days from the petition date of the Seller Bankruptcy Proceedings or if the Series Bond E Approval and Mezz Lender Approval are not obtained within the applicable period provided above, Purchaser may terminate this Agreement, whereupon the Initial Downpayment shall promptly be refunded by Escrow Agent to Purchaser, Seller shall pay to Purchaser the Expense Reimbursement and the parties shall have no further obligation to each other except for those obligations intended to survive the termination of this Agreement.  If the Purchaser elects to not terminate, it will retain the right to terminate until such time as the Bid Protection Order is entered, and the Outside Date shall be extended by the number of days in addition to the twenty-one (21) days needed to obtain Bankruptcy Court approval of the Bid Protections Order (but in no event later than the Extended Outside Date (as hereinafter defined)).  If the Purchaser elects to no longer wait for the Bankruptcy Court to enter the Bid Protection Order after the twenty-one (21) days, the Purchaser may terminate this Agreement in accordance with this Section 9.1.7 upon five (5) Business Days' notice to Sellers.  If the Bid Protections Order is rejected by the Bankruptcy Court , then Purchaser shall make its

49

election to terminate this Agreement in accordance with this Section 9.1.7 within five (5) Business Days after notice of the issuance of such order rejecting the Bid Protections Order, time being of the essence.

        9.1.8    Sellers shall use commercially reasonable efforts to take the following actions:

        (i)    Sellers shall file a motion in the Seller Bankruptcy Proceedings to establish a deadline for filing claims against the Sellers within fourteen (14) days of the filing of the Seller Bankruptcy Proceedings.

        (ii)    Sellers will file a (x) a joint chapter 11 plan for the Sellers to implement the terms of this Agreement (the "Plan"), (y) a disclosure statement in support of the Chapter 11 Plan (the "Disclosure Statement"), and (z) a motion seeking Bankruptcy Court approval of the Disclosure Statement, implementing procedures for soliciting votes on the Chapter 11 Plan and scheduling a hearing for the confirmation of the Chapter 11 Plan, in each case within thirty (30) days of filing of the Seller Bankruptcy Proceedings.

        (iii)    Sellers shall serve solicitation packages within ten (10) days of entry of an order by the Bankruptcy Court approving the Disclosure Statement and procedures for soliciting votes on the Chapter 11 Plan.

        (iv)    Provided the Confirmation Order was entered and is not stayed on the Closing Date, Sellers shall cause the Chapter 11 Plan's "Effective Date" and the Closing of the sale of the Properties to occur on or before the Outside Date (but in no event later than the Extended Outside Date (as hereinafter defined)).

        9.1.9    In the event a milestone enumerated in Section 9.1.8 (i), (ii) or (iii) shall fail to occur as and when required thereunder, Purchaser may, in in its sole discretion,

ACTIVE/111354839.1
5921483-2

extend the Outside Date on a day-for-day basis until such milestone shall have been completed; provided that in no event may Purchaser extend the Outside Date beyond the one-year anniversary of the commencement date of the Seller Bankruptcy Proceedings (such date, the "Extended Outside Date").

        9.1.10      Before it is filed with the Bankruptcy Court, Sellers shall provide Purchaser the right to review the Chapter 11 Plan and confirm that the terms thereof that relate to this Agreement are consistent herewith (including, but not limited to, provisions regarding the treatment of claims and interests of competing creditors and interest holders that directly impact the Closing of the transactions contemplated hereunder).  Sellers agree (i) promptly to proceed to obtain approval of the Chapter 11 Plan in accordance with the timing provisions of Section 9.1.9, (ii) to take all commercially reasonable actions necessary to obtain the Confirmation Order and (iii) not to do anything to, intentionally and in bad faith, hinder, delay, disrupt, interfere in or undermine the process of obtaining the Confirmation Order.

        9.1.11      Upon execution of this Agreement through termination of this Agreement in accordance with the terms hereof, Sellers shall not market, solicit or respond to offers for or provide due diligence information with respect to the Properties or negotiate with any other party with respect to the possible sale of all or any part of the Property (subject in each case to applicable fiduciary duties of Sellers with respect to unsolicited expressions of interest, offers or bids and any Bankruptcy Court order that might be entered providing for or requiring a marketing and auction process).

        9.2      In the event Sellers enter into any Initial Lease or Lease Renewal pursuant to Section 9.1.3 hereof, including, without limitation, a Lease Modification that is required by the applicable Lease, by law or by any agreement to which the Properties are subject, then subject to

51

the adjustments provided in Section 9.1.3 above, Purchaser shall be solely liable for all costs incurred in connection with such transaction, including, without limitation, leasing commissions, costs of any improvements performed for the tenant and tenant finish allowances payable under such lease and reasonable legal fees (collectively, "Leasing Costs") and shall reimburse Sellers at Closing for the portion of such Leasing Costs prorated over the term of the Initial Lease or Lease Renewal and apportioned as of the Closing Date and shall pay all other Leasing Costs as and when the same become due and payable, provided that the same are adjusted at the Closing.  In the event any tenant improvement work is in progress as of the Closing Date ("Pending TI Work"), then at the Closing: (i) Sellers shall assign to Purchaser and Purchaser shall assume any design and construction contracts, plans and specifications and building permits relating to such work, and (ii) if any of the Tenants for whom the Pending TI Work is being performed is obligated under its Lease to pay a portion of the cost thereof, and if such Tenant has paid or advanced to Sellers, as landlord, any portion of such costs, then Purchaser shall receive a credit at Closing for any portion of such sums that have not yet been paid or applied by Sellers to the construction and design costs of the Pending TI Work.

9.3    Between the date hereof and the Closing Date, Purchaser and Purchaser's lenders, partners, appraisers, consultants, architects, engineers, brokers and other design and construction professionals shall be afforded reasonable access to the Properties required by Purchaser in connection with its preparation for the Closing, subject in all events to the rights of Tenants pursuant to their Leases. Purchaser agrees that in entering upon and inspecting or examining the Properties, it will not communicate with the Tenants, any employees or any service providers without the prior written consent of Sellers to be given or withheld in Sellers' sole and absolute discretion, provided that Purchaser may exchange courteous social remarks in the event

52

of unintended exchanges if the representatives of Purchaser encounter Tenants or employees.  Any access to the Properties required by Purchaser in connection with the inspection of the Properties contemplated hereunder shall be subject to the following terms and conditions (i) must be upon written notice to Sellers and during reasonable business hours, (ii) at all times Purchaser and its representatives shall be accompanied by a representative of Sellers when at the Properties and (iii) prior to any entry, Purchaser shall deliver to Sellers proof of the insurance listed below in the form of a certificate of insurance.  Purchaser agrees to carry, or to require its authorized agents who access the Properties to carry, (i) a policy of commercial general liability insurance with a minimum limit of One Million Dollars ($1,000,000.00) for each occurrence and Two Million Dollars ($2,000,000.00) in the aggregate for bodily injury and Properties damage; and (ii) a workman's compensation or employer's liability insurance policy in accordance with the laws of the State of New York.  The insurance shall be (a) issued by an insurance company or companies with a rating of no less than A-VIII in the then current Best's Insurance Guide, or that is otherwise acceptable to Sellers in its discretion, and that are admitted to engage in the business of insurance in the State of New York, and (b) name Sellers and its agents by endorsement as an additional insured under such general liability coverage. Purchaser agrees that its inspection activities shall not unreasonably interfere with the operation of the Properties or with any Tenants and Purchaser shall repair any and all damage caused to the Properties arising or resulting from such inspection. Sellers do not warrant that Purchaser shall be afforded access to tenanted areas.

9.3.1    Notwithstanding anything to the contrary contained in this Section 9.3, Purchaser shall not and shall not permit its employees, consultants, engineers and agents to conduct any soil test or sampling, boring, digging or any other physical intrusion of the Properties and/or the Improvements (collectively, "Testing") without the prior written consent of the

applicable Seller to be given or withheld in such Seller's sole and absolute discretion.

9.3.2   Purchaser hereby indemnifies, defends and holds harmless Sellers and Seller Related Parties from any and all claims, damages, liability, loss, cost and expense (including, without limitation, reasonable attorney's fees and disbursements) arising out of the acts of Purchaser, its representatives, partners, shareholders, agents, employees, licensees, invitees, contractors and consultants in connection with any inspection and/or Testing conducted at the Properties.  The provisions of this Section 9.3.2 shall survive the Closing or earlier termination of this Agreement.

9.4   Employee Matters.

The term "Employment Liabilities" shall mean all obligations and liabilities (including reasonable attorneys' fees) incurred or suffered as a result of any claim by or on behalf of any Employee (as hereinafter defined) of Sellers or the Seller Related Parties or contracting parties on behalf of Sellers that arise under federal, state or local statute (including, without limitation, NY RPTL Section 421-a, Title 7 of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination and Employment Act of 1990, the Equal Pay Act, the Americans with Disabilities Act of 1990, the Employee Retirement Income Security Act of 1974, the Displaced Building Service Workers Protection Act (Section 22-505 of the Administrative Code of New York City) ("DBSWA"), the payment of wages or salaries or other amounts, hours, benefits, the payment of social security and similar taxes, worker's compensation and occupational safety, and all other statutes regulating the terms and conditions of employment, regulation or ordinance, the common law or inequity, or under any policy, agreement, understanding or promise, written or oral, formal or informal.  Purchaser shall be solely responsible for and shall indemnify Sellers against and hold Sellers and Seller Related Parties harmless from any and all Employment

Liabilities arising on or after the Closing Date with respect to Employees employed at the Properties including, but not limited to, any claims for wages, salary and benefits provided to such Employees on and after the Closing Date, and any notices, payments, fines or assessments due to any governmental authority pursuant to any laws with respect to the employment, discharge or failure to hire any Employees at the Properties on and after the Closing Date.  In connection therewith and not in limitation thereof:

9.4.1    Purchaser or its managing agent shall offer employment to those building service Employees (as defined in the DBSWA) employed at the Properties by Sellers or Sellers' affiliates or managing agents on the Closing Date (the "Employees").  To the extent required by the DBSWA, Sellers shall, no less than fifteen (15) calendar days before the Closing provide (or have its managing agent contract to provide) to Purchaser a full and accurate list of the Employees with name, address, date of hire and employment classification.  Purchaser agrees to comply with the terms of the DBSWA.

9.4.2    Purchaser has been notified that the Properties are subject to the prevailing wage requirements of Section 421-a of the Real Property Tax Law.  Not less than least thirty (30) Business Days prior to the Closing Date, Sellers shall send to the Office of the Attorney General of the State of New York written notice of this Agreement which shall include (i) confirmation of the notification that the Properties are subject to the prevailing wage requirements of Section 421-a of the Real Property Tax Law and (ii) the terms of this Section and Purchaser's assumption of all of Sellers' obligations to comply with the prevailing wage requirements.

9.4.3    Purchaser acknowledges that Sellers and/or Seller's agents have entered into the Union Agreements affecting the Employees and/or the Properties.  Without limiting any other provision of this Section 9.4, (i) Sellers have informed Purchaser that Sellers

ACTIVE/111354839.1
5921483-2

are bound by the terms of the Union Agreements; (ii) Sellers have provided or have made available to Purchaser copies of the Union Agreements or Sellers have directed Purchaser to contact the unions to obtain copies prior to Purchaser's execution of this Agreement and Sellers or Sellers' Agent shall provide the sixty (60) days' notice required under Section 8.1.10; (iii) Purchaser will, pursuant to the terms of this Agreement, offer to retain all Employees that if they accept their offers their employment will continue uninterrupted without loss of seniority, compensation, benefits or employment subject to the Union Agreements and applicable law; and (iv) Purchaser will execute an agreement with PBS Facility Services Inc., Platinum Amenity Services and Dynamic Building Services, causing such entities to remain responsible for the Employees at the Properties, which agreement shall provide for the continued retention of all Employees pursuant to and in accordance with their present terms of employment (including the applicable collective bargaining agreements), or Purchaser shall retain another management company or agent to cause each of the foregoing to occur, so that in all events Sellers shall have no liability whatsoever to the Employees or to the applicable unions.  Purchaser further agrees if required to avoid any liability to Sellers on account of the Employees or collective bargaining agreements (except in the event that Purchaser executes a management agreement with a party who is a party to the Union Agreement on the Closing Date with respect to the Properties) to execute (or to cause such designee reasonably acceptable to Purchaser and the Union to execute) an assumption agreement in the form attached hereto as **Exhibit L** and made a part hereof (the "Union Assumption Agreement") to effectuate an assumption of the Union Agreements in Purchaser's (or its designee's) name (without modification or amendment).  To the extent required by the Union Agreements, Purchaser shall also cause its designee to manage or which becomes the employer of the Employees to be a party to the Assumption Agreement.  To the extent Sellers have executed a short-form pledge under and

pursuant to the Union Agreements or otherwise in connection with the unions that are subject to the Union Agreements, Purchaser agrees to assume the obligations thereunder. Sellers and the Employer will not change the Union employee staffing levels at the property between the date hereof and the Closing.

9.4.4 Each Building has an Employee who is titled a "super" or "handyman." Other Employees vary and, as of the date hereof, are as set forth on **Exhibit J** annexed hereto and made a part hereof. Regarding the "supers" or "handymen," the Employees have additional compensation and benefits (including with respect to an apartment unit) as described on **Exhibit J-1** annexed hereto and made a part hereof

9.4.5 The provisions of this Section 9.4 shall survive the Closing indefinitely.

9.5 At or prior to Closing, Sellers, at Sellers' sole cost and expense, shall terminate with no cost or liability to Purchaser (i) the management agreement affecting the Melrose Street Property between Seller 1 and All Year Management NY Inc.; (ii) the management agreement affecting the Noll Street Property between Seller 2 and All Year Management NY Inc. operating as Smart Management NY Inc.; and (iii) those master leases affecting some or all of the residential and commercial spaces at the Properties between Sellers and The NY Zen LLC. At Closing, Sellers shall provide proof of such terminations reasonably acceptable to Purchaser; provided in no event shall Sellers be obligated to disclose any confidential or privileged information relating to the management, ownership, financing and/or operations of the Properties. If requested by Purchaser, Sellers shall also provide a certificate reflecting that Leases executed by the counterparties on the master leases were and are for the benefit of Sellers hereunder, as landlords.

9.6     Purchaser expressly agrees and acknowledges that the Properties are subject to the Regulatory Agreement.   At Closing, Sellers will assign all of their rights under the Regulatory Agreement to Purchaser, and Purchaser shall assume all of the obligations thereunder pursuant to the Assignment and Assumption of Regulatory Agreement.

9.7     Notwithstanding anything set forth in Section 9.6, Purchaser acknowledges that in furtherance of the Regulatory Agreement and Sellers' obligations thereunder, Sellers entered into that certain Administrative Agent Agreement Inclusionary Housing Program between the Housing Partnership Development Corporation ("HPDC") and Sellers dated June 29, 2017. HPDC submitted a proposal to Sellers dated October 14, 2016 to act as administrating agent and managing agent of the Properties.  The proposal referred to an agreement to be executed with HPD (attached to the Regulatory Agreement) and refers to a Private Administrating Agent and Managing Agent Agreement between HPDC and Sellers.

9.8     Sellers have an open obligation to complete a public park between the two Buildings in accordance with the terms and conditions of the Restrictive Declaration.  Sellers filed drawings with the applicable governmental agency for approval by City Planning on or about January 30, 2019, but have not completed the construction of the park in accordance with the Restrictive Declaration.  Effective upon the Closing Date, Purchaser hereby (i) assumes and undertakes any and all obligations pursuant to the Restrictive Declaration at Purchaser's sole cost and expense, and (ii) indemnifies Sellers for any loss, obligation, cost or damage (including reasonable attorneys' fees) relating to the Restrictive Declaration and any obligations thereunder accruing from and after the Closing (including but not limited to the obligation to complete the public park and any purported non-compliance or delayed compliance therewith).  The provisions of this Section 9.8 shall survive the Closing.

9.9     If construction obligations remain regarding incomplete aspects of the Properties (including, but not limited to, completion of the public park as described in <u>Section 9.8</u> above), then Purchaser shall acquire the Properties subject to Sellers' construction obligations as set forth herein and in the JLL Report, and shall indemnify Sellers for any loss, cost or damage hereafter incurred by Sellers by reason thereof.  The provisions of this Section 9.9 shall survive the Closing.

9.10    <u>Intentionally omitted</u>.

10.    <u>Conditions to Closing</u>.

10.1    The obligation of Purchaser to consummate the Closing shall be subject to the satisfaction of each of the following conditions, any or all of which, other than the conditions set forth in sections 10.1(iii) and (iv), may be waived in whole or in part:

(i)     Each of Sellers' representations and warranties set forth in this Agreement (as deemed to have been modified as permitted under Section 7.1) shall be true and correct in all material respects as of the Closing Date (provided that if any representation speaks as of a particular date or period, it will continue to speak as of such date or period), provided that (x) a representation or warranty shall not be deemed to have been breached and Sellers shall not be in default hereunder if the representation or warranty is not true and correct in all material respects as of the Closing Date by reason of changed facts and circumstances arising following the date hereof which are not prohibited pursuant to this Agreement and did not arise by reason of a breach of any covenant made by Sellers under this Agreement, and (y) subject to the preceding sub-clause (x), if there are any material inaccuracies in such representations and warranties (as so modified), Sellers may at their option elect to attempt to cure such inaccuracies, in which event the Closing Date shall be extended for a reasonable period to allow such condition to be satisfied,

59

but in no event later than the Outside Date.  An inaccuracy in Sellers' representations and warranties shall be deemed to be material if it (a) materially adversely affects Sellers' ability to proceed to the Closing under this Agreement, or (b) requires a modification to Sellers' representations and warranties that in the aggregate with all such modifications or updates has a material adverse effect on the values or operations of the Properties.

(ii)     Sellers shall have performed all of its material obligations under this Agreement required to have been performed at or prior to the Closing.

(iii)     The Bankruptcy Court shall have entered the Confirmation Order, in form reasonably acceptable to Sellers and Purchaser, and such Confirmation Order (a) is final and non-appealable (which can be waived by Purchaser); (b) provides for the transfer of the Properties to Purchaser free and clear of all liens, claims, interests, and encumbrances, with any such liens, claims, interests, and encumbrances, to the extent not extinguished, to attach to the proceeds of the sale pursuant to Bankruptcy Code Section 1129(b)(2)(A)(ii); (c) contains findings of fact and conclusions of law fully invoking the protections of Bankruptcy Code sections 363(m) and (n); and (d) no court of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Agreement.

(iv)     Sellers shall have obtained the Series E Bondholder Approval and the Executed RSA.

(v)     The 421-a tax benefit presently applicable to the Properties has not been challenged that if such challenge were successful would materially adversely affect the benefits conferred thereby, revoked or withdrawn by any governmental agency.

ACTIVE/111354839.1
5921483-2

(vi)     The Title Company shall be prepared to insure title to the Property subject to no exceptions except as permitted hereunder and payment of its standard premium.

10.2     In the event of the failure of any condition precedent set forth in Section 10.1, Purchaser, at its sole election, may (i) terminate this Agreement and receive from Sellers or Escrow Agent, as applicable, a return of its Downpayment; (ii) waive the condition and proceed to the Closing without an abatement of the Purchase Price; or (iii) extend the Closing Date for such additional period of time as may be reasonably required to allow such condition to be satisfied, but in no event beyond the Outside Date.

10.3     The obligation of Sellers to consummate the Closing shall be subject to the satisfaction of each of the following conditions, any or all of which, other than the conditions set forth in sections 10.3(iii) and (iv), may be waived in whole or in part by Sellers:

(i)      Each of Purchaser's representations and warranties set forth in this Agreement shall be true and correct in all material respects as of the Closing Date.

(ii)     Purchaser shall have performed all of its material obligations under this Agreement required to have been performed at or prior to the Closing.

(iii)    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance satisfactory to Sellers and no court of competent jurisdiction shall have issued an order restraining, enjoining or otherwise prohibiting the Closing or making illegal the transactions contemplated by this Agreement; provided that if such a restraining or similar order is proposed or issued, Sellers shall use reasonable efforts to challenge and attempt to void or remove such an order.

(iv)     Sellers shall have obtained the Series E Bondholder Approval, Mezz Lender Approval and the Executed RSA.

10.4    In the event of the failure of any condition precedent set forth in Section 10.3, Sellers, at their sole election, may (i) terminate this Agreement, in which event the Downpayment will be released to Sellers; (ii) waive the condition and proceed to the Closing (other than the conditions set forth in sections 10.3(iii) and (iv)); or (iii) extend the Closing Date for such additional period of time as may be reasonably required to allow Purchaser to satisfy such condition, but in no event beyond the Outside Date.  Nothing set forth in this Section 10.4 shall affect Sellers' right or remedies under Section 10.3 with respect to any breach of this Agreement by Purchaser.

11.    <u>Limitation on Liability of Parties.</u>

11.1    In the event Purchaser shall default in the performance of Purchaser's obligations under this Agreement after a Purchaser Cure Period (as hereinafter defined) (a "<u>Purchaser Default</u>"), Sellers shall be entitled to terminate this Agreement and to retain the Downpayment and any interest earned thereon as and for full and complete liquidated and agreed damages such Purchaser Default, and thereupon Purchaser shall be released from any further liability to Sellers hereunder.  Notwithstanding the foregoing to the contrary, in the event Purchaser shall default in making timely payment of the First Additional Downpayment, the Second Additional Downpayment or in closing on the Closing Date, Purchaser shall not be entitled to a Purchaser Cure Period and upon Purchaser's default in timely making the First Additional Downpayment, the Second Additional Downpayment  or in closing on the Closing Date, Sellers shall be entitled to terminate this Agreement and to retain the Downpayment and any interest earned thereon as and for full and complete liquidated and agreed damages for Purchaser's default, and thereupon Purchaser shall be released from any further liability to Sellers hereunder.  For the purposes of this Section 11.1, in the event of any Purchaser Default other than failing timely to

62

pay the First Additional Downpayment, failing timely to pay the Second Additional Downpayment or failing to close on the Closing Date in accordance with the terms of this Agreement, Sellers shall give to Purchaser written notice of such default; and Purchaser shall have five (5) Business Days to remedy such default provided, if such default is not susceptible to cure within such five (5) Business Days and Purchaser commences curing such default within such five (5) Business Days, Purchaser shall be entitled to a reasonable extension of such five (5) Business Days not to exceed in the aggregate thirty (30) days (such period to cure, being a "Purchaser Cure Period"). SELLERS AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLERS MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLERS WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

11.2  In the event that Sellers shall default in the performance of Sellers' obligations under this Agreement and the Closing does not occur as a result thereof, Purchaser shall be entitled, as its sole and exclusive remedy to terminate this Agreement and instruct Escrow Agent to pay to Purchaser the Downpayment with the interest earned thereon, if any (upon which Sellers shall be released from any further liability to Purchaser hereunder for any other damages of any kind whatsoever, except in the limited events and to the limited extent specifically set forth at Article 35 hereof).  Upon the Escrow Agent's return of the Downpayment (and, if applicable, the payment by Sellers to Purchaser under Article 35 hereof), this Agreement shall terminate and neither party hereto shall have any further obligations hereunder.

ACTIVE/111354839.1
5921483-2

11.3     Notwithstanding anything to the contrary contained in this Agreement, any claim by Purchaser prior to the Closing of a Breach shall be made by Purchaser delivering to Sellers written notice (a "Claim Notice") within the Breach Claim Period, which Claim Notice shall set forth (a) a description in reasonable detail of the claimed Breach, (b) the section and subsection of this Agreement under which the claimed Breach is asserted, and (c) Purchaser's good faith calculation of the Damages directly resulting from such Breach (the "Claimed Damage"). Time shall be of the essence in respect of Purchaser's obligation to deliver to Sellers a Claim Notice as and when and in the manner herein provided.  As used below, the term "Material Adverse Effect" means an aggregate Claimed Damage (when assessed, together with all other Claimed Damage), in an amount equal to or greater than TWO HUNDRED FIFTY THOUSAND AND 00/100 ($250,000.00) DOLLARS (the "Threshold Amount").  Purchaser's and Sellers' rights and remedies in respect of any alleged Breach shall, without limiting the foregoing, be as hereinbelow provided.

(i)     If, prior to the Closing, there occurs or exists a Breach which does not have a Material Adverse Effect, then Purchaser shall have no remedy therefor and must proceed to the Closing with no adjustment of the Purchase Price.  If, prior to the Closing, Purchaser shall assert a Breach, the Claimed Damage for which has a Material Adverse Effect (a "Material Breach"), then Purchaser may, as its sole and exclusive remedy, either (a) proceed to close title to the Properties without adjustment of the Purchase Price on account of such asserted Breach (it being understood and agreed that the closing of title hereunder under such circumstances shall be deemed to constitute the waiver by Purchaser, of any claims against Sellers for the Claimed Damage with respect to such Breach) or (b) terminate this Agreement by the giving of the Claim Notice, which termination shall be effective upon the expiration of the Termination Nullification

64

Period (as herein defined) unless Sellers have theretofore given a Termination Nullification Notice (as herein defined) as provided below. If Purchaser has elected properly to terminate this Agreement pursuant to clause (b) above, Purchaser shall receive a full refund of the Downpayment in accordance with Section 11.2 above; provided, however, that if Purchaser's Claimed Damage is less than $15,000,000.00, Sellers may nullify such termination with five (5) Business Days of receipt by Sellers of a Claim Notice from Purchaser electing to terminate this Agreement (the "Termination Nullification Period") by (i) delivering to Purchaser a notice nullifying such termination (a "Termination Nullification Notice") and (ii) either (A) crediting the Purchase Price in the amount by which the Claimed Damage exceeds the Threshold Amount (the "Material Breach Credit"), in which event Purchaser shall be required to close title to the Properties without further adjustment to the Purchase Price under this Section 11.3 or (B) if Sellers dispute that Purchaser is entitled to terminate this Agreement under this Section 11.3 because Sellers assert that either (1) no Breach has occurred or exists and/or, (2) the asserted Breach is not a Material Breach (a "Dispute"), delivering a Dispute Notice (as hereinafter defined) and depositing with Escrow Agent upon Closing an amount equal to the Material Breach Credit as described in Section 11.3(ii) below, in which event Purchaser shall be required to close title to the Properties without further adjustment of the Purchase Price, and such dispute shall be resolved pursuant to Section 11.3(iii) below.

(ii)      If, prior to the Closing, Purchaser serves a Claim Notice asserting a Material Breach and Sellers have given a Termination Nullification Notice in accordance with Section 11.3(i), Sellers may dispute such Claim Notice by delivering written notice to Purchaser in the manner herein provided (a "Dispute Notice"). A Dispute Notice shall be given at or prior to the Closing or within five (5) Business Days of receipt of a Claim Notice if received more than five (5) Business Days prior to the scheduled Closing Date. If Sellers have given a Termination

65

Nullification Notice but do not deliver a Dispute Notice, then the parties shall proceed with the

Closing as described above and the Purchase Price shall be reduced by the Material Breach Credit.

If Sellers have given a Termination Nullification Notice and deliver a Dispute Notice, then Sellers

shall deposit with Escrow Agent at the Closing an amount equal to the Material Breach Credit (the

"Escrow Funds") to be held in escrow pending a resolution of the Dispute.  Sellers may direct that

a portion of the Purchase Price to be paid at Closing be paid to Escrow Agent to serve as the

Escrow Funds.  Provided Sellers have deposited the Escrow Funds with Escrow Agent pending

resolution of the Dispute as hereinabove provided, Purchaser shall be required to close title to the

Properties without adjustment of the Purchase Price on account of the Breach in Dispute.

(iii)    The Dispute as set forth in Sellers' Dispute Notice shall be resolved

pursuant to the accelerated procedures set forth in Section 27 of this Agreement.  In no event shall

Purchaser file or cause to be filed of record against the Properties a notice of lis pendens in

connection with any Dispute.

(iv)    Notwithstanding anything to the contrary herein contained, from

and after the Closing Date, with respect to any asserted Breach of Sellers' representations, Sellers

shall have no liability to Purchaser.

12.    Fire or Other Casualty, Condemnation.

12.1    Sellers agree to give Purchaser reasonably prompt notice of any fire or other

casualty occurring at the Properties of which Sellers obtain knowledge, between the date hereof

and the date of the Closing, or of any actual or threatened condemnation of all or any part of the

Properties of which Sellers obtain knowledge.

12.2    If prior to the Closing there shall occur (a) damage to the Properties caused

by fire or other casualty which would cost an amount greater than SEVEN MILLION FIVE

HUNDRED THOUSAND AND 00/100 ($7,500,000.00) DOLLARS or more to repair, as reasonably determined by an engineer selected by Sellers which is reasonably satisfactory to Purchaser or (b) a taking by condemnation of any material portion of the Properties, then, and in either such event, Purchaser may elect to terminate this Agreement by written notice given to Sellers within ten (10) days after Sellers have given Purchaser the notice referred to in Section 12.1 hereof, or at the Closing, whichever is earlier, in which event Sellers shall promptly instruct Escrow Agent, to make a Downpayment Return, this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for the provisions hereof intended to survive the termination of this Agreement.  If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Sellers shall assign to Purchaser at the Closing, by written instrument, all of Sellers' interest in and to any insurance proceeds or condemnation awards which may be payable to Sellers on account of any such fire, casualty or condemnation, shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "Reimbursable Amounts") (i) actually and reasonably expended or incurred by Sellers in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Sellers for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Sellers (to the extent Sellers have not theretofore been reimbursed by its insurance carriers for such expenditures), and Sellers shall pay to Purchaser the amount of the deductible, if any, under applicable insurance policy(ies) affecting the applicable Property, less all Reimbursable Amounts not received by Sellers from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of

67

rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Sellers.

12.3    If, prior to the Closing, there shall occur (a) damage to the Properties caused by fire or other casualty which would cost less than SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 ($7,500,000.00) DOLLARS to repair, as reasonably determined by an engineer selected by Sellers, or (b) a taking by condemnation of any part of the Properties which is not material, then, and in either such event, neither party shall have the right to terminate its obligations under this Agreement by reason thereof, but Sellers shall assign to Purchaser at the Closing, by written instrument, all of Sellers' interest in any insurance proceeds or condemnation awards which may be payable to Sellers on account of any such fire, casualty or condemnation, or shall deliver to Purchaser any such proceeds or awards actually theretofore paid, in each case less any Reimbursable Amounts, and Sellers shall pay to Purchaser the amount of the deductible, if any, under Sellers' Properties insurance policy(ies), less all Reimbursable Amounts not received by Sellers from any insurance proceeds or condemnation awards paid to Sellers prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Sellers.

12.4    Nothing contained in this Section 12 shall be construed to impose upon Sellers any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

12.5    For purposes of this Section 12, a taking by condemnation or eminent domain of a material part of the Properties shall mean any taking which leaves remaining a balance of Properties which may not be economically operated (after appropriate restoration) for the purpose for which the Properties was operated or intended to be operated prior to such taking.

68

12.6    In the event Purchaser elects not to terminate this Agreement in accordance with Section 12.2 above, or upon the occurrence of the events set forth in Section 12.3 (a) or (b) above, Sellers and Purchaser shall jointly negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

12.7    The provisions of this Article 12 are intended to supersede the provisions of New York law to the contrary, including without limitation, Section 5-1311 of the General Obligations Law.

13.    Brokerage.

Purchaser and Sellers each represent and warrant that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby other than Meridian Capital, through Helen Hwang (the "Broker").  Sellers shall pay the commission due to the Broker pursuant to a separate agreement between Sellers and the Broker.  Purchaser and Sellers agree to indemnify and hold each other and the Related Parties of the other harmless from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorney's fees and disbursements) which may be asserted against, imposed upon or incurred by such party by reason of any claim made by any other broker, consultant, finder or like agent for commissions or other compensation for bringing about this transaction or claiming to have introduced the Properties to Purchaser. The provisions of this Section 13 shall survive the Closing or the termination of this Agreement.

14.    Closings Costs; Fees and Disbursements of Counsel.

At the Closing, Sellers shall pay the New York State Real Estate Transfer Tax

69

imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "State Transfer Tax") and the New York City Real Properties Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax") upon or payable in connection with the transfer of title to the Properties and the recordation of the Deed, which State Transfer Tax and City Transfer Tax shall, at Sellers' election, be allowed for out of the Purchase Price and paid by Purchaser on behalf of Sellers. Sellers and Purchaser shall each execute and/or swear to the returns or statements required in connection with the State Transfer Tax and the City Transfer Tax. All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company. At the Closing, Purchaser shall pay (a) all charges for recording and/or filing the Deed and (b) all title charges and survey costs, including the premium on Purchaser's title policy and lender's policy, if any. Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation and preparation of this Agreement and the Closing. The provisions of this Section 14 shall survive the Closing.

15.    Notices.

Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by e-mail, if followed by giving of, pursuant to one of the other means set forth in this Section 15 before the end of the first Business Day thereafter, confirmation of successful transmission to the appropriate e-mail address of the address listed below as obtained

70

by the sender from the sender's e-mail address, or (c) upon receipt, when sent by prepaid reputable

overnight courier, in each case if delivered before 5:00 pm Eastern Time on a Business Day and

otherwise on the next succeeding Business Day, addressed as follows:

<table>
<tr><td>If to Sellers:</td><td>Evergreen Gardens I LLC<br>Evergreen Gardens II LLC<br>c/o All Year Holdings Limited<br>199 Lee Avenue, #693<br>Brooklyn, New York 11233<br>Attention: Ephraim Diamond and Asaf Ravid<br>Email: ephraim@arbelcapital.com<br>Email: ravidasaf@gmail.com</td></tr>
<tr><td>with a copy to:</td><td>Goldberg Weprin Finkel Goldstein LLP<br>1501 Broadway - 22nd Floor<br>New York, New York 10036<br>Attention: Andrew W. Albstein, Esq.<br>E-mail: aalbstein@gwfglaw.com</td></tr>
<tr><td>If to Purchaser:</td><td>ACI VI DENIZEN LLC<br>c/o Atlas Capital Investors VI, L.P.<br>40 West 57th Street, 29th Floor<br>New York, New York 10019<br>Attention: Jeffrey A. Goldberger and Andrew B. Cohen<br>Email:jgoldberger@ATLAS-CAP.COM;<br>    acohen@ATLAS-CAP.COM; and<br>    jrenton@ATLAS-CAP.COM</td></tr>
<tr><td>with a copy to:</td><td>Olshan Frome Wolosky LLP<br>1325 Avenue of the Americas<br>New York, New York 10019<br>Attention: Eric L. Goldberg, Esq.<br>Email: egoldberg@olshanlaw.com</td></tr>
<tr><td>If to Escrow Agent, to:</td><td>Fidelity National Title Insurance Company<br>405 Lexington Avenue, 18th Floor<br>New York, New York 10017<br>Attention: Nick DeMartini, Esq.</td></tr>
</table>

ACTIVE/111354839.1
5921483-2

E-mail: ndemartini@fnf.com

Notices shall be valid only if served in the manner provided above. Notices may be sent by the attorneys for the respective parties and each such Notice so served shall have the same force and effect as if sent by such party.

16.   <u>Survival; Governing Law.</u>

Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein. This Agreement shall be governed by, interpreted under, and construed. and enforced in accordance with, the laws of the State of New York.

17.   <u>Counterparts; Captions.</u>

This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

18.   <u>Entire Agreement; No Third-Party Beneficiaries.</u>

This Agreement (including all exhibits annexed hereto), contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. The provisions of this Section shall survive the Closing.

19.   <u>Waivers; Extensions.</u>

72

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

20.    <u>No Recording.</u>

The parties hereto agree that neither this Agreement nor any memorandum or notice hereof shall be recorded. Any recordation or attempted recordation by Purchaser in contravention of the preceding sentence shall constitute a Purchaser's Default.

21.    <u>Assignments.</u>

Purchaser shall neither assign its rights nor delegate its obligations hereunder without obtaining Sellers' prior written consent, which consent may be granted or withheld in Sellers' sole discretion.  In connection with any assignment permitted or consented to hereunder, such assignee shall assume in writing all of the assignor's obligations under this Agreement in form and substance satisfactory to Sellers, provided that Purchaser originally named herein shall not be relieved from its obligations under this Agreement. Any other purported or attempted assignment or delegation without obtaining Sellers' prior written consent or not otherwise permitted hereunder shall be void and of no effect. Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 21.  No consent given by Sellers to any transfer or assignment of Purchaser's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder. Purchaser shall not resell the Properties or any part thereof through a "double escrow" or other similar procedure without Sellers' prior written consent, which consent may be granted or

73

withheld in Sellers' sole discretion. No transfer or assignment in violation of the provisions hereof shall be valid or enforceable.  Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement (including, without limitation, a transfer of direct or indirect interests in Purchaser) subject to the following conditions: (a) the assignment must be to one or more limited partnerships, limited liability companies, funds or other entities controlled by Jeffrey A. Goldberger and/or Andrew B. Cohen (any such entity, a "Qualified Assignee"); (b) Jeffrey A. Goldberger and/or Andrew B. Cohen and/or their immediate family members and/or trusts for the benefit of Jeffrey A. Goldberger and Andrew B. Cohen and/or their immediate family members must be in operational control of such fund, subject to material control rights that may be exercised by significant investors; (c) such Qualified Assignee must assume all of Purchaser's obligations hereunder in a manner reasonably acceptable to Sellers and become jointly and severally liable for all such obligations; (d) notice of such assignment shall be provided to Sellers not less than five (5) days prior to the Closing Date; and (e) such assignment shall specifically provide that it is not effective prior to the Closing Date.

22.    Pronouns, Several Liability Only.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.  Notwithstanding any provision in this Agreement to the contrary, the liability of each of the Sellers shall be several only, and limited to the liability with respect to the specific Property owned by such Seller, provided that Purchaser shall in no event be required to close on one Property without the other.

23.    Successors and Assigns.

This Agreement shall bind and inure to the benefit of Sellers, Purchaser and their respective permitted successors and permitted assigns.

74

24.      Escrow.

24.1     Upon receipt by Escrow Agent of the Downpayment, provided that a completed and signed Request for Taxpayer Identification Number and Certification (Form W-9) and any other documentation required in connection with the placement of the Downpayment in an interest bearing account are provided to Escrow Agent at Citibank, N.A., Escrow Agent shall cause the Downpayment to be deposited into an interest bearing account (the "Escrow Account") (it being agreed that Escrow Agent shall not be liable for the amount of interest which accrues thereon, if any).  One-half (1/2) of the interest earned on the Downpayment shall be deemed to be part of the Downpayment (but shall not be credited toward the Purchase Price), and the other one-half (1/2) of the Downpayment shall also be deemed to be part of the Downpayment  (but shall be credited toward the Purchase Price), and shall be delivered by Escrow Agent to the party entitled to receive the Downpayment at Closing or upon termination of this Agreement in accordance with the terms hereof.  The party receiving the Downpayment shall pay any income taxes payable thereon.

24.2     Escrow Agent shall acknowledge receipt of the Downpayment and agrees to hold the Downpayment in the Escrow Account pursuant to the provisions of this Agreement for application in accordance with the provisions hereof, upon the following terms:

24.2.1 If the Closing has occurred Escrow Agent shall deliver the Downpayment, together with the interest earned thereon to Sellers.  If Escrow Agent receives a written notice signed by both Sellers and Purchaser that this Agreement has been terminated or cancelled, Escrow Agent shall deliver the Downpayment, together with the interest thereon, as directed therein.

ACTIVE/111354839.1
5921483-2

24.2.2  Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein.  Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery or to enforce any obligation of any person to perform any other act.  Escrow Agent shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document.  Except for amendments to this Agreement expressly approved by Escrow Agent and except for joint instructions given to Escrow Agent by Sellers and Purchaser relating to the Downpayment, Escrow Agent shall not be obligated to recognize any agreement between any or all of the persons referred to herein, notwithstanding that references thereto may be made herein and whether or not it has knowledge thereof.

24.2.3  In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Agent to have been signed by the proper person.  Escrow Agent may assume that any person purporting to give any notice hereunder has been duly authorized to do so.  Escrow Agent is acting as a stakeholder only with respect to the Downpayment.  Promptly after the receipt by Escrow Agent of (a) notice of any demand by either party claiming that it is entitled to the Downpayment or (b) any other claim or the commencement of any action, suit or proceeding by either party, Escrow Agent shall, if a claim in respect thereof is to be made against any of the other parties hereto, send a copy of such notice to the other party and inform the other party of such claim; but the failure by Escrow Agent

ACTIVE/111354839.1
5921483-2

to give such notice shall not relieve any party from any liability which such party may have to Escrow Agent hereunder. If Escrow Agent shall receive written notice from either party within ten (10) Business Days after delivery of such notice instructing Escrow Agent to not deliver the Downpayment to the other party or to otherwise hold the Downpayment, or if for any reason there is any dispute or uncertainty concerning any action to be taken hereunder, Escrow Agent shall take no action and shall continue to hold the Downpayment until it has received instructions in writing concurred to by Sellers and Purchaser or until directed by a final order of judgment of a court of competent jurisdiction, whereupon Escrow Agent shall take such action in accordance with such instructions or such order.

24.2.4 It is understood and agreed that the duties of Escrow Agent are purely ministerial in nature and Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Sellers. Escrow Agent shall not be liable to the other parties hereto or to anyone else for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, except for acts of willful misconduct or gross negligence. Escrow Agent may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel (including counsel chosen by Escrow Agent), statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by Escrow Agent to be genuine and to be signed or presented by the proper person or persons. Escrow Agent shall not be bound by any notice or demand, or any waiver, modification, termination or rescission of this Agreement or any of the terms hereof, unless evidenced by a final judgment or decree of a court of competent jurisdiction in the State of New York, or a Federal court in such jurisdiction or a

77

writing delivered to Escrow Agent signed by the proper party or parties and, if the duties or rights of Escrow Agent are affected, unless it shall give its prior written consent thereto.

24.2.5  Escrow Agent shall have the right to assume in the absence of written notice to the contrary from the proper person or persons that a fact or an event by reason of which an action would or might be taken by Escrow Agent does not exist or has not occurred, without incurring liability to the other parties hereto or to anyone else for any action taken or omitted, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, in reliance upon such assumption.

24.2.6  Except in connection with Escrow Agent's willful misconduct or gross negligence, Escrow Agent shall be indemnified and held harmless jointly and severally by the other parties hereto from and against any and all expenses or loss suffered by Escrow Agent (as Escrow Agent), including reasonable attorneys' fees, in connection with any action, suit or other proceeding involving any claim, which arises out of or relates to this Agreement, the services of Escrow Agent hereunder or the monies held by it hereunder.

24.2.7  From time to time on and after the date hereof, Sellers and Purchaser shall deliver or cause to be delivered to Escrow Agent such further documents and instruments and shall do and cause to be done such further acts as Escrow Agent shall reasonably request (it being understood that Escrow Agent shall have no obligation to make any such request), to evidence compliance herewith or to assure itself that it is protected in acting hereunder.

24.2.8  Escrow Agent may resign at any time as Escrow Agent hereunder upon giving five (5) days' prior written notice to that effect to both Sellers and Purchaser.  In such event, the successor Escrow Agent shall be a nationally recognized title insurance company or other person acceptable to both Sellers and Purchaser.  Such party that will no longer be serving

ACTIVE/111354839.1
5921483-2

as Escrow Agent shall deliver, against receipt, to such successor Escrow Agent, the Downpayment

held by such party, to be held by such successor Escrow Agent pursuant to the terms and provisions

of this Agreement.  If no such successor has been designated on or before such party ceases to be

Escrow Agent hereunder, whether by resignation or otherwise, its obligations as Escrow Agent

shall continue until such successor is appointed, provided, however, its sole obligation thereafter

shall be to safely keep all monies then held by it and to deliver the same to the person, firm or

corporation designated as its successor or until directed by a final order or judgment of a court of

competent jurisdiction, whereupon Escrow Agent shall make disposition thereof in accordance

with such order; provided further, however, that such Escrow Agent, in such event, shall deliver

the Downpayment against receipt, to any bank or trust company or title insurance company

operating in New York City selected by such party.  If no successor Escrow Agent is designated

and qualified within five (5) days after its resignation is effective, such party that will no longer

be serving as Escrow Agent may apply to any court of competent jurisdiction for the appointment

of a successor Escrow Agent.  Further, notwithstanding anything contained in this Section 24 to

the contrary, if Escrow Agent shall have received a notice of objection as provided for in Section

24.2.3 above within the time therein prescribed, or shall have received at any time before actual

disbursement of the Downpayment a written notice signed by either Sellers or Purchaser disputing

entitlement to the Downpayment or shall otherwise believe in good faith at any time that a

disagreement or dispute has arisen between the parties hereto over entitlement to the

Downpayment (whether or not litigation has been instituted), Escrow Agent shall have the right,

upon written notice to both Sellers and Purchaser, (a) to deposit the Downpayment, together with

the interest earned thereon with the Clerk of the Court in which any litigation is pending and/or

(b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its

79

duties as Escrow Agent, including, without limitation, the depositing of the Downpayment, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Sellers or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

24.2.9  Escrow Agent shall not be responsible for levies by taxing authorities based upon the taxpayer identification number used to establish the interest-bearing account.  Escrow Agent shall have no liability in the event of failure, insolvency, or inability of the depositary to pay said funds, or accrued interest upon demand for withdrawal.

25.    <u>Tax Proceedings.</u>

From and after the date hereof until the Closing, Sellers are hereby authorized to commence any new proceeding or proceedings and/or continue any proceeding or proceedings now pending for the reduction of the assessed valuation of the Properties, and in Sellers' discretion at its sole cost and expense to litigate or settle same; provided, however, that Purchaser shall be entitled to that portion of any refund relating to the period occurring after the Closing after payment to Sellers of all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Sellers in obtaining such refund, and Sellers shall not settle any such action for the tax year in which the Closing occurs without the consent of Purchaser, not to be unreasonably withheld or delayed. Purchaser shall deliver to Sellers, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Sellers. Any refunds or credits due for the periods prior to Purchaser's ownership of the Properties shall remain the sole Properties of Sellers. The provisions of this

Section 25 shall survive the Closing.

26.     <u>Mortgage Tax Savings</u>.  At Purchaser's option, Sellers shall request the holder(s) of the existing mortgage(s) to assign its mortgage(s) to Purchaser's lender(s).  If the holder(s) of the existing mortgage(s) agrees to such assignment, Purchaser shall pay the costs and expenses of the holder(s) and the holder's counsel in connection with the assignment and all mortgage recording tax savings shall inure to the benefit of Purchaser.

27.     <u>Accelerated Dispute Resolution</u>.  Subject to the requirements for a case to be heard in the Commercial Division, the parties agree to submit to the exclusive jurisdiction of the Commercial Division, New York State Supreme Court, and to the application of the court's accelerated procedures in connection with any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement or validity thereof.

28.     <u>Tax Free Exchange</u>.

Purchaser acknowledges that Sellers may be disposing of the Properties as part of an IRC Section 1031 Tax Deferred Exchange for Sellers' benefit (the "<u>Exchange</u>").  Purchaser agrees to assist and cooperate in the Exchange, including consummating the Exchange through the use of a qualified intermediary, and will execute any and all documents, subject to the reasonable approval of its counsel, as are reasonably necessary in connection with the Exchange, provided Purchaser shall not incur any additional liability, cost or expense.

29.     <u>Confidentiality.</u>

Purchaser covenants and agrees prior to Closing not to communicate the terms or any aspect of this Agreement and the transactions contemplated hereby to any person or entity without the express written consent of Sellers and to hold, in the strictest confidence, the content of any and all information in respect of the Properties which is supplied by Sellers to Purchaser;

81

provided, however, that Purchaser may, without consent, disclose the terms hereof and the transactions contemplated hereby (a) to its respective advisors, consultants, attorneys, accountants, partners and lenders (the "Transaction Parties") without the express written consent of Sellers, so long as Purchaser advises any such Transaction Parties to whom disclosure is made to keep all such information confidential in accordance with the terms hereof and (b) if disclosure is required by law or by regulatory or judicial process, provided that in such event Purchaser shall notify Sellers in writing of such required disclosure, shall exercise all commercially reasonable efforts to preserve the confidentiality of the confidential documents or information, as the case may be, including, without limitation, reasonably cooperating with Sellers to obtain an appropriate order or other reliable assurance that confidential treatment will be accorded such confidential documents or information, as the case may be, by such tribunal and shall disclose only that portion of the confidential documents or information which it is legally required to disclose. If this Agreement is terminated, such confidentiality shall be maintained and Purchaser and the Transaction Parties will destroy or deliver to Sellers, upon request, all documents and other materials, and all copies thereof, obtained thereby in connection with this Agreement that are subject to such confidence, with any such destruction confirmed by Purchaser and the Transaction Parties in writing. The foregoing confidentiality obligations shall not apply to the extent that any such information is a matter of public record or is provided in other sources readily available to the real estate industry other than as a result of disclosure by Purchaser or the Transaction Parties. Purchaser hereby indemnifies, defends and holds Sellers and the Seller Related Parties harmless from and against any and all claims, losses, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising out of, or in connection with, Purchaser's breach of its obligations under this Section 29. The provisions of this Section 29 shall

ACTIVE/111354839.1
5921483-2

survive the Closing or the earlier termination of this Agreement.

30.    <u>Business Day(s)</u>.    For the purposes of this Agreement, the capitalized term "<u>Business Day(s)</u>" or the term "<u>business day(s)</u>" means any day of the year except Saturdays, Sundays and national holidays on which banks are required or authorized by law to close in New York City.

31.    <u>Separateness</u>.    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that each Seller shall be liable only for the representations, warranties and obligations which relate to such Seller and/or that Property owned by such Seller; and in no event shall any representations, warranties or obligations of Sellers hereunder be construed as a joint and several obligation of more than one (1) Seller.

32.    <u>Limitation of Liability</u>.    Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that none of the employees, directors, officers, members, partners, managers, principals, consultants, shareholders, advisors, attorneys, or agents of Sellers or Purchaser shall have any personal liability or obligation whatsoever for any obligations under this Agreement or under any documents delivered at the Closing, entered into by or on behalf of Sellers or either Seller or Purchaser.    However, the foregoing shall not in any way limit the parties' obligations and liabilities under this Agreement. The provisions of this Section 32 shall survive the Closing.

33.    <u>No Offer</u>.    This Agreement shall not be deemed an offer or binding upon Sellers or Purchaser until this Agreement is fully executed and delivered by each Seller and Purchaser.

34.    <u>Entirety of the Properties</u>.    The parties acknowledge that the Properties are comprised of two (2) parcels which are described on **<u>Exhibit A-1</u>** and **<u>A-2</u>**.    Notwithstanding that there are two (2) parcels, the parties agree that there shall be one Closing and Purchaser shall not

83

be permitted to acquire one parcel and not the other, it being the intent and agreement of the parties that the sale and acquisition of all parcels to be sold shall occur contemporaneously subject to and in accordance with the terms of this Agreement. A default by either party in connection with one parcel shall be deemed a default in connection with all parcels.

35. <u>Termination</u>.

35.1. This Agreement may be terminated at any time prior to Closing, as follows:

(a)  By written agreement of Purchaser and Sellers;

(b)  As set forth at Section 11.2, by Purchaser if Sellers have breached any covenant or agreement required to be performed by Sellers pursuant to this Agreement (including, without limitation, failing to satisfy any required milestone in accordance with Section 9.1.8 or 9.1.9) and the Closing does not occur by reason thereof;

(c)  As set forth at Section 11.1, by Sellers in the event of a Purchaser Default;

(d)  By any party if (i) the Conditions to Closing set forth in Section 10 are not satisfied or waived by the party having the right to waive the applicable condition, (ii) the Bid Protections Order is not entered by the Bankruptcy Court as provided for in Section 9.1.7, or (iii) the Closing does not occur by the Outside Date pursuant to the provisions of this Agreement, other than as described at subsections (b), (c), (d)(i) or (d)(ii) of this Section 35.1; or

(e)  By the Sellers, (i) if this Agreement is in full force and effect and the Sellers determine in the exercise of their fiduciary duties to sell the Properties to a person or entity other than the Purchaser or (ii) if the Bankruptcy Court shall enter an order approving a sale or a chapter 11 plan that provides for any sale or other disposition of the Properties to a person or entity other than Purchaser, including by reason of an auction (each, an "<u>Alternate Transaction</u>").

35.2 <u>Effect of Termination</u>.

(a) Other than as specifically set forth in sections 35.2(b), (c), and (d), in the event of termination of this Agreement pursuant to Section 35.1, this Agreement shall thereafter become void and have no effect, and no party shall have any liability to the other parties or their respective affiliates, directors, officers, or employees, except for the obligations of the parties contained in Section 29 and this Section 35.2.

(b) If this Agreement is terminated by Sellers pursuant to Section 35.1(c), the Escrow Agent shall pay the Downpayment to the Sellers.  If this Agreement is terminated by Purchaser pursuant to Section 35.1(b) or by either party pursuant to Section 35.1(d), Escrow Agent shall pay the Downpayment to Purchaser and Sellers shall pay the Expense Reimbursement to Purchaser.

(c) If between the issuance of the Bid Protections Order and the earlier of the Closing Date and the termination of this Agreement, Sellers (i) sell the Properties or any part thereof to a third-party other than Purchaser or a permitted assignee thereof, or (ii) lease substantially all of either Property to a third-party other than Purchaser or a permitted assignee thereof, or (iii) refinance any mortgage encumbering any portion of the Properties, which prevents Sellers from being able to complete their performance in accordance with the terms of this Agreement or renders Sellers unable to deliver title to Purchaser as required under this Agreement, Purchaser's ability to purchase the Property in accordance with terms hereof, or (iv) willfully take any act intended to cause a termination (other than as expressly permitted under the terms hereof) or rejection of this Agreement, in each case which prevents Sellers from being able to complete their performance in accordance with the terms of this Agreement or renders Sellers unable to deliver title to Purchaser as required under this Agreement (such actions enumerated in this Section 35.2, each a "Sellers-Prohibited Act"), Sellers shall be obligated to pay to Purchaser the Break-Up

85

Fee concurrently with any such actions, but in no event later than ten (10) days following demand therefor with respect to the Sellers-Prohibited Act (i), (ii) and (iii), and within sixty (60) days of Sellers-Prohibited Act (iv), provided there is no material non-monetary or monetary Purchaser Default.  If Sellers have engaged in any Sellers-Prohibited Act prior to the issuance of the Bid Protections Order, Sellers shall be obligated to pay to Purchaser the Expense Reimbursement and the Escrow Agent shall return the Downpayment promptly following demand therefor. Except as expressly otherwise provided herein, Purchaser shall not be entitled to any other damages from Sellers of any kind or nature upon Sellers performing a Sellers-Prohibited Act.  Notwithstanding anything to the contrary contained herein, prior to the commencement of the Seller Bankruptcy Proceedings, Purchaser shall have all remedies available at law and in equity, which shall include the right to specific performance, but Purchaser shall not be entitled to damages from Sellers of any kind or nature unless Seller shall commit any act which makes the remedy of specific performance unavailable.

(d) If (i) the Bid Protections Order is entered, (ii) this Agreement is terminated by Sellers pursuant to Section 35.1(e) and (iii) an Alternate Transaction shall be fully-consummated (provided that if such Alternate Transaction is an auction ordered by the Bankruptcy Court, Purchaser permits this Agreement to remain in effect and to serve as a "stalking horse" contract), Sellers shall pay to Purchaser concurrently with the closing of such Alternate Transaction by wire transfer of immediately available funds to an account designated by Purchaser, the sum of Twenty Million and 00/100 Dollars ($20,000,000.00) (the "Break-Up Fee").

(e) If (A) (i) the Bid Procedures Order is entered, (ii) the Bankruptcy Court does not enter the Confirmation Order by the Outside Date and (iii) Purchaser or Sellers elect to terminate this Agreement in accordance with its terms; or (B) (i) the Bid Procedures Order is

ACTIVE/111354839.1
5921483-2

entered and (ii) the Bankruptcy Court directs for an auction to be held and Purchaser does not permit this Agreement to remain as a stalking horse contract, then in either such event Sellers shall be obligated to pay to Purchaser within ten days following demand all of Purchaser's reasonable costs and expenses (including reasonable attorneys' fees) actually incurred in connection with Purchaser's due diligence, negotiation, and entry into this Agreement, not to exceed ONE HUNDRED FIFTY THOUSAND AND 00/100 ($150,000.00) DOLLARS by wire transfer of immediately available funds to an account designated by Purchaser (the "Expense Reimbursement"). Further, if the Series E Bondholder Approval and the Executed RSA are not obtained, Sellers shall be obligated to pay Purchaser the Expense Reimbursement. Notwithstanding anything to the contrary herein, Sellers will not be obligated to remit the Expense Reimbursement to Purchaser in the event of a material non-monetary or monetary Purchaser Default.

(f) Upon payment of the Downpayment to the party entitled thereto in accordance with Section 35.2(b), payment of the Downpayment and the Break-Up Fee to Purchaser in accordance with Section 35.2(c), and/or payment of the Expense Reimbursement in accordance with Section 35.2(e), as applicable, Sellers and their respective representatives and affiliates, on the one hand, and Purchaser and its representatives, on the other hand, will be deemed to have fully released and discharged each other from any liability resulting from the termination of this Agreement and neither Sellers nor their respective representatives or affiliates, on the one hand, nor Purchaser or its representatives or affiliates, on the other hand, or any other person will have any other remedy or cause of action under or relating to this Agreement or applicable law, including for reimbursement of expenses.

ACTIVE/111354839.1
5921483-2

(g) Whenever Purchaser is entitled to the Break-Up Fee or Expense Reimbursement hereunder, or Purchaser otherwise terminates this Agreement in accordance with its rights, Sellers shall direct the Escrow Agent to promptly return the Downpayment to Purchaser.

36.    Series E Bondholder and Mezz Lender Approval and Executed RSA.

36.1    Sellers shall obtain the consent and approval for the consummation of the transactions contemplated by this Agreement from MREF REIT Lender 9 LLC ("Mezz Lender Approval") and the holders of the Series E Bonds (the "Series E Bondholder Approval"), which approval shall be documented in a restructuring support agreement (the "Executed RSA").  The Executed RSA shall provide that the signatories thereto consent to and support the transactions contemplated under this Agreement and that, during the period from the "effective date" of the Executed RSA through the date that is the earlier to occur of the Bankruptcy Court's entry of the Bid Protections Order or termination of this Agreement in accordance with the terms hereof, such parties shall not market, solicit or respond to offers for or provide due diligence information with respect to the Properties or negotiate with any other party with respect to the possible sale of all or any part of the Property (subject in each case to applicable fiduciary duties of MREF REIT Lender 9 LLC, the Series E Bonds and Sellers with respect to unsolicited expressions of interest, offers or bids and any Bankruptcy Court order that might be entered providing for or requiring a marketing and auction process), and, as to the holders of the Series E Bonds, shall require such holders to assign the mortgage(s) encumbering the applicable Properties to Purchaser's lender without cost, other than reasonable attorneys' fees.  Sellers agree to take all commercially reasonable actions necessary to obtain such Executed RSA within fourteen (14) days from the date of this Agreement and not to do anything to hinder delay, disrupt, interfere in or undermine the process of obtaining the Executed RSA. Sellers shall keep Purchaser apprised of its progress on obtaining the Executed

ACTIVE/111354839.1
5921483-2

RSA.  If the Executed RSA is not obtained within fourteen (14) days following the date of this

Agreement (as the same may be extended in accordance with Section 9.1.7 above), either Sellers

the Purchaser may elect to terminate at any time thereafter until the Executed RSA is delivered,

and in the event of such termination (i) this Agreement shall be of no further force or effect except

for those provisions expressly stated to survive and (ii) Sellers shall pay to Purchaser the Expense

Reimbursement and cause the Downpayment to be returned to Purchaser.  Notwithstanding the

foregoing, if the Executed RSA is not timely obtained (but not expressly denied), then Purchaser

shall have the right to extend the time period for the Sellers to obtain the same for an additional

reasonable period not to exceed fourteen (14) days. For purposes of this Section 36.1, the "effective

date" of the Executed RSA shall be the first date on which all of the following have occurred: (i)

all of the parties thereto have executed such agreement, and (ii) the Series E Bondholders have

voted to authorize and approve such agreement and all other steps (if any) have been taken to make

such agreement enforceable as to all of the Series E Bondholders.

37.   COVID-19.   This Agreement was negotiated and executed during the ongoing

global COVID-19 pandemic ("COVID") and the existence of federal, state and local laws,

interventions, ordinances, orders, guidelines and other actions as a result of COVID (collectively

"Official COVID Actions"). It is foreseeable that COVID can extend or worsen and that Official

COVID Actions can expand, become more stringent or otherwise change. Provided there is not

then an Order prohibiting the transaction from occurring on the date and time required hereunder,

the Title Company is unable to issue its title policy because of its inability to complete searches,

Purchaser's lenders are unable to wire funds due to impediments in the banking system, neither

the existence of COVID and Official COVID Actions nor any change in COVID or Official

COVID Action shall: (i) excuse Purchaser's or Sellers' obligations to perform their respective

89

obligations under and in accordance with this Agreement, in whole or in part; (ii) expand a party's economic and other obligations under this Agreement; or (iii) be the basis of any defense to a party's performance or a claim brought under this Agreement, including but not limited, claims or defenses based on force majeure, impossibility of performance or frustration of purpose.

[SIGNATURES ON THE FOLLOWING PAGE]

90

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first above written.

**SELLERS:**

Evergreen Gardens I LLC
By: Evergreen Gardens Mezz LLC, its manager
By: All Year Holdings LLC, its manager
By: All Year Holdings Limited, its manager

By: _____
Name: Assaf Ravid
Title: Authorized Signatory

By: _____
Name: Ephraim Diamond
Title: Authorized Signatory

Evergreen Gardens II LLC
By: Evergreen Gardens Holdings II LLC, its manager
By: All Year Holdings LLC, its manager
By: All Year Holdings Limited, its manager

By: _____
Name: Assaf Ravid
Title: Authorized Signatory

By: _____
Name: Ephraim Diamond
Title: Authorized Signatory

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first above written.

**SELLERS:**

Evergreen Gardens I LLC

By: _____
     Name:
     Title:

Evergreen Gardens II LLC

By: _____
     Name:
     Title:

**PURCHASER:**

ACI VI DENIZEN LLC

By: _____
     Name: Jeffrey A. Goldberger
     Title:  Authorized Signatory

By: _____
     Name: Andrew B. Cohen
     Title:  Authorized Signatory

**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF CONFIRMING
THE PROVISIONS OF ARTICLE 24:

FIDELITY NATIONAL TITLE INSURANCE COMPANY,
as Escrow Agent

By: _____
     Name:
     Title:

88.

**PURCHASER:**

ACI VI DENIZEN LLC

By: _____
      Name:  Jeffrey A. Goldberger
      Title:   Authorized Signatory

By: _____
      Name: Andrew B. Cohen
      Title:   Authorized Signatory

**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF CONFIRMING
THE PROVISIONS OF ARTICLE 24:

FIDELITY NATIONAL TITLE INSURANCE COMPANY,
as Escrow Agent

By: _____
      Name:  Avis Somers
      Title:   VP / Counsel

## **SCHEDULE OF EXHIBITS**

| | |
|---|---|
| Exhibit A-1 | Legal Description for Melrose Street Parcel |
| Exhibit A-2 | Legal Description for Noll Street Parcel |
| Exhibit B-1 | Lease Schedule for Melrose Street Property |
| Exhibit B-2 | Lease Schedule for Noll Street Property |
| Exhibit B-3 | Security Deposits Melrose Street Property |
| Exhibit B-4 | Security Deposits Noll Street Property |
| Exhibit C-1 | Service Contracts for Melrose St. Property |
| Exhibit C-2 | Service Contracts for Noll Street Property |
| Exhibit D-1 | Permitted Exceptions for Melrose Street Property |
| Exhibit D-2 | Permitted Exceptions for Noll Street Property |
| Exhibit D-3 | Schedule B to Title Report |
| Exhibit E | Bargain and Sale Deed without Covenants |
| Exhibit F | Assignment of Leases |
| Exhibit G | Bill of Sale |
| Exhibit H | Form of Foodtown Estoppel Certificate and Form of Coffee Estoppel Certificate |
| Exhibit H-1 | Retail Tenant Leasing Issues |
| Exhibit H-2 | Form of Owner's Estoppel Certificate |
| Exhibit I | Assignment of Contracts |
| Exhibit J | Employees as of July 27, 2021 |
| Exhibit J-1 | Other Employee Compensation |
| Exhibit K | Environmental Reports |
| Exhibit L | Union Assumption Agreement |
| Exhibit M | Intentionally Omitted |
| Exhibit M-1 | Intentionally Omitted |
| Exhibit N | Intentionally Omitted |
| Exhibit O | Enumerated Liens |
| Exhibit P | Real Estate Tax Proceedings |
| Exhibit Q | Form of Title Affidavit |
| Exhibit R | Form of Bid Protections Order |
| Exhibit S | Form of Lease and Rider |
| Exhibit T | Form of Notice to Local 713 |
| Exhibit U | Escrow Agent |
| Exhibit V | Fresh Declaration |
| Exhibit W | Assignment Agreement |

## EXHIBIT A-1

### Legal Description for Melrose Street Property

All that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Stanwix Street, with the northwesterly side of Melrose Street;

RUNNING THENCE northwesterly along the northeasterly side of Stanwix Street, 187.27 feet to an angle point;

THENCE continuing northwesterly along the northeasterly side of Stanwix Street, a distance of 80.54 feet;

THENCE northwesterly along a line forming an angle of 90 degrees 00 minutes 09 seconds with the northeasterly side of Stanwix Street, a distance of 349.99 feet to the southwesterly side of Evergreen Avenue;

THENCE southeasterly along the southwesterly side of Evergreen Avenue, 80.94 feet to an angle point;

THENCE continuing easterly along the southerly side of Evergreen Avenue, 125.73 feet to the corner formed by the southerly side of Evergreen Avenue, with the northwesterly side of Melrose Street;

THENCE southwesterly along the northwesterly side of Melrose Street, 446.92 feet to the corner formed by the intersection of the northeasterly side of Stanwix Street, with the northwesterly side of Melrose Street, the point or place of BEGINNING.

## EXHIBIT A-2

### Legal Description Contracts for Noll Street Property

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being bounded and described as follows:

BEGINNING at a point on the easterly side of Stanwix Street, distant 267.81 feet northwesterly, as measured along the easterly side of Stanwix Street, from the corner formed by the intersection of the easterly side of Stanwix Street, with the northwesterly side of Melrose Street;

RUNNING THENCE northeasterly along a line forming an angle of 90 degrees 00 minutes 09 seconds with the easterly side of Stanwix Street, a distance of 349.99 feet to the westerly side of Evergreen Avenue;

THENCE northwesterly along the westerly side of Evergreen Avenue, 200.95 feet;

THENCE southwesterly along a line forming an angle of 88 degrees 43 minutes 56 seconds with the last mentioned course, a distance of 350.08 feet to the easterly side of Stanwix Street;

THENCE southeasterly along the easterly side of Stanwix Street, 193.22 feet to the point or place of BEGINNING.

## EXHIBIT B-1

### Lease Schedule for Melrose Street Property

*Residential Rent Roll (As of 7/27/2021)*

| Building | Apt. # | Occupancy Status | Rent | Other Charges* | Arrears** |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 101 | Occupied | $3,325 | $225 | $0 |
| Denizen X / 123 Melrose St | 102 | Occupied | $947 | $0 | $1,267 |
| Denizen X / 123 Melrose St | 103 | Occupied | $3,125 | $150 | $0 |
| Denizen X / 123 Melrose St | 104 | Occupied | $3,600 | $150 | $0 |
| Denizen X / 123 Melrose St | 105 | Occupied | $3,800 | $150 | $1 |
| Denizen X / 123 Melrose St | 106 | Occupied | $3,250 | $150 | $0 |
| Denizen X / 123 Melrose St | 107 | Occupied | $3,850 | $0 | $6,723 |
| Denizen X / 123 Melrose St | 108 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 109 | Occupied | $2,850 | $0 | $17,545 |
| Denizen X / 123 Melrose St | 110 | Occupied | $2,575 | $75 | $0 |
| Denizen X / 123 Melrose St | 140 | Occupied | $1,230 | $0 | $1,480 |
| Denizen X / 123 Melrose St | 205 | Occupied | $3,125 | $150 | $0 |
| Denizen X / 123 Melrose St | 206 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 207 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 208 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 209 | Occupied | $1,230 | $600 | $1,809 |
| Denizen X / 123 Melrose St | 210 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 211 | Occupied | $4,800 | $525 | $0 |
| Denizen X / 123 Melrose St | 212 | Occupied | $1,230 | $75 | $1,920 |
| Denizen X / 123 Melrose St | 213 | Occupied | $1,230 | $0 | $0 |
| Denizen X / 123 Melrose St | 214 | Occupied | $3,350 | $0 | $223 |
| Denizen X / 123 Melrose St | 215 | Occupied | $3,250 | $650 | $0 |
| Denizen X / 123 Melrose St | 216 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 217 | Occupied | $2,350 | $75 | $6,410 |
| Denizen X / 123 Melrose St | 218 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 219 | Occupied | $2,400 | $225 | $0 |
| Denizen X / 123 Melrose St | 220 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 221 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 222 | Occupied | $2,450 | $0 | $0 |
| Denizen X / 123 Melrose St | 223 | Occupied | $2,425 | $75 | $364 |
| Denizen X / 123 Melrose St | 224 | Occupied | $3,550 | $150 | $0 |
| Denizen X / 123 Melrose St | 225 | Occupancy | $2,450 | $0 | $0 |
| Denizen X / 123 Melrose St | 226 | Occupied | $2,375 | $0 | $25,581 |
| Denizen X / 123 Melrose St | 227 | Occupied | $2,375 | $75 | $0 |
| Denizen X / 123 Melrose St | 228 | Occupied | $2,450 | $75 | $2,450 |
| Denizen X / 123 Melrose St | 229 | Occupied | $2,675 | $100 | $0 |
| Denizen X / 123 Melrose St | 230 | Superintendent | $3,900 | -$3,900 | $0 |
| Denizen X / 123 Melrose St | 240 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 241 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 242 | Occupied | $1,017 | $0 | $3 |
| Denizen X / 123 Melrose St | 243 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 244 | Occupied | $2,375 | $75 | $0 |
| Denizen X / 123 Melrose St | 245 | Occupied | $2,350 | $0 | $2,350 |
| Denizen X / 123 Melrose St | 246 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 247 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 248 | Occupied | $3,850 | $225 | $834 |
| Denizen X / 123 Melrose St | 249 | Occupied | $3,125 | $225 | $0 |
| Denizen X / 123 Melrose St | 250 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 251 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 252 | Occupied | $3,325 | $100 | $0 |
| Denizen X / 123 Melrose St | 253 | Occupied | $3,000 | $375 | $0 |
| Denizen X / 123 Melrose St | 254 | Occupied | $2,650 | $75 | $0 |
| Denizen X / 123 Melrose St | 255 | Occupied | $3,300 | $75 | $0 |
| Denizen X / 123 Melrose St | 256 | Occupied | $3,075 | $75 | $0 |
| Denizen X / 123 Melrose St | 257 | Occupied | $3,150 | $300 | $0 |
| Denizen X / 123 Melrose St | 258 | Occupied | $2,975 | $375 | $2,975 |
| Denizen X / 123 Melrose St | 259 | Occupied | $3,850 | $150 | $0 |
| Denizen X / 123 Melrose St | 260 | Occupied | $3,575 | $75 | $4,440 |
| Denizen X / 123 Melrose St | 270 | Occupied | $1,017 | $375 | $0 |
| Denizen X / 123 Melrose St | 271 | Occupied | $1,042 | $100 | $0 |
| Denizen X / 123 Melrose St | 272 | Occupied | $3,200 | $150 | $0 |
| Denizen X / 123 Melrose St | 273 | Occupied | $1,017 | $525 | $28 |
| Denizen X / 123 Melrose St | 274 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 275 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 276 | Occupied | $3,325 | $300 | $6,650 |
| Denizen X / 123 Melrose St | 277 | Occupied | $3,400 | $75 | $0 |
| Denizen X / 123 Melrose St | 278 | Occupied | $3,200 | -$50 | $0 |
| Denizen X / 123 Melrose St | 301 | Occupied | $3,000 | $225 | $0 |
| Denizen X / 123 Melrose St | 302 | Occupied | $1,230 | $0 | $0 |
| Denizen X / 123 Melrose St | 303 | Occupied | $1,230 | $150 | $459 |
| Denizen X / 123 Melrose St | 304 | Occupied | $3,575 | $225 | $0 |
| Denizen X / 123 Melrose St | 305 | Occupied | $3,200 | $150 | $0 |
| Denizen X / 123 Melrose St | 306 | Occupied | $3,775 | $450 | $0 |
| Denizen X / 123 Melrose St | 307 | Occupied | $3,325 | $150 | $0 |
| Denizen X / 123 Melrose St | 308 | Occupied | $1,230 | $0 | $925 |
| Denizen X / 123 Melrose St | 309 | Occupied | $4,700 | $150 | $0 |
| Denizen X / 123 Melrose St | 310 | Occupied | $4,475 | $0 | $4,475 |
| Denizen X / 123 Melrose St | 311 | Occupied | $3,350 | $150 | $0 |
| Denizen X / 123 Melrose St | 312 | Occupied | $3,350 | $150 | $0 |
| Denizen X / 123 Melrose St | 313 | Occupied | $3,550 | $375 | $0 |
| Denizen X / 123 Melrose St | 314 | Occupied | $4,150 | $150 | $150 |
| Denizen X / 123 Melrose St | 315 | Occupied | $3,550 | $75 | $1,403 |
| Denizen X / 123 Melrose St | 316 | Occupied | $3,550 | $225 | $31,351 |
| Denizen X / 123 Melrose St | 317 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 318 | Occupied | $2,350 | $75 | $35 |
| Denizen X / 123 Melrose St | 319 | Occupied | $947 | $0 | $1,209 |

| Denizen X / 123 Melrose St | 320 | Occupied | $2,425 | $0 | $2,347 |
| Denizen X / 123 Melrose St | 321 | Occupied | $947 | $75 | $522 |
| Denizen X / 123 Melrose St | 322 | Occupied | $2,425 | $0 | $0 |
| Denizen X / 123 Melrose St | 323 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 324 | Occupied | $2,425 | $0 | $0 |
| Denizen X / 123 Melrose St | 325 | Occupied | $947 | $0 | $4,259 |
| Denizen X / 123 Melrose St | 326 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 327 | Occupied | $947 | $0 | $312 |
| Denizen X / 123 Melrose St | 328 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 329 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 330 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 331 | Occupied | $2,575 | $75 | $3,572 |
| Denizen X / 123 Melrose St | 332 | Occupied | $2,525 | $0 | $489 |
| Denizen X / 123 Melrose St | 333 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 334 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 335 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 336 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 337 | Occupied | $2,425 | $0 | $0 |
| Denizen X / 123 Melrose St | 338 | Occupied | $2,525 | $0 | $2,525 |
| Denizen X / 123 Melrose St | 339 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 340 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 341 | Occupied | $2,425 | $150 | $75 |
| Denizen X / 123 Melrose St | 342 | Occupied | $2,550 | $0 | $2,975 |
| Denizen X / 123 Melrose St | 343 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 344 | Occupied | $947 | $75 | $75 |
| Denizen X / 123 Melrose St | 345 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 346 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 347 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 348 | Occupied | $2,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 349 | Occupied | $4,050 | $75 | $0 |
| Denizen X / 123 Melrose St | 350 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 351 | Occupied | $3,175 | $75 | $0 |
| Denizen X / 123 Melrose St | 352 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 353 | Occupied | $3,375 | $0 | $1,089 |
| Denizen X / 123 Melrose St | 354 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 355 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 356 | Occupied | $3,350 | $75 | $0 |
| Denizen X / 123 Melrose St | 357 | Occupied | $3,550 | $150 | $3,508 |
| Denizen X / 123 Melrose St | 358 | Occupied | $2,975 | $75 | $428 |
| Denizen X / 123 Melrose St | 359 | Occupied | $3,375 | $525 | $0 |
| Denizen X / 123 Melrose St | 360 | Occupied | $4,050 | $750 | $0 |
| Denizen X / 123 Melrose St | 361 | Occupied | $3,800 | $75 | $0 |
| Denizen X / 123 Melrose St | 370 | Occupied | $1,017 | $0 | $306 |
| Denizen X / 123 Melrose St | 371 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 372 | Occupied | $3,400 | $150 | $0 |
| Denizen X / 123 Melrose St | 373 | Occupied | $1,017 | $0 | $109 |
| Denizen X / 123 Melrose St | 374 | Occupied | $1,017 | $0 | $9,491 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 375 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 376 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 377 | Occupied | $3,900 | $200 | $0 |
| Denizen X / 123 Melrose St | 378 | Occupied | $3,550 | $75 | $0 |
| Denizen X / 123 Melrose St | 379 | Occupied | $3,600 | $0 | $0 |
| Denizen X / 123 Melrose St | 401 | Occupied | $3,225 | $375 | $0 |
| Denizen X / 123 Melrose St | 402 | Occupied | $1,230 | $0 | $0 |
| Denizen X / 123 Melrose St | 403 | Occupied | $1,230 | $450 | $0 |
| Denizen X / 123 Melrose St | 404 | Occupied | $3,975 | $450 | $0 |
| Denizen X / 123 Melrose St | 405 | Occupied | $3,500 | $75 | $0 |
| Denizen X / 123 Melrose St | 406 | Occupied | $3,650 | $300 | $4,025 |
| Denizen X / 123 Melrose St | 407 | Occupied | $3,425 | $75 | $0 |
| Denizen X / 123 Melrose St | 408 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 409 | Occupied | $4,500 | $175 | $0 |
| Denizen X / 123 Melrose St | 410 | Occupied | $4,650 | $450 | $0 |
| Denizen X / 123 Melrose St | 411 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 412 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 413 | Occupied | $3,600 | $150 | $0 |
| Denizen X / 123 Melrose St | 414 | Occupied | $4,000 | $225 | $5,500 |
| Denizen X / 123 Melrose St | 415 | Occupied | $3,600 | $150 | $122 |
| Denizen X / 123 Melrose St | 416 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 417 | Occupied | $4,675 | $150 | $0 |
| Denizen X / 123 Melrose St | 418 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 419 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 420 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 421 | Occupied | $947 | $40 | $81 |
| Denizen X / 123 Melrose St | 422 | Occupied | $2,650 | $75 | $30,645 |
| Denizen X / 123 Melrose St | 423 | Occupied | $947 | $0 | $1,244 |
| Denizen X / 123 Melrose St | 424 | Occupied | $2,650 | $75 | $5,375 |
| Denizen X / 123 Melrose St | 425 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 426 | Occupied | $2,650 | $0 | $0 |
| Denizen X / 123 Melrose St | 427 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 428 | Occupied | $2,650 | $0 | $3,419 |
| Denizen X / 123 Melrose St | 429 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 430 | Occupied | $2,650 | $0 | $0 |
| Denizen X / 123 Melrose St | 431 | Occupied | $2,700 | $75 | $0 |
| Denizen X / 123 Melrose St | 432 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 433 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 434 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 435 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 436 | Occupied | $2,600 | $75 | $0 |
| Denizen X / 123 Melrose St | 437 | Occupied | $2,600 | $75 | $2,600 |
| Denizen X / 123 Melrose St | 438 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 439 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 440 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 441 | Occupied | $2,675 | $75 | $2,675 |
| Denizen X / 123 Melrose St | 442 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 443 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 444 | Occupied | $947 | $75 | $1,058 |
| Denizen X / 123 Melrose St | 445 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 446 | Occupied | $947 | $75 | $77 |
| Denizen X / 123 Melrose St | 447 | Occupied | $2,675 | $175 | $644 |
| Denizen X / 123 Melrose St | 448 | Occupied | $2,550 | $0 | $0 |
| Denizen X / 123 Melrose St | 449 | Occupied | $4,100 | $0 | $8,200 |
| Denizen X / 123 Melrose St | 450 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 451 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 452 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 453 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 454 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 455 | Occupied | $2,825 | $375 | $0 |
| Denizen X / 123 Melrose St | 456 | Occupied | $3,400 | $75 | $3,400 |
| Denizen X / 123 Melrose St | 457 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 458 | Occupied | $3,300 | $75 | $0 |
| Denizen X / 123 Melrose St | 459 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 460 | Occupied | $4,200 | $100 | $1,110 |
| Denizen X / 123 Melrose St | 461 | Occupied | $3,825 | $450 | $0 |
| Denizen X / 123 Melrose St | 470 | Occupied | $1,017 | $0 | $29 |
| Denizen X / 123 Melrose St | 471 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 472 | Occupied | $3,475 | $75 | $1 |
| Denizen X / 123 Melrose St | 473 | Occupied | $1,017 | $75 | $209 |
| Denizen X / 123 Melrose St | 474 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 475 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 476 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 477 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 478 | Occupied | $3,400 | $100 | $0 |
| Denizen X / 123 Melrose St | 479 | Occupied | $3,875 | $150 | $0 |
| Denizen X / 123 Melrose St | 501 | Occupied | $3,325 | $75 | $0 |
| Denizen X / 123 Melrose St | 502 | Occupied | $1,230 | $150 | $0 |
| Denizen X / 123 Melrose St | 503 | Occupied | $1,261 | $75 | $702 |
| Denizen X / 123 Melrose St | 504 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 505 | Occupied | $3,650 | $75 | $3,650 |
| Denizen X / 123 Melrose St | 506 | Occupied | $3,700 | $375 | $75 |
| Denizen X / 123 Melrose St | 507 | Occupied | $3,450 | $450 | $0 |
| Denizen X / 123 Melrose St | 508 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 509 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 510 | Occupied | $4,675 | $525 | $0 |
| Denizen X / 123 Melrose St | 511 | Vacant | $3,650 | | $0 |
| Denizen X / 123 Melrose St | 512 | Occupied | $3,650 | $275 | $0 |
| Denizen X / 123 Melrose St | 513 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 514 | Occupied | $4,475 | $450 | $0 |
| Denizen X / 123 Melrose St | 515 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 516 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 517 | Occupied | $4,700 | -$4,400 | $0 |
| Denizen X / 123 Melrose St | 518 | Occupied | $2,400 | $75 | $1,496 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 519 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 520 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 521 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 522 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 523 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 524 | Occupied | $2,700 | $300 | $0 |
| Denizen X / 123 Melrose St | 525 | Occupied | $947 | $100 | $0 |
| Denizen X / 123 Melrose St | 526 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 527 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 528 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 529 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 530 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 531 | Occupied | $2,725 | $375 | $0 |
| Denizen X / 123 Melrose St | 532 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 533 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 534 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 535 | Occupied | $2,700 | $75 | $5,625 |
| Denizen X / 123 Melrose St | 536 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 537 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 538 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 539 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 540 | Occupied | $2,700 | $75 | $0 |
| Denizen X / 123 Melrose St | 541 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 542 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 543 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 544 | Occupied | $947 | $0 | $441 |
| Denizen X / 123 Melrose St | 545 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 546 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 547 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 548 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 549 | Occupied | $4,500 | $150 | $0 |
| Denizen X / 123 Melrose St | 550 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 551 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 552 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 553 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 554 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 555 | Occupied | $2,875 | $150 | $2,875 |
| Denizen X / 123 Melrose St | 556 | Occupied | $3,600 | $150 | $0 |
| Denizen X / 123 Melrose St | 557 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 558 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 559 | Occupied | $3,525 | $75 | $7,050 |
| Denizen X / 123 Melrose St | 560 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 561 | Occupied | $4,200 | $225 | $75 |
| Denizen X / 123 Melrose St | 570 | Occupied | $1,017 | $75 | $231 |
| Denizen X / 123 Melrose St | 571 | Occupied | $1,017 | $100 | $0 |
| Denizen X / 123 Melrose St | 572 | Occupied | $3,700 | $150 | $0 |
| Denizen X / 123 Melrose St | 573 | Occupied | $1,017 | $75 | $34 |

| Denizen X / 123 Melrose St | 574 | Occupied | $1,017 | $0 | $0 |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 575 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 576 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 577 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 578 | Occupied | $3,650 | $75 | $0 |
| Denizen X / 123 Melrose St | 579 | Occupied | $4,300 | $225 | $1,154 |
| Denizen X / 123 Melrose St | 601 | Occupied | $3,550 | $225 | $0 |
| Denizen X / 123 Melrose St | 602 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 603 | Occupied | $1,230 | $150 | $0 |
| Denizen X / 123 Melrose St | 604 | Occupied | $4,250 | $150 | $2,331 |
| Denizen X / 123 Melrose St | 605 | Occupied | $3,600 | $0 | $4,980 |
| Denizen X / 123 Melrose St | 606 | Occupied | $3,725 | $225 | $0 |
| Denizen X / 123 Melrose St | 607 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 608 | Occupied | $1,230 | $150 | $0 |
| Denizen X / 123 Melrose St | 609 | Occupied | $4,550 | $450 | $0 |
| Denizen X / 123 Melrose St | 610 | Occupied | $4,700 | $75 | $0 |
| Denizen X / 123 Melrose St | 611 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 612 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 613 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 614 | Occupied | $4,500 | $150 | $0 |
| Denizen X / 123 Melrose St | 615 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 616 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 617 | Occupied | $4,725 | $0 | $0 |
| Denizen X / 123 Melrose St | 618 | Occupied | $2,400 | $375 | $0 |
| Denizen X / 123 Melrose St | 619 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 620 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 621 | Occupied | $947 | $0 | $3,341 |
| Denizen X / 123 Melrose St | 622 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 623 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 624 | Occupied | $2,750 | $75 | $206 |
| Denizen X / 123 Melrose St | 625 | Occupied | $947 | $375 | $0 |
| Denizen X / 123 Melrose St | 626 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 627 | Occupied | $947 | $75 | $3 |
| Denizen X / 123 Melrose St | 628 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 629 | Occupied | $947 | $75 | $19 |
| Denizen X / 123 Melrose St | 630 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 631 | Occupied | $2,900 | $375 | $1,185 |
| Denizen X / 123 Melrose St | 632 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 633 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 634 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 635 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 636 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 637 | Occupied | $2,575 | $0 | $0 |
| Denizen X / 123 Melrose St | 638 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 639 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 640 | Occupied | $2,750 | $75 | $5,147 |
| Denizen X / 123 Melrose St | 641 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 642 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 643 | Occupied | $947 | $0 | $0 |
| Denizen X / 123 Melrose St | 644 | Occupied | $947 | $75 | $1,544 |
| Denizen X / 123 Melrose St | 645 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 646 | Occupied | $947 | $75 | $0 |
| Denizen X / 123 Melrose St | 647 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 648 | Occupied | $2,750 | $75 | $0 |
| Denizen X / 123 Melrose St | 649 | Occupied | $4,200 | $150 | $0 |
| Denizen X / 123 Melrose St | 650 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 651 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 652 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 653 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 654 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 655 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 656 | Occupied | $3,625 | $75 | $3,156 |
| Denizen X / 123 Melrose St | 657 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 658 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 659 | Occupied | $1,017 | $0 | $256 |
| Denizen X / 123 Melrose St | 660 | Occupied | $4,275 | $300 | $0 |
| Denizen X / 123 Melrose St | 661 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 670 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 671 | Occupied | $1,017 | $0 | $2,428 |
| Denizen X / 123 Melrose St | 672 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 673 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 674 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 675 | Occupied | $1,017 | $0 | $1,071 |
| Denizen X / 123 Melrose St | 676 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 677 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 678 | Occupied | $3,650 | $150 | $3,725 |
| Denizen X / 123 Melrose St | 679 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 701 | Occupied | $3,575 | $150 | $0 |
| Denizen X / 123 Melrose St | 702 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 703 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 704 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 705 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 706 | Occupied | $3,750 | $75 | $1,875 |
| Denizen X / 123 Melrose St | 707 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 708 | Occupied | $3,150 | $75 | $0 |
| Denizen X / 123 Melrose St | 709 | Occupied | $4,650 | $150 | $2,115 |
| Denizen X / 123 Melrose St | 710 | Occupied | $5,275 | $0 | $0 |
| Denizen X / 123 Melrose St | 711 | Occupied | $4,300 | $0 | $64,223 |
| Denizen X / 123 Melrose St | 712 | Occupied | $4,300 | $450 | $0 |
| Denizen X / 123 Melrose St | 713 | Occupied | $4,300 | $225 | $4,003 |
| Denizen X / 123 Melrose St | 714 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 715 | Occupied | $4,750 | $75 | $75 |
| Denizen X / 123 Melrose St | 716 | Occupied | $2,400 | $75 | $3,119 |
| Denizen X / 123 Melrose St | 717 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 718 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 719 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 720 | Occupied | $5,300 | $475 | $0 |
| Denizen X / 123 Melrose St | 721 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 722 | Occupied | $5,300 | $300 | $0 |
| Denizen X / 123 Melrose St | 723 | Occupied | $3,900 | $525 | $8,475 |
| Denizen X / 123 Melrose St | 724 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 735 | Occupied | $3,900 | $75 | $4,150 |
| Denizen X / 123 Melrose St | 736 | Occupied | $3,900 | $75 | $3,900 |
| Denizen X / 123 Melrose St | 737 | Occupied | $3,650 | $375 | $0 |
| Denizen X / 123 Melrose St | 738 | Occupied | $4,200 | $375 | $0 |
| Denizen X / 123 Melrose St | 739 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 740 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 741 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 742 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 743 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 744 | Occupied | $2,800 | $150 | $12,400 |
| Denizen X / 123 Melrose St | 745 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 746 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 747 | Occupied | $2,850 | $75 | $0 |
| Denizen X / 123 Melrose St | 748 | Occupied | $4,300 | $150 | $5,060 |
| Denizen X / 123 Melrose St | 749 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 750 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 751 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 752 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 753 | Occupied | $3,175 | $75 | $0 |
| Denizen X / 123 Melrose St | 754 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 755 | Occupied | $3,700 | $75 | $6,909 |
| Denizen X / 123 Melrose St | 756 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 757 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 758 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 759 | Occupied | $4,450 | $500 | $0 |
| Denizen X / 123 Melrose St | 760 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 770 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 771 | Occupied | $1,017 | $0 | $1,625 |
| Denizen X / 123 Melrose St | 772 | Occupied | $3,625 | $475 | $0 |
| Denizen X / 123 Melrose St | 773 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 774 | Occupied | $1,017 | $150 | $0 |
| Denizen X / 123 Melrose St | 775 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 776 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 777 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 778 | Occupied | $3,550 | $150 | $0 |
| Denizen X / 123 Melrose St | 779 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 801 | Occupied | $3,650 | $525 | $2,043 |
| Denizen X / 123 Melrose St | 802 | Occupied | $4,700 | $150 | $0 |
| Denizen X / 123 Melrose St | 803 | Occupied | $1,230 | $75 | $0 |
| Denizen X / 123 Melrose St | 804 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 816 | Occupied | $4,750 | $225 | $0 |
| Denizen X / 123 Melrose St | 817 | Occupied | $4,700 | $150 | $25,311 |
| Denizen X / 123 Melrose St | 818 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 819 | Occupied | $5,400 | $150 | $73,241 |
| Denizen X / 123 Melrose St | 820 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 821 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 822 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 823 | Occupied | $3,000 | $75 | $0 |
| Denizen X / 123 Melrose St | 824 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 835 | Occupied | $3,200 | $0 | $0 |
| Denizen X / 123 Melrose St | 836 | Occupied | $3,000 | $150 | $0 |
| Denizen X / 123 Melrose St | 837 | Occupied | $3,150 | $0 | $3,150 |
| Denizen X / 123 Melrose St | 838 | Occupied | $3,650 | $150 | $0 |
| Denizen X / 123 Melrose St | 839 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 840 | Occupied | $2,700 | $150 | $0 |
| Denizen X / 123 Melrose St | 841 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 842 | Occupied | $4,300 | $0 | $1,703 |
| Denizen X / 123 Melrose St | 843 | Occupied | $5,500 | $225 | $0 |
| Denizen X / 123 Melrose St | 844 | Occupied | $4,900 | $75 | $5,050 |
| Denizen X / 123 Melrose St | 845 | Occupied | $5,300 | $75 | $0 |
| Denizen X / 123 Melrose St | 846 | Occupied | $3,450 | $450 | $0 |
| Denizen X / 123 Melrose St | 847 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 848 | Occupied | $5,550 | $225 | $0 |
| Denizen X / 123 Melrose St | 849 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 850 | Occupied | $5,400 | $100 | $0 |
| Denizen X / 123 Melrose St | 851 | Occupied | $1,017 | $375 | $0 |
| Denizen X / 123 Melrose St | 852 | Occupied | $3,600 | $150 | $0 |
| Denizen X / 123 Melrose St | 853 | Occupied | $1,230 | $0 | $1,947 |
| Denizen X / 123 Melrose St | 854 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 870 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 871 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 872 | Occupied | $3,800 | $75 | $1,226 |
| Denizen X / 123 Melrose St | 873 | Occupied | $1,017 | $75 | $0 |
| Denizen X / 123 Melrose St | 874 | Occupied | $1,017 | $375 | $0 |
| Denizen X / 123 Melrose St | 875 | Occupied | $1,017 | $0 | $0 |
| Denizen X / 123 Melrose St | 876 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 877 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 878 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 879 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 944 | Occupied | $2,700 | $0 | $523 |
| Denizen X / 123 Melrose St | 945 | Occupied | $2,900 | $75 | $0 |
| Denizen X / 123 Melrose St | 946 | Occupied | $3,750 | $150 | $0 |
| Denizen X / 123 Melrose St | 947 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 948 | Occupied | $4,850 | $75 | $0 |
| Denizen X / 123 Melrose St | 949 | Occupied | $5,250 | $100 | $0 |
| Denizen X / 123 Melrose St | 950 | Occupied | $3,550 | $450 | $0 |
| Denizen X / 123 Melrose St | 951 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 952 | Occupied | $2,700 | $75 | $806 |
| Denizen X / 123 Melrose St | 953 | Occupied | $4,850 | $150 | $2,742 |
| Denizen X / 123 Melrose St | 954 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 955 | Occupied | $3,600 | $75 | $0 |
| Denizen X / 123 Melrose St | 956 | Vacant | | | $0 |
| Denizen X / 123 Melrose St | 957 | Occupied | $4,350 | $375 | $0 |
| Denizen X / 123 Melrose St | Portion of Ground Floor | Occupied per License Agreement dated July 28, 2021 | See License Agreement | See License Agreement | |

\* Includes the aggregate sum of (i) all Amenity Fees, Parking Fees/Rents/Charges, Washer/Dryer Fees paid by such Tenant and (ii) all credits received by such Tenant pursuant to its Lease or other applicable written agreement with the landlord.

\*\* Includes legal and NSF Fees

## EXHIBIT B-2

### Lease Schedule for Noll Street Property

*Residential Rent Roll (As of 7/27/2021)*

| Building | Apt. # | Occupancy Status | Rent | Other Charges* | Arrears** |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 101 | Occupied | $3,450 | $200 | $0 |
| Denizen Y / 54 Noll St | 102 | Occupied | $1,230 | $0 | $0 |
| Denizen Y / 54 Noll St | 103 | Occupied | $3,300 | $100 | $0 |
| Denizen Y / 54 Noll St | 104 | Occupied | $3,175 | $0 | $0 |
| Denizen Y / 54 Noll St | 105 | Occupied | $3,300 | $300 | $0 |
| Denizen Y / 54 Noll St | 201 | Occupied | $3,000 | $0 | $0 |
| Denizen Y / 54 Noll St | 202 | Occupied | $3,000 | $175 | $6,000 |
| Denizen Y / 54 Noll St | 203 | Occupied | $3,200 | $0 | $4,848 |
| Denizen Y / 54 Noll St | 204 | Occupied | $1,032 | $0 | $0 |
| Denizen Y / 54 Noll St | 205 | Occupied | $4,175 | $200 | $0 |
| Denizen Y / 54 Noll St | 206 | Occupied | $3,100 | $200 | $0 |
| Denizen Y / 54 Noll St | 207 | Occupied | $1,248 | $175 | $2,300 |
| Denizen Y / 54 Noll St | 208 | Occupied | $3,200 | $100 | $0 |
| Denizen Y / 54 Noll St | 209 | Occupied | $1,261 | $0 | $351 |
| Denizen Y / 54 Noll St | 210 | Occupied | $3,100 | $500 | $0 |
| Denizen Y / 54 Noll St | 213 | Occupied | $3,200 | $100 | $0 |
| Denizen Y / 54 Noll St | 214 | Occupied | $1,261 | $0 | $0 |
| Denizen Y / 54 Noll St | 215 | Occupied | $1,042 | $0 | $4,092 |
| Denizen Y / 54 Noll St | 216 | Occupied | $3,147 | $75 | $3,222 |
| Denizen Y / 54 Noll St | 217 | Occupied | $3,525 | $150 | $0 |
| Denizen Y / 54 Noll St | 218 | Occupied | $1,042 | $100 | $0 |
| Denizen Y / 54 Noll St | 219 | Occupied | $3,200 | $200 | $0 |
| Denizen Y / 54 Noll St | 220 | Occupied | $2,950 | $300 | $0 |
| Denizen Y / 54 Noll St | 221 | Occupied | $3,150 | $0 | $0 |
| Denizen Y / 54 Noll St | 222 | Occupied | $3,050 | $275 | $1,773 |
| Denizen Y / 54 Noll St | 223 | Occupied | $3,325 | $100 | $222 |
| Denizen Y / 54 Noll St | 226 | Occupied | $4,375 | $500 | $0 |
| Denizen Y / 54 Noll St | 227 | Occupied | $3,200 | $100 | $0 |
| Denizen Y / 54 Noll St | 228 | Occupied | $2,850 | $100 | $0 |
| Denizen Y / 54 Noll St | 229 | Occupied | $2,925 | $100 | $0 |
| Denizen Y / 54 Noll St | 230 | Occupied | $3,000 | $175 | $17,493 |
| Denizen Y / 54 Noll St | 231 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 232 | Occupied | $2,350 | $400 | $0 |
| Denizen Y / 54 Noll St | 233 | Occupied | $2,300 | $100 | $0 |
| Denizen Y / 54 Noll St | 234 | Occupied | $3,300 | $200 | $0 |
| Denizen Y / 54 Noll St | 235 | Occupied | $2,350 | $100 | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 236 | Occupied | $2,400 | $0 | $2,400 |
| Denizen Y / 54 Noll St | 237 | Occupied | $3,250 | $100 | $0 |
| Denizen Y / 54 Noll St | 240 | Occupied | $3,000 | $500 | $0 |
| Denizen Y / 54 Noll St | 241 | Occupied | $2,400 | $0 | $0 |
| Denizen Y / 54 Noll St | 242 | Occupied | $2,325 | $200 | $0 |
| Denizen Y / 54 Noll St | 243 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 244 | Occupied | $3,248 | $175 | $231 |
| Denizen Y / 54 Noll St | 245 | Occupied | $2,350 | $100 | $4,697 |
| Denizen Y / 54 Noll St | 246 | Occupied | $2,350 | $100 | $0 |
| Denizen Y / 54 Noll St | 247 | Occupied | $2,875 | $200 | $1,134 |
| Denizen Y / 54 Noll St | 248 | Occupied | $2,350 | $175 | $156 |
| Denizen Y / 54 Noll St | 249 | Occupied | $2,284 | $100 | $0 |
| Denizen Y / 54 Noll St | 250 | Occupied | $4,750 | $200 | $1,059 |
| Denizen Y / 54 Noll St | 251 | Occupied | $2,900 | $100 | $0 |
| Denizen Y / 54 Noll St | 252 | Occupied | $2,500 | $0 | $11,400 |
| Denizen Y / 54 Noll St | 253 | Occupied | $1,017 | $75 | $0 |
| Denizen Y / 54 Noll St | 254 | Occupied | $3,600 | $100 | $0 |
| Denizen Y / 54 Noll St | 255 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 256 | Occupied | $961 | $0 | $1,053 |
| Denizen Y / 54 Noll St | 257 | Occupied | $2,500 | $0 | $0 |
| Denizen Y / 54 Noll St | 258 | Occupied | $1,042 | $0 | $64 |
| Denizen Y / 54 Noll St | 259 | Occupied | $3,500 | $400 | $75 |
| Denizen Y / 54 Noll St | 260 | Occupied | $3,550 | $200 | $0 |
| Denizen Y / 54 Noll St | 261 | Occupied | $1,017 | $175 | $0 |
| Denizen Y / 54 Noll St | 262 | Occupied | $1,017 | $0 | $0 |
| Denizen Y / 54 Noll St | 263 | Occupied | $1,017 | $100 | $96 |
| Denizen Y / 54 Noll St | 264 | Occupied | $3,100 | $100 | $0 |
| Denizen Y / 54 Noll St | 265 | Occupied | $3,100 | $200 | $3,300 |
| Denizen Y / 54 Noll St | 266 | Superintendent | $3,900 | -$2,000 | $1,900 |
| Denizen Y / 54 Noll St | 301 | Occupied | $3,150 | $200 | $0 |
| Denizen Y / 54 Noll St | 302 | Occupied | $3,000 | $50 | $0 |
| Denizen Y / 54 Noll St | 303 | Occupied | $3,225 | $300 | $48 |
| Denizen Y / 54 Noll St | 304 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 305 | Occupied | $4,000 | $200 | $525 |
| Denizen Y / 54 Noll St | 306 | Occupied | $3,325 | $0 | $3,325 |
| Denizen Y / 54 Noll St | 307 | Occupied | $1,230 | $475 | $3,627 |
| Denizen Y / 54 Noll St | 308 | Occupied | $3,225 | $500 | $0 |
| Denizen Y / 54 Noll St | 309 | Occupied | $1,248 | $100 | $0 |
| Denizen Y / 54 Noll St | 310 | Occupied | $3,225 | $100 | $10 |
| Denizen Y / 54 Noll St | 311 | Occupied | $3,850 | $0 | $0 |
| Denizen Y / 54 Noll St | 312 | Occupied | $1,261 | $100 | $0 |
| Denizen Y / 54 Noll St | 313 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 314 | Occupied | $4,150 | $300 | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 315 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 316 | Occupied | $3,100 | $475 | $0 |
| Denizen Y / 54 Noll St | 317 | Occupied | $3,650 | $300 | $0 |
| Denizen Y / 54 Noll St | 318 | Occupied | $1,042 | $50 | $0 |
| Denizen Y / 54 Noll St | 319 | Occupied | $3,300 | $200 | $0 |
| Denizen Y / 54 Noll St | 320 | Occupied | $1,042 | $100 | $58 |
| Denizen Y / 54 Noll St | 321 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 322 | Occupied | $1,017 | $175 | $325 |
| Denizen Y / 54 Noll St | 323 | Occupied | $3,325 | $200 | $0 |
| Denizen Y / 54 Noll St | 324 | Occupied | $2,900 | $100 | $2,900 |
| Denizen Y / 54 Noll St | 325 | Occupied | $2,975 | $200 | $0 |
| Denizen Y / 54 Noll St | 326 | Occupied | $4,500 | $0 | $50,706 |
| Denizen Y / 54 Noll St | 327 | Occupied | $1,042 | $0 | $0 |
| Denizen Y / 54 Noll St | 328 | Occupied | $3,300 | $0 | $2,555 |
| Denizen Y / 54 Noll St | 329 | Occupied | $3,000 | $0 | $654 |
| Denizen Y / 54 Noll St | 330 | Occupied | $3,350 | $75 | $1,546 |
| Denizen Y / 54 Noll St | 331 | Occupied | $2,525 | $0 | $0 |
| Denizen Y / 54 Noll St | 332 | Occupied | $2,400 | $300 | $198 |
| Denizen Y / 54 Noll St | 333 | Occupied | $947 | $100 | $0 |
| Denizen Y / 54 Noll St | 334 | Occupied | $3,250 | $0 | $0 |
| Denizen Y / 54 Noll St | 335 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 336 | Occupied | $961 | $0 | $14,693 |
| Denizen Y / 54 Noll St | 337 | Occupied | $3,225 | $0 | $0 |
| Denizen Y / 54 Noll St | 338 | Occupied | $2,400 | $75 | $2,472 |
| Denizen Y / 54 Noll St | 339 | Occupied | $947 | $0 | $641 |
| Denizen Y / 54 Noll St | 340 | Occupied | $2,850 | $200 | $0 |
| Denizen Y / 54 Noll St | 341 | Occupied | $2,400 | $0 | $0 |
| Denizen Y / 54 Noll St | 342 | Occupied | $961 | $0 | $0 |
| Denizen Y / 54 Noll St | 343 | Occupied | $2,900 | $0 | $0 |
| Denizen Y / 54 Noll St | 344 | Occupied | $3,525 | $0 | $0 |
| Denizen Y / 54 Noll St | 345 | Occupied | $2,525 | $50 | $0 |
| Denizen Y / 54 Noll St | 346 | Occupied | $2,425 | $100 | $0 |
| Denizen Y / 54 Noll St | 347 | Occupied | $2,825 | $175 | $0 |
| Denizen Y / 54 Noll St | 348 | Occupied | $2,425 | $0 | $0 |
| Denizen Y / 54 Noll St | 349 | Occupied | $2,350 | $100 | $0 |
| Denizen Y / 54 Noll St | 350 | Occupied | $4,325 | $50 | $57 |
| Denizen Y / 54 Noll St | 351 | Occupied | $2,950 | $200 | $0 |
| Denizen Y / 54 Noll St | 352 | Occupied | $2,600 | $0 | $1,387 |
| Denizen Y / 54 Noll St | 353 | Occupied | $1,017 | $400 | $0 |
| Denizen Y / 54 Noll St | 354 | Occupied | $3,700 | $400 | $0 |
| Denizen Y / 54 Noll St | 355 | Occupied | $3,200 | $0 | $6,400 |
| Denizen Y / 54 Noll St | 356 | Occupied | $947 | $0 | $0 |
| Denizen Y / 54 Noll St | 357 | Occupied | $2,825 | $300 | $1,591 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 358 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 359 | Occupied | $3,650 | $200 | $0 |
| Denizen Y / 54 Noll St | 360 | Occupied | $3,400 | $275 | $0 |
| Denizen Y / 54 Noll St | 361 | Occupied | $1,032 | $0 | $245 |
| Denizen Y / 54 Noll St | 362 | Occupied | $1,017 | $0 | $7 |
| Denizen Y / 54 Noll St | 363 | Occupied | $1,042 | $0 | $0 |
| Denizen Y / 54 Noll St | 364 | Occupied | $3,125 | $200 | $3,125 |
| Denizen Y / 54 Noll St | 365 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 366 | Occupied | $3,450 | $100 | $3,550 |
| Denizen Y / 54 Noll St | 401 | Occupied | $3,125 | $0 | $0 |
| Denizen Y / 54 Noll St | 402 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 403 | Occupied | $3,400 | $50 | $0 |
| Denizen Y / 54 Noll St | 404 | Occupied | $1,042 | $0 | $891 |
| Denizen Y / 54 Noll St | 405 | Occupied | $4,150 | $200 | $2,905 |
| Denizen Y / 54 Noll St | 406 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 407 | Occupied | $1,230 | $0 | $0 |
| Denizen Y / 54 Noll St | 408 | Occupied | $3,350 | $150 | $0 |
| Denizen Y / 54 Noll St | 409 | Occupied | $1,230 | $100 | $0 |
| Denizen Y / 54 Noll St | 410 | Occupied | $3,250 | $100 | $95 |
| Denizen Y / 54 Noll St | 411 | Occupied | $3,900 | $150 | $0 |
| Denizen Y / 54 Noll St | 412 | Occupied | $1,248 | $0 | $2 |
| Denizen Y / 54 Noll St | 413 | Occupied | $3,150 | $200 | $0 |
| Denizen Y / 54 Noll St | 414 | Occupied | $4,150 | $0 | $600 |
| Denizen Y / 54 Noll St | 415 | Occupied | $1,042 | $0 | $63 |
| Denizen Y / 54 Noll St | 416 | Occupied | $3,125 | $100 | $0 |
| Denizen Y / 54 Noll St | 417 | Occupied | $3,675 | $300 | $110 |
| Denizen Y / 54 Noll St | 418 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 419 | Occupied | $3,400 | $0 | $1,974 |
| Denizen Y / 54 Noll St | 420 | Occupied | $1,017 | $75 | $0 |
| Denizen Y / 54 Noll St | 421 | Occupied | $3,300 | $150 | $3,450 |
| Denizen Y / 54 Noll St | 422 | Occupied | $1,042 | $0 | $0 |
| Denizen Y / 54 Noll St | 423 | Occupied | $3,350 | $100 | $0 |
| Denizen Y / 54 Noll St | 424 | Occupied | $3,050 | $100 | $0 |
| Denizen Y / 54 Noll St | 425 | Occupied | $3,300 | $0 | $3,375 |
| Denizen Y / 54 Noll St | 426 | Occupied | $4,450 | $400 | $500 |
| Denizen Y / 54 Noll St | 427 | Occupied | $3,350 | $400 | $650 |
| Denizen Y / 54 Noll St | 428 | Occupied | $3,400 | $200 | $0 |
| Denizen Y / 54 Noll St | 429 | Occupied | $3,000 | $100 | $0 |
| Denizen Y / 54 Noll St | 430 | Occupied | $3,550 | $100 | $2,768 |
| Denizen Y / 54 Noll St | 431 | Occupied | $2,575 | $100 | $2,486 |
| Denizen Y / 54 Noll St | 432 | Occupied | $2,525 | $0 | $2,609 |
| Denizen Y / 54 Noll St | 433 | Occupied | $947 | $0 | $1,565 |
| Denizen Y / 54 Noll St | 434 | Vacant | | | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 435 | Occupied | $2,425 | $75 | $2,111 |
| Denizen Y / 54 Noll St | 436 | Occupied | $971 | $0 | $71 |
| Denizen Y / 54 Noll St | 437 | Occupied | $3,250 | $800 | $0 |
| Denizen Y / 54 Noll St | 438 | Occupied | $2,425 | $100 | $2,002 |
| Denizen Y / 54 Noll St | 439 | Occupied | $947 | $0 | $341 |
| Denizen Y / 54 Noll St | 440 | Occupied | $2,925 | $0 | $25 |
| Denizen Y / 54 Noll St | 441 | Occupied | $2,375 | $75 | $0 |
| Denizen Y / 54 Noll St | 442 | Occupied | $961 | $0 | $2,478 |
| Denizen Y / 54 Noll St | 443 | Occupied | $1,017 | $0 | $0 |
| Denizen Y / 54 Noll St | 444 | Occupied | $3,550 | $0 | $0 |
| Denizen Y / 54 Noll St | 445 | Occupied | $2,475 | $0 | $6,373 |
| Denizen Y / 54 Noll St | 446 | Occupied | $2,450 | $0 | $2,450 |
| Denizen Y / 54 Noll St | 447 | Occupied | $2,875 | $50 | $0 |
| Denizen Y / 54 Noll St | 448 | Occupied | $2,450 | $100 | $0 |
| Denizen Y / 54 Noll St | 449 | Occupied | $2,375 | $100 | $284 |
| Denizen Y / 54 Noll St | 450 | Occupied | $4,800 | $350 | $150 |
| Denizen Y / 54 Noll St | 451 | Occupied | $2,950 | $0 | $0 |
| Denizen Y / 54 Noll St | 452 | Occupied | $2,575 | $100 | $0 |
| Denizen Y / 54 Noll St | 453 | Occupied | $1,032 | $0 | $0 |
| Denizen Y / 54 Noll St | 454 | Occupied | $3,725 | $150 | $0 |
| Denizen Y / 54 Noll St | 455 | Occupied | $3,200 | $500 | $0 |
| Denizen Y / 54 Noll St | 456 | Occupied | $947 | $0 | $0 |
| Denizen Y / 54 Noll St | 457 | Occupied | $2,900 | $75 | $87 |
| Denizen Y / 54 Noll St | 458 | Occupied | $1,017 | $100 | $1,227 |
| Denizen Y / 54 Noll St | 459 | Occupied | $3,700 | $0 | $5,840 |
| Denizen Y / 54 Noll St | 460 | Occupied | $3,425 | $0 | $3,970 |
| Denizen Y / 54 Noll St | 461 | Occupied | $1,042 | $0 | $4,355 |
| Denizen Y / 54 Noll St | 462 | Occupied | $1,042 | $100 | $0 |
| Denizen Y / 54 Noll St | 463 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 464 | Occupied | $3,200 | $200 | $0 |
| Denizen Y / 54 Noll St | 465 | Occupied | $3,200 | $200 | $0 |
| Denizen Y / 54 Noll St | 466 | Occupied | $3,525 | $100 | $0 |
| Denizen Y / 54 Noll St | 501 | Occupied | $3,200 | $100 | $3,200 |
| Denizen Y / 54 Noll St | 502 | Occupied | $3,100 | $0 | $0 |
| Denizen Y / 54 Noll St | 503 | Occupied | $3,625 | $200 | $0 |
| Denizen Y / 54 Noll St | 504 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 505 | Occupied | $4,200 | $200 | $138 |
| Denizen Y / 54 Noll St | 506 | Occupied | $3,300 | $200 | $21,454 |
| Denizen Y / 54 Noll St | 507 | Occupied | $1,261 | $0 | $0 |
| Denizen Y / 54 Noll St | 508 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 509 | Occupied | $1,261 | $300 | $0 |
| Denizen Y / 54 Noll St | 510 | Occupied | $3,400 | $100 | $23,777 |
| Denizen Y / 54 Noll St | 511 | Occupied | $3,950 | $200 | $4,009 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 512 | Occupied | $1,261 | $0 | $0 |
| Denizen Y / 54 Noll St | 513 | Occupied | $3,225 | $200 | $0 |
| Denizen Y / 54 Noll St | 514 | Occupied | $4,200 | $0 | $4,326 |
| Denizen Y / 54 Noll St | 515 | Occupied | $1,042 | $0 | $0 |
| Denizen Y / 54 Noll St | 516 | Occupied | $3,150 | $200 | $0 |
| Denizen Y / 54 Noll St | 517 | Occupied | $3,700 | $200 | $1,850 |
| Denizen Y / 54 Noll St | 518 | Occupied | $1,042 | $100 | $0 |
| Denizen Y / 54 Noll St | 519 | Occupied | $3,450 | $400 | $0 |
| Denizen Y / 54 Noll St | 520 | Occupied | $1,017 | $175 | $250 |
| Denizen Y / 54 Noll St | 521 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 522 | Occupied | $1,042 | $0 | $0 |
| Denizen Y / 54 Noll St | 523 | Occupied | $3,350 | $200 | $720 |
| Denizen Y / 54 Noll St | 524 | Occupied | $3,125 | $100 | $0 |
| Denizen Y / 54 Noll St | 525 | Occupied | $3,125 | $100 | $0 |
| Denizen Y / 54 Noll St | 526 | Occupied | $4,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 527 | Occupied | $3,225 | $100 | $0 |
| Denizen Y / 54 Noll St | 528 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 529 | Occupied | $3,050 | $100 | $0 |
| Denizen Y / 54 Noll St | 530 | Occupied | $3,575 | $200 | $0 |
| Denizen Y / 54 Noll St | 531 | Occupied | $2,575 | $100 | $0 |
| Denizen Y / 54 Noll St | 532 | Occupied | $2,400 | $0 | $0 |
| Denizen Y / 54 Noll St | 533 | Occupied | $947 | $100 | $0 |
| Denizen Y / 54 Noll St | 534 | Occupied | $3,300 | $75 | $2,744 |
| Denizen Y / 54 Noll St | 535 | Occupied | $2,400 | $200 | $0 |
| Denizen Y / 54 Noll St | 536 | Occupied | $971 | $0 | $1,313 |
| Denizen Y / 54 Noll St | 537 | Occupied | $3,300 | $0 | $142 |
| Denizen Y / 54 Noll St | 538 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 539 | Occupied | $971 | $100 | $0 |
| Denizen Y / 54 Noll St | 540 | Occupied | $2,950 | $100 | $1,118 |
| Denizen Y / 54 Noll St | 541 | Occupied | $2,425 | $100 | $625 |
| Denizen Y / 54 Noll St | 542 | Occupied | $947 | $0 | $0 |
| Denizen Y / 54 Noll St | 543 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 544 | Occupied | $3,575 | $0 | $5,482 |
| Denizen Y / 54 Noll St | 545 | Occupied | $2,400 | $200 | $7,200 |
| Denizen Y / 54 Noll St | 546 | Occupied | $2,450 | $0 | $400 |
| Denizen Y / 54 Noll St | 547 | Occupied | $2,900 | $100 | $0 |
| Denizen Y / 54 Noll St | 548 | Occupied | $2,375 | $0 | $0 |
| Denizen Y / 54 Noll St | 549 | Occupied | $2,400 | $0 | $36 |
| Denizen Y / 54 Noll St | 550 | Occupied | $4,850 | $200 | $520 |
| Denizen Y / 54 Noll St | 551 | Occupied | $3,025 | $100 | $21 |
| Denizen Y / 54 Noll St | 552 | Occupied | $2,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 553 | Occupied | $1,017 | $0 | $0 |
| Denizen Y / 54 Noll St | 554 | Occupied | $3,806 | $75 | $6,080 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 555 | Occupied | $3,300 | $0 | $0 |
| Denizen Y / 54 Noll St | 556 | Occupied | $947 | $0 | $0 |
| Denizen Y / 54 Noll St | 557 | Occupied | $2,950 | $100 | $0 |
| Denizen Y / 54 Noll St | 558 | Occupied | $1,042 | $100 | $0 |
| Denizen Y / 54 Noll St | 559 | Occupied | $3,750 | $275 | $244 |
| Denizen Y / 54 Noll St | 560 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 561 | Occupied | $1,032 | $0 | $0 |
| Denizen Y / 54 Noll St | 562 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 563 | Occupied | $1,042 | $75 | $993 |
| Denizen Y / 54 Noll St | 564 | Occupied | $3,300 | $50 | $325 |
| Denizen Y / 54 Noll St | 565 | Occupied | $3,300 | $200 | $3,500 |
| Denizen Y / 54 Noll St | 566 | Occupied | $3,550 | $0 | $0 |
| Denizen Y / 54 Noll St | 601 | Occupied | $3,250 | $200 | $510 |
| Denizen Y / 54 Noll St | 602 | Occupied | $3,075 | $75 | $0 |
| Denizen Y / 54 Noll St | 603 | Occupied | $3,400 | $200 | $0 |
| Denizen Y / 54 Noll St | 604 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 605 | Occupied | $4,250 | $100 | $0 |
| Denizen Y / 54 Noll St | 606 | Occupied | $3,400 | $300 | $0 |
| Denizen Y / 54 Noll St | 607 | Occupied | $1,248 | $0 | $0 |
| Denizen Y / 54 Noll St | 608 | Occupied | $3,400 | $100 | $790 |
| Denizen Y / 54 Noll St | 609 | Occupied | $3,950 | $100 | $0 |
| Denizen Y / 54 Noll St | 610 | Occupied | $3,350 | $150 | $50 |
| Denizen Y / 54 Noll St | 611 | Occupied | $4,000 | $75 | $0 |
| Denizen Y / 54 Noll St | 612 | Occupied | $1,230 | $100 | $126 |
| Denizen Y / 54 Noll St | 613 | Occupied | $3,250 | $200 | $3,250 |
| Denizen Y / 54 Noll St | 614 | Occupied | $4,250 | $300 | $0 |
| Denizen Y / 54 Noll St | 615 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 616 | Occupied | $3,200 | $100 | $0 |
| Denizen Y / 54 Noll St | 617 | Occupied | $3,725 | $200 | $0 |
| Denizen Y / 54 Noll St | 618 | Occupied | $1,032 | $100 | $0 |
| Denizen Y / 54 Noll St | 619 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 620 | Occupied | $1,017 | $0 | $19 |
| Denizen Y / 54 Noll St | 621 | Occupied | $3,200 | $100 | $3,248 |
| Denizen Y / 54 Noll St | 622 | Occupied | $1,017 | $175 | $0 |
| Denizen Y / 54 Noll St | 623 | Occupied | $3,375 | $100 | $2,375 |
| Denizen Y / 54 Noll St | 624 | Occupied | $3,150 | $200 | $0 |
| Denizen Y / 54 Noll St | 625 | Occupied | $3,150 | $100 | $3,150 |
| Denizen Y / 54 Noll St | 626 | Occupied | $4,100 | $0 | $12,700 |
| Denizen Y / 54 Noll St | 627 | Occupied | $3,350 | $100 | $3,251 |
| Denizen Y / 54 Noll St | 628 | Occupied | $3,450 | $200 | $104 |
| Denizen Y / 54 Noll St | 629 | Occupied | $3,200 | $200 | $0 |
| Denizen Y / 54 Noll St | 630 | Occupied | $3,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 631 | Occupied | $2,625 | $100 | $532 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 632 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 633 | Occupied | $947 | $0 | $8,425 |
| Denizen Y / 54 Noll St | 634 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 635 | Occupied | $2,400 | $175 | $1,280 |
| Denizen Y / 54 Noll St | 636 | Occupied | $947 | $200 | $0 |
| Denizen Y / 54 Noll St | 637 | Occupied | $3,350 | $200 | $3,550 |
| Denizen Y / 54 Noll St | 638 | Occupied | $971 | $100 | $0 |
| Denizen Y / 54 Noll St | 639 | Occupied | $2,475 | $75 | $2,550 |
| Denizen Y / 54 Noll St | 640 | Occupied | $2,975 | $100 | $432 |
| Denizen Y / 54 Noll St | 641 | Occupied | $2,450 | $100 | $2,487 |
| Denizen Y / 54 Noll St | 642 | Occupied | $2,425 | $75 | $0 |
| Denizen Y / 54 Noll St | 643 | Occupied | $1,017 | $100 | $1,299 |
| Denizen Y / 54 Noll St | 644 | Occupied | $3,625 | $200 | $3,679 |
| Denizen Y / 54 Noll St | 645 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 646 | Occupied | $2,450 | $175 | $2,292 |
| Denizen Y / 54 Noll St | 647 | Occupied | $2,925 | $100 | $1,728 |
| Denizen Y / 54 Noll St | 648 | Occupied | $2,475 | $100 | $0 |
| Denizen Y / 54 Noll St | 649 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 650 | Occupied | $5,000 | $300 | $0 |
| Denizen Y / 54 Noll St | 651 | Occupied | $3,050 | $0 | $0 |
| Denizen Y / 54 Noll St | 652 | Occupied | $2,600 | $0 | $2,600 |
| Denizen Y / 54 Noll St | 653 | Occupied | $1,032 | $75 | $0 |
| Denizen Y / 54 Noll St | 654 | Occupied | $3,800 | $200 | $5,998 |
| Denizen Y / 54 Noll St | 655 | Occupied | $3,300 | $400 | $0 |
| Denizen Y / 54 Noll St | 656 | Occupied | $2,725 | $75 | $0 |
| Denizen Y / 54 Noll St | 657 | Occupied | $2,975 | $275 | $521 |
| Denizen Y / 54 Noll St | 658 | Occupied | $1,017 | $0 | $0 |
| Denizen Y / 54 Noll St | 659 | Occupied | $3,775 | $100 | $65 |
| Denizen Y / 54 Noll St | 660 | Occupied | $3,525 | $200 | $0 |
| Denizen Y / 54 Noll St | 661 | Occupied | $1,017 | $100 | $0 |
| Denizen Y / 54 Noll St | 662 | Occupied | $1,042 | $100 | $3,709 |
| Denizen Y / 54 Noll St | 663 | Occupied | $1,042 | $0 | $504 |
| Denizen Y / 54 Noll St | 664 | Occupied | $3,350 | $200 | $100 |
| Denizen Y / 54 Noll St | 665 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 666 | Occupied | $1,230 | $0 | $0 |
| Denizen Y / 54 Noll St | 701 | Occupied | $3,400 | $200 | $135 |
| Denizen Y / 54 Noll St | 702 | Occupied | $3,100 | $0 | $4,200 |
| Denizen Y / 54 Noll St | 703 | Occupied | $3,500 | $200 | $3,500 |
| Denizen Y / 54 Noll St | 704 | Occupied | $4,600 | $300 | $9,800 |
| Denizen Y / 54 Noll St | 706 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 707 | Occupied | $4,375 | $575 | $0 |
| Denizen Y / 54 Noll St | 708 | Occupied | $3,500 | $150 | $3,553 |
| Denizen Y / 54 Noll St | 709 | Occupied | $3,700 | $0 | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 710 | Occupied | $3,575 | $75 | $3,575 |
| Denizen Y / 54 Noll St | 711 | Occupied | $3,500 | $100 | $2,484 |
| Denizen Y / 54 Noll St | 712 | Occupied | $1,230 | $475 | $0 |
| Denizen Y / 54 Noll St | 713 | Occupied | $4,900 | $100 | $49,389 |
| Denizen Y / 54 Noll St | 714 | Occupied | $4,400 | $200 | $0 |
| Denizen Y / 54 Noll St | 715 | Occupied | $3,300 | $400 | $0 |
| Denizen Y / 54 Noll St | 716 | Occupied | $3,300 | $450 | $1,175 |
| Denizen Y / 54 Noll St | 717 | Occupied | $3,800 | $500 | $0 |
| Denizen Y / 54 Noll St | 718 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 719 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 720 | Occupied | $3,550 | $200 | $0 |
| Denizen Y / 54 Noll St | 721 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 723 | Occupied | $3,400 | $275 | $3,400 |
| Denizen Y / 54 Noll St | 724 | Occupied | $5,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 725 | Occupied | $5,550 | $350 | $11,100 |
| Denizen Y / 54 Noll St | 727 | Occupied | $4,250 | $200 | $0 |
| Denizen Y / 54 Noll St | 728 | Occupied | $3,500 | $100 | $400 |
| Denizen Y / 54 Noll St | 729 | Occupied | $3,248 | $0 | $15,078 |
| Denizen Y / 54 Noll St | 730 | Occupied | $3,600 | $100 | $0 |
| Denizen Y / 54 Noll St | 731 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 732 | Occupied | $2,475 | $100 | $0 |
| Denizen Y / 54 Noll St | 733 | Occupied | $2,425 | $100 | $0 |
| Denizen Y / 54 Noll St | 734 | Occupied | $3,400 | $200 | $0 |
| Denizen Y / 54 Noll St | 735 | Occupied | $2,475 | $0 | $0 |
| Denizen Y / 54 Noll St | 736 | Occupied | $2,425 | $0 | $0 |
| Denizen Y / 54 Noll St | 737 | Occupied | $3,350 | $100 | $0 |
| Denizen Y / 54 Noll St | 738 | Occupied | $2,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 739 | Occupied | $2,400 | $100 | $0 |
| Denizen Y / 54 Noll St | 740 | Occupied | $3,000 | $200 | $100 |
| Denizen Y / 54 Noll St | 741 | Occupied | $2,550 | $75 | $2,630 |
| Denizen Y / 54 Noll St | 742 | Occupied | $2,425 | $100 | $100 |
| Denizen Y / 54 Noll St | 743 | Occupied | $2,950 | $400 | $0 |
| Denizen Y / 54 Noll St | 744 | Occupied | $3,600 | $0 | $1,600 |
| Denizen Y / 54 Noll St | 745 | Occupied | $2,500 | $50 | $150 |
| Denizen Y / 54 Noll St | 746 | Occupied | $2,425 | $100 | $100 |
| Denizen Y / 54 Noll St | 747 | Occupied | $2,900 | $200 | $0 |
| Denizen Y / 54 Noll St | 748 | Occupied | $2,500 | $0 | $0 |
| Denizen Y / 54 Noll St | 749 | Occupied | $2,350 | $150 | $0 |
| Denizen Y / 54 Noll St | 750 | Occupied | $4,950 | $75 | $958 |
| Denizen Y / 54 Noll St | 751 | Occupied | $3,100 | $400 | $0 |
| Denizen Y / 54 Noll St | 752 | Occupied | $2,650 | $100 | $0 |
| Denizen Y / 54 Noll St | 753 | Occupied | $3,400 | $0 | $0 |
| Denizen Y / 54 Noll St | 754 | Occupied | $3,850 | $100 | $135 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 755 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 756 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 757 | Occupied | $2,950 | $100 | $0 |
| Denizen Y / 54 Noll St | 758 | Occupied | $3,450 | $100 | $0 |
| Denizen Y / 54 Noll St | 759 | Occupied | $3,800 | $300 | $123 |
| Denizen Y / 54 Noll St | 760 | Occupied | $3,600 | $200 | $0 |
| Denizen Y / 54 Noll St | 761 | Occupied | $3,400 | $0 | $3,400 |
| Denizen Y / 54 Noll St | 762 | Occupied | $3,550 | $200 | $825 |
| Denizen Y / 54 Noll St | 763 | Occupied | $3,450 | $400 | $123 |
| Denizen Y / 54 Noll St | 764 | Occupied | $3,400 | $0 | $0 |
| Denizen Y / 54 Noll St | 765 | Occupied | $3,350 | $200 | $0 |
| Denizen Y / 54 Noll St | 766 | Occupied | $3,650 | $200 | $3,705 |
| Denizen Y / 54 Noll St | 801 | Occupied | $3,450 | $0 | $0 |
| Denizen Y / 54 Noll St | 802 | Occupied | $3,100 | $100 | $1,700 |
| Denizen Y / 54 Noll St | 803 | Occupied | $3,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 804 | Occupied | $4,500 | $175 | $0 |
| Denizen Y / 54 Noll St | 806 | Occupied | $3,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 807 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 808 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 809 | Occupied | $5,450 | $100 | $10,900 |
| Denizen Y / 54 Noll St | 810 | Occupied | $3,500 | $100 | $0 |
| Denizen Y / 54 Noll St | 812 | Occupied | $1,230 | $50 | $0 |
| Denizen Y / 54 Noll St | 813 | Occupied | $3,425 | $200 | $3,476 |
| Denizen Y / 54 Noll St | 814 | Occupied | $5,050 | $300 | $5,050 |
| Denizen Y / 54 Noll St | 815 | Occupied | $4,725 | $400 | $0 |
| Denizen Y / 54 Noll St | 817 | Occupied | $4,000 | $0 | $3,400 |
| Denizen Y / 54 Noll St | 818 | Occupied | $3,600 | $100 | $0 |
| Denizen Y / 54 Noll St | 819 | Occupied | $5,150 | $150 | $0 |
| Denizen Y / 54 Noll St | 820 | Occupied | $4,450 | $450 | $0 |
| Denizen Y / 54 Noll St | 821 | Occupied | $4,900 | $450 | $0 |
| Denizen Y / 54 Noll St | 822 | Occupied | $3,900 | $200 | $4,292 |
| Denizen Y / 54 Noll St | 823 | Occupied | $4,300 | $200 | $0 |
| Denizen Y / 54 Noll St | 824 | Occupied | $5,125 | $400 | $0 |
| Denizen Y / 54 Noll St | 825 | Occupied | $3,750 | $0 | $0 |
| Denizen Y / 54 Noll St | 826 | Occupied | $3,600 | $575 | $0 |
| Denizen Y / 54 Noll St | 827 | Occupied | $3,750 | $200 | $0 |
| Denizen Y / 54 Noll St | 828 | Occupied | $3,500 | $200 | $1,510 |
| Denizen Y / 54 Noll St | 829 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 830 | Occupied | $5,400 | $300 | $25 |
| Denizen Y / 54 Noll St | 831 | Occupied | $3,100 | $100 | $0 |
| Denizen Y / 54 Noll St | 832 | Occupied | $4,600 | $100 | $0 |
| Denizen Y / 54 Noll St | 833 | Occupied | $4,725 | $675 | $0 |
| Denizen Y / 54 Noll St | 834 | Occupied | $2,500 | $175 | $0 |

| | | | | | |
|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 835 | Occupied | $3,100 | $100 | $4,263 |
| Denizen Y / 54 Noll St | 836 | Occupied | $2,500 | $400 | $0 |
| Denizen Y / 54 Noll St | 837 | Occupied | $2,400 | $100 | $2,733 |
| Denizen Y / 54 Noll St | 838 | Occupied | $5,000 | $0 | $40,850 |
| Denizen Y / 54 Noll St | 851 | Occupied | $3,150 | $100 | $0 |
| Denizen Y / 54 Noll St | 852 | Occupied | $2,700 | $100 | $2,700 |
| Denizen Y / 54 Noll St | 853 | Occupied | $3,450 | $450 | $150 |
| Denizen Y / 54 Noll St | 854 | Occupied | $3,975 | $400 | $0 |
| Denizen Y / 54 Noll St | 855 | Vacant | | | $0 |
| Denizen Y / 54 Noll St | 856 | Occupied | $2,750 | $100 | $100 |
| Denizen Y / 54 Noll St | 857 | Occupied | $3,000 | $0 | $1,645 |
| Denizen Y / 54 Noll St | 858 | Occupied | $3,500 | $150 | $0 |
| Denizen Y / 54 Noll St | 859 | Occupied | $3,850 | $150 | $58 |
| Denizen Y / 54 Noll St | 860 | Occupied | $3,600 | $500 | $0 |
| Denizen Y / 54 Noll St | 861 | Occupied | $3,500 | $450 | $0 |
| Denizen Y / 54 Noll St | 862 | Occupied | $3,575 | $0 | $3,575 |
| Denizen Y / 54 Noll St | 863 | Occupied | $3,500 | $200 | $4,900 |
| Denizen Y / 54 Noll St | 864 | Occupied | $3,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 865 | Occupied | $3,500 | $200 | $0 |
| Denizen Y / 54 Noll St | 866 | Occupied | $3,700 | $200 | $56 |
| Denizen Y / 54 Noll St | A3 | Occupied**** | $2,150 | $125*** | $0 |
| Denizen Y / 54 Noll St | Ground Floor Retail and Portion of Basement | Tenant not in Possession | Tenant has not commenced paying rent | Tenant has not commenced paying rent | $0 |

\* Includes the aggregate sum of (i) all Amenity Fees, Parking Fees/Rents/Charges, Washer/Dryer Fees paid by such Tenant and (ii) all credits received by such Tenant pursuant to its Lease or other applicable written agreement with the landlord.

\*\* Includes legal and NSF Fees.

\*\*\*Includes water and sewer charges to Tenant.

\*\*\*\* Tenant has a renewal option as set forth more fully in its Lease.

**EXHIBIT B-3**

**Security Deposits for Melrose Street Property**

**(As of July 27, 2021)**

| Building | Unit | Occupancy | Rhino* (Y/N) | Voucher* (Y/N) | Garage Remote | Security Deposit |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 101 | Occupied | No | N/A | N/A | $3,325 |
| Denizen X / 123 Melrose St | 102 | Occupied | No | Yes | N/A | $956 |
| Denizen X / 123 Melrose St | 103 | Occupied | No | N/A | N/A | $3,125 |
| Denizen X / 123 Melrose St | 104 | Occupied | No | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 105 | Occupied | No | N/A | N/A | $3,800 |
| Denizen X / 123 Melrose St | 106 | Occupied | No | N/A | N/A | $3,250 |
| Denizen X / 123 Melrose St | 107 | Occupied | No | N/A | N/A | $3,850 |
| Denizen X / 123 Melrose St | 108 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 109 | Occupied | No | N/A | N/A | $2,850 |
| Denizen X / 123 Melrose St | 110 | Occupied | No | N/A | N/A | $2,575 |
| Denizen X / 123 Melrose St | 140 | Occupied | No | **To be Confirmed | N/A | $1,230 |
| Denizen X / 123 Melrose St | 205 | Occupied | No | N/A | N/A | $3,125 |
| Denizen X / 123 Melrose St | 206 | Occupied | No | N/A | N/A | $956 |
| Denizen X / 123 Melrose St | 207 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 208 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 209 | Occupied | No | N/A | $75 | $1,230 |
| Denizen X / 123 Melrose St | 210 | Occupied | No | To be Confirmed | N/A | $1,027 |
| Denizen X / 123 Melrose St | 211 | Occupied | No | N/A | $75 | $4,800 |
| Denizen X / 123 Melrose St | 212 | Occupied | No | N/A | N/A | $1,242 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 213 | Occupied | No | To be Confirmed | N/A | $1,242 |
| Denizen X / 123 Melrose St | 214 | Occupied | Yes | N/A | N/A | $3,350 |
| Denizen X / 123 Melrose St | 215 | Occupied | Yes | N/A | $150 | $3,250 |
| Denizen X / 123 Melrose St | 216 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 217 | Occupied | No | N/A | N/A | $2,350 |
| Denizen X / 123 Melrose St | 218 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 219 | Occupied | No | N/A | $75 | $2,400 |
| Denizen X / 123 Melrose St | 220 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 221 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 222 | Occupied | Yes | N/A | N/A | $2,450 |
| Denizen X / 123 Melrose St | 223 | Occupied | Yes | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 224 | Occupied | No | N/A | N/A | $3,550 |
| Denizen X / 123 Melrose St | 225 | Occupied | Yes | N/A | N/A | $2,450 |
| Denizen X / 123 Melrose St | 226 | Occupied | No | N/A | N/A | $2,375 |
| Denizen X / 123 Melrose St | 227 | Occupied | No | N/A | N/A | $2,375 |
| Denizen X / 123 Melrose St | 228 | Occupied | Yes | N/A | N/A | $2,525 |
| Denizen X / 123 Melrose St | 229 | Occupied | Yes | N/A | N/A | $2,675 |
| Denizen X / 123 Melrose St | 230 | Super | No | N/A | N/A | $3,900 |
| Denizen X / 123 Melrose St | 240 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 241 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 242 | Occupied | No | Yes | N/A | $1,027 |
| Denizen X / 123 Melrose St | 243 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 244 | Occupied | Yes | N/A | N/A | $2,375 |
| Denizen X / 123 Melrose St | 245 | Occupied | No | N/A | N/A | $2,350 |
| Denizen X / 123 Melrose St | 246 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 247 | Vacant | No | N/A | N/A | N/A |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 248 | Occupied | No | N/A | N/A | $3,850 |
| Denizen X / 123 Melrose St | 249 | Occupied | No | N/A | N/A | $3,125 |
| Denizen X / 123 Melrose St | 250 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 251 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 252 | Occupied | Yes | N/A | N/A | $3,325 |
| Denizen X / 123 Melrose St | 253 | Occupied | Yes | N/A | $75 | $3,000 |
| Denizen X / 123 Melrose St | 254 | Occupied | No | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 255 | Occupied | No | N/A | N/A | $3,300 |
| Denizen X / 123 Melrose St | 256 | Occupied | No | N/A | N/A | $3,075 |
| Denizen X / 123 Melrose St | 257 | Occupied | No | N/A | $75 | $3,150 |
| Denizen X / 123 Melrose St | 258 | Occupied | No | N/A | $75 | $2,975 |
| Denizen X / 123 Melrose St | 259 | Occupied | No | N/A | N/A | $3,850 |
| Denizen X / 123 Melrose St | 260 | Occupied | No | N/A | N/A | $3,575 |
| Denizen X / 123 Melrose St | 270 | Occupied | No | N/A | $75 | $1,017 |
| Denizen X / 123 Melrose St | 271 | Occupied | No | N/A | N/A | $1,042 |
| Denizen X / 123 Melrose St | 272 | Occupied | No | N/A | N/A | $3,200 |
| Denizen X / 123 Melrose St | 273 | Occupied | No | N/A | $75 | $1,027 |
| Denizen X / 123 Melrose St | 274 | Occupied | No | N/A | N/A | $1,027 |
| Denizen X / 123 Melrose St | 275 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 276 | Occupied | No | N/A | $75 | $3,325 |
| Denizen X / 123 Melrose St | 277 | Occupied | No | N/A | N/A | $3,400 |
| Denizen X / 123 Melrose St | 278 | Occupied | No | N/A | $75 | $3,200 |
| Denizen X / 123 Melrose St | 301 | Occupied | No | N/A | N/A | $3,000 |
| Denizen X / 123 Melrose St | 302 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 303 | Occupied | No | To be Confirmed | N/A | $1,242 |
| Denizen X / 123 Melrose St | 304 | Occupied | No | N/A | N/A | $3,575 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 305 | Occupied | No | N/A | N/A | $3,200 |
| Denizen X / 123 Melrose St | 306 | Occupied | No | N/A | $75 | $3,775 |
| Denizen X / 123 Melrose St | 307 | Occupied | No | N/A | N/A | $3,325 |
| Denizen X / 123 Melrose St | 308 | Occupied | No | Yes | N/A | $1,230 |
| Denizen X / 123 Melrose St | 309 | Occupied | No | N/A | N/A | $4,700 |
| Denizen X / 123 Melrose St | 310 | Occupied | Yes | N/A | N/A | $4,475 |
| Denizen X / 123 Melrose St | 311 | Occupied | No | N/A | N/A | $3,350 |
| Denizen X / 123 Melrose St | 312 | Occupied | No | N/A | N/A | $3,350 |
| Denizen X / 123 Melrose St | 313 | Occupied | No | N/A | $75 | $3,550 |
| Denizen X / 123 Melrose St | 314 | Occupied | No | N/A | N/A | $4,150 |
| Denizen X / 123 Melrose St | 315 | Occupied | Yes | N/A | N/A | $3,550 |
| Denizen X / 123 Melrose St | 316 | Occupied | No | N/A | N/A | $3,550 |
| Denizen X / 123 Melrose St | 317 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 318 | Occupied | No | N/A | N/A | $2,350 |
| Denizen X / 123 Melrose St | 319 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 320 | Occupied | Yes | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 321 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 322 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 323 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 324 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 325 | Occupied | No | To be Confirmed | N/A | $947 |
| Denizen X / 123 Melrose St | 326 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 327 | Occupied | No | To be Confirmed | N/A | $7,370 |
| Denizen X / 123 Melrose St | 328 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 329 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 330 | Occupied | No | N/A | N/A | $2,425 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 331 | Occupied | Yes | N/A | N/A | $2,575 |
| Denizen X / 123 Melrose St | 332 | Occupied | No | N/A | N/A | $2,525 |
| Denizen X / 123 Melrose St | 333 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 334 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 335 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 336 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 337 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 338 | Occupied | Yes | N/A | N/A | $2,525 |
| Denizen X / 123 Melrose St | 339 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 340 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 341 | Occupied | Yes | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 342 | Occupied | No | N/A | N/A | $2,550 |
| Denizen X / 123 Melrose St | 343 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 344 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 345 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 346 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 347 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 348 | Occupied | No | N/A | N/A | $2,425 |
| Denizen X / 123 Melrose St | 349 | Occupied | No | N/A | N/A | $4,050 |
| Denizen X / 123 Melrose St | 350 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 351 | Occupied | No | N/A | N/A | $3,175 |
| Denizen X / 123 Melrose St | 352 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 353 | Occupied | Yes | N/A | N/A | $3,375 |
| Denizen X / 123 Melrose St | 354 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 355 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 356 | Occupied | No | N/A | N/A | $3,350 |
| Denizen X / 123 Melrose St | 357 | Occupied | Yes | N/A | N/A | $3,550 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 358 | Occupied | Yes | N/A | N/A | $2,975 |
| Denizen X / 123 Melrose St | 359 | Occupied | No | N/A | $75 | $3,375 |
| Denizen X / 123 Melrose St | 360 | Occupied | No | N/A | $150 | $4,050 |
| Denizen X / 123 Melrose St | 361 | Occupied | Yes | N/A | N/A | $3,800 |
| Denizen X / 123 Melrose St | 370 | Occupied | No | To be Confirmed | N/A | $1,027 |
| Denizen X / 123 Melrose St | 371 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 372 | Occupied | Yes | N/A | N/A | $3,400 |
| Denizen X / 123 Melrose St | 373 | Occupied | No | To be Confirmed | N/A | $1,017 |
| Denizen X / 123 Melrose St | 374 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 375 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 376 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 377 | Occupied | No | N/A | N/A | $3,900 |
| Denizen X / 123 Melrose St | 378 | Occupied | No | N/A | N/A | $3,550 |
| Denizen X / 123 Melrose St | 379 | Occupied | No | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 401 | Occupied | No | N/A | $75 | $3,225 |
| Denizen X / 123 Melrose St | 402 | Occupied | No | Yes | N/A | $1,230 |
| Denizen X / 123 Melrose St | 403 | Occupied | No | N/A | $75 | $1,230 |
| Denizen X / 123 Melrose St | 404 | Occupied | No | N/A | $75 | $3,975 |
| Denizen X / 123 Melrose St | 405 | Occupied | No | N/A | N/A | $3,500 |
| Denizen X / 123 Melrose St | 406 | Occupied | Yes | N/A | $75 | $3,650 |
| Denizen X / 123 Melrose St | 407 | Occupied | No | N/A | N/A | $3,425 |
| Denizen X / 123 Melrose St | 408 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 409 | Occupied | No | N/A | N/A | $4,500 |
| Denizen X / 123 Melrose St | 410 | Occupied | No | N/A | $75 | $4,650 |
| Denizen X / 123 Melrose St | 411 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 412 | Vacant | No | N/A | N/A | N/A |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 413 | Occupied | No | N/A | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 414 | Occupied | No | N/A | N/A | N/A | $4,225 |
| Denizen X / 123 Melrose St | 415 | Occupied | No | N/A | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 416 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 417 | Occupied | No | N/A | N/A | N/A | $4,675 |
| Denizen X / 123 Melrose St | 418 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 419 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 420 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 421 | Occupied | No | To be Confirmed | N/A | N/A | $7,738 |
| Denizen X / 123 Melrose St | 422 | Occupied | No | N/A | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 423 | Occupied | No | N/A | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 424 | Occupied | No | N/A | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 425 | Occupied | No | Yes | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 426 | Occupied | No | N/A | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 427 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 428 | Occupied | Yes | N/A | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 429 | Occupied | No | N/A | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 430 | Occupied | Yes | N/A | N/A | N/A | $2,650 |
| Denizen X / 123 Melrose St | 431 | Occupied | Yes | N/A | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 432 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 433 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 434 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 435 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 436 | Occupied | No | N/A | N/A | N/A | $2,600 |
| Denizen X / 123 Melrose St | 437 | Occupied | Yes | N/A | N/A | N/A | $2,600 |
| Denizen X / 123 Melrose St | 438 | Vacant | No | N/A | N/A | N/A | N/A |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 439 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 440 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 441 | Occupied | No | N/A | N/A | $2,675 |
| Denizen X / 123 Melrose St | 442 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 443 | Occupied | No | Yes | N/A | $947 |
| Denizen X / 123 Melrose St | 444 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 445 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 446 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 447 | Occupied | Yes | N/A | N/A | $2,675 |
| Denizen X / 123 Melrose St | 448 | Occupied | No | N/A | N/A | $2,550 |
| Denizen X / 123 Melrose St | 449 | Occupied | No | N/A | N/A | $4,100 |
| Denizen X / 123 Melrose St | 450 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 451 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 452 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 453 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 454 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 455 | Occupied | No | N/A | $75 | $2,825 |
| Denizen X / 123 Melrose St | 456 | Occupied | No | N/A | N/A | $3,400 |
| Denizen X / 123 Melrose St | 457 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 458 | Occupied | No | N/A | N/A | $3,300 |
| Denizen X / 123 Melrose St | 459 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 460 | Occupied | No | N/A | N/A | $4,200 |
| Denizen X / 123 Melrose St | 461 | Occupied | No | N/A | $75 | $3,825 |
| Denizen X / 123 Melrose St | 470 | Occupied | No | Yes | N/A | $1,017 |
| Denizen X / 123 Melrose St | 471 | Occupied | No | N/A | N/A | $1,027 |
| Denizen X / 123 Melrose St | 472 | Occupied | No | N/A | N/A | $3,475 |
| Denizen X / 123 Melrose St | 473 | Occupied | No | Yes | N/A | $1,027 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 474 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 475 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 476 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 477 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 478 | Occupied | No | N/A | N/A | $3,400 |
| Denizen X / 123 Melrose St | 479 | Occupied | No | N/A | N/A | $3,875 |
| Denizen X / 123 Melrose St | 501 | Occupied | No | N/A | N/A | $3,325 |
| Denizen X / 123 Melrose St | 502 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 503 | Occupied | No | N/A | N/A | $1,261 |
| Denizen X / 123 Melrose St | 504 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 505 | Occupied | Yes | N/A | N/A | $3,650 |
| Denizen X / 123 Melrose St | 506 | Occupied | No | N/A | $75 | $3,700 |
| Denizen X / 123 Melrose St | 507 | Occupied | No | N/A | $75 | $3,450 |
| Denizen X / 123 Melrose St | 508 | Qccupied | No | To be Confirmed | N/A | $1,242 |
| Denizen X / 123 Melrose St | 509 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 510 | Occupied | No | N/A | $75 | $4,675 |
| Denizen X / 123 Melrose St | 511 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 512 | Occupied | No | N/A | N/A | $3,650 |
| Denizen X / 123 Melrose St | 513 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 514 | Occupied | No | N/A | $75 | $4,475 |
| Denizen X / 123 Melrose St | 515 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 516 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 517 | Occupied | No | N/A | $75 | $4,700 |
| Denizen X / 123 Melrose St | 518 | Occupied | No | N/A | N/A | $2,400 |
| Denizen X / 123 Melrose St | 519 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 520 | Vacant | No | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 521 | Occupied | No | To be Confirmed | N/A | $956 |
| Denizen X / 123 Melrose St | 522 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 523 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 524 | Occupied | No | N/A | $75 | $2,700 |
| Denizen X / 123 Melrose St | 525 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 526 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 527 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 528 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 529 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 530 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 531 | Occupied | No | N/A | $75 | $2,725 |
| Denizen X / 123 Melrose St | 532 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 533 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 534 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 535 | Occupied | No | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 536 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 537 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 538 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 539 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 540 | Occupied | No | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 541 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 542 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 543 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 544 | Occupied | No | To be Confirmed | N/A | $947 |
| Denizen X / 123 Melrose St | 545 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 546 | Occupied | No | N/A | N/A | $947 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 547 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 548 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 549 | Occupied | No | N/A | N/A | $4,500 | |
| Denizen X / 123 Melrose St | 550 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 551 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 552 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 553 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 554 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 555 | Occupied | No | N/A | N/A | $2,875 | |
| Denizen X / 123 Melrose St | 556 | Occupied | No | N/A | N/A | $3,600 | |
| Denizen X / 123 Melrose St | 557 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 558 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 559 | Occupied | No | N/A | N/A | $3,525 | |
| Denizen X / 123 Melrose St | 560 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 561 | Occupied | Yes | N/A | N/A | $4,200 | |
| Denizen X / 123 Melrose St | 570 | Occupied | No | N/A | N/A | $1,017 | |
| Denizen X / 123 Melrose St | 571 | Occupied | No | N/A | N/A | $1,017 | |
| Denizen X / 123 Melrose St | 572 | Occupied | No | N/A | N/A | $3,700 | |
| Denizen X / 123 Melrose St | 573 | Occupied | No | N/A | N/A | $1,017 | |
| Denizen X / 123 Melrose St | 574 | Occupied | No | N/A | N/A | $1,017 | |
| Denizen X / 123 Melrose St | 575 | Occupied | No | N/A | N/A | $1,027 | |
| Denizen X / 123 Melrose St | 576 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 577 | Vacant | No | N/A | N/A | N/A | |
| Denizen X / 123 Melrose St | 578 | Occupied | No | N/A | N/A | $3,650 | |
| Denizen X / 123 Melrose St | 579 | Occupied | No | N/A | N/A | $4,300 | |
| Denizen X / 123 Melrose St | 601 | Occupied | No | N/A | N/A | $3,550 | |
| Denizen X / 123 Melrose St | 602 | Occupied | No | N/A | N/A | $1,230 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 603 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 604 | Occupied | No | N/A | N/A | $4,250 |
| Denizen X / 123 Melrose St | 605 | Occupied | Yes | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 606 | Occupied | No | N/A | N/A | $3,725 |
| Denizen X / 123 Melrose St | 607 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 608 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 609 | Occupied | No | N/A | $75 | $4,550 |
| Denizen X / 123 Melrose St | 610 | Occupied | No | N/A | N/A | $4,700 |
| Denizen X / 123 Melrose St | 611 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 612 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 613 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 614 | Occupied | No | N/A | N/A | $4,500 |
| Denizen X / 123 Melrose St | 615 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 616 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 617 | Occupied | Yes | N/A | N/A | $4,725 |
| Denizen X / 123 Melrose St | 618 | Occupied | No | N/A | $75 | $2,400 |
| Denizen X / 123 Melrose St | 619 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 620 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 621 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 622 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 623 | Occupied | No | Yes | N/A | $956 |
| Denizen X / 123 Melrose St | 624 | Occupied | No | N/A | N/A | $2,750 |
| Denizen X / 123 Melrose St | 625 | Occupied | No | To be Confirmed | $75 | $947 |
| Denizen X / 123 Melrose St | 626 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 627 | Occupied | No | Yes | N/A | $947 |
| Denizen X / 123 Melrose St | 628 | Vacant | No | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 629 | Occupied | No | Yes | N/A | $947 |
| Denizen X / 123 Melrose St | 630 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 631 | Occupied | No | N/A | $150 | $2,900 |
| Denizen X / 123 Melrose St | 632 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 633 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 634 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 635 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 636 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 637 | Occupied | Yes | N/A | N/A | $2,575 |
| Denizen X / 123 Melrose St | 638 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 639 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 640 | Occupied | No | N/A | N/A | $2,750 |
| Denizen X / 123 Melrose St | 641 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 642 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 643 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 644 | Occupied | No | N/A | N/A | $947 |
| Denizen X / 123 Melrose St | 645 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 646 | Occupied | No | N/A | N/A | $956 |
| Denizen X / 123 Melrose St | 647 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 648 | Occupied | No | N/A | N/A | $2,750 |
| Denizen X / 123 Melrose St | 649 | Occupied | No | N/A | N/A | $4,200 |
| Denizen X / 123 Melrose St | 650 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 651 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 652 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 653 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 654 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 655 | Vacant | No | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 656 | Occupied | Yes | N/A | N/A | $3,625 |
| Denizen X / 123 Melrose St | 657 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 658 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 659 | Occupied | No | To be Confirmed | N/A | $1,027 |
| Denizen X / 123 Melrose St | 660 | Occupied | Yes | N/A | $75 | $4,275 |
| Denizen X / 123 Melrose St | 661 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 670 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 671 | Occupied | No | To be Confirmed | N/A | $1,017 |
| Denizen X / 123 Melrose St | 672 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 673 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 674 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 675 | Occupied | No | To be Confirmed | N/A | $1,017 |
| Denizen X / 123 Melrose St | 676 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 677 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 678 | Occupied | Yes | N/A | N/A | $3,650 |
| Denizen X / 123 Melrose St | 679 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 701 | Occupied | No | N/A | N/A | $3,575 |
| Denizen X / 123 Melrose St | 702 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 703 | Occupied | No | N/A | N/A | $1,230 |
| Denizen X / 123 Melrose St | 704 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 705 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 706 | Occupied | No | N/A | N/A | $3,750 |
| Denizen X / 123 Melrose St | 707 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 708 | Occupied | No | N/A | N/A | $3,150 |
| Denizen X / 123 Melrose St | 709 | Occupied | Yes | N/A | N/A | $4,650 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 710 | Occupied | No | N/A | N/A | $5,275 |
| Denizen X / 123 Melrose St | 711 | Occupied | No | N/A | N/A | $4,300 |
| Denizen X / 123 Melrose St | 712 | Occupied | No | N/A | $75 | $4,750 |
| Denizen X / 123 Melrose St | 713 | Occupied | No | N/A | N/A | $4,300 |
| Denizen X / 123 Melrose St | 714 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 715 | Occupied | Yes | N/A | N/A | $4,750 |
| Denizen X / 123 Melrose St | 716 | Occupied | No | N/A | N/A | $2,400 |
| Denizen X / 123 Melrose St | 717 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 718 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 719 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 720 | Occupied | Yes | N/A | $75 | $5,300 |
| Denizen X / 123 Melrose St | 721 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 722 | Occupied | No | N/A | $0 | $6,300 |
| Denizen X / 123 Melrose St | 723 | Occupied | No | N/A | $75 | $3,900 |
| Denizen X / 123 Melrose St | 724 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 735 | Occupied | No | N/A | N/A | $3,900 |
| Denizen X / 123 Melrose St | 736 | Occupied | No | N/A | N/A | $3,900 |
| Denizen X / 123 Melrose St | 737 | Occupied | No | N/A | $75 | $3,650 |
| Denizen X / 123 Melrose St | 738 | Occupied | No | N/A | $75 | $4,200 |
| Denizen X / 123 Melrose St | 739 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 740 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 741 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 742 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 743 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 744 | Occupied | No | N/A | $150 | $2,800 |
| Denizen X / 123 Melrose St | 745 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 746 | Vacant | No | N/A | N/A | N/A |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 747 | Occupied | No | N/A | N/A | N/A | $2,850 |
| Denizen X / 123 Melrose St | 748 | Occupied | No | N/A | N/A | N/A | $4,300 |
| Denizen X / 123 Melrose St | 749 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 750 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 751 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 752 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 753 | Occupied | No | N/A | N/A | N/A | $3,175 |
| Denizen X / 123 Melrose St | 754 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 755 | Occupied | Yes | N/A | N/A | N/A | $3,700 |
| Denizen X / 123 Melrose St | 756 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 757 | Occupied | No | Yes | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 758 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 759 | Occupied | Yes | N/A | $75 | N/A | $4,450 |
| Denizen X / 123 Melrose St | 760 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 770 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 771 | Occupied | No | N/A | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 772 | Occupied | Yes | N/A | $150 | N/A | $3,625 |
| Denizen X / 123 Melrose St | 773 | Occupied | No | N/A | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 774 | Occupied | No | Yes | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 775 | Occupied | No | N/A | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 776 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 777 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 778 | Occupied | No | N/A | N/A | N/A | $3,550 |
| Denizen X / 123 Melrose St | 779 | Vacant | No | N/A | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 801 | Occupied | No | N/A | $75 | N/A | $3,650 |
| Denizen X / 123 Melrose St | 802 | Occupied | No | N/A | N/A | N/A | $4,700 |
| Denizen X / 123 Melrose St | 803 | Occupied | No | N/A | N/A | N/A | $1,230 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 804 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 816 | Occupied | No | N/A | N/A | $4,750 |
| Denizen X / 123 Melrose St | 817 | Occupied | No | N/A | N/A | $4,700 |
| Denizen X / 123 Melrose St | 818 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 819 | Occupied | No | N/A | N/A | $5,400 |
| Denizen X / 123 Melrose St | 820 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 821 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 822 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 823 | Occupied | No | N/A | N/A | $3,000 |
| Denizen X / 123 Melrose St | 824 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 835 | Occupied | No | N/A | N/A | $3,200 |
| Denizen X / 123 Melrose St | 836 | Occupied | No | N/A | N/A | $3,000 |
| Denizen X / 123 Melrose St | 837 | Occupied | No | N/A | N/A | $3,150 |
| Denizen X / 123 Melrose St | 838 | Occupied | No | N/A | N/A | $3,650 |
| Denizen X / 123 Melrose St | 839 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 840 | Occupied | No | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 841 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 842 | Occupied | Yes | N/A | $0 | $4,300 |
| Denizen X / 123 Melrose St | 843 | Occupied | Yes | N/A | N/A | $5,500 |
| Denizen X / 123 Melrose St | 844 | Occupied | No | N/A | N/A | $4,975 |
| Denizen X / 123 Melrose St | 845 | Occupied | Yes | N/A | N/A | $5,300 |
| Denizen X / 123 Melrose St | 846 | Occupied | Yes | N/A | $75 | $3,450 |
| Denizen X / 123 Melrose St | 847 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 848 | Occupied | No | N/A | N/A | $5,500 |
| Denizen X / 123 Melrose St | 849 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 850 | Occupied | No | N/A | N/A | $5,400 |
| Denizen X / 123 Melrose St | 851 | Occupied | No | N/A | $75 | $1,017 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | 852 | Occupied | No | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 853 | Occupied | No | Yes | N/A | $1,242 |
| Denizen X / 123 Melrose St | 854 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 870 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 871 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 872 | Occupied | Yes | N/A | N/A | $3,800 |
| Denizen X / 123 Melrose St | 873 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 874 | Occupied | No | N/A | $75 | $1,017 |
| Denizen X / 123 Melrose St | 875 | Occupied | No | N/A | N/A | $1,017 |
| Denizen X / 123 Melrose St | 876 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 877 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 878 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 879 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 944 | Occupied | Yes | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 945 | Occupied | Yes | N/A | N/A | $2,900 |
| Denizen X / 123 Melrose St | 946 | Occupied | No | N/A | N/A | $3,750 |
| Denizen X / 123 Melrose St | 947 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 948 | Occupied | No | N/A | N/A | $4,850 |
| Denizen X / 123 Melrose St | 949 | Occupied | No | N/A | N/A | $5,250 |
| Denizen X / 123 Melrose St | 950 | Occupied | No | N/A | $75 | $3,550 |
| Denizen X / 123 Melrose St | 951 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 952 | Occupied | No | N/A | N/A | $2,700 |
| Denizen X / 123 Melrose St | 953 | Occupied | No | N/A | N/A | $4,850 |
| Denizen X / 123 Melrose St | 954 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 955 | Occupied | No | N/A | N/A | $3,600 |
| Denizen X / 123 Melrose St | 956 | Vacant | No | N/A | N/A | N/A |
| Denizen X / 123 Melrose St | 957 | Occupied | No | N/A | $75 | $4,425 |

| | Portion of Ground Floor (NYEG Corp.) | | | | | |
|---|---|---|---|---|---|---|
| Denizen X / 123 Melrose St | | Occupied | N/A | N/A | N/A | $0 |

\* Units with Rhino or Voucher are deemed to have Non-Cash Security Deposits.

\*\* With respect to Units marked "To Be Confirmed", Sellers will endeavor to confirm during the executory period whether such unit is subject to a voucher (in which event it will be deemed to have a Non-Cash Security Deposit) or is not subject to a voucher.

## EXHIBIT B-4

### Security Deposits for Noll Street Property

### (As of July 27, 2021)

| Building | Unit | Occupancy | Rhino* (Y/N) | Voucher* (Y/N) | Garage Remote | Security Deposit |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 101 | Occupied | No | N/A | N/A | $3,450 |
| Denizen Y / 54 Noll St | 102 | Occupied | No | **To be Confirmed | N/A | $1,230 |
| Denizen Y / 54 Noll St | 103 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 104 | Occupied | Yes | N/A | N/A | $3,175 |
| Denizen Y / 54 Noll St | 105 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 201 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 202 | Occupied | Yes | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 203 | Occupied | Yes | N/A | N/A | $1,032 |
| Denizen Y / 54 Noll St | 204 | Occupied | No | To be Confirmed | N/A | $1,032 |
| Denizen Y / 54 Noll St | 205 | Occupied | No | N/A | N/A | $4,175 |
| Denizen Y / 54 Noll St | 206 | Occupied | No | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 207 | Occupied | No | To be Confirmed | N/A | $1,261 |
| Denizen Y / 54 Noll St | 208 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 209 | Occupied | No | To be Confirmed | N/A | $1,261 |
| Denizen Y / 54 Noll St | 210 | Occupied | No | N/A | $75 | $3,100 |
| Denizen Y / 54 Noll St | 213 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 214 | Occupied | No | To be Confirmed | N/A | $1,261 |
| Denizen Y / 54 Noll St | 215 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 216 | Occupied | Yes | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 217 | Occupied | No | N/A | N/A | $3,525 |
| Denizen Y / 54 Noll St | 218 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 219 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 220 | Occupied | No | N/A | $75 | $2,950 |
| Denizen Y / 54 Noll St | 221 | Occupied | No | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 222 | Occupied | No | N/A | N/A | $3,050 |
| Denizen Y / 54 Noll St | 223 | Occupied | No | N/A | N/A | $3,325 |
| Denizen Y / 54 Noll St | 226 | Occupied | No | N/A | $75 | $4,375 |
| Denizen Y / 54 Noll St | 227 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 228 | Occupied | No | N/A | N/A | $2,850 |
| Denizen Y / 54 Noll St | 229 | Occupied | No | N/A | N/A | $2,925 |
| Denizen Y / 54 Noll St | 230 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 231 | Occupied | No | N/A | N/A | $2,400 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 232 | Occupied | No | N/A | $75 | $2,350 |
| Denizen Y / 54 Noll St | 233 | Occupied | No | N/A | N/A | $2,300 |
| Denizen Y / 54 Noll St | 234 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 235 | Occupied | No | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 236 | Occupied | Yes | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 237 | Occupied | No | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 240 | Occupied | No | N/A | $75 | $3,000 |
| Denizen Y / 54 Noll St | 241 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 242 | Occupied | No | N/A | N/A | $2,325 |
| Denizen Y / 54 Noll St | 243 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 244 | Occupied | Yes | N/A | N/A | $3,248 |
| Denizen Y / 54 Noll St | 245 | Occupied | Yes | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 246 | Occupied | Yes | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 247 | Occupied | No | N/A | N/A | $2,875 |
| Denizen Y / 54 Noll St | 248 | Occupied | Yes | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 249 | Occupied | No | N/A | N/A | $2,284 |
| Denizen Y / 54 Noll St | 250 | Occupied | No | N/A | N/A | $4,750 |
| Denizen Y / 54 Noll St | 251 | Occupied | No | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 252 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 253 | Occupied | No | To be Confirmed | N/A | $1,027 |
| Denizen Y / 54 Noll St | 254 | Occupied | No | N/A | N/A | $3,600 |
| Denizen Y / 54 Noll St | 255 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 256 | Occupied | No | To be Confirmed | N/A | $961 |
| Denizen Y / 54 Noll St | 257 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 258 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 259 | Occupied | No | N/A | $75 | $3,500 |
| Denizen Y / 54 Noll St | 260 | Occupied | No | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 261 | Occupied | No | To be Confirmed | N/A | $1,027 |
| Denizen Y / 54 Noll St | 262 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 263 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 264 | Occupied | No | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 265 | Occupied | No | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 266 | Super | No | N/A | N/A | $3,900 |
| Denizen Y / 54 Noll St | 301 | Occupied | No | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 302 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 303 | Occupied | Yes | N/A | $75 | $3,225 |
| Denizen Y / 54 Noll St | 304 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 305 | Occupied | No | N/A | N/A | $4,000 |
| Denizen Y / 54 Noll St | 306 | Occupied | Yes | N/A | N/A | $3,325 |
| Denizen Y / 54 Noll St | 307 | Occupied | No | N/A | $75 | $1,230 |
| Denizen Y / 54 Noll St | 308 | Occupied | No | N/A | $75 | $3,225 |
| Denizen Y / 54 Noll St | 309 | Occupied | No | To be Confirmed | N/A | $1,248 |
| Denizen Y / 54 Noll St | 310 | Occupied | No | N/A | N/A | $3,225 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 311 | Occupied | Yes | N/A | N/A | $3,850 |
| Denizen Y / 54 Noll St | 312 | Occupied | No | N/A | N/A | $1,261 |
| Denizen Y / 54 Noll St | 313 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 314 | Occupied | No | N/A | $75 | $4,150 |
| Denizen Y / 54 Noll St | 315 | Occupied | No | To be Confirmed | N/A | $1,017 |
| Denizen Y / 54 Noll St | 316 | Occupied | Yes | N/A | $75 | $3,100 |
| Denizen Y / 54 Noll St | 317 | Occupied | No | N/A | $75 | $3,650 |
| Denizen Y / 54 Noll St | 318 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 319 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 320 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 321 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 322 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 323 | Occupied | No | N/A | N/A | $3,325 |
| Denizen Y / 54 Noll St | 324 | Occupied | Yes | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 325 | Occupied | No | N/A | N/A | $2,975 |
| Denizen Y / 54 Noll St | 326 | Occupied | No | N/A | N/A | $4,500 |
| Denizen Y / 54 Noll St | 327 | Occupied | No | To be Confirmed | N/A | $1,042 |
| Denizen Y / 54 Noll St | 328 | Occupied | Yes | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 329 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 330 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 331 | Occupied | No | N/A | N/A | $2,525 |
| Denizen Y / 54 Noll St | 332 | Occupied | No | N/A | $75 | $3,250 |
| Denizen Y / 54 Noll St | 333 | Occupied | No | Yes | N/A | $956 |
| Denizen Y / 54 Noll St | 334 | Occupied | No | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 335 | Occupied | Yes | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 336 | Occupied | No | Yes | N/A | $961 |
| Denizen Y / 54 Noll St | 337 | Occupied | No | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 338 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 339 | Occupied | No | Yes | N/A | $956 |
| Denizen Y / 54 Noll St | 340 | Occupied | No | N/A | N/A | $2,850 |
| Denizen Y / 54 Noll St | 341 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 342 | Occupied | No | Yes | N/A | $961 |
| Denizen Y / 54 Noll St | 343 | Occupied | No | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 344 | Occupied | Yes | N/A | N/A | $3,525 |
| Denizen Y / 54 Noll St | 345 | Occupied | No | N/A | N/A | $2,525 |
| Denizen Y / 54 Noll St | 346 | Occupied | No | N/A | N/A | $2,525 |
| Denizen Y / 54 Noll St | 347 | Occupied | No | N/A | N/A | $2,825 |
| Denizen Y / 54 Noll St | 348 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 349 | Occupied | No | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 350 | Occupied | No | N/A | N/A | $4,325 |
| Denizen Y / 54 Noll St | 351 | Occupied | No | N/A | N/A | $2,950 |
| Denizen Y / 54 Noll St | 352 | Occupied | Yes | N/A | N/A | $2,600 |
| Denizen Y / 54 Noll St | 353 | Occupied | No | N/A | $75 | $1,027 |
| Denizen Y / 54 Noll St | 354 | Occupied | No | N/A | $75 | $3,700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 355 | Occupied | Yes | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 356 | Occupied | No | N/A | N/A | $956 |
| Denizen Y / 54 Noll St | 357 | Occupied | No | N/A | $75 | $2,825 |
| Denizen Y / 54 Noll St | 358 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 359 | Occupied | No | N/A | N/A | $3,650 |
| Denizen Y / 54 Noll St | 360 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 361 | Occupied | No | Yes | N/A | $1,032 |
| Denizen Y / 54 Noll St | 362 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 363 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 364 | Occupied | No | N/A | N/A | $3,125 |
| Denizen Y / 54 Noll St | 365 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 366 | Occupied | No | N/A | N/A | $3,450 |
| Denizen Y / 54 Noll St | 401 | Occupied | Yes | N/A | N/A | $3,125 |
| Denizen Y / 54 Noll St | 402 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 403 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 404 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 405 | Occupied | No | N/A | N/A | $4,150 |
| Denizen Y / 54 Noll St | 406 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 407 | Occupied | No | N/A | N/A | $1,230 |
| Denizen Y / 54 Noll St | 408 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 409 | Occupied | No | N/A | N/A | $1,242 |
| Denizen Y / 54 Noll St | 410 | Occupied | No | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 411 | Occupied | No | N/A | N/A | $3,900 |
| Denizen Y / 54 Noll St | 412 | Occupied | No | Yes | N/A | $1,248 |
| Denizen Y / 54 Noll St | 413 | Occupied | No | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 414 | Occupied | No | N/A | N/A | $4,150 |
| Denizen Y / 54 Noll St | 415 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 416 | Occupied | No | N/A | N/A | $3,125 |
| Denizen Y / 54 Noll St | 417 | Occupied | No | N/A | $75 | $3,675 |
| Denizen Y / 54 Noll St | 418 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 419 | Occupied | Yes | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 420 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 421 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 422 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 423 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 424 | Occupied | No | N/A | N/A | $3,050 |
| Denizen Y / 54 Noll St | 425 | Occupied | Yes | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 426 | Occupied | No | N/A | $75 | $4,450 |
| Denizen Y / 54 Noll St | 427 | Occupied | No | N/A | $75 | $3,350 |
| Denizen Y / 54 Noll St | 428 | Occupied | Yes | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 429 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 430 | Occupied | No | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 431 | Occupied | No | N/A | N/A | $5,150 |
| Denizen Y / 54 Noll St | 432 | Occupied | Yes | N/A | N/A | $2,525 |
| Denizen Y / 54 Noll St | 433 | Occupied | No | Yes | N/A | $947 |
| Denizen Y / 54 Noll St | 434 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 435 | Occupied | Yes | N/A | N/A | $2,425 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 436 | Occupied | No | Yes | N/A | $971 |
| Denizen Y / 54 Noll St | 437 | Occupied | No | N/A | $150 | $3,250 |
| Denizen Y / 54 Noll St | 438 | Occupied | Yes | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 439 | Occupied | No | N/A | N/A | $947 |
| Denizen Y / 54 Noll St | 440 | Occupied | No | N/A | N/A | $2,925 |
| Denizen Y / 54 Noll St | 441 | Occupied | No | N/A | N/A | $2,375 |
| Denizen Y / 54 Noll St | 442 | Occupied | No | Yes | N/A | $971 |
| Denizen Y / 54 Noll St | 443 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 444 | Occupied | Yes | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 445 | Occupied | No | N/A | N/A | $2,475 |
| Denizen Y / 54 Noll St | 446 | Occupied | No | N/A | N/A | $2,450 |
| Denizen Y / 54 Noll St | 447 | Occupied | No | N/A | N/A | $2,875 |
| Denizen Y / 54 Noll St | 448 | Occupied | No | N/A | N/A | $2,450 |
| Denizen Y / 54 Noll St | 449 | Occupied | No | N/A | N/A | $2,375 |
| Denizen Y / 54 Noll St | 450 | Occupied | No | N/A | $75 | $4,800 |
| Denizen Y / 54 Noll St | 451 | Occupied | No | N/A | N/A | $2,950 |
| Denizen Y / 54 Noll St | 452 | Occupied | No | N/A | N/A | $2,575 |
| Denizen Y / 54 Noll St | 453 | Occupied | No | N/A | N/A | $1,032 |
| Denizen Y / 54 Noll St | 454 | Occupied | No | N/A | N/A | $3,725 |
| Denizen Y / 54 Noll St | 455 | Occupied | No | N/A | $75 | $3,200 |
| Denizen Y / 54 Noll St | 456 | Occupied | No | N/A | N/A | $956 |
| Denizen Y / 54 Noll St | 457 | Occupied | No | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 458 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 459 | Occupied | No | N/A | N/A | $3,700 |
| Denizen Y / 54 Noll St | 460 | Occupied | No | N/A | N/A | $3,425 |
| Denizen Y / 54 Noll St | 461 | Occupied | No | N/A | N/A | $1,042 |
| Denizen Y / 54 Noll St | 462 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 463 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 464 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 465 | Occupied | Yes | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 466 | Occupied | No | N/A | N/A | $3,525 |
| Denizen Y / 54 Noll St | 501 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 502 | Occupied | Yes | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 503 | Occupied | No | N/A | N/A | $3,625 |
| Denizen Y / 54 Noll St | 504 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 505 | Occupied | No | N/A | N/A | $4,200 |
| Denizen Y / 54 Noll St | 506 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 507 | Occupied | No | Yes | N/A | $1,261 |
| Denizen Y / 54 Noll St | 508 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 509 | Occupied | No | Yes | $75 | $1,261 |
| Denizen Y / 54 Noll St | 510 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 511 | Occupied | No | N/A | N/A | $3,950 |
| Denizen Y / 54 Noll St | 512 | Occupied | No | Yes | N/A | $1,261 |
| Denizen Y / 54 Noll St | 513 | Occupied | Yes | N/A | N/A | $3,225 |
| Denizen Y / 54 Noll St | 514 | Occupied | No | N/A | N/A | $4,200 |
| Denizen Y / 54 Noll St | 515 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 516 | Occupied | No | N/A | N/A | $3,150 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 517 | Occupied | No | N/A | N/A | $3,700 |
| Denizen Y / 54 Noll St | 518 | Occupied | No | N/A | N/A | $1,042 |
| Denizen Y / 54 Noll St | 519 | Occupied | No | N/A | $75 | $3,450 |
| Denizen Y / 54 Noll St | 520 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 521 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 522 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 523 | Occupied | Yes | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 524 | Occupied | Yes | N/A | N/A | $3,125 |
| Denizen Y / 54 Noll St | 525 | Occupied | No | N/A | N/A | $3,125 |
| Denizen Y / 54 Noll St | 526 | Occupied | No | N/A | N/A | $4,500 |
| Denizen Y / 54 Noll St | 527 | Occupied | No | N/A | N/A | $3,225 |
| Denizen Y / 54 Noll St | 528 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 529 | Occupied | No | N/A | N/A | $3,050 |
| Denizen Y / 54 Noll St | 530 | Occupied | No | N/A | N/A | $3,575 |
| Denizen Y / 54 Noll St | 531 | Occupied | No | N/A | N/A | $2,575 |
| Denizen Y / 54 Noll St | 532 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 533 | Occupied | No | N/A | N/A | $947 |
| Denizen Y / 54 Noll St | 534 | Occupied | Yes | N/A | N/A | $3,375 |
| Denizen Y / 54 Noll St | 535 | Occupied | Yes | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 536 | Occupied | No | Yes | N/A | $971 |
| Denizen Y / 54 Noll St | 537 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 538 | Occupied | Yes | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 539 | Occupied | No | Yes | N/A | $971 |
| Denizen Y / 54 Noll St | 540 | Occupied | Yes | N/A | N/A | $2,950 |
| Denizen Y / 54 Noll St | 541 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 542 | Occupied | No | N/A | N/A | $947 |
| Denizen Y / 54 Noll St | 543 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 544 | Occupied | Yes | N/A | N/A | $3,575 |
| Denizen Y / 54 Noll St | 545 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 546 | Occupied | No | N/A | N/A | $2,450 |
| Denizen Y / 54 Noll St | 547 | Occupied | No | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 548 | Occupied | No | N/A | N/A | $2,375 |
| Denizen Y / 54 Noll St | 549 | Occupied | Yes | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 550 | Occupied | No | N/A | N/A | $4,850 |
| Denizen Y / 54 Noll St | 551 | Occupied | No | N/A | N/A | $3,025 |
| Denizen Y / 54 Noll St | 552 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 553 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 554 | Occupied | No | N/A | N/A | $4,050 |
| Denizen Y / 54 Noll St | 555 | Occupied | Yes | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 556 | Occupied | No | Yes | N/A | $947 |
| Denizen Y / 54 Noll St | 557 | Occupied | No | N/A | N/A | $2,950 |
| Denizen Y / 54 Noll St | 558 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 559 | Occupied | Yes | N/A | N/A | $3,750 |
| Denizen Y / 54 Noll St | 560 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 561 | Occupied | No | Yes | N/A | $1,032 |
| Denizen Y / 54 Noll St | 562 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 563 | Occupied | No | Yes | N/A | $1,042 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 564 | Occupied | No | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 565 | Occupied | Yes | N/A | N/A | $3,300 |
| Denizen Y / 54 Noll St | 566 | Occupied | No | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 601 | Occupied | No | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 602 | Occupied | No | N/A | N/A | $3,075 |
| Denizen Y / 54 Noll St | 603 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 604 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 605 | Occupied | No | N/A | N/A | $4,250 |
| Denizen Y / 54 Noll St | 606 | Occupied | No | N/A | $75 | $3,400 |
| Denizen Y / 54 Noll St | 607 | Occupied | No | Yes | N/A | $1,248 |
| Denizen Y / 54 Noll St | 608 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 609 | Occupied | No | N/A | $75 | $3,950 |
| Denizen Y / 54 Noll St | 610 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 611 | Occupied | No | N/A | N/A | $4,000 |
| Denizen Y / 54 Noll St | 612 | Occupied | No | N/A | N/A | $1,230 |
| Denizen Y / 54 Noll St | 613 | Occupied | Yes | N/A | N/A | $3,250 |
| Denizen Y / 54 Noll St | 614 | Occupied | No | N/A | N/A | $4,250 |
| Denizen Y / 54 Noll St | 615 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 616 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 617 | Occupied | No | N/A | N/A | $3,725 |
| Denizen Y / 54 Noll St | 618 | Occupied | No | Yes | N/A | $1,032 |
| Denizen Y / 54 Noll St | 619 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 620 | Occupied | No | Yes | N/A | $1,027 |
| Denizen Y / 54 Noll St | 621 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 622 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 623 | Occupied | No | N/A | N/A | $3,375 |
| Denizen Y / 54 Noll St | 624 | Occupied | Yes | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 625 | Occupied | No | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 626 | Occupied | No | N/A | N/A | $4,100 |
| Denizen Y / 54 Noll St | 627 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 628 | Occupied | No | N/A | N/A | $3,450 |
| Denizen Y / 54 Noll St | 629 | Occupied | No | N/A | N/A | $3,200 |
| Denizen Y / 54 Noll St | 630 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 631 | Occupied | No | N/A | N/A | $2,625 |
| Denizen Y / 54 Noll St | 632 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 633 | Occupied | No | N/A | N/A | $947 |
| Denizen Y / 54 Noll St | 634 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 635 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 636 | Occupied | No | N/A | N/A | $947 |
| Denizen Y / 54 Noll St | 637 | Occupied | Yes | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 638 | Occupied | No | Yes | N/A | $971 |
| Denizen Y / 54 Noll St | 639 | Occupied | Yes | N/A | N/A | $2,475 |
| Denizen Y / 54 Noll St | 640 | Occupied | Yes | N/A | N/A | $2,975 |
| Denizen Y / 54 Noll St | 641 | Occupied | No | N/A | N/A | $2,450 |
| Denizen Y / 54 Noll St | 642 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 643 | Occupied | No | N/A | N/A | $1,017 |
| Denizen Y / 54 Noll St | 644 | Occupied | No | N/A | N/A | $3,625 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 645 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 646 | Occupied | Yes | N/A | N/A | $2,450 |
| Denizen Y / 54 Noll St | 647 | Occupied | No | N/A | N/A | $2,925 |
| Denizen Y / 54 Noll St | 648 | Occupied | No | N/A | N/A | $2,475 |
| Denizen Y / 54 Noll St | 649 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 650 | Occupied | No | N/A | N/A | $5,000 |
| Denizen Y / 54 Noll St | 651 | Occupied | No | N/A | N/A | $3,050 |
| Denizen Y / 54 Noll St | 652 | Occupied | No | N/A | N/A | $2,600 |
| Denizen Y / 54 Noll St | 653 | Occupied | No | N/A | N/A | $1,032 |
| Denizen Y / 54 Noll St | 654 | Occupied | No | N/A | N/A | $3,800 |
| Denizen Y / 54 Noll St | 655 | Occupied | No | N/A | $75 | $3,300 |
| Denizen Y / 54 Noll St | 656 | Occupied | Yes | N/A | N/A | $2,725 |
| Denizen Y / 54 Noll St | 657 | Occupied | No | N/A | N/A | $2,975 |
| Denizen Y / 54 Noll St | 658 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 659 | Occupied | No | N/A | N/A | $3,775 |
| Denizen Y / 54 Noll St | 660 | Occupied | No | N/A | N/A | $3,525 |
| Denizen Y / 54 Noll St | 661 | Occupied | No | N/A | N/A | $1,027 |
| Denizen Y / 54 Noll St | 662 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 663 | Occupied | No | Yes | N/A | $1,042 |
| Denizen Y / 54 Noll St | 664 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 665 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 666 | Occupied | No | N/A | N/A | $1,230 |
| Denizen Y / 54 Noll St | 701 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 702 | Occupied | No | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 703 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 704 | Occupied | No | N/A | $75 | $4,600 |
| Denizen Y / 54 Noll St | 706 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 707 | Occupied | No | N/A | $75 | $4,375 |
| Denizen Y / 54 Noll St | 708 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 709 | Occupied | No | N/A | N/A | $3,700 |
| Denizen Y / 54 Noll St | 710 | Occupied | No | N/A | N/A | $3,575 |
| Denizen Y / 54 Noll St | 711 | Occupied | Yes | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 712 | Occupied | No | N/A | $75 | $1,242 |
| Denizen Y / 54 Noll St | 713 | Occupied | No | N/A | N/A | $14,700 |
| Denizen Y / 54 Noll St | 714 | Occupied | No | N/A | N/A | $4,400 |
| Denizen Y / 54 Noll St | 715 | Occupied | No | N/A | $75 | $3,300 |
| Denizen Y / 54 Noll St | 716 | Occupied | No | N/A | $75 | $3,300 |
| Denizen Y / 54 Noll St | 717 | Occupied | No | N/A | $75 | $3,800 |
| Denizen Y / 54 Noll St | 718 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 719 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 720 | Occupied | No | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 721 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 723 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 724 | Occupied | No | N/A | N/A | $5,500 |
| Denizen Y / 54 Noll St | 725 | Occupied | No | N/A | $75 | $11,100 |
| Denizen Y / 54 Noll St | 727 | Occupied | No | N/A | N/A | $4,250 |
| Denizen Y / 54 Noll St | 728 | Occupied | No | N/A | N/A | $3,500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 729 | Occupied | No | N/A | N/A | $6,400 |
| Denizen Y / 54 Noll St | 730 | Occupied | Yes | N/A | N/A | $3,600 |
| Denizen Y / 54 Noll St | 731 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 732 | Occupied | No | N/A | N/A | $2,475 |
| Denizen Y / 54 Noll St | 733 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 734 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 735 | Occupied | Yes | N/A | N/A | $2,475 |
| Denizen Y / 54 Noll St | 736 | Occupied | Yes | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 737 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 738 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 739 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 740 | Occupied | No | N/A | $75 | $3,000 |
| Denizen Y / 54 Noll St | 741 | Occupied | Yes | N/A | N/A | $2,550 |
| Denizen Y / 54 Noll St | 742 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 743 | Occupied | No | N/A | $75 | $2,950 |
| Denizen Y / 54 Noll St | 744 | Occupied | No | N/A | N/A | $3,600 |
| Denizen Y / 54 Noll St | 745 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 746 | Occupied | No | N/A | N/A | $2,425 |
| Denizen Y / 54 Noll St | 747 | Occupied | No | N/A | N/A | $2,900 |
| Denizen Y / 54 Noll St | 748 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 749 | Occupied | No | N/A | N/A | $2,350 |
| Denizen Y / 54 Noll St | 750 | Occupied | No | N/A | N/A | $4,950 |
| Denizen Y / 54 Noll St | 751 | Occupied | No | N/A | $75 | $3,100 |
| Denizen Y / 54 Noll St | 752 | Occupied | No | N/A | N/A | $2,650 |
| Denizen Y / 54 Noll St | 753 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 754 | Occupied | No | N/A | N/A | $3,850 |
| Denizen Y / 54 Noll St | 755 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 756 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 757 | Occupied | No | N/A | N/A | $2,950 |
| Denizen Y / 54 Noll St | 758 | Occupied | No | N/A | N/A | $3,450 |
| Denizen Y / 54 Noll St | 759 | Occupied | No | N/A | $75 | $3,800 |
| Denizen Y / 54 Noll St | 760 | Occupied | No | N/A | N/A | $3,600 |
| Denizen Y / 54 Noll St | 761 | Occupied | No | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 762 | Occupied | Yes | N/A | N/A | $3,550 |
| Denizen Y / 54 Noll St | 763 | Occupied | No | N/A | $75 | $3,450 |
| Denizen Y / 54 Noll St | 764 | Occupied | Yes | N/A | N/A | $3,400 |
| Denizen Y / 54 Noll St | 765 | Occupied | No | N/A | N/A | $3,350 |
| Denizen Y / 54 Noll St | 766 | Occupied | No | N/A | N/A | $3,650 |
| Denizen Y / 54 Noll St | 801 | Occupied | No | N/A | N/A | $3,450 |
| Denizen Y / 54 Noll St | 802 | Occupied | Yes | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 803 | Occupied | Yes | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 804 | Occupied | No | N/A | N/A | $4,500 |
| Denizen Y / 54 Noll St | 806 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 807 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 808 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 809 | Occupied | No | N/A | N/A | $5,450 |
| Denizen Y / 54 Noll St | 810 | Occupied | No | N/A | N/A | $3,500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Denizen Y / 54 Noll St | 812 | Occupied | No | N/A | N/A | $1,242 |
| Denizen Y / 54 Noll St | 813 | Occupied | No | N/A | N/A | $3,425 |
| Denizen Y / 54 Noll St | 814 | Occupied | No | N/A | $75 | $5,050 |
| Denizen Y / 54 Noll St | 815 | Occupied | No | N/A | $75 | $4,725 |
| Denizen Y / 54 Noll St | 817 | Occupied | Yes | N/A | N/A | $4,000 |
| Denizen Y / 54 Noll St | 818 | Occupied | No | N/A | N/A | $3,600 |
| Denizen Y / 54 Noll St | 819 | Occupied | No | N/A | N/A | $5,150 |
| Denizen Y / 54 Noll St | 820 | Occupied | No | N/A | $75 | $4,450 |
| Denizen Y / 54 Noll St | 821 | Occupied | No | N/A | $75 | $4,900 |
| Denizen Y / 54 Noll St | 822 | Occupied | No | N/A | N/A | $3,900 |
| Denizen Y / 54 Noll St | 823 | Occupied | No | N/A | N/A | $4,300 |
| Denizen Y / 54 Noll St | 824 | Occupied | No | N/A | $75 | $5,125 |
| Denizen Y / 54 Noll St | 825 | Occupied | No | N/A | N/A | $3,806 |
| Denizen Y / 54 Noll St | 826 | Occupied | No | N/A | $75 | $3,600 |
| Denizen Y / 54 Noll St | 827 | Occupied | No | N/A | N/A | $3,750 |
| Denizen Y / 54 Noll St | 828 | Occupied | Yes | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 829 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 830 | Occupied | No | N/A | $75 | $5,400 |
| Denizen Y / 54 Noll St | 831 | Occupied | No | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 832 | Occupied | No | N/A | N/A | $4,600 |
| Denizen Y / 54 Noll St | 833 | Occupied | No | N/A | $150 | $4,725 |
| Denizen Y / 54 Noll St | 834 | Occupied | No | N/A | N/A | $2,500 |
| Denizen Y / 54 Noll St | 835 | Occupied | Yes | N/A | N/A | $3,100 |
| Denizen Y / 54 Noll St | 836 | Occupied | No | N/A | $75 | $2,500 |
| Denizen Y / 54 Noll St | 837 | Occupied | No | N/A | N/A | $2,400 |
| Denizen Y / 54 Noll St | 838 | Occupied | No | N/A | $75 | $5,000 |
| Denizen Y / 54 Noll St | 851 | Occupied | No | N/A | N/A | $3,150 |
| Denizen Y / 54 Noll St | 852 | Occupied | No | N/A | N/A | $2,700 |
| Denizen Y / 54 Noll St | 853 | Occupied | No | N/A | $75 | $3,450 |
| Denizen Y / 54 Noll St | 854 | Occupied | No | N/A | $75 | $3,975 |
| Denizen Y / 54 Noll St | 855 | Vacant | No | N/A | N/A | N/A |
| Denizen Y / 54 Noll St | 856 | Occupied | No | N/A | N/A | $2,750 |
| Denizen Y / 54 Noll St | 857 | Occupied | No | N/A | N/A | $3,000 |
| Denizen Y / 54 Noll St | 858 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 859 | Occupied | No | N/A | N/A | $3,850 |
| Denizen Y / 54 Noll St | 860 | Occupied | No | N/A | $75 | $3,600 |
| Denizen Y / 54 Noll St | 861 | Occupied | No | N/A | $75 | $3,500 |
| Denizen Y / 54 Noll St | 862 | Occupied | No | N/A | N/A | $3,575 |
| Denizen Y / 54 Noll St | 863 | Occupied | Yes | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 864 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 865 | Occupied | No | N/A | N/A | $3,500 |
| Denizen Y / 54 Noll St | 866 | Occupied | No | N/A | N/A | $3,700 |
| Denizen Y / 54 Noll St | A3 (E & A'S 1080 BREW) | Occupied | N/A | N/A | N/A | $2,150 |
| Denizen Y / 54 Noll St | GROCERY (54 NOLL, LLC) | Tenant not in Possession | N/A | N/A | N/A | $40,000 |

\* Units with Rhino or Voucher are deemed to have Non-Cash Security Deposits.

\*\* With respect to Units marked "To Be Confirmed", Sellers will endeavor to confirm during the executory period whether such unit is subject to a voucher (in which event it will be deemed to have a Non-Cash Security Deposit) or is not subject to a voucher.

## EXHIBIT C-1

### Service Contracts for Melrose Street Property

| Vendor | Purpose |
| --- | --- |
| Rotavele Elevator Service Inc. | Elevator |
| Verizon Services Corp. | Marketing Agreement |
| **LaundryMac | Laundry |
| **Green Food Solutions | Seasonal Hydroponic Garden |
| **Fitness Machine Technicians | Gym Equipment |

** Affects both the Melrose Street Property and Noll Street Property

## EXHIBIT C-2

### Service Contracts for Noll Street Property

| Vendor | Purpose |
| --- | --- |
| Elite Pool & Fitness Management Inc. | Amenity Management |
| Rotavele Elevator Service Inc. | Elevator |
| Verizon Services Corp. | Marketing Agreement |
| **LaundryMac | Laundry |
| **Green Food Solutions | Seasonal Hydroponic Garden |
| **Fitness Machine Technicians | Gym Equipment |

** Affects both the Melrose Street Property and Noll Street Property

## EXHIBIT D-1

### Permitted Exceptions for Melrose Street Property

1. Covenants and Restriction in Reel 1668 Page 621, repeated in Reel 1668 Page 613.
2. Restrictive Declaration in CRFN 2014000163409.
3. Waiver of Execution of Restrictive Declaration and Subordination of Mortgage in CRFN 2014000163412, CRFN 2014000163410 and CRFN 2014000163411.
4. Agreement in CRFN 2015000182948 and in CRFN 2015000183044.
5. Mapping Agreement in CRFN 2018000218656.
6. Restrictive Declaration in CRFN 2018000223890.
7. Zoning Lot Development Agreement in CRFN 2019000187256.
8. Waiver, Consent and Subordination Agreement in CRFN 2019000187257.
9. Waiver, Consent and Subordination Agreement in CRFN 2019000187258.
10. Terms and conditions of the Regulatory Agreement dated 6/29/2017 and recorded on 8/11/2017 in CRFN 2017000300445, as amended by Amendment to Regulatory Agreement dated 9/12/2018 and recorded 9/20/2018 in CRFN 2018000314660.

## EXHIBIT D-2

### Permitted Exceptions for Noll Street Property

1. Utility Easement in Liber 752 Page 269 as cited in Reel 1831 Page 1575.
2. Agreement in Liber 601 Page 52.
3. Easement in Reel 753 Page 259, as amended by Partial Easement Termination in CRFN 2020000235505.
4. Covenants and Restriction in Reel 1668 Page 621, repeated in Reel 1668 Page 613.
5. Restrictive Declaration in CRFN 2014000163409.
6. Agreement in CRFN 2015000182948 and in CRFN 2015000183044.
7. Mapping Agreement in CRFN 2018000218656.
8. Restrictive Declaration in CRFN 2018000223890.
9. Maps in CRFN 2018000295110.
10. Zoning Lot Development Agreement in CRFN 2019000187256.
11. Certification Pursuant to Zoning Lot Subdivision D in CRFN 2019000187254.
12. Confirmatory Declaration of Zoning Restrictions in CRFN 2019000187255.
13. Waiver, Consent and Subordination Agreement in CRFN 2019000187257.
14. Waiver, Consent and Subordination Agreement in CRFN 2019000187258.
15. Notice of Sidewalk Violation No. HWS2013K filed on 10/28/2013.
16. Terms and conditions of the Regulatory Agreement dated 6/29/2017 and recorded on 8/11/2017 in CRFN 2017000300445.

## EXHIBIT D-3

**Schedule B to Title Report**

**[To be attached]**

# Fidelity National Title Insurance Company

### TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*

*The policy to be issued under this preliminary certificate will not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of the following exceptions unless they are disposed of to our satisfaction:*

DISPOSITION

1. <u>Taxes</u>, tax liens, tax sales, water rents, sewer rents and assessments set forth on separate schedule herein.

2. Rights of tenants and persons in possession. | Per Rent Roll attached, as tenants only with no rights to purchase or rights of first offer/refusal. |

3. Mortgages returned herein (31). Detailed statement within. | Omit or as assigned to Purchaser's lender. |

4. **(AMENDED 7/27/21: GL/mm)**

    <u>As to Lot 1:</u>

    <u>Survey</u> made by Leonard J. Strandberg and Associates, Consulting Engineers and Land Surveyors, P.C., dated February 17, 2015, and last updated January 29, 2020, shows a 5-8 story brick building with basement level (under construction), an area under construction, concrete ramps, a loading zone, and also shows: 1. Awning projects up to 4 feet onto Melrose Street. Subject to any changes since that date.

    <u>As to Lot 48:</u>

    <u>Survey</u> made by Leonard J. Strandberg and Associates, Consulting Engineers and Land Surveyors, P.C., dated February 17, 2015, and last updated January 16, 2019, shows an 8 story building under construction, and also shows, and Subject to any changes since that date.

    a. Fences vary with record lines of Title.

    b. Awning along Northerly record line projects up to 6.3 feet North of the Northerly record line onto Noll Street.

5. Covenants, Conditions, Restrictions, Easements, Agreements, etc. of record: | To confirm affirmative insurance with Fidelity ✱ |

    a. Utility Easement in Liber 752 Page 269 as cited in <u>Reel 1831 Page 1575</u>.

    b. Agreement in Liber 601 Page 52.

    c. Easement in <u>Reel 753 Page 259</u>, as amended by Partial Easement Termination in <u>CRFN 2020000235505</u>.

    d. Covenants and Restriction, including but not limited to a $1 Condemnation Clause in <u>Reel 1668 Page 621</u>, repeated in <u>Reel 1668 Page 613</u>.

    e. Restrictive Declaration in <u>CRFN 2014000163409</u>, with regards thereto:

        i. <u>FOR INFORMATION ONLY</u>: Waiver of Execution of Restrictive Declaration and Subordination of Mortgage in CRFN 2014000163412, CRFN 2014000163410 and in CRFN 2014000163411.

    f. <u>FOR INFORMATION ONLY</u>: Certification Pursuant to Zoning Lot Subdivision C in CRFN 2015000139955.

---

| *QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.*<br>*Counsel* | *TELEPHONE: 212-471-3704*<br>*FACSIMILE: 212-481-5996* |

*SCHEDULE B (Exceptions)*

✱ References to Affirmative Insurance shall be deemed "Except".

# Fidelity National Title Insurance Company

### TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

**DISPOSITION**

    g.  FOR INFORMATION ONLY: Zoning Lot Description and Ownership statement in CRFN 2015000139956.

    h.  Agreement in CRFN 2015000182948 and in CRFN 2015000183044.

    i.  Mapping Agreement in CRFN 2018000218656.

    j.  Restrictive Declaration in CRFN 2018000223890.

    k.  Maps in CRFN 2018000295110.

    l.  Zoning Lot Development Agreement in CRFN 2019000187256.

    With regards thereto and for information only:

        i.  Certification Pursuant to Zoning Lot Subdivision D in CRFN 2019000187254 .

        ii.  Confirmatory Declaration of Zoning Restrictions in CRFN 2019000187255.

        iii.  Waiver, Consent, and Subordination Agreement in CRFN 2019000187257.

        iv.  Waiver, Consent, and Subordination Agreement in CRFN 2019000187258.

6.  **Note:** The closing instrument must contain the following recital: [ Omit. ]

    Being and intended to be the same premises conveyed to the Grantor(s) by deed recorded in CRFN 2016000124529 and CRFN 2018000072917.

~~7.~~  **(OMITTED 7/14/21: GL/mm)** ~~Searches were run for judgments, liens, federal tax liens, etc. against the same/similar name as Evergreen Gardens II LLC. The following returns were found:~~

    ~~One (1) Judgment to be disposed of:~~

    ~~a.~~  ~~Creditor:~~  ~~Mapcap Funding LLC~~
        ~~Debtor:~~  ~~Evergreen Gardens, LLC~~
        ~~Amount:~~  ~~$9,187,725.00~~

8.  Compliance with terms and conditions of the Regulatory Agreement dated 06/29/2017 and recorded on 08/11/2017 in CRFN 2017000300445. [ To confirm affirmative insurance with Fidelity. ]

    With regards thereto:

    a.  Subordination and Non-Disturbance Agreement dated 06/29/2017 recorded 08/11/2017 in CRFN 2017000300446. Subordinates Mortgage(s) 1-11 to Regulatory Agreement.

---

| *QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.* <br> *Counsel* | *TELEPHONE:* 212-471-3704 <br> *FACSIMILE:* 212-481-5996 |
| --- | --- | --- |

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

### TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

9.  Four (4) UCC-1 Financing Statement found of record:  | Omit. |

*DISPOSITION*

    a.  Filing No.:     CRFN 2018000088960
       Filing Date:    03/14/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company LTD.
       Covers:        Fixture filings, etc.

    b.  Filing No.:     CRFN 2018000103331
       Filing Date:    03/28/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD
       Covers:        Fixture filings, etc.

    c.  Filing No.:     CRFN 2018000224574
       Filing Date:    07/09/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD
       Covers:        Fixture filings, etc.

    d.  Filing No.:     CRFN 2019000166219
       Filing Date:    05/28/2019
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD
       Covers:        Fixture filings, etc.

10.  UCC Searches run in the New York State Department of State against Evergreen Gardens II LLC disclosed
    the following returns:  | Omit. |

    a.  Filing No.:     201803130120107
       Filing Date:    03/13/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD.
       Covers:        Fixture filings, etc.

    b.  Filing No.:     201803260141362
       Filing Date:    03/26/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD
       Covers:        Fixture filings, etc.

    c.  Filing No.:     201807100321092
       Filing Date:    07/10/2018
       Debtor:        Evergreen Gardens II LLC
       Secured Party: Mishmeret Trust Company, LTD
       Covers:        Fixture filings, etc.

---

| *QUESTIONS CONCERNING THIS*<br>*TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.*<br><br>*Counsel* | *TELEPHONE:* 212-471-3704<br>*FACSIMILE:* 212-481-5996 |
| --- | --- | --- |

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE No.: 21-7406-57600-K

July 27, 2021

## SCHEDULE B (Exceptions)
### - Continued -

**DISPOSITION**

    d. Filing No.:    201905240235313
       Filing Date:    05/24/2019
       Debtor:    Evergreen Gardens II LLC
       Secured Party:  Mishmeret Trust Company, LTD
       Covers:    Fixture filings, etc.

11.    Notice of Sidewalk Violation to be disposed of:    `For information only.`

  a.    Filed on 10/28/2013    No. HWS2013K

12.    Notice of Pendency in Action filed 06/30/2020, in Supreme Court of Kings County; E-J Electric Installation Company, Plaintiff, v. Evergreen Gardens 11, LLC and others, Defendants, under Index No. 511340/2020, to foreclose a Mechanics Lien. This action must be discontinued, judgment, if any, vacated, and Notice of Pendency canceled by order of Court. `Omit.`

13.    Notice of Pendency in Action filed 12/07/2020, in Supreme Court of Kings County; Blondie's Treehouse, Inc., Plaintiff, v. Evergreen Gardens II LLC and others, Defendants, under Index No. 524261/2020, to foreclose a Mechanics Lien. This action must be discontinued, judgment, if any, vacated, and Notice of Pendency canceled by order of Court. `Omit.`

14.    Mechanics Lien filed on 01/09/2020 in Kings County.
     Debtor: Evergreen Gardens II LLC
     Creditor: Rotavele Elevator Construction Inc.    `Omit.`
     In the amount of: $121,777.71
     One time extension filed on 12/31/2020.
     TO BE DISPOSED OF

15.    Mechanics Lien filed on 01/09/2020 in Kings County.
     Debtor: Evergreen Gardens II LLC
     Creditor: Rotavele Elevator Construction Inc.    `Omit.`
     In the amount of: $168,740.00
     One time extension filed on 12/31/2020.
     TO BE DISPOSED OF.

16.    Mechanics Lien filed on 06/06/2019 in Kings County.
     Debtor: Evergreen Gardens II LLC
     Creditor: E-J Electric Installation Co    `Omit.`
     In the amount of: $75,000.00
     One time extension filed on 06/15/2020
     TO BE DISPOSED OF.

---

*QUESTIONS CONCERNING THIS*      *Avis Somers, Esq.*      *TELEPHONE:* 212-471-3704
*TITLE SHOULD BE REFERRED TO:*      *Counsel*      *FACSIMILE:* 212-481-5996

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*
### - Continued -

*DISPOSITION*

17. <u>Mechanics Lien</u> filed on 11/09/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Blondie's Treehouse Inc
   In the amount of: $406,020.69
   TO BE DISPOSED OF.

   Omit.

18. <u>Mechanics Lien</u> filed on 12/04/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Hivolts Electrical Inc
   In the amount of: $1,419,981.88
   TO BE DISPOSED OF.

   Omit.

19. <u>Mechanics Lien</u> filed on 12/07/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Hi-I LLC
   In the amount of: $34,226.00
   TO BE DISPOSED OF.

   Omit.

20. <u>Mechanics Lien</u> filed on 12/08/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: MPI Plumbing Corp.
   In the amount of: $134,265.61.
   TO BE DISPOSED OF.

   Omit.

21. <u>Mechanics Lien</u> filed on 12/10/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Aura Electrical Supply Inc.
   In the amount of: $249,067.98.
   TO BE DISPOSED OF.

   Omit.

22. **(AMENDED 7/19/21: GL/mm)** <u>Mechanics</u> Lien filed on 12/11/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Berry's Cooling & Heating LLC
   In the amount of: $956,219.50.
   TO BE DISPOSED OF.

   Omit.

23. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/11/2020 in Kings County.
   Debtor: Evergreen Gardens II LLC
   Creditor: Security Shield USA Inc.
   In the amount of: $119,397.00.
   TO BE DISPOSED OF.

   Omit.

---

*QUESTIONS CONCERNING THIS
TITLE SHOULD BE REFERRED TO:*

*Avis Somers, Esq.*

*Counsel*

*TELEPHONE: 212-471-3704
FACSIMILE: 212-481-5996*

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

*DISPOSITION*

24. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/14/2020 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: 1 Seal USA LLC
    In the amount of: $151,502.80.
    TO BE DISPOSED OF.
    
    Omit.

25. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/15/2020 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: Safety Fire Sprinkler Corp
    In the amount of: $203,000.00.
    TO BE DISPOSED OF.
    
    Omit.

26. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/18/2020 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: 20/20 Inspections Inc
    In the amount of: $125,303.99.
    TO BE DISPOSED OF.
    
    Omit.

27. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/28/2020 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: Supreme Wood Floors Inc
    In the amount of: $426,790.61.
    TO BE DISPOSED OF.
    
    Omit.

28. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 12/31/2020 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: PBS Services Inc
    In the amount of: $256,734.79.
    TO BE DISPOSED OF.
    
    Omit.

29. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/05/2021 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: Worldwide Plumbing Supply Inc
    In the amount of: $85,495.42.
    TO BE DISPOSED OF.
    
    Omit.

30. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/05/2021 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: Dynamic Building Services
    In the amount of: $832,924.46.
    TO BE DISPOSED OF.
    
    Omit.

31. **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/05/2021 in Kings County.
    Debtor: Evergreen Gardens II LLC
    Creditor: Em Es Enterprise LLC
    In the amount of: $369,338.98.
    TO BE DISPOSED OF.
    
    Omit.

---

*QUESTIONS CONCERNING THIS
TITLE SHOULD BE REFERRED TO:*

*Avis Somers, Esq.*

*Counsel*

*TELEPHONE: 212-471-3704*
*FACSIMILE: 212-481-5996*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

## SCHEDULE B *(Exceptions)*
### - Continued -

*DISPOSITION*

32.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/05/2021 in Kings County.
Debtor: Evergreen Gardens II LLC
Creditor: Big Apple Designers Inc        Omit.
In the amount of: $746,979.03.
Amendment filed on 02/18/2021
TO BE DISPOSED OF.

33.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/06/2021 in Kings County.
Debtor: Evergreen Gardens II LLC
Creditor: Supreme Wood Floors Inc        Omit.
In the amount of: $143,703.20.
TO BE DISPOSED OF.

34.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/14/2021 in Kings County.
Debtor: Evergreen Gardens II LLC
Creditor: Thomas Tiles Inc        Omit.
In the amount of: $1,906.25.
TO BE DISPOSED OF.

35.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/15/2021 in Kings County.
Debtor: Evergreen Gardens 1 LLC
Creditor: Global Quality Contractors        Omit.
In the amount of: $100,000.00.
TO BE DISPOSED OF.

<u>NOTE</u>: This lien was indexed against premises with debtor as Evergreen Gardens 1 LLC, and the copy is currently unavailable.

36.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 01/15/2021 in Kings County.
Debtor: Evergreen Gardens II LLC
Creditor: United Panel Technologies Corp        Omit.
In the amount of: $800,113.46.
TO BE DISPOSED OF.

37.  **(ADDED 7/19/21: GL/mm)** <u>Mechanics Lien</u> filed on 02/22/2021 in Kings County.
Debtor: Evergreen Gardens 1 LLC
Creditor: Pool Docs of NJ        Omit.
In the amount of: $20,636.00.
TO BE DISPOSED OF.

<u>NOTE</u>: This lien was indexed against premises with debtor as Evergreen Gardens 1 LLC.

| *QUESTIONS CONCERNING THIS* *TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.* *Counsel* | *TELEPHONE:* 212-471-3704 *FACSIMILE:* 212-481-5996 |
|---|---|---|

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

38. Searches run against Evergreen Gardens II LLC disclosed the following results:

*DISPOSITION*

Three (3) Environmental Control Board Judgments to be disposed of:

   a. Name:            Evergreen Gardens I Llc
      Amount:          $625.00 plus interest           Except.
      Violation No.:   35451651Y
      Docketed:        02/28/21

   b. Name:            Evergreen Gardens Inc
      Amount:          $2,175.00 plus interest
      Violation No.:   11670048Z
      Docketed:        04/30/20

   c. Name:            Evergreen Gardens Inc
      Amount:          $300.00 plus interest
      Violation No.:   210588034
      Docketed:        11/30/20

39. **FOR INFORMATION ONLY:**  Bankruptcy searches made against Evergreen Gardens II LLC in the Eastern District Court, Kings County, disclosed no filings as of June 3, 2021.

40. Re: Evergreen Gardens II LLC, a New York limited liability company. With respect thereto, the following must be provided:   Omit.

   a. A copy of the Articles of Organization together with proof of filing thereof with the Secretary of State of New York.

   b. A fully executed copy of the Operating Agreement.

   c. Proof of publication of the Articles of Organization in accordance with the New York Limited Liability Company Law.

   d. Proof is required that the party or parties executing instruments on behalf of the organization have authority to act.

41. Terms of Sale must be submitted to this Company for consideration, prior to closing.   Omit.

42. **NOTE:**  Since the consideration is $400,000.00 or more, a copy of the contract of sale or closing statement must be attached to the RPT being filed.   Omit.

43. All loss or damage arising from the imposition of any lien resulting from the restoration of real property taxes upon the premises or the rescission of tax abatements as said exemption and/or abatement is provided for pursuant to the provisions of the Administrative Code of the City of New York.   Omit.

44. The assessed valuation on the premises herein are listed as partially exempt for taxation at the present time, but will be subject to the discontinuance of such exemption and the possible imposition of an additional tax as of the date of transfer of title or possession from the exempt owner.   Omit.

---

| | | |
|---|---|---|
| *QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.*<br>*Counsel* | *TELEPHONE:* 212-471-3704<br>*FACSIMILE:* 212-481-5996 |

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

### TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*
### *- Continued -*

*DISPOSITION*

45. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by The City of New York, or any demand has been made by The City of New York for any such work that may result in: ⟦Omit.⟧

   a.  Charges by the New York City Department of Rent and Housing Maintenance Emergency Services.

   b.  Charges by the New York City Department of Health.

   c.  Charges by the New York City Department of Environmental Protection.

46. Section 26-128 of the Administrative Code of The City of New York, creates tax liens for unpaid Inspection Fees and Permit Fees billed by the Building Department and Fire Department regardless of the fact that such fees may not be reflected in the City Collector's records.  Policy excepts any loss, claim or damage for any unpaid fee or charge claimed by the Building Department or Fire Department and entered in the records of the City Collector after the date of closing. ⟦Omit.⟧

47. Attention is called to the fact that any instrument covering premises in the State of New York must be endorsed with the Section, Block and Lot of the Tax Map of the City or Town in which the premises are situated before it will be acceptable for recording. ⟦Omit.⟧

48. **NOTE:** The County Clerks require that all documents submitted for recording must be signed in black ink. ⟦Omit.⟧

49. **NOTE:** Company will not accept personal uncertified checks in payment of its closing charges or fees in an amount greater than $750.00 nor personal checks of the seller in any amount without prior authorization from an officer of this company. ⟦Omit.⟧

50. The identity and character of the proposed insured purchaser must be disclosed to this company, prior to closing at which time additional exception and/or requirements may be added. ⟦Omit.⟧

### As to Lot 48

51. Covenants, Conditions, Restrictions, Easements, Agreements, etc. of record: ⟦To confirm affirmative insurance with Fidelity.⟧

   a.  Covenants and Restriction, including but not limited to a $1 Condemnation Clause in Reel 1668 Page 621, repeated in Reel 1668 Page 613.

   b.  Restrictive Declaration in CRFN 2014000163409.

   With regards thereto:

   i.  Waivers of Execution of Restrictive Declaration and Subordination of Mortgage in CRFN 2014000163412, in CRFN 2014000163410 and in CRFN 2014000163411.

   c.  FOR INFORMATION ONLY: Certification Pursuant to Zoning Lot Subdivision C in CRFN 2015000139955

   d.  FOR INFORMATION ONLY: Zoning Lot Description and Ownership Statement in CRFN 2015000139956, as confirmed in CRFN 2019000187255.

   e.  Agreement in CRFN 2015000182948 and in CRFN 2015000183044.

   f.  Mapping Agreement in CRFN 2018000218656.

---

| *QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.*  *Counsel* | *TELEPHONE:* 212-471-3704  *FACSIMILE:* 212-481-5996 |
| --- | --- | --- |

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

**DISPOSITION**

    g.  Restrictive Declaration in CRFN 2018000223890.

    h.  FOR INFORMATION ONLY: Certification Pursuant to Zoning Lot Subdivision D in CRFN 2019000187254

    i.  Zoning Lot Development Agreement in CRFN 2019000187256.

        With regards thereto and for information only:

        i.  Waiver, Consent and Subordination to Zoning Lot Development Agreement in CRFN 2019000187257and in CRFN 2019000187258.

52.  **Note:** The closing instrument must contain the following recital: | Omit. |

    Being and intended to be the same premises conveyed to the Grantor(s) by deed recorded in CRFN 2015000394820 and CRFN 2018000072004.

53.  Terms and conditions of the Regulatory Agreement dated 06/29/2017 and recorded on 08/11/2017 in CRFN 2017000300445, as amended by Amendment to Regulatory Agreement dated 09/12/2018 and recorded 09/20/2018 in CRFN 2018000314660. | To confirm affirmative insurance with Fidelity. |

54.  Subordination and Non-Disturbance Agreement dated 06/29/2017 recorded 08/11/2017 in CRFN 2017000300446. Subordinated Mortgage(s) 19-29 to Regulatory Agreement. | To confirm affirmative insurance with Fidelity. |

55.  Subordination and Non-Disturbance Agreement dated 06/06/2019 recorded 06/13/2019 in CRFN 2019000187260. Subordinated Mortgage(s) 19-30 to Regulatory Agreement. | To confirm affirmative insurance with Fidelity. |

56.  FOR INFORMATION ONLY: Deeds in CRFN 2020000233884 and in CRFN 2020000235504 are indexed vs. Lot 48 pursuant to Mapping Agreement in CRFN 2018000218656.

57.  Re: Evergreen Gardens I LLC, a New York limited liability company.  With respect thereto, the following must be provided: | Omit. |

    a.  A copy of the Articles of Organization together with proof of filing thereof with the Secretary of State of New York.

    b.  A fully executed copy of the Operating Agreement.

    c.  Proof of publication of the Articles of Organization in accordance with the New York Limited Liability Company Law.

    d.  Proof is required that the party or parties executing instruments on behalf of the organization have authority to act.

58.  Notice of Lending filed on 07/07/2017, Debtor: Evergreens Gardens LLC, Creditor: 123 Melrose Street 2 LLC, In the amount of: $30,000,000.00. | Omit. |

59.  Building Loan Agreement filed on 07/07/2017, Debtor: Evergreens Gardens LLC, Creditor: 123 Melrose Street LLC, In the amount of: $30,000,000.00. | Omit. |

60.  Mechanics Lien filed on 11/20/2019 in Kings County. | Omit. |

---

| QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO: | Avis Somers, Esq. | TELEPHONE: 212-471-3704 |
| --- | --- | --- |
| | Counsel | FACSIMILE: 212-481-5996 |

# Fidelity National Title Insurance Company

### TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*
### *- Continued -*

*DISPOSITION*

Debtor: Evergreen Gardens I LLC
Creditor: Leverage Builders Group Inc.
In the amount of: $34,024.34.
One Time Extension filed on 10/27/2020
TO BE DISPOSED OF.

61. <u>Mechanics Lien</u> filed on 02/04/2020 in Kings County.  | Omit. |
Debtor: Evergreen Gardens I LLC
Creditor: Rotavele Brooklyn Construction Inc.
In the amount of: $34,540.00.
Control# 003930125 - 01 and Control# 003930126 - 01
One Time Extension filed on 01/29/2021
TO BE DISPOSED OF.

62. <u>Mechanics Lien</u> filed on 02/04/2020 in Kings County.  | Omit. |
Debtor: Evergreen Gardens I LLC
Creditor: Rotavele Elevator Construction Inc. In
the amount of: $80,269.50.
One Time Extension filed on 01/29/2021.
TO BE DISPOSED OF.

63. <u>Mechanics Lien</u> filed on 02/13/2020 in Kings County.  | Omit. |
Debtor: Evergreen Gardens I LLC
Creditor: Y&S Plumbing & Heating Supply NY LLC
In the amount of: $288,731.10.
One Time Extension filed on 02/11/2021
TO BE DISPOSED OF.

64. <u>Mechanics Lien</u> filed on 03/04/2020 in Kings County.  | Omit. |
Debtor: Evergreen Gardens 11 LLC
Creditor: Issm Protective Services Inc.
In the amount of: $30,000.00.
TO BE DISPOSED OF.

65. <u>Mechanics Lien</u> filed on 06/12/2020 in Kings County.  | Omit. |
Debtor: Evergreen Gardens I LLC
Creditor: Urban Wall Finishes LLC
In the amount of: $36,110.00.
TO BE DISPOSED OF.

66. <u>Mechanics Lien</u> filed on 11/09/2020 in Kings County.  | Omit. |
Owner: Evergreen Gardens I LLC
Third Party: Brooklyn GC LLC
Creditor: Blondlie's Treehouse Inc.
In the amount of: $406,020.69.
TO BE DISPOSED OF.

---

*QUESTIONS CONCERNING THIS*
*TITLE SHOULD BE REFERRED TO:*

*Avis Somers, Esq.*

*Counsel*

*TELEPHONE:* **212-471-3704**
*FACSIMILE:* **212-481-5996**

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

### SCHEDULE B (Exceptions)
#### - Continued -

*DISPOSITION*

67. Mechanics Lien filed on 11/09/2020 in Kings County.   Omit.
    Owner: Evergreen Gardens I LLC
    Third Party: Brooklyn GC LLC
    Creditor: Blondie's Treehouse Inc.
    In the amount of: $171,183.12.
    TO BE DISPOSED OF.

68. Notice of Pendency in Action filed 12/07/2020, in Supreme Court of Kings County; Blondie's
    Treehouse, Inc., Plaintiff, v. Evergreen Gardens I LLC and others, Defendants, under Index No.
    524261/2020, to foreclose a Mechanic's Lien. This action must be discontinued, judgment, if any,
    vacated, and Notice of Pendency canceled by order of Court.   Omit.

69. Mechanics Lien filed on 11/16/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens LLC
    Creditor: Quality Facility Solutions
    In the amount of: $423,564.93.
    TO BE DISPOSED OF.

70. Mechanics Lien filed on 12/02/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: A Ostreicher Construction Corp.
    In the amount of: $204,161.53.
    TO BE DISPOSED OF.

71. Mechanics Lien filed on 12/04/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens II LLC
    Creditor: Hivolts Electrical Inc.
    In the amount of: $25,000.00.
    TO BE DISPOSED OF.

72. Mechanics Lien filed on 12/07/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Complete Window Treatment
    In the amount of: $58,875.00.
    TO BE DISPOSED OF.

73. Mechanics Lien filed on 12/07/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: BMW Plumbing Supplies
    In the amount of: $559,851.23.
    TO BE DISPOSED OF.

74. Mechanics Lien filed on 12/07/2020 in Kings County.   Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Hi I LLC
    In the amount of: $276,101.00.
    TO BE DISPOSED OF.

---

| QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO: | Avis Somers, Esq. | TELEPHONE: 212-471-3704 |
|---|---|---|
| | Counsel | FACSIMILE: 212-481-5996 |

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE No.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B (Exceptions)
### - Continued -

*DISPOSITION*

75. <u>Mechanics Lien</u> filed on 12/08/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: HS Floors Inc.
    In the amount of: $8,648.30.
    TO BE DISPOSED OF.

76. <u>Mechanics Lien</u> filed on 12/10/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Aura Electrical Supply Inc.
     In the amount of: $249,067.98.
    TO BE DISPOSED OF.

77. <u>Mechanics Lien</u> filed on 12/11/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Berry's Cooling & Heating LLC
    In the amount of: $311,201.01.
    TO BE DISPOSED OF.

78. <u>Mechanics Lien</u> filed on 12/11/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Security Shield USA Inc.
    In the amount of: $72,470.00.
    TO BE DISPOSED OF

79. <u>Mechanics Lien</u> filed on 12/18/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: 20/20 Inspections Inc
    In the amount of: $125,303.99.
    TO BE DISPOSED OF

80. <u>Mechanics Lien</u> filed on 12/28/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Statewide Source Inc.
    In the amount of: $55,060.00.
    TO BE DISPOSED OF.

81. <u>Mechanics Lien</u> filed on 12/28/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Supreme Wood Floors Inc.
    In the amount of: $205,299.49.
    TO BE DISPOSED OF.

82. <u>Mechanics Lien</u> filed on 12/29/2020 in Kings County. Omit.
    Debtor: Evergreen Gardens I LLC
    Creditor: Certified Lumber Corp.
    In the amount of: $84,745.90.
    TO BE DISPOSED OF.

---

*QUESTIONS CONCERNING THIS*              *Avis Somers, Esq.*         TELEPHONE: *212-471-3704*
*TITLE SHOULD BE REFERRED TO:*                                     FACSIMILE: *212-481-5996*
                                           *Counsel*

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE No.: 21-7406-57600-K

July 27, 2021

## SCHEDULE B (Exceptions)
### - Continued -

*DISPOSITION*

83. Mechanics Lien filed on 12/31/2020 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Magellan Concrete Structures 1 Corp.
In the amount of: $558,792.57.
TO BE DISPOSED OF.

Omit.

84. Mechanics Lien filed on 12/31/2020 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Ben Rottenstein Associates Inc.
In the amount of: $80,000.00.
TO BE DISPOSED OF.

Omit.

85. Mechanics Lien filed on 12/31/2020 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Master Roofing & Siding Inc.
In the amount of: $467,206.79.
TO BE DISPOSED OF.

Omit.

86. Mechanics Lien filed on 12/31/2020 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: PBS Services Inc.
In the amount of: $340,194.77.
TO BE DISPOSED OF.

Omit.

87. Mechanics Lien filed on 01/05/2021 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Worldwide Plumbing Supply Inc.
In the amount of: $156,385.52.
TO BE DISPOSED OF.

Omit.

88. Mechanics Lien filed on 01/05/2021 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Worldwide Plumbing Supply Inc.
In the amount of: $14,037.39.
TO BE DISPOSED OF.

Omit.

89. Mechanics Lien filed on 01/05/2021 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: Dynamic Building Services
In the amount of: $906,742.91.
TO BE DISPOSED OF.

Omit.

90. Mechanics Lien filed on 01/05/2021 in Kings County.
Debtor: Evergreen Gardens I LLC
Creditor: EM ES Enterprise LLC
In the amount of: $369,338.98.
TO BE DISPOSED OF.

Omit.

| *QUESTIONS CONCERNING THIS* *TITLE SHOULD BE REFERRED TO:* | *Avis Somers, Esq.* *Counsel* | *TELEPHONE:* 212-471-3704 *FACSIMILE:* 212-481-5996 |
|---|---|---|

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*
### - *Continued* -

*DISPOSITION*

91.  Mechanics Lien filed on 01/05/2021 in Kings County.
     Debtor: Evergreen Gardens I LLC          Omit.
     Creditor: Style Stone Gallery
     In the amount of: $64,044.51.
     TO BE DISPOSED OF.

92.  Mechanics Lien filed on 01/05/2021 in Kings County.
     Debtor: Evergreen Gardens I LLC          Omit.
     Creditor: Big Apple Designers Inc.
     In the amount of: $2,857,315.21.
     Amendment filed on 02/18/2021
     TO BE DISPOSED OF.

93.  Mechanics Lien filed on 01/05/2021 in Kings County.
     Debtor: Evergreen Gardens I LLC          Omit.
     Creditor: E&W Wholesale Hardware Inc.
     In the amount of: $40,000.00.
     TO BE DISPOSED OF.

94.  Mechanics Lien filed on 01/06/2021 in Kings County.
     Debtor: Evergreen Gardens I LLC          Omit.
     Creditor: Supreme Wood Floors Inc
     In the amount of: $24,734.26.
     TO BE DISPOSED OF.

95.  Mechanics Lien filed on 01/15/2021 in Kings County.
     Debtor: Evergreen Gardens 1 LLC          Omit.
     Creditor: Global Quality Contractors
     In the amount of: $100,000.00.
     TO BE DISPOSED OF.

     Note: Indexed against Lot 1 with Evergreen Gardens I LLC as debtor/owner. Copy is currently
     unavailable.

96.  Mechanics Lien filed on 01/15/2021 in Kings County.
     Debtor: Evergreen Gardens 1 LLC          Omit.
     Creditor: Global Quality Contractors
     In the amount of: $335,996.90.
     TO BE DISPOSED OF.

97.  Mechanics Lien filed on 01/21/2021 in Kings County.
     Debtor: Evergreen Gardens I LLC          Omit.
     Creditor: Gilchrist Metal Fabricating Co Inc
     In the amount of: $180,462.01.
     TO BE DISPOSED OF.

98.  Mechanics Lien filed on 02/16/2021 in Kings County.
     Debtor: Evergreen 1 Gardens LLC          Omit.
     Creditor: Essential Basics Inc.
     In the amount of: $100,841.22.

---

*QUESTIONS CONCERNING THIS*              *Avis Somers, Esq.*              *TELEPHONE:* 212-471-3704
*TITLE SHOULD BE REFERRED TO:*                                          *FACSIMILE:* 212-481-5996
                                            *Counsel*

*SCHEDULE B (Exceptions)*

# Fidelity National Title Insurance Company

## TITLE NO.: 21-7406-57600-K

July 27, 2021

---

## SCHEDULE B *(Exceptions)*
### *- Continued -*

TO BE DISPOSED OF.

*DISPOSITION*

99. <u>Mechanics Lien</u> filed on 02/22/2021 in Kings County.  | Omit. |
    Debtor: Evergreen Gardens 1 LLC
    Creditor: Pool Docs of NJ
    In the amount of: $73,498.00.
    TO BE DISPOSED OF.

100. <u>Mechanics Lien</u> filed on 03/19/2021 in Kings County.  | Omit. |
     Debtor: Evergreen Gardens I LLC
     Creditor: Kitchen Art America Inc.
     In the amount of: $39,004.75.
     TO BE DISPOSED OF

101. Searches run against Evergreen Gardens I LLC – TO FOLLOW   | Omit. |

102. **(AMENDED 7/14/21: GL/mm)** <u>**FOR INFORMATION ONLY:**</u>  Bankruptcy searches made against <u>Evergreen Gardens I LLC</u> in the Eastern District Court, Kings County disclosed no filings as of June 28, 2021.   | Omit. |

103. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by The City of New York, or any demand has been made by The City of New York for any such work that may result in:   | Omit. |

   a.  Charges by the New York City Department of Rent and Housing Maintenance Emergency Services.
   b.  Charges by the New York City Department of Health.
   c.  Charges by the New York City Department of Environmental Protection.

104. **This certificate is made for and accepted by the applicant upon the express understanding that no policy of title insurance is to be issued hereunder.  Liability is limited to One Thousand Dollars ($1,000.00) for negligence only, but reasonable opportunity shall be afforded this Company to defend this certificate or to take such other steps as it may deem proper.  This certificate shall be null and void if the applicant, his attorney or agent makes any untrue statement with respect to any material fact.**   | Omit. |

---

*QUESTIONS CONCERNING THIS TITLE SHOULD BE REFERRED TO:*          *Avis Somers, Esq.*
*Counsel*          *TELEPHONE:* 212-471-3704
*FACSIMILE:* 212-481-5996

*SCHEDULE B (Exceptions)*

# EXHIBIT E

### Bargain & Sale Deed Without Covenants

## BARGAIN & SALE DEED WITHOUT COVENANTS

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

**THIS INDENTURE,** made as of the ____ day of _____, two thousand and twenty-one

**BETWEEN**

_____, a _____,
having an address at _____,

party of the first part, and

_____, a _____,
having an address at _____,

party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the **BOROUGH OF BROOKLYN, COUNTY OF KINGS, CITY AND STATE OF NEW YORK,** bounded and described more particularly as set forth in Schedule A annexed hereto and made a part hereof;

### See SCHEDULE A annexed hereto.

**PREMISES** being known as _____ Street, New York, New York.

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center of the lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to the premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

**IN PRESENCE OF:**

_____

By:_____
    Name:
    Title:

STATE OF NEW YORK          )
COUNTY OF NEW YORK      ) ss:

On the _____ day of _____ in the year 2021, before me, the undersigned personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

STATE OF NEW YORK          )
COUNTY OF NEW YORK      ) ss:

On the _____ day of _____ in the year 2021, before me, the undersigned personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____
Notary Public

**BARGAIN AND SALE DEED
WITHOUT COVENANTS
AGAINST GRANTOR'S ACTS**

TITLE NO.
=================================

_____

- to -

_____

=================================

SECTION:
BLOCK:           3152
LOT:
COUNTY:          Kings
ADDRESS:         _____ Street
                 Brooklyn, New York

RETURN BY MAIL TO:

# EXHIBIT F

## Assignment Of Leases

## ASSIGNMENT OF LEASES

**ASSIGNMENT AND ASSUMPTION OF LEASES** (the "<u>Assignment</u>") made as of the __ day of _____, 2021, by and between _____ **LLC**, a New York limited partnership, having an address c/o All Year Holdings Limited, 199 Lee Avenue, Suite #693, Brooklyn, New York 11233 ("<u>Assignor</u>"), and _____, a _____, having an address at _____ ("<u>Assignee</u>").

**WHEREAS,** Assignor is the landlord under certain tenant leases (the "<u>Leases</u>"), a list of which Leases together with the amount of the security deposits (the "<u>Security Deposits</u>"), if any, given in connection therewith and held by Assignor is annexed hereto as <u>Exhibit A</u>, affecting the premises located at _____ Street, Brooklyn, New York; and

**WHEREAS,** simultaneously herewith, Assignor has conveyed the Premises to Assignee.

**NOW, THEREFORE,** in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by Assignee, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee do hereby agree as follows:

1. Assignor does hereby assign to Assignee all of its right, title and interest in and to (i) the Leases, including any and all rents payable thereunder, and (ii) the Security Deposits.

2. Assignee hereby accepts this Assignment, and assumes and agrees to be bound by the terms, covenants and conditions of the Leases. Without limiting the generality of the preceding sentence, Assignee acknowledges the receipt of the Security Deposits.

3. This Assignment is made without representations or warranties, expressed or implied, and is without recourse against Assignor in any event whatsoever.

4. From and after the date hereof, Assignee hereby agrees to indemnify and hold harmless Assignor from any and all claims, liability costs and expenses (including, but not limited to reasonable attorneys' fees and disbursements) incurred in connection with the Security Deposits to the extent transferred to Assignee.

5. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**IN WITNESS WHEREOF,** this Assignment has been entered into on the date first above written.

**ASSIGNOR:**

_____

By:_____
      Name:
      Title:

**ASSIGNEE:**

_____

By:_____
      Name:
      Title:

## EXHIBIT G

**Bill Of Sale**

## BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS** that _____ **LLC**, a New York limited liability company, having an address c/o All Year Holdings Limited, 199 Lee Avenue, Suite #693, Brooklyn, New York 11233 ("Grantor"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and the sufficiency of which is hereby acknowledged, by these presents, does, without representation by, or warranty or recourse against, Grantor, convey, assign, transfer, sell, deliver and set over unto _____, a _____, having an address at _____ ("Grantee"), its successors and assigns, all of Grantor's right, title and interest in and to the personal property, fixtures, equipment, furniture, furnishings and other items of personal property transferred pursuant to that certain Agreement of Purchase and Sale between, *inter alia*, Grantor and Grantee dated _____ ___, 2021, used in connection with, located at, attached or appurtenant to the building located at _____ Street, Brooklyn, New York.

**IN WITNESS WHEREOF**, Grantor has caused this Bill of Sale to be signed as of the ___ day of _____, 2018.

**GRANTOR:**

_____

By:_____
        Name:
        Title:

**EXHIBIT H**

**Form Of Tenant Estoppel**

**TENANT ESTOPPEL CERTIFICATE**

Landlord: _____

Tenant: _____

Premises: _____
Brooklyn, New York

The undersigned Tenant hereby certifies to the prospective purchaser (the "Purchaser") of the Real Property of which the premises demised under the above-referenced Lease are a part (the "Premises"), to the prospective lenders to the Purchaser and to their constituent entities (collectively, the "Lender") and to their respective successors and assigns as follows:

1. The Tenant has leased space at the Premises from the Landlord under that certain lease dated _____ between the Landlord and the Tenant. The portion of the Premises leased to the Tenant under the Lease is hereinafter referred to as the "Demised Premises". The lease is in full force and effect, represents the entire agreement between Landlord and Tenant with respect to the Demised Premises, and has not been modified or amended except for the following amendments: _____ (the lease, together with all amendments, if any, shall be collectively referred to as the "Lease").

2. The Demised Premises have not been sublet or assigned.

3. The commencement date of the term of the Lease is _____.

4. The amount of the base rent due under the Lease for the month in which falls the date of this Estoppel Certificate is $_____,

5. All rents, additional rents and other sums due and payable under the Lease have been paid in full through the date of this certificate. No rents, additional rents or other sums payable under the Lease have been paid more than one (1) month in advance of the due dates therefor and the Tenant has no present right of offset or defense against any rents, additional rents or other sums due or to become due under the Lease.

6. There is no remaining free rent period or any unexpired concession or abatement of rent.

7.      To the best of the Tenant's knowledge and belief, neither Landlord nor Tenant are in default under any of its obligations under the Lease, and all obligations and conditions under the Lease to be performed to date by Landlord or Tenant have been satisfied, free of defenses and set-offs including construction work in the Demised Premises.

8.      A security deposit in the amount of $_____ is being held by Landlord.

9.      Except as provided in the Lease, Tenant has no rights of first refusal, first offer or option to purchase any portion of the Property.

9.      This certification is made knowing that Purchaser, Lender and their respective successors and assigns are relying upon the representations herein made.  This certification shall be binding upon Tenant and Tenant's heirs, legal representatives, successors and assigns.

Dated: _____          Tenant: _____

                                        By:      _____
                                        Name: _____
                                          Title: _____

**EXHIBIT H-1**

**Grocery Tenant Lease Obligations**

Outstanding Leasing Commission, Tenant Improvement Allowance and Landlord Work as per the lease between Denizen Y LLC and 54 Noll LLC dated November 13, 2018.

(1)    Leasing Commission due to EXR -                    $337,900.04 (a)

(2)    Exhibit B Tenant allowance toward Tenant Improvement -          $530,000.00

(3)    Exhibit B further describes pending Landlord's Work obligations, which includes (but is not limited to) the construction of ADA restrooms and installation of HVAC based on tenant's plans. See Exhibit B for further details.

(a) Amount of $337,900.04 is the amount owed to EXR after Seller has paid EXR $160,000 of total commission amount.

**EXHIBIT H-2**

**Form Of Seller Estoppel**

Landlord:        _____

Tenant:          _____

Premises:        _____
                 Brooklyn, New York

The undersigned Seller hereby certifies to the prospective purchaser (the ōPurchaserö) of the Real Property of which the premises demised under the above-referenced Lease are a part (the ōPremisesö), to the prospective lenders to the Purchaser and to their constituent entities (collectively, the ōLenderö) and to their respective successors and assigns as follows:

1.      The Tenant has leased space at the Premises from the Landlord under that certain lease dated _____ between _____ and the Tenant. The portion of the Premises leased to the Tenant under the Lease is hereinafter referred to as the ōDemised Premisesö. The lease is in full force and effect, represents the entire agreement between Landlord and Tenant with respect to the Demised Premises, and has not been modified or amended except for the following amendments: _____ (the lease, together with all amendments, if any, shall be collectively referred to as the ōLeaseö).

2.      To Sellerøs knowledge, the Demised Premises have been sublet or assigned.

3.      The commencement date of the term of the Lease is _____.

4.      To Sellerøs knowledge, the Demised Premises has not been sublet or assigned.

5.      The amount of the base rent due under the Lease for the month in which falls the date of this Estoppel Certificate is $_____,

6.      All rents, additional rents and other sums due and payable under the Lease have been paid in full through the date of this certificate. No rents, additional rents or other sums payable under the Lease have been paid more than one (1) month in advance of the due dates therefor and the Tenant has no present right of offset or defense against any rents, additional rents or other sums due or to become due under the Lease.

7.      There is no remaining free rent period or any unexpired concession or abatement of rent.

8.      To Seller's knowledge and belief, neither Landlord nor Tenant are in default under any of its obligations under the Lease, and all obligations and conditions under the Lease to be performed to date by Landlord or Tenant have been satisfied, free of defenses and set-offs including construction work in the Demised Premises.

9.      A security deposit in the amount of $_____ is required to be delivered by Tenant pursuant to the Lease.

10.     Except as provided in the Lease, Tenant has no rights of first refusal, first offer or option to purchase any portion of the Premises.

11.     This certification is made knowing that Purchaser, Lender and their respective successors and assigns are relying upon the representations herein made.  This certification shall be binding upon Tenant and Tenant's heirs, legal representatives, successors and assigns. Notwithstanding the foregoing, this certification is subject to all limitations on Seller's liabilities and obligations as set forth in that certain Agreement of Purchase and Sale dated as of July __, 2021 by, between and among _____, _____ and _____ with respect to the Premises and the real property and improvements located at _____ Street, Brooklyn, New York.


Dated: _____ _____       Seller: _____ _____

                                         By: _____

                                         Name: _____

                                         Title: _____

# EXHIBIT I

### Assignment Of Service Contracts

## ASSIGNMENT OF SERVICE CONTRACTS

**ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS** (the "Assignment") made as of the ___ day of _____, 2021, by and between _____ **LLC**, a New York limited liability company, having an address c/o All Year Holdings Limited, 199 Lee Avenue, Suite #693, Brooklyn, New York 11233 ("Assignor"), and _____, a _____, having an address at _____ ("Assignee").

In consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by Assignee, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

The services contracts (collectively, the "Contracts") covering the premises located at _____ Street, Brooklyn, New York set forth on Exhibit A attached hereto and made a part hereof.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained in the Contracts.

ASSIGNEE hereby accepts this Assignment, agrees to be bound by the terms, covenants and conditions of the Contracts and assumes the obligations of the Assignor accruing from and after the date hereof with respect to the Contracts.

THIS SPACE INTENTIONALLY LEFT BLANK
SIGNATURES FOLLOW ON THE NEXT PAGE

**IN WITNESS WHEREOF,** this Assignment has been entered into on the date first above written.

**ASSIGNOR:**

_____

By:_____
     Name:
     Title:

**ASSIGNEE:**

_____

By:_____
     Name:
     Title:

## EXHIBIT J

### Employees

| Position | Employee | Date of Hire (at Property) | Status | Total Hours | Pay Rate |
|---|---|---|---|---|---|
| Doorman - Noll | David Morgan | 10/7/2016 | Full Time | 40 | $26.45 |
|  | Edwin Rivera | 1/4/2020 | Part Time | 16 | $19.84 |
| Doorman - Noll | Keycha Camarena Ayarza | 10/19/2018 | Full Time | 40 | $22.48 |
|  | Edwin Rivera | 1/4/2020 | Part Time | 16 | $19.84 |
| Guard - Noll | Eddy Acosta | 11/29/2019 | Part Time | 32 | $19.84 |
|  | Cristian Vargas | 6/8/2019 | Part Time | 8 | $22.48 |
|  | Roman Dominguez | 5/20/2019 | Full Time | 8 | $22.48 |
|  | Klajdi Gjoni | 6/5/2021 | Part Time | 8 | $19.84 |
| Guard - Noll | Hannah Yekutiel | 2/19/2019 | Part Time | 24 | $15.88 |
|  | Cristian Vargas | 6/8/2019 | Part Time | 24 | $15.88 |
|  | Christopher Yost | 5/22/2021 | Part Time | 8 | $15.88 |
| Security - Noll | Deontae Johnson | 3/30/2021 | Part Time | 16 | $15.88 |
|  | Roman Dominguez | 5/20/2019 | Full Time | 16 | $15.88 |
|  | Christopher Yost | 5/22/2021 | Part Time | 8 | $15.88 |
|  | Brandon Brathwaite | 3/19/2021 | Part Time | 8 | $15.88 |
|  | Jose Mas | 5/28/2021 | Part Time | 8 | $15.88 |

| | | | | | |
|---|---|---|---|---|---|
| Rover - Noll/Melrose | Brandon Brathwaite | 3/19/2021 | Part Time | 32 | $15.88 |
| | Christopher Yost | 5/22/2021 | Part Time | 8 | $15.88 |
| | Austin Johnson | 5/14/2021 | Part Time | 16 | $15.88 |
| Doorman - Melrose | Eddie Javier | 5/31/2018 | Full Time | 40 | $22.48 |
| | Keyanna Penner | 9/20/2019 | Full Time | 16 | $19.84 |
| Doorman - Melrose | Desiree Cruz | 5/21/2019 | Full Time | 40 | $22.48 |
| | Christopher Pacheco | 9/5/2019 | Part Time | 16 | $19.84 |
| Guard - Melrose | Matthew Morales | 8/12/2020 | Full Time | 40 | $15.88 |
| | Chris Carabajo | 7/8/2021 | Part Time | 16 | $15.88 |
| Guard - Melrose | Cesar Perez | 1/20/2021 | Full Time | 20 | $15.88 |
| | Hannah Yekutiel | 2/19/2019 | Part Time | 4 | $15.88 |
| | Christopher Pacheco | 9/5/2019 | Part Time | 4 | $15.88 |
| Guard - Melrose | Roman Dominguez | 5/20/2019 | Full Time | 8 | $15.88 |
| | Keyanna Penner | 9/20/2019 | Full Time | 24 | $15.88 |
| | Christopher Pacheco | 9/5/2019 | Part Time | 8 | $15.88 |
| | Mark Hunter | 12/21/2020 | Part Time | 8 | $15.88 |
| | Christopher Yost | 5/22/2021 | Part Time | 8 | $15.88 |
| Super/Handyman (Noll) | Michael Galarza | 8/3/2018 | Full Time | 40 | $29.08 |
| Super/Handyman (Melrose) | Placido Collado | 5/29/2017 | Full Time | 40 | $29.08 |

| Porter - Noll/Melrose | Jhonatan Baena Ruiz | 7/7/2019 | Full Time | 40 | $22.48 |
|---|---|---|---|---|---|
| | Samuel Batista | 9/13/2019 | Full Time | 40 | $19.84 |
| | Luz Calderon | 4/8/2019 | Part Time | 32 | $22.48 |
| | Patricia Franco | 7/12/2021 | Part Time | 8 | $22.48 |
| | Daniela Garcia | 5/29/2017 | Full Time | 40 | $26.45 |
| | Ronal Giraldo Cardona | 8/24/2018 | Full Time | 40 | $22.48 |
| | Yolanda Hernandez Garcia | 1/22/2019 | Part Time | 32 | $22.48 |
| | Yuliana Lopez | 7/4/2021 | Part Time | 8 | $19.84 |
| | Norma Olivares | 1/11/2020 | Part Time | 8 | $19.84 |
| | Johana Perdomo | 4/12/2020 | Part Time | 40 | $19.84 |
| | Victor Valenzuela | 1/4/2021 | Full Time | 40 | $19.84 |
| | Sarahi Vega | 7/25/2021 | Part Time | 8 | $19.84 |

## EXHIBIT J-1

### Employees

Denizen X – 123 Melrose Street - Apartment 230 – Placido Collardo – lease expires 12/31/21(1) – Seller is crediting $3900 per month as noted on Owner's rent roll.

Denizen Y – 54 Noll Street- Apartment 266 – Michael Galarza – lease expires 12/31/21 (2) – Seller is crediting tenant's rental account $2000 per month as per Owner's rent roll.  Seller is receiving a check monthly from DBS/PBS for $1,900 and crediting tenant's rental account.

## EXHIBIT K

### Environmental Reports

Phase I Environmental Site Assessment Report dated March 29, 2021, provided by Environmental Business Consultants.

Remediation Investigative Report dated October 2014, provided by Environmental Business Consultants.

Notice of Completion - June 19, 2019 -89-141 Melrose – OER # 15CVCP073K

Final Notice of Satisfaction – July 27, 2018 -36-70 Noll Street - OER # 15EHAN178K / 15CVCP072K

# EXHIBIT L

## Union Assumption Agreement

This ASSIGNMENT AND ASSUMPTION OF UNION AGREEMENT (this Assignment") is made as of the _____ day of _____, 2021 (the "Effective Date"), between _____ ("Assignor") and _____ ("Assignee").

## WITNESSETH:

**WHEREAS,** pursuant to that certain Agreement of Purchase and Sale dated as of _____, 2021 by and between Assignor, as seller, and _____, as purchaser and as assigned by _____ to Assignee (as so amended and assigned, the  Agreement"), Assignor is selling the Property to Assignee; and

**WHEREAS,** Assignor desires to assign to Assignee, and Assignee desires to assume from Assignor, the Union Agreement (as hereinafter defined).

**NOW, THEREFORE,** in consideration of the sum of Ten Dollars ($ 10.00) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged.

1.      In accordance with the Agreement, (i) Assignor hereby assigns all of its right, title and interest in and to the 2018 Apartment Building Agreement between the Realty Advisory Board on Labor Relations, Inc. and SEIU, Local 32BJ (the "Union Agreement") to Assignee, and (ii) Assignee hereby assumes all rights and obligations under, arising from or otherwise relating to the Union Agreement from and after the Effective Date.

2.      This Assignment shall be made in accordance with and subject to the provisions of the Agreement, which such provisions are incorporated into this Assignment as if expressly set forth herein. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Agreement.

3.      This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of New York and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

4.      This Assignment may be signed in multiple counterparts which, when taken together and signed by all parties and delivered to any other party hereto, shall constitute a binding Assignment between the parties.

[Signature Page Follows]

**IN WITNESS WHEREOF,** this Agreement has been executed as of the date and year first above written.

**ASSIGNOR**:

[_____]

By:    _____
          Name:
          Title:

**ASSIGNEE**:

[_____]

By:    _____
          Name:
          Title:

# EXHIBIT M

## INTENTIONALLY OMITTED

# EXHIBIT M-1

## INTENTIONALLY OMITTED

# EXHIBIT N

## INTENTIONALLY OMITTED

# EXHIBIT O

## Enumerated Liens

Mechanic's Lien filed on 1/9/2020
Debtor: Evergreen Gardens II LLC
Creditor: Rovatele Elevator Construction Inc.
Amount: $121,777.71

Mechanic's Lien filed on 1/9/2020
Debtor: Evergreen Gardens II LLC
Creditor: Rovatele Elevator Construction Inc.
Amount: $168,740.00

Mechanic's Lien filed on 6/6/2019
Debtor: Evergreen Gardens II LLC
Creditor: E-J Electric Installation Co.
Amount: $75,000.00

Mechanic's Lien filed on 11/9/2020
Debtor: Evergreen Gardens II LLC
Creditor: Blondie's Treehouse Inc.
Amount: $406,020.69

Mechanic's Lien filed on 12/4/2020
Debtor: Evergreen Gardens II LLC
Creditor: Hivolts Electrical Inc.
Amount: $1,419,981.88

Mechanic's Lien filed on 12/7/2020
Debtor: Evergreen Gardens II LLC
Creditor: Hi-I LLC
Amount: $34,226.00

Mechanic's Lien filed on 12/8/2020
Debtor: Evergreen Gardens II LLC
Creditor: MPI Plumbing Corp.
Amount: $134,265.61

Mechanic's Lien filed on 12/10/2020
Debtor: Evergreen Gardens II LLC
Creditor: Aura Electrical Supply Inc.
Amount: $249,067.98

Mechanic's Lien filed on 12/11/2020
Debtor: Evergreen Gardens II LLC
Creditor: Berry's Cooling & Heating LLC
Amount: $956,219.50

Mechanic's Lien filed on 12/11/2020
Debtor: Evergreen Gardens II LLC
Creditor: Security Shield USA Inc.
Amount: $119,397.00

Mechanic's Lien filed on 12/14/2020
Debtor: Evergreen Gardens II LLC
Creditor: 1 Seal USA LLC
Amount: $151,502.80

Mechanic's Lien filed on 12/15/2020
Debtor: Evergreen Gardens II LLC
Creditor: Safety Fire Sprinkler Corp
Amount: $203,000.00

Mechanic's Lien filed on 12/18/2020
Debtor: Evergreen Gardens II LLC
Creditor: 20/20 Inspections Inc
Amount: $125,303.99

Mechanic's Lien filed on 12/28/2020
Debtor: Evergreen Gardens II LLC
Creditor: Supreme Wood Floors Inc
Amount: $426,790.61

Mechanic's Lien filed on 12/31/2020
Debtor: Evergreen Gardens II LLC
Creditor: PBS Services Inc
Amount: $256,734.79

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens II LLC
Creditor: Worldwide Plumbing Supply Inc
Amount: $85,495.42

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens II LLC
Creditor: Dynamic Building Services
Amount: $832,924.46

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens II LLC
Creditor: Em Es Enterprise LLC
Amount: $369,338.98

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens II LLC
Creditor: Big Apple Designers Inc
Amount: $746,979.03

Mechanic's Lien filed on 1/6/2021
Debtor: Evergreen Gardens II LLC
Creditor: Supreme Wood Floors Inc
Amount: $143,703.20

Mechanic's Lien filed on 1/14/2021
Debtor: Evergreen Gardens II LLC
Creditor: Thomas Tiles Inc
Amount: $1,906.25

Mechanic's Lien filed on 1/15/2021
Debtor: Evergreen Gardens 1 LLC
Creditor: Global Quality Contractors
Amount: $100,000.00

Mechanic's Lien filed on 1/15/2021
Debtor: Evergreen Gardens II LLC
Creditor: United Panel Technologies Corp
Amount: $800,113.46

Mechanic's Lien filed on 2/22/2021
Debtor: Evergreen Gardens 1 LLC
Creditor: Pool Docs of NJ
Amount: $20,636.00

Mechanic's Lien filed on 11/20/2019
Debtor: Evergreen Gardens I LLC
Creditor: Leverage Builders Group Inc.
Amount: $34,024.34

Mechanic's Lien filed on 2/4/2020
Debtor: Evergreen Gardens I LLC
Creditor: Rovatele Brooklyn Construction Inc.
Amount: $34,540.00

Mechanic's Lien filed on 2/4/2020
Debtor: Evergreen Gardens I LLC
Creditor: Rovatele Elevator Construction Inc.
Amount: $80,269.50

Mechanic's Lien filed on 2/13/2020
Debtor: Evergreen Gardens I LLC
Creditor: Y&S Plumbing & heating Supply NY LLC
Amount: $288,731.10

Mechanic's Lien filed on 3/4/2020
Debtor: Evergreen Gardens I LLC
Creditor: Issm Protective Services Inc.
Amount: $30,000.00

Mechanic's Lien filed on 6/12/2020
Debtor: Evergreen Gardens I LLC
Creditor: Urban Wall Finishes LLC
Amount: $36,110.00

Mechanic's Lien filed on 11/9/2020
Debtor: Evergreen Gardens I LLC
Creditor: Blondie's Treehouse Inc.
Amount: $406,020.69

Mechanic's Lien filed on 11/9/2020
Debtor: Evergreen Gardens I LLC
Creditor: Blondie's Treehouse Inc.
Amount: $171,183.12

Mechanic's Lien filed on 11/16/2020
Debtor: Evergreen Gardens I LLC
Creditor: Quality Facility Solutions
Amount: $423,564.93

Mechanic's Lien filed on 12/2/2020
Debtor: Evergreen Gardens I LLC
Creditor: A Ostreicher Construction Corp.
Amount: $204,161.53

Mechanic's Lien filed on 12/4/2020
Debtor: Evergreen Gardens I LLC
Creditor: Hivolts Electrical Inc.
Amount: $25,000.00

Mechanic's Lien filed on 12/7/2020
Debtor: Evergreen Gardens I LLC
Creditor: Complete Window Treatment
Amount: $58,875.00

Mechanic's Lien filed on 12/7/2020
Debtor: Evergreen Gardens I LLC
Creditor: BMW Plumbing Supplies
Amount: $559,851.23

Mechanic's Lien filed on 12/7/2020
Debtor: Evergreen Gardens I LLC
Creditor: Hi I LLC
Amount: $276,101.00

Mechanic's Lien filed on 12/8/2020
Debtor: Evergreen Gardens I LLC
Creditor: HS Floors Inc.
Amount: $8,648.30

Mechanic's Lien filed on 12/10/2020
Debtor: Evergreen Gardens I LLC
Creditor: Aura Electrical Supply Inc.
Amount: $249,067.98

Mechanic's Lien filed on 12/11/2020
Debtor: Evergreen Gardens I LLC
Creditor: Berry's Cooling & Heating LLC
Amount: $311,201.01

Mechanic's Lien filed on 12/11/2020
Debtor: Evergreen Gardens I LLC
Creditor: Security Shield USA Inc.
Amount: $72,470.00

Mechanic's Lien filed on 12/18/2020
Debtor: Evergreen Gardens I LLC
Creditor: 20/20 Inspections Inc.
Amount: $125,303.99

Mechanic's Lien filed on 12/28/2020
Debtor: Evergreen Gardens I LLC
Creditor: Statewide Source Inc.
Amount: $55,060.00

Mechanic's Lien filed on 12/28/2020
Debtor: Evergreen Gardens I LLC
Creditor: Supreme Wood Floors Inc.
Amount: $205,299.49

Mechanic's Lien filed on 12/29/2020
Debtor: Evergreen Gardens I LLC
Creditor: Certified Lumber Corp.
Amount: $84,795.90

Mechanic's Lien filed on 12/31/2020
Debtor: Evergreen Gardens I LLC
Creditor: Magellan Concrete Structures 1 Corp.
Amount: $558,792.57

Mechanic's Lien filed on 12/31/2020
Debtor: Evergreen Gardens I LLC
Creditor: Ben Rottenstein Associates Inc.
Amount: $80,000.00

Mechanic's Lien filed on 12/31/2020
Debtor: Evergreen Gardens I LLC
Creditor: Master Roofing & Siding Inc.
Amount: $467,206.79

Mechanic's Lien filed on 12/31/2020
Debtor: Evergreen Gardens I LLC
Creditor: PBS Services Inc.
Amount: $340,194.77

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: Worldwide Plumbing Supply Inc.
Amount: $156,385.52

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: Worldwide Plumbing Supply Inc.
Amount: $14,037.39

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: Dynamic Building Services
Amount: $906,742.91

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: EM ES Enterprise LLC
Amount: $369,338.98

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: Style Stone Gallery
Amount: $64,044.51

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: Big Apple Designers Inc.
Amount: $2,857,315.21

Mechanic's Lien filed on 1/5/2021
Debtor: Evergreen Gardens I LLC
Creditor: E &W Wholesale Hardware Inc.
Amount: $40,000.00

Mechanic's Lien filed on 1/6/2021
Debtor: Evergreen Gardens I LLC
Creditor: Supreme Wood Floors Inc.
Amount: $24,734.26

Mechanic's Lien filed on 1/15/2021
Debtor: Evergreen Gardens I LLC
Creditor: Global Quality Contractors
Amount: $100,000.00

Mechanic's Lien filed on 1/15/2021
Debtor: Evergreen Gardens I LLC
Creditor: Global Quality Contractors
Amount: $335,996.90

Mechanic's Lien filed on 1/21/2021
Debtor: Evergreen Gardens I LLC
Creditor: Gilchrist Metal Fabricating Co Inc.
Amount: $180,462.01

Mechanic's Lien filed on 2/16/2021
Debtor: Evergreen Gardens I LLC
Creditor: Essential Basics Inc.
Amount: $100,841.22

Mechanic's Lien filed on 2/22/2021
Debtor: Evergreen Gardens I LLC
Creditor: Pool Docs of NJ
Amount: $73,498.00

Mechanic's Lien filed on 3/19/2021
Debtor: Evergreen Gardens I LLC
Creditor: Kitchen Art America Inc.
Amount: $39,004.75

**EXHIBIT P**

**Pending Certiorari Proceedings**

Melrose Street Property – Index Number 404050/2019

Noll Street Property – Index Number 404051/2019

## EXHIBIT Q

## Title Affidavit

FIDELITY NATIONAL TITLE INSURANCE COMPANY

<u>GENERAL AFFIDAVIT (New York City)</u>

STATE OF NEW YORK      }         TITLE NO.:
                         } ss:
COUNTY OF NEW YORK    }         DATE:

_____, being duly sworn, deposes and says:

1. That (I am/we are) (the/a) (owner) (shareholder/member/partner of _____
_____), the (grantor/mortgagor/lesser) executing the (deed/mortgage/lease) of the
property     known     as     _____     to
_____.

2. Each tenant of the Property either (a) is in possession under a lease containing a standard subordination clause fully and unconditionally subordinating said lease to all existing and future mortgages, (b) is a statutory tenant, or (c) is a month-to-month tenant.

3. To Seller's knowledge, no work has been done upon the above premises by the City of New York nor has any demand been made by the City of New York for any such work that may result in charges by the New York City Department of Rent and Housing Maintenance, Emergency Services or charges by the New York City Department for Environmental Protection for water tap closings or any related work.

4. To Seller's knowledge, no inspection fees, permit fees, elevator(s), sign, boiler or other charges have been levied, charged, created or incurred that may become tax or other liens pursuant to Title 28 ("New York City Construction Codes"), Chapter 1, Article 112, Section 112.9.2 of the Administrative Code of the City of New York, and Title 29 ("New York City Fire Code"), Chapter 2, Chapter 1, Section FC 117.4 of the Administrative Code of the City of New York or any other section of law. The undersigned, or the entity signing below, agrees to indemnify Fidelity National Title Insurance Company for any loss, cost or damage resulting from any unpaid fee or charge claimed by the Department of Buildings and entered in the records of the City Collector after the date of closing.

[5. To Seller's knowledge, the bankruptcies, judgments, federal tax liens, Parking Violation Bureau judgments, Environmental Control Board liens, Environmental Control Board fire liens, Transit Adjudication Bureau liens, New York State and City tax warrants, and other liens set forth in the above captioned report of title, if any, are not against your deponent(s), but against other(s) having the same or similar name(s), and that your deponent(s) (has/have) never resided or done business, maintained an office, or registered a motor vehicle at any of the addresses listed in connection therewith.]

6. That there has been no change in the membership of the partnership/limited liability company known as _____ since delivery of the applicable governance documents or operating agreement therefor to Fidelity National Title Insurance Company. That the

person(s) executing the closing instruments are authorized to bind the (corporation/partnership/limited liability company).

That (I/We) make this affidavit to induce Fidelity National Title Insurance Company to insure title free and clear of the aforesaid, knowing that it will rely on the truth of the statements herein made. Notwithstanding the foregoing, the individual executing this affidavit does so in his capacity as authorized signatory for the corporate owner, and such individual shall have no personal liability therefor or for any representations set forth herein.

_____

_____

Sworn to before me this _____
day of _____, 202_

**EXHIBIT R**

**Form of Bid Protections Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                             :

In re                           :      **Chapter 11**

                             :

**EVERGREEN GARDENS MEZZ LLC,**     :      **Case No. 21-10335 (MG)**

                             :

        Debtor.              :      **(Joint Administration Pending)**

                             :

**Fed. Tax Id. No. 83-3200416**        :
------------------------------------------------------------X
                             :

In re                           :      **Chapter 11**

                             :

**EVERGREEN GARDENS I LLC,**      :      **Case No. 21-[_____] (___)**

                             :

        Debtor.              :      **(Joint Administration Pending)**

                             :

**Fed. Tax Id. No. [●]**             :
------------------------------------------------------------X
                             :

In re                           :      **Chapter 11**

                             :

**EVERGREEN GARDENS II LLC,**     :      **Case No. 21-[_____] (___)**

                             :

        Debtor.              :      **(Joint Administration Pending)**

                             :

**Fed. Tax Id. No. [●]**             :
------------------------------------------------------------X

**ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363 AND 503(b) AND FED. R. BANKR. P.**
**6004 FOR ENTRY OF AN ORDER APPROVING BREAK-UP FEE AND EXPENSE**
**REIMBURSEMENT PROTECTIONS IN CONNECTION WITH**
**<u>SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS</u>**

Upon the motion (the "**Motion**"),[1] dated ____, 2021 [ECF No. [__]], of Evergreen Gardens Mezz LLC ("**Evergreen Mezz**" or the "**Initial Debtor**"), together with Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363 and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order approving the terms for the proposed payment of the Break-Up Fee and Expense Reimbursements (each as defined below and, collectively, the "**Bid Protections**") in connection with a sale of all or substantially all of the Debtors' assets pursuant to that certain Agreement of Purchase and Sale (the "**Purchase Agreement**"), dated [●], 2021, by and among the Debtors and Atlas Capital Group, LLC (the "**Purchaser**"), all as more fully set forth in the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and the accompanying declarations establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

---

[1]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

## IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.      <u>Jurisdiction and Venue</u>.    Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction to consider the relief requested in accordance with 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

B.      <u>Bid Protection</u>.    The Purchase Agreement provides for the following Bid Protections:  (1) a termination payment in the amount of $20,000,000.00 (the "**Break-Up Fee**") payable to Purchaser in the event (a) this Order is entered, (b) the Purchase Agreement is terminated or caused to be terminated by Sellers pursuant to Sections 35.1(e), 35.2(c)(i), (ii), (iii), (iv) and the Break-Up Fee becomes payable pursuant to Section 35.2(d); (2) the reimbursement of reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with Purchaser's due diligence, negotiation, and entry into the Purchase Agreement not to exceed $150,000.00 (the "**Expense Reimbursement**") payable to Purchaser pursuant to Sections 35.2(b), 35.2(e), and 36.1; and (3) the return of the Downpayment pursuant to Sections 35.2(g) in all instances where the Purchaser is entitled to receive the Break-Up Fee and/or the Expense Reimbursement.  The Bid Protections are reasonable and appropriate and represent the best method for maximizing the value of the Debtors' estates.

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    Adequate Notice.   Due and proper notice of the relief requested in the Motion and a reasonable opportunity to object or be heard regarding the relief granted herein has been afforded to all parties in interest in these Chapter 11 Cases.

D.    Relief is Warranted.   The Debtors have articulated good and sufficient reasons for approving the Bid Protections and the legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

**IT IS HEREBY ORDERED THAT**

1.    The Motion is granted to the extent set forth herein.

2.    The Bid Protections, on the terms set forth in the Purchase Agreement, are approved.  The Debtors are hereby authorized to pay in cash any amounts owed to the Purchaser on account of the Break-Up Fee and the Expense Reimbursement in accordance with the terms of the Purchase Agreement without further action or order by the Court.  Nothing contained in this Order is intended to give the Purchaser greater rights than are provided by the Purchase Agreement.

3.    If payable, the Break-Up Fee and Expense Reimbursement shall constitute allowed administrative expenses pursuant to section 503(b) of the Bankruptcy Code.

4.    The Escrow Agent is directed to pay the Downpayment to the Purchaser in accordance with the terms of the Purchase Agreement without further action or order by the Court.

5.    Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

6.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

7.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

8.    The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated: _____, 2021
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT S

## Form of Lease and Rider

"ATTACHED RIDER SETS FORTH RIGHTS AND OBLIGATIONS OF TENANTS AND LANDLORDS UNDER THE RENT STABILIZATION LAW." ("LOS DERECHOS Y RESPONSABILIDADES DE INQUILINOS Y CASEROS ESTÁN DISPONIBLE EN ESPAÑOL").

---

**STANDARD FORM OF APARTMENT LEASE**
**THE REAL ESTATE BOARD OF NEW YORK, INC.**
©Copyright 2019 All Rights Reserved. Reproduction in whole or in part prohibited.

---

REBNY Apt. Stab. 2019 Rev 7.19

**PREAMBLE:** This Lease contains the agreements between You and Owner concerning Your rights and obligations and the rights and obligations of Owner. You and Owner have other rights and obligations which are set forth in government laws and regulations.

You should read this Lease and all of its attached parts carefully. If You have any questions, or if You do not understand any words or statements, get clarification. Once You and Owner sign this Lease You and Owner will be presumed to have read it and understood it. You and Owner admit that all agreements between You and Owner have been written into this Lease. You understand that any agreements made before or after this Lease was signed and not written into it will not be enforceable.

THIS LEASE is made on _____ between Owner, _____, whose address is
                Month    day    year
_____ and You, the Tenant, _____, whose address is _____
_____.

**1. APARTMENT AND USE**

    Owner agrees to lease to You Apartment _____ on the ____ floor in the Building at _____ in the Borough of _____, City and State of New York.

    You shall use the Apartment for living purposes only. The Apartment may be occupied by the tenant or tenants named above and by the immediate family of the tenant or tenants and by occupants as defined in and only in accordance with Real Property Law §235-f.

**2. LENGTH OF LEASE**

    The term (that means the length) of this Lease is ____years, ____ months, ____ days, beginning on _____ and ending on _____.

    If you do not do everything You agree to do in this Lease, Owner may have the right to end it before the above date. If Owner does not do everything that owner agrees to do in this Lease, You may have the right to end the Lease before ending date.

**3. RENT**

    Your monthly rent for the Apartment is $ _____ until adjusted pursuant to Article 4 below in addition to the monthly or weekly charge in consideration for Your use and occupation of the of building as set forth on any rider annexed to this Lease. You must pay Owner the rent, in advance, on the first day of each month either at Owner's office or at another place that Owner may inform You of by written notice. You must pay the first month's rent to Owner when You sign this Lease if the lease begins on the first day of the month. If the Lease begins after the first day of the month, Tenant must pay when Tenant signs this Lease one (1) full months' rent and for the next full calendar month Tenant shall pay a prorated rent based on the number of days the Lease began after the first day of the month (for example, if the beginning date of this Lease is the 16th day of the month, Tenant would pay for fifteen (15) out of thirty (30) days, or one-half (1/2), of a full months' rent for the second calendar month). In any event, if the lease commencement date shall not occur on the first day of a calendar month, the term shall also include the remainder of the month in which the lease commencement date occurred. If this Lease is a Renewal Lease, the rent for the first month of this Lease need not be paid until the first day of the month when the renewal term begins. Owner need not give notice each month to Tenant to pay the rent. Rent must be paid in full and no amount subtracted from it.

**4. RENT ADJUSTMENTS**

    If this Lease is for a Rent Stabilized apartment, the rent shall be adjusted up or down during the Lease term, including retroactively, to conform to the Rent Guidelines. Where Owner, upon application to the State Division of Housing and Community Renewal ("authorized agency") is found to be entitled to an increase in rent or other relief, You and Owner agree: a. to be bound by such determination; b. where the authorized agency has granted an increase in rent, You shall pay such increase in the manner set forth by the authorized agency; c. except that in the event that an order is issued increasing the stabilization rent because of Owner hardship, You may, within (30) days of your receipt of a copy of the order, cancel your lease on sixty (60) days written notice to Owner. During said period You may continue in occupancy at no increase in rent.

    Pursuant to Real Property Law Section 238-a(2), You shall be obligated to pay a late fee if payment of rent has not been received within five days of the first day of each month. Late fee shall be the lesser of $50.00 or five percent of the monthly rent in addition to legal

interest at the maximum amount allowable at law. You will also be liable to pay all bank fees and charges for any check which is dishonored or returned.

5.    SECURITY DEPOSIT

You are required to give Owner the sum of $ _____ (such amount not to exceed one (1) months' rent pursuant to The Housing Stability and Tenant Protection Act of 2019) when You sign this Lease as a security deposit, which is called in law a trust. Owner will deposit this security at _____ bank at _____.

If the Building contains six or more apartments, the bank account will earn interest.  If You carry out all of your agreements in this Lease, at the end of each calendar year Owner or the bank will pay to Owner 1% interest on the deposit for administrative costs and to You all other interest earned on the security deposit.

If You carry out all of your agreements in this Lease and if You move out of the Apartment and return it to Owner in the same condition it was in when You first occupied it, except for ordinary wear and tear or damage caused by fire or other casualty, Owner will return to You the full amount of the Security Deposit and interest where applicable, within fourteen (14) days after the later of (i) the date this Lease ends, or (ii) the date You vacate the Apartment. However, if You are in default of Your obligations under this Lease and/or there are any damages to the Apartment beyond ordinary wear and tear or damage caused by fire or other casualty, Owner may keep all or part of the Security Deposit to cover missed rent payments, other loses or expenses incurred and reasonable repairs of such damage and Owner shall provide You with an itemized statement indicating the basis for the amount of the Security Deposit retained within the aforementioned fourteen (14) day period.

If Owner sells or leases the building, Owner will turn over your security, with interest, either to You or to the person buying or leasing (lessee) the building within 5 days after the sale or lease. Owner will then notify You, by registered or certified mail, of the name and address of the person or company to whom the deposit has been turned over. In such case, Owner will have no further responsibility to You for the security deposit. The new owner or lessee will become responsible to You for the security deposit.

6.    IF YOU ARE UNABLE TO MOVE IN

A situation could arise which might prevent Owner from letting You move into the Apartment on the beginning date set in this Lease. If this happens for reasons beyond Owner's reasonable control, Owner will not be responsible for Your damages or expenses, and this Lease will remain in effect. However, in such case, this Lease will start on the date when You can move in, and the ending date in Article 2 will be changed to a date reflecting the full term of years set forth in Article 2. You will not have to pay rent until the move-in date Owner gives You by written notice, or the date You move in, whichever is earlier. If Owner does not give You notice that the move-in date is within 30 days after the beginning date of the term of this Lease as stated in Article 2, You may tell Owner in writing, that Owner has 15 additional days to let You move in, or else the Lease will end. If Owner does not allow You to move in within those additional 15 days, then the Lease is ended. Any money paid by You on account of this Lease will then be refunded promptly by Owner.

7.    CAPTIONS

In any dispute arising under this Lease, in the event of a conflict between the text and a caption, the text controls.

8 .    WARRANTY OF HABITABILITY

A.    All of the sections of this Lease are subject to the provisions of the Warranty of Habitability Law in the form it may have from time to time during this Lease. Nothing in this Lease can be interpreted to mean that You have given up any of your rights under that law. Under that law, Owner agrees that the Apartment and the Building are fit for human habitation and that there will be no conditions which will be detrimental to life, health or safety.

B.    You will do nothing to interfere or make more difficult Owner's efforts to provide You and all other occupants of the Building with the required facilities and services. Any condition caused by your misconduct or the misconduct of anyone under your direction or control shall not be a breach by Owner.

9.    CARE OF YOUR APARTMENT; END OF LEASE; MOVING OUT

A.    At all times during the Term of this Lease, Tenant will take good care of the Apartment and will not permit or do any damage to it, except for damage which occurs through ordinary wear and tear. Tenant shall, at Tenant's own cost and expense, make all repairs caused or occasioned by Tenant or Tenant's agents, contractors, invitees, licensees, guests or servants (collectively hereinafter "Tenant Parties"). In addition, Tenant shall promptly notify Owner and/or the Building Superintendent/Building Manager in writing upon the occurrence of any problem, malfunction or damage to the Apartment. Tenant will move out on or before the ending date of this Lease and leave the Apartment in good order and in the same condition as it was when Tenant first occupied it, except for ordinary wear and tear and damage caused by fire or other casualty through no fault of Tenant.

B.    **Cleaning.** Tenant is required to use only non-abrasive cleaning agents in the Apartment. Tenant is responsible for damage done by use of any improper cleaning agents.

C.    If Tenant fails to maintain the Apartment or make a needed repair or replacement as required hereunder, Owner may hire a professional and make such maintenance, repairs or replacements at Tenant's sole cost and expense. Owner's reasonable expense will be payable by Tenant to Owner as additional rent within ten (10) business days after Tenant receives a bill from Owner

D.      When this Lease ends, Tenant must remove all of Tenant's movable property. Tenant must also remove at Tenant's own expense, any wall covering, bookcases, cabinets, mirrors, painted murals or any other installation or attachment Tenant may have installed in the Apartment, even if it was done with Owner's consent. Tenant must restore and repair to its original condition those portions of the Apartment affected by those installations and removals. Tenant has not moved out until all persons, furniture and other property of Tenant's is also out of the Apartment. If Tenant's property remains in the Apartment after this Lease ends, Owner may either treat Tenant as still in occupancy and charge Tenant for use, or may consider that Tenant has given up the Apartment and any property remaining in the Apartment. In this event, Owner may either discard the property or store it at Tenant's expense. Tenant agrees to pay Owner for all costs and expenses incurred in removing such property. The provisions of this article will continue to be in effect after the end of this Lease.

E.      Within a reasonable time after notification of either party's intention to terminate this Lease, unless Tenant provides less than two (2) weeks' notice of Tenant's intention to terminate, Owner shall notify Tenant in writing of Tenant's right to request an inspection before vacating the Apartment. Tenant shall have the right to be present at said inspection. Subject to the foregoing, if Tenant requests such inspection, the inspection shall be made no earlier than two (2) weeks and no later than one (1) week before the end of the tenancy.  Owner shall provide at least forty-eight (48) hours written notice of the date and time of the inspection. After the inspection, Owner shall provide Tenant with an itemized statement specifying repairs, cleaning or other deficiencies that are proposed to be the basis of any deductions from the Security Deposit. If Tenant requests such inspection, Tenant shall be given an opportunity to remedy any identified deficiencies prior to the end of the tenancy (or, at Owner's sole option, if Tenant fails to remedy any such identified deficiencies, Owner may remedy such identified deficiencies at Tenant's sole cost and expense as described hereinafter). Any and all repairs or alterations made to the Apartment as a result of said inspection shall be at Tenant's sole cost and expense. Said repairs must be approved by Owner and shall be performed, at Owner's sole option by (i) licensed and adequately insured Tenant's contractors in a good and skillful manner with materials of quality and appearance comparable to existing materials and approved by Owner or (ii) by Owner's contractor(s).

10.    **CHANGES AND ALTERATIONS TO APARTMENT**

A.      Tenant cannot build in, add to, change or alter, the Apartment in any way, including, but not limited to, installing, changing, or altering any paneling, wallpaper, flooring, "built in" decorations, partitions, railings, paint, carpeting, plumbing, ventilating, air conditioning, electric, or heating systems without first obtaining the prior written consent of Owner which may be withheld in Owner's sole discretion. If Owner's consent is given, the alterations and installations shall become the property of Owner when completed and paid for by Tenant. They shall remain with and as part of the Apartment at the end of the Term. Notwithstanding the foregoing, Owner has the right to demand that Tenant remove the alterations and installations at the end of the Lease Term, and in such case Tenant shall repair all damage resulting from said removal and restore the Apartment to its original condition, including any holes in the wall or damage caused by the removal of any pictures, artwork or TV mounts hung by Tenant on the walls. Any and all work shall be performed by Tenant in accordance with the terms and conditions of this Lease and in accordance with all applicable laws, rules, regulations and codes of any governmental or quasi-governmental entity.  Tenant's contractor shall also supply, before performing any such work, a certificate of insurance naming Owner and the Building's managing agent (if applicable) as additional insured.

B.      Without Owner's prior written consent, Tenant cannot install or use in the Apartment any of the following: dishwasher machines, clothes washing or drying machines, electric stoves, garbage disposal units, heating, ventilating or air conditioning units or any other electrical equipment which, in Owner's reasonable opinion, will overload the existing wiring installation in the Building or interfere with the use of such electrical wiring facilities by other tenants of the Building. Also, Tenant cannot place in the Apartment water-filled furniture.

C.      If a lien is filed on the Apartment or Building due to Tenant's fault, Tenant must promptly pay or bond the amount stated in the lien. Owner may pay or bond the Lien if Tenant fails to do so within ten (10) days after Tenant has written notice about the lien, in which case, Owner's costs shall be paid by Tenant as Additional Rent.

11.  **YOUR DUTY TO OBEY AND COMPLY WITH LAWS; REGULATIONS AND LEASE RULES**

A.      **Government Laws and Orders.** You will obey and comply (1) with all present and future city, state and federal laws and regulations, including the Rent Stabilization Code and Law, which affect the Building or the Apartment, and (2) with all orders and regulations of Insurance Rating Organizations which affect the Apartment and the Building. You will not allow any windows in the Apartment to be cleaned from the outside, unless the equipment and safety devices required by law are used.

B.      **Owner's Rules Affecting You.** You will obey all Owner's rules listed in this Lease and all future reasonable rules of Owner or Owner's agent. Notice of all additional rules shall be delivered to You in writing or posted in the lobby   or other public place in the building, Owner shall not be responsible to You for not enforcing any rules, regulations or provisions of another tenant's lease except to the extent required by law.

C.      **Your Responsibility.** You are responsible for the behavior of yourself, of your immediate family, your servants and people who are visiting You. You will reimburse Owner as additional rent upon demand for the cost of all losses, damages, fines, penalties and reasonable legal expenses incurred by Owner because You, members of your immediate family, servants or people visiting You have not obeyed government laws and orders or the provisions and rules of this Lease.

12.    **OBJECTIONABLE CONDUCT**

As a tenant in the Building, You will not engage in nor permit family members, guests or invitees to engage in objectionable conduct. Objectionable conduct means behavior which makes or will make the Apartment or the Building less fit to live in for You or other occupants. It also means anything which interferes with the right of others to properly and peacefully enjoy their Apartments, or causes conditions that are

dangerous, hazardous, unsanitary and detrimental to other tenants in the Building. Objectionable conduct by You gives Owner the right to end this Lease.

**13.    SERVICES AND FACILITIES**

A.    **Required Services.** Owner will provide cold and hot water and heat as required by law, repairs to the Apartment, as required by law, elevator service if the Building has elevator equipment, and the utilities, if any, included in the rent, as set forth in sub-paragraph B. You are not entitled to any rent reduction because of a stoppage or reduction of any of the above services unless it is provided by law.

B.    The following utilities are included in the rent: _____.

C.    **Electricity and Other Utilities.** If Owner provides electricity or gas and the charge is included in the rent on Page 1, or if You buy electricity or gas from Owner for a separate (sub metered) charge, your obligations are described in the Rider attached to this Lease. If electricity or gas is not included in the rent or is not charged separately by Owner, You must arrange for this service directly with the utility company. You must also pay directly for telephone service if it is not included in the rent.

D.    **Appliances.** Appliances supplied by Owner in the Apartment are for your use. They will be maintained and repaired or replaced by Owner, but if repairs or replacement are made necessary because of your negligence or misuse, You will pay Owner for the cost of such repair or replacement as additional rent.

E.    **Elevator Service.** If the elevator is the kind that requires an employee of Owner to operate it, Owner may end this service without reducing the rent if: (1) Owner gives You 10 days notice that this service will end; and (2) within  a reasonable time after the end of this 10-day notice, Owner begins to substitute an automatic control type of elevator and proceeds diligently with its installation. All non-automatic passenger and service elevators shall be operated only by employees of Owner and must not in any event be interfered with by Tenants. The service elevators, if any, shall be used by servants, messengers and trades people for entering and leaving, and the passenger elevators, if any, shall not be used by them for any purpose. Nurses with children, however, may use the passenger elevators.

F.    **Storeroom Use.** If Owner permits You to use any storeroom, laundry or any other facility located in the building but outside of the Apartment, the use of this storeroom or facility will be furnished to You free of charge and at your own risk, except for loss suffered by You due to Owner's negligence. You will operate at your expense any coin operated appliances located in such storerooms or laundries.

**14.    INABILITY TO PROVIDE SERVICES**

Because of a strike, labor trouble, national emergency, repairs, or any other cause beyond Owner's reasonable control, Owner may not be able to provide or may be delayed in providing any services or in making any repairs to the Building.

In any of these events, any rights You may have against Owner are only those rights which are allowed by laws in effect when the reduction in service occurs.

**15.    ENTRY TO APARTMENT**

During reasonable hours and with reasonable notice, except in emergencies, Owner may enter the Apartment for the following reasons:

A.    To erect, use and maintain pipes and conduits in and through the walls and ceilings of the Apartment; to inspect the Apartment and to make any necessary repairs or changes Owner decides are necessary. Your rent will not be reduced because of any of this work, unless required by law.

B.    To show the Apartment to persons who may wish to become owners or lessees of the entire Building or may be interested in lending money to Owner;

C.    For four months before the end of the Lease, to show the Apartment to persons who wish to rent it;

D.    If during the last month of the Lease You have moved out and removed all or almost all of your property from the Apartment, Owner may enter to make changes, repairs, or redecorations. Your rent will not be reduced for that month and this Lease will not be ended by Owner's entry.

E.    If at any time You are not personally present to permit Owner or Owner's representative to enter the Apartment and entry is necessary or allowed by law or under this lease, Owner or Owner's representatives may nevertheless enter the Apartment. Owner may enter by force in an emergency. Owner will not be responsible to You, unless during this entry, Owner or Owner's representative is negligent or misuses your property.

**16.    ASSIGNING; SUBLETTING; ABANDONMENT**

A.    Assigning and Subletting. You cannot assign this Lease or sublet the Apartment without Owner's advance written consent in each instance to a request made by You in the manner required by Real Property Law §226-b. and in accordance with the provisions of the Rent Stabilization Code and Law, relating to subletting. Owner may refuse to consent to a lease assignment for any reason or no reason, but if Owner unreasonably refuses to consent to request for a Lease assignment properly made, at your request in writing, Owner will end this Lease effective as of thirty days after your request. The first and every other time you wish to sublet the Apartment, You must get the written consent

of Owner unless Owner unreasonably withholds consent following your request to sublet in the manner provided by Real Property Law §226-b. Owner may impose a reasonable credit check fee on You in connection with an application to assign or sublet. If You fail to pay your rent Owner may collect rent from subtenant or occupant without releasing You from the Lease. Owner will credit the amount collected against the rent due from You.  However, Owner's acceptance of such rent does not change the status of the subtenant or the occupant to that of direct tenant of Owner and does not release You from this Lease.

B.      Abandonment. If You move out of the Apartment (abandonment) before the end of this Lease without the consent of Owner, this Lease will not be ended (except as provided by law following Owner's unreasonable refusal to con- sent to an assignment or subletting requested by You.)  You will remain responsible for each monthly payment of rent as it becomes due until the end of this Lease subject to Real Property Law §227-e.

## 17.      DEFAULT

You default under the Lease if You act in any of the following ways:

A.   You fail to carry out any agreement or provision of this Lease other than Article 12 of this Lease;
B.   You do not take possession or move into the Apartment 15 days after the beginning of this Lease;
C.   You and other legal occupants of the Apartment move out permanently before this Lease ends.

If You do default in any one of these ways, other than a default in the agreement to pay rent, Owner may serve You with a written notice to stop or correct the specified default within ten days (the "Cure Period"). You must then either stop or correct the default within the Cure Period, or, if You need more than the Cure Period, You must begin to correct the default within the Cure Period and continue to do all that is necessary to correct the default as soon as possible.

If You do not stop or begin to correct a default in the Cure Period or if You or other legal occupants or guests engage in Objectionable Conduct as defined in this Lease, Owner shall give You a written notice that this Lease will end seven (7) days after the date the written notice is sent to You. At the end of the seven (7) day period, this Lease will end and You then must move out of the Apartment. If you fail to vacate on the date set forth in the termination notice, Owner shall commence an action or proceeding to recover possession. Even though this Lease ends, You will remain liable to Owner for unpaid rent up to the end of the term of this Lease set forth in Article 2 or any renewal thereof, the fair market value of your occupancy, if any, after the end of the Lease, and damages caused to Owner after that time as stated in Article 18 and as permitted by law.

If You do not pay your rent when this Lease requires, Owner or Owner's agent shall send you by certified mail a written notice stating the Owner or Owner's agent did not receive payment for rent within five (5) days of the date specified in the Lease. This does not waive, impair or modify Your obligation to pay rent by the first day of each month. If You fail to pay Owner the rent as demanded in a 14 day statutory written rent demand, Owner may commence an action or summary nonpayment eviction proceeding based upon the non-payment of rent.

Once this Lease has been ended, whether because of default or otherwise, You give up any right You might otherwise have to reinstate or renew the Lease.

## 18.      REMEDIES OF OWNER AND YOUR LIABILITY

If this Lease is ended by Owner because of your default, the following are the rights and obligations of You and Owner:

A.   You must pay your rent until this Lease has ended. Thereafter, You must pay an equal amount for what the law calls "use and occupancy" until You actually move out.
B.   Once You are out, Owner may re-rent the Apartment or any portion of it for a period of time which may end before or after the ending date of this Lease. Owner may re-rent to a new tenant at a lesser rent or may charge a higher rent than the rent in this Lease. Notwithstanding the foregoing, if You vacate the Apartment in violation of the terms of this Lease, only then shall Owner use reasonable efforts to re-rent the Apartment at the lesser of the fair market value of the Apartment or the rent paid under this Lease pursuant to Real Property Law §227-e.
C.   Whether the Apartment is re-rented or not, You must pay to Owner as damages:
  1.   the difference between the rent in this Lease and the amount, if any, of the rents collected in any later lease or leases of the Apartment for what would have been the remaining period of this Lease except to the extent limited by Real Property Law §227-e if applicable; and
  2.   Owner's expenses for advertisements, broker's fees and the cost of putting the Apartment in good condition for re-rental; and
  3.   Owner's expenses for attorney's fees except in the event of a default judgment.
D.   You shall pay all damages due in monthly installments on the rent day established in this Lease. Any legal action brought to collect one or more monthly installments of damages shall not prejudice in any way Owner's right to collect the damages for a later month by a similar action. If the rent collected by Owner from a subsequent tenant of the Apartment is more than the unpaid rent and damages which You owe Owner, You cannot receive the difference. Owner's failure to re-rent to another tenant will not release or change your liability for damages, unless the failure is due to Owner's deliberate inaction.

## 19.      ADDITIONAL OWNER REMEDIES

If You do not do everything You have agreed to do, or if You do anything which shows that You intend not to do what You have agreed to do, Owner has the right to ask a court to make You carry out your agreement or to give the Owner such other relief as the Court can provide.  This is in addition to the remedies in Article 17 and 18 of this lease.

**20.  FEES AND EXPENSES**

A.  **Owner's Right.** You must reimburse Owner for any of the following fees and expenses incurred by Owner:

1.  Making any repairs to the Apartment or the Building, including any appliances in the Apartment, which result from misuse, omissions or negligence by Tenant, the permitted occupants of the Apartment, the Tenant Parties or any other visitors to the Apartment;

2.  Correcting any violations of city, state or federal laws or orders and regulations of insurance rating organization concerning the Apartment or the Building which Tenant, the permitted occupants of the Apartment, the Tenant Parties, or any other persons who visit the Apartment or work for Tenant have caused;

3.  Preparing the Apartment for the next tenant if Tenant moves out of the Apartment before the Lease ending date without Owner's prior written consent;

4.  Any legal fees and disbursements for the preparation and service of legal notices; legal actions or proceedings brought by Owner against Tenant because of a default by Tenant under this Lease; or for defending lawsuits brought against Owner because of the actions of Tenant, the permitted occupants of the Apartment, the Tenant Parties or any other persons who visit the Apartment;

5.  Removing any of Tenant's property from the Apartment after this Lease is ended;

6.  Any miscellaneous charges payable to the Owner for services Tenant requested that are not required to be furnished Tenant under this Lease for which Tenant has failed to pay the Owner and which Owner has paid;

7.  All other fees and expenses incurred by Owner because of the failure to obey any other provisions and agreements of this Lease by Tenant, the permitted occupants of the Apartment, the Tenant Parties or any other persons who visit the Apartment or work for Tenant.

These fees and expenses shall be paid by You to Owner as additional rent within 30 days after You receive Owner's bill or statement. If this Lease has ended when these fees and expenses are incurred, You will still be liable to Owner for the same amount as damages.

B.  **Tenant's Right.** Owner agrees that unless sub-paragraph 4 of this Article 20 has been stricken out of this Lease You have the right to collect reasonable legal fees and expenses incurred in a successful defense by You of a lawsuit brought by Owner against You or brought by You against Owner to the extent provided by Real Property Law§ 234.

**21. PROPERTY LOSS, DAMAGES OR INCONVENIENCE**

Unless caused by the negligence or misconduct of Owner or Owner's agents or employees, Owner or Owner's agents and employees are not responsible to You for any of the following: (1) any loss of or damage to You or your property in the Apartment or the Building due to any accidental or intentional cause, even a theft or another crime committed in the Apartment or elsewhere in the Building; (2) any loss of or damage to your property delivered to any employee of the Building (i.e., doorman, superintendent, etc.); or (3) any damage or inconvenience caused to You by actions, negligence or violations of a Lease by any other tenant or person in the Building except to the extent required by law.

Owner will not be liable for any temporary interference with light, ventilation, or view caused by construction by or in behalf of Owner. Owner will not be liable for any such interference on a permanent basis caused by construction on any parcel of land not owned by Owner. Also, Owner will not be liable to You for such interference caused by the permanent closing, darkening or blocking up of windows, if such action is required by law. None of the foregoing events will cause a suspension or reduction of the rent or allow You to cancel the Lease.

**22.  FIRE OR CASUALTY**

A.  If the Apartment becomes unusable, in part or totally, because of fire, accident or other casualty, this Lease will continue unless ended by Owner under C below or by You under D below. But the rent will be reduced immediately. This reduction will be based upon the part of the Apartment which is unusable.

B.  Owner will repair and restore the Apartment, unless Owner decides to take actions described in paragraph C below.

C.  After a fire, accident or other casualty in the Building, Owner may decide to tear down the Building or to substantially rebuild it. In such case, Owner need not restore the Apartment but may end this Lease. Owner may do this even if the Apartment has not been damaged, by giving You written notice of this decision within 30 days after the date when the damage occurred. If the Apartment is usable when Owner gives You such notice, this Lease will end 60 days from the last day of the calendar month in which You were given the notice.

D.  If the Apartment is completely unusable because of fire, accident or other casualty and it is not repaired in 30 days, You may give Owner written notice that You end the Lease. If You give that notice, this Lease is considered ended on the day that the fire, accident or casualty occurred. Owner will refund your security deposit and the pro-rata portion of rents paid for the month in which the casualty happened.

E.  Unless prohibited by the applicable insurance policies, to the extent that such insurance is collected, You and Owner release and waive all right of recovery against the other or anyone claiming through or under each by way of subrogation.

**23.  PUBLIC TAKING**

The entire building or a part of it can be acquired (condemned) by any government or government agency for a public or quasi-public use or purpose. If this happens, this Lease shall end on the date the government or agency take title, You shall have no claim against Owner for any damage resulting; You also agree that by signing this Lease, You assign to Owner any claim against the Government or Government agency for the value of the unexpired portion of this Lease.

24.   **SUBORDINATION CERTIFICATE AND ACKNOWLEDGEMENTS**

All leases and mortgages of the Building or of the land on which the Building is located, now in effect or made after this Lease is signed, come ahead of this Lease. In other words, this Lease is "subject and subordinate to" any existing or future lease or mortgage on the Building or land, including any renewals, consolidations, modifications and replacements of these leases or mortgages. If certain provisions of any of these leases or mortgages come into effect, the holder of such lease or mortgage can end this Lease. If this happens, You agree that You have no claim against Owner or such lease or mortgage holder. If Owner requests, You will sign promptly an acknowledgement of the "subordination" in the form that Owner requires.

You also agree to sign (if accurate) a written acknowledgement to any third party designated by Owner that this Lease is in effect, that Owner is performing Owner's obligations under this Lease and that you have no present claim against Owner.

25.   **TENANT'S RIGHT TO LIVE IN AND USE THE APARTMENT**

If You pay the rent and any required additional rent on time and You do everything You have agreed to do in this Lease, your tenancy cannot be cut off before the ending date, except as provided for in Articles 22, 23, and 24.

26.   **BILLS AND NOTICE; ELECTRONIC SIGNATURES**

A.   **Notices to You.** Any notice from Owner or Owner's agent or attorney will be considered properly given to You if it (1) is in writing; (2) is signed by or in the name of Owner or Owner's agent; and (3) is (a) addressed to You at the Apartment and delivered to You personally or sent by registered or certified mail to You at the Apartment or (b) sent to You electronically to an email address You have provided to Owner or an email address from which You communicated by email to Owner. The date of service of any written notice by Owner to You under this Lease is the date of delivery or mailing of such notice.

B.   **Notices to Owner.** If You wish to give a notice to Owner, You must write it and deliver it or send it by registered, or certified mail to Owner at the address noted on page 1 of this Lease, or at another address of which Owner or Agent has given You written notice.

C.   An electronic signature on this Lease, rider or any renewal of Owner or Tenant shall be deemed an original document and a binding signature pursuant to the Electronic Signatures and Records Act of the State Technology Law.

27.   **NO SHORT-TERM RENTAL**

Under no circumstances shall Tenant put a listing for the Apartment on Airbnb or for other similar short term rental (i.e., a rental for less than thirty (30) days), or use the Apartment for same. If Tenant does so, Owner has the right to immediately terminate this Lease.

TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT. IF TENANT DISREGARDS THIS AGREEMENT, IN ADDITION TO THE RIGHT OF INJUNCTION, AND THE RIGHT TO TERMINATE THIS LEASE ON SEVEN (7) DAYS' WRITTEN NOTICE TO TENANT WITHOUT ANY RIGHT TO A CURE PERIOD, AND ANY AND ALL REMEDIES AVAILABLE UNDER THIS LEASE AND AT LAW OR EQUITY, TENANT SHALL ALSO BE RESPONSIBLE FOR ANY AND ALL FINES AND PENALTIES IMPOSED BY ANY GOVERNMENTAL OR QUASI-GOVERNEMENTAL AGENCY OR BODY.

28.   **GIVING UP RIGHT TO TRIAL BY JURY AND COUNTERCLAIM**

Both You and Owner agree to give up the right to a trial by jury in a court action, proceeding or counter claim on any matters concerning this Lease, the relationship of You and Owner as Tenant and Landlord or your use or occupancy of the Apartment. This agreement to give up the right to a jury trial does not include claims for personal injury or property damage.

If Owner begins any court action or proceeding against You which asks that You be compelled to move out, You cannot make a counterclaim unless You are claiming that Owner has not done what Owner is supposed to do about the condition of the Apartment or the Building.

29.   **NO WAIVER OF LEASE PROVISIONS**

A.   Even if Owner accepts your rent or fails once or more often to take action against You when You have not done what You have agreed to do in this Lease, the failure of Owner to take action or Owner's acceptance of rent does not prevent Owner from taking action at a later date if You again do not do what You have agreed to do.

B.   Only a written agreement between You and Owner can waive any violation of this Lease.

C.   If You pay and Owner accepts an amount less than all the rent due, the amount received shall be considered to be in payment of all or a part of the earliest rent due. It will not be considered an agreement by Owner to accept this lesser amount in full satisfaction of all of the rent due.

D.   Any agreement to end this Lease and also to end the rights and obligations of You and Owner must be in writing, signed by You and Owner or Owner's agent. Even if You give keys to the Apartment and they are accepted by any employee, or agent, or Owner, this Lease is not ended.

30.   **CONDITION OF THE APARTMENT; APARTMENT RENTED "AS IS"**

By signing this Lease Tenant acknowledges that Owner, Owner's representatives or superintendent has not made any representations or promises with respect to the Building or the Apartment except as herein expressly set forth. After signing this Lease but before Tenant begins occupancy, Tenant shall have the opportunity to inspect the Apartment with Owner or Owner's agent to determine the

condition of the Apartment. If Tenant requests such inspection, the parties shall execute a written agreement before Tenant begins occupancy of the Apartment attesting to the condition of the Apartment and specifically noting any existing defects or damages. Before taking occupancy of the Apartment, Tenant has inspected the Apartment (or Tenant has waived such inspection) and Tenant accepts it in its present condition "as is," except for any condition which Tenant could not reasonably have seen during Tenant's inspection. Tenant agrees that Owner has not promised to do any work in the Apartment except as specified in a rider to be annexed hereto (if any) and made apart hereof.

31.    **RENT INCREASE FOR MAJOR CAPITAL IMPROVEMENT**

Owner advises you that an application for increase in stabilized rent on the ground of a building-wide major capital improvement dated _____ Docket No._____ is now pending before the State Division of Housing and Community Renewal ("Agency"). Such application involves the following major capital improvements which are now completed or in progress:
_____
_____

You agree that the stabilized rent herein may be increased during the term of this lease by reason of such improvement as of a date and in the amount permitted by an order from the Agency.

32.    **DEFINITIONS**

A.    **Owner:** The term "Owner" means the person or organization receiving or entitled to receive rent from You or the Apartment at any particular time other than a rent collector or managing agent of Owner. "Owner" includes the owner of the land or Building, a lessor, or sublessor of the land or Building and a mortgagee in possession. It does not include a former owner, even if the former owner signed this Lease.

B.    **You:** The Term "You" means the person or persons signing this Lease as Tenant and the successors and assigns of the signer. This Lease has established a tenant-landlord relationship between You and Owner.

33.    **SUCCESSOR INTERESTS**

The agreements in this Lease shall be binding on Owner and You and on those who succeed to the interest of Owner or You by law, by approved assignment or by transfer.

34.    **PUBLIC ACCESS WAYS**

A.    Tenant shall not block or leave anything in or on fire escapes, the sidewalks, entrances, driveways, elevators, stairways, or halls. Public access ways shall be used only for entering and leaving the Apartment and the Building. Only those elevators and passageways designated by Owner can be used or deliveries.

B.    Baby carriages, bicycles or other property of Tenant shall not be allowed to stand in the halls, passageways, public areas or courts of the Building.

35.    **LAUNDRY**

Laundry and drying apparatus, if any, shall be used by Tenant in the manner and at the times that the superintendent or other representative of Owner may direct. Tenant shall not dry or air clothes on the roof, balcony, terrace or outside the windows of Apartment.

36.    **KEYS AND LOCKS**

Owner may retain a pass key to the Apartment. Tenant may install on the entrance of the Apartment an additional lock of not more than three inches in circumference. Tenant may also install a lock on any window but only in the manner provided by law. Immediately upon making any installation of either type, Tenant shall notify Owner or Owner's agent and shall give Owner or Owner's agent a duplicate key. If changes are made to the locks or mechanism installed by Tenant, Tenant must deliver keys to Owner. At the end of this Lease, Tenant must return to Owner all keys either furnished or otherwise obtained. If Tenant loses or fails to return any keys which were furnished to Tenant, Tenant shall pay to Owner the cost of replacing them.

37.    **NOISE**

Tenant, Tenant Parties and permitted occupants shall not make or permit any disturbing noises in the Apartment or Building or permit anything to be done that will interfere with the rights, comforts or convenience of other tenants and shall not play a musical instrument or operate or allow to be operated a phonograph, radio or television set so as to disturb or annoy any other tenant in the Building.

38.    **NO PROJECTIONS**

An aerial may not be erected on the roof or outside wall of the Building without the written consent of Owner. Also, awnings or other projections shall not be attached to the outside walls of the Building or to any balcony or terrace.

39.    **NO PETS**

Dogs or animals of any kind shall not be kept or harbored in the Apartment, unless in each instance it be expressly permitted in writing by Owner. This consent, if given, can be taken back by Owner at any time for good cause on reasonably given notice. Unless carried or on a leash, a dog shall not be permitted on any passenger elevator or in any public portion of the building. Also, dogs are not permitted on any grass or garden plot under any condition. BECAUSE OF THE HEALTH HAZARD AND POSSIBLE DISTURBANCE OF OTHER TENANTS

WHICH ARISE FROM THE UNCONTROLLED PRESENCE OF ANIMALS, ESPECIALLY DOGS, IN THE BUILDING, THE STRICT ADHERENCE TO THE PROVISIONS OF THIS RULE BY EACH TENANT IS A MATERIAL REQUIREMENT OF EACH LEASE. TENANT'S FAILURE TO OBEY THIS RULE SHALL BE CONSIDERED A SERIOUS VIOLATION OF AN IMPORTANT OBLIGATION BY TENANT UNDER THIS LEASE. OWNER MAY ELECT TO END THIS LEASE BASED UPON THIS VIOLATION.

**40.    MOVING**

Tenant can use the elevator to move furniture and possessions only on designated days and hours. Owner shall not be liable for any costs, expenses or damages incurred by Tenant in moving because of delays caused by the unavailability of the elevator.

**41.    FLOORS**

Apartment floors shall be covered with rugs or carpeting to the extent of at least 80% of the floor area of each room excepting only kitchens, pantries, bathrooms and hallways. The tacking strip for wall-to-wall carpeting will be glued, not nailed to the floor.

**42.    COUNTERPARTS**

This Lease may be executed in any number of identical counterparts and by scanned or facsimile signature, and each counterpart hereof shall be deemed to be an original instrument, but all counterparts hereof taken together shall constitute but a single instrument.

**43.    GARBAGE, REFUSE AND RECYLCLING**

Tenant shall comply with the rules and regulations of the Building in all respects, including, but not limited to, those regarding garbage and recycling laws. Tenant shall not place any large articles outside of the Apartment except in compliance with the rules and regulations of the Building in all respects. Carpets, rugs or other articles shall not be hung or shaken out of any window of the Building. Tenant shall not sweep or throw or permit to be swept or thrown any dirt, garbage or other substances out of the windows or into any of the halls, elevators or elevator shafts.

**44.    TERRACE/BALCONY (IF APPLICABLE)**

All of the terms and conditions of this Lease apply to the terrace, balcony and/or backyard (as applicable). Tenant's use of the terrace or balcony must comply with any rules that may be provided to Tenant by Owner. Tenant shall clean the terrace or balcony and keep the terrace or balcony free from snow, ice, garbage and other debris. No cooking is allowed on the terrace or balcony except as may be otherwise permitted by law. Tenant may not install a fence or any addition on the terrace or balcony. Tenant is responsible for making all repairs to the terrace or balcony if caused by Tenant, the Tenant Parties or any other visitor to the Apartment, at Tenant's sole expense.

**45.    TOILETS/PLUMBING FIXTURES**

The toilets and plumbing fixtures shall only be used for the purposes for which they were designed or built for. No feminine hygiene products or, sweepings, rubbish bags, acids may be discarded in the toilets or plumbing fixtures.

**46.    EMERGENCIES**

Tenant will provide Owner with list of persons to contact in the event of an emergency. Emergencies include, but are not limited to: health and safety of Tenant or guests, water damage or fire, or unauthorized persons attempting entry into the Apartment without Owner's knowledge.

**47.    MOVING IN, VACATING APARTMENT AND TERMINATION**

A.    Should Owner become concerned with the inadequate care and/or supervision of Tenant's moving company's crew, Tenant shall instruct moving personnel to comply with Owner's reasonable request for added protection throughout the Apartment. All moving personnel must be fully insured and reasonable proof of such insurance must be supplied to Owner before moving will be permitted on or in the Apartment.

B.    In the course of Tenant's moving in, out or having items delivered to the Apartment, should there be any damage to the halls, doors or any other part of the Apartment or the Building, Tenant shall be responsible to pay for the repair of such damage.

**48.    LEAD BASED PAINT**

Owner and Tenant shall sign and complete the lead-based paint and/or lead-based hazard disclosure annexed as a rider to this Lease.

**49.    WINDOW GUARDS**

Simultaneously with the execution of this Lease, Tenant shall complete and deliver to Owner a notice with respect to the installation of window guards in the Apartment in the form required by the City of New York annexed as a rider attached to this Lease. Tenant acknowledges that it is a violation of law to refuse, interfere with installation, or remove window guards where required.

**50.    BED BUG DISCLOSURE**

Tenant and Owner shall sign and complete the disclosure of bedbug infestation history annexed as a rider attached to this Lease.

**51.    SPRINKLER DISCLOSURE**

Tenant and Owner shall sign and complete the sprinkler disclosure annexed as a rider to this Lease.

**52.    OCCUPANCY NOTICE FOR INDOOR ALLERGEN HAZARDS**

Owner shall complete and deliver to Tenant the Occupancy Notice for Indoor Allergen Hazards annexed as a rider attached to this Lease. Owner acknowledges that it has delivered to Tenant "What Every Tenant Should Know About Indoor Allergens" and Tenant acknowledges receipt of such notice.

**53.    STOVE KNOB COVERS**

Owner shall complete and deliver to Tenant the Occupancy Notice for Indoor Allergen Hazards annexed as a rider attached to this Lease. Owner acknowledges that it has delivered to Tenant "What Every Tenant Should Know About Indoor Allergens" and Tenant acknowledges receipt of such notice.

**54.    SMOKING POLICY**

Owner has attached as a rider the smoking policy for the Building.

**SIGNATURES CONTINUED ON NEXT PAGE**

TO CONFIRM OUR AGREEMENTS, OWNER AND YOU RESPECTIVELY SIGN THIS LEASE AS OF THE DAY AND YEAR FIRST WRITTEN ON PAGE 1.

Witnesses

_____          _____ [L.S.]
                                                  Owner's  Signature

_____          _____ [L.S.]
                                                  Tenant's  Signature

_____          _____ [L.S.]
                                                  Tenant's  Signature

## GUARANTY

The undersigned Guarantor [or Guarantors (hereinafter collectively referred to as "Guarantor")] guarantees to Owner the strict payment performance of and observance by Tenant of all the agreements, provisions and rules in the attached Lease. Guarantor agrees to waive all notices when Tenant is not paying Rent and/or Additional Rent or not observing and complying with all of the provisions of the attached Lease. Guarantor agrees to be equally liable with Tenant so that Owner may sue Guarantor directly without first suing Tenant. The Guarantor further agrees that this guaranty shall remain in full effect even if the Lease is renewed, assigned, changed or extended in any way and even if Owner has to make a claim against Guarantor. Owner and Guarantor agree to waive trial by jury in any such action, proceeding or counterclaim brought against the other on any matters concerning the attached Lease or the Guaranty. Guarantor will pay reasonable attorneys' fees, court costs and other expenses incurred by Owner in enforcing or attempting to enforce this Guaranty. This Guaranty shall be binding upon the Guarantor and shall inure to the benefit of the Owner, and their respective heirs, distributees, executors, administrators, successors and assigns. The Guarantors shall be jointly and severally liable under this Guaranty.

Guarantor further agrees that if Tenant becomes insolvent or shall be adjudicated a bankrupt or shall file for reorganization or similar relief or if such petition is filed by creditors of Tenant, under any present or future Federal or State law, Guarantor's obligations hereunder may nevertheless be enforced against the Guarantor.  The termination of the Lease pursuant to the exercise of any rights of a trustee or receiver in any of the foregoing proceedings, shall not affect Guarantor's obligation hereunder or create in Guarantor any setoff against such obligation.  Neither Guarantor's obligation under this Guaranty nor any remedy for enforcement thereof, shall be impaired, modified or limited in any manner whatsoever by any impairment, modification, waiver or discharge resulting from the operation of any present or future operation of any present or future provision under the National Bankruptcy Act or any other statute or decision of any court.  Guarantor further agrees that its liability under this Guaranty shall be primary and that in any right of action which may accrue to Owner under the Lease, Owner may, at its option, proceed against Guarantor and Tenant, or may proceed against either Guarantor or Tenant without having commenced any action against or having obtained any judgment against Tenant or Guarantor.

Dated, _____

_____ Guarantor
Name:

_____ Address

STATE OF NEW YORK              )
                               ) ss.:
COUNTY OF                      )

On the ____ day of _____ in the year _____, before me, the undersigned, a Notary Public in and said State of New York, _____ personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

_____ Guarantor

Name:

_____ Address

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF                  )

On the _____ day of _____ in the year _____, before me, the undersigned, a Notary Public in and said State of New York, _____ personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Apartment    _____

Premises    _____

Tenant    _____

Expires

 STANDARD FORM OF APARTMENT 

# Lease

### The Real Estate Board of New York, Inc.

Copyright 2019.  All Rights Reserved.  Reproduction in whole or in part prohibi

RENEWAL LEASE FORM

Owners and Tenants should read **INSTRUCTIONS TO OWNER** and **INSTRUCTIONS TO TENANT**
on reverse side before filling out or signing this form

**THIS IS A NOTICE FOR RENEWAL OF LEASE AND RENEWAL LEASE FORM ISSUED UNDER SECTION 2523.5(a) OF
THE RENT STABILIZATION CODE. ALL COPIES OF THIS FORM MUST BE SIGNED BELOW AND RETURNED TO YOUR
LANDLORD WITHIN 60 DAYS.**

Dated: _____ 20_____

Tenant's Name(s) and Address: _____        Owner's /Agent's Name and Address: _____

1. **The owner hereby notifies you that your lease
   will expire on:** _____

| PART A - OFFER TO TENANT TO RENEW |
|---|

2. **You may renew this lease, for one or two years, at your option, as follows:**

| Column A Renewal Term | Column B Legal Rent on Sept.30th Preceding Commencement Date of this Renewal Lease | Column C Guideline % or Minimum $ Amount (If unknown, check box and see below)* | Column D Applicable Guideline Supplement, if any | Column E Lawful Rent Increase, if any, Effective after Sept. 30th | Column F New Legal Rent (If a lower rent is to be charged, check box and see item 5 below) |
|---|---|---|---|---|---|
| 1 Year | $_____ | (      %) $_____ | $_____ | $_____ | $_____ ** |
| 2 Years | Same as above | (      %) $_____ | $_____ | $_____ | $_____ |

* If applicable guideline rate is unknown at time offer is made, check box in Column C and enter current guideline which will be
  subject to adjustment when rates are ordered.
** Rent Guidelines Board Order #53 applies to leases commencing between 10/1/21 and 9/30/22. The one (1) year lease guideline
  increase cannot be applied until the final six (6) months of the lease. There is no guideline increase in the first six (6) months.

3. **Security Deposit:** *** Collectable after the sixth (6) month of a one-year lease renewal.

   Current Deposit: $_____          Additional Deposit Required – 1 year lease:  $_____ ***
                                             Additional Deposit Required – 2 year lease:  $_____

4. **Specify separate charges, if applicable:**
   a. Air conditioner : $_____     c.  421a (2.2%):   $_____     **Total separate charges:** $_____
   b. Appliances      : $_____     d.  Other:         $_____

5. **Lower Rent to be charged, if any.**  1 year lease $_____ , 2 year lease $_____   Agreement attached:  Yes [  ]  No [  ]

6. **Tenant shall pay a monthly rent (enter amount from 2F or 5) of** $_____ **for a 1 year renewal or** $_____ **for a
   2 year renewal, plus total separate charges (enter amount from 4) $**_____ **for a total monthly payment of
   $**_____ **for a 1 year renewal  or $**_____ **for a 2 year renewal.**

7. This renewal lease shall commence on _____, which shall not be less than 90 days nor more than 150 days from the
   date of mailing or personal delivery of this Renewal Lease Form. This Renewal Lease shall terminate on _____ (1 year
   lease) or _____ (2 year lease).

8. This renewal lease is based on the same terms and conditions as your expiring lease.  (See instructions about additional provisions.)

9. SCRIE and DRIE. Owner and Tenant acknowledge that, as of the date of this renewal, Tenant is entitled to pay a reduced monthly rent in
   the amount of $_____ under the New York City SCRIE program or the New York City DRIE program. The reduced rent may
   be adjusted by orders of such program.

10. **Leased premises does** [  ] **, does not** [  ] **have an operative sprinkler system.** If operative, it was last maintained and inspected
    on _____ .

**This form becomes a binding lease renewal when signed by the owner below and returned to the tenant. A rider setting forth the
rights and obligations of tenants and owners under the Rent Stabilization Law must be attached to this lease when signed by the
owner and returned to the tenant. The rent, separate charges and total payment provided for in this renewal lease may be increased
or decreased by order or annual updates of the Division of Housing and Community Renewal (DHCR) or the Rent Guidelines Board
(RGB).**

| PART B - TENANT'S RESPONSE TO OWNER |
|---|

Tenant: Check and complete where indicated one of three responses below after reading instructions on reverse side. Then date and sign
your response below. You must return this Renewal Lease Form to the owner in person or by regular mail, within 60 days of the date this
Notice was served upon you by the owner. Your failure to do so may be grounds for the commencement of an action by the owner to evict
you from your apartment.

[  ] I (we), the undersigned Tenant(s), accept the offer of a **one (1) year** renewal lease at a monthly rent of $_____ , plus
     separate charges of $_____ for a total monthly payment of $_____ . **No rent increase in the first six (6) months.
[  ] I (we), the undersigned Tenants(s), accept the offer of a **two (2) year** renewal lease at a monthly rent of $_____ , plus
     separate charges of $_____ for a total monthly payment of $_____ .
[  ] I (we) will not renew my (our) lease and I (we) intend to vacate the apartment on the expiration date of the current lease.

                                             Tenant's Signature(s): _____

Dated: _____ 20_____

Dated: _____ 20_____          Owner's Signature(s): _____

RTP-8  (6/21)

## INSTRUCTIONS TO OWNER

At least two copies of this completed Renewal Lease Form must be mailed to the tenant in occupancy or personally delivered not more than 150 days and not less than 90 days prior to the end of the tenant's lease term, along with the New York City Lease Rider For Rent Stabilized Tenants.

If the owner offers a Renewal Lease less than 90 days prior to the expiration of the existing lease, the lease term selected by the tenant shall begin at the tenant's option either (1) on the date a renewal lease would have begun had a timely offer been made or (2) on the first rent payment date occurring no less than 90 days after the date that the owner does offer the lease to the tenant. The guidelines rate applicable for such lease shall be no greater than the rate in effect on the commencement date of the lease for which a timely offer should have been made, and the increased rental shall not begin before the first rent payment date occurring no less than 90 days after such offer is made.

The owner must fully complete PART A on the reverse side of this Form explaining how the new rent has been computed. Any rent increase must not exceed the applicable Rent Guidelines Board adjustment(s) plus other adjustments authorized by the Rent Stabilization Code.

Tenants that were paying a preferential rent as of June 14, 2019 or thereafter, retain the preferential rent for the life of the tenancy. Rent Guidelines Board increases and other increases allowed by the Rent Stabilization Law are to be applied to the preferential rent.

This Renewal Lease must be offered on the same terms and conditions as the expiring lease, except for such additional provisions as are permitted by law or the Rent Stabilization Code which must be set forth by the owner and attached to this Form. If there are any additional lawful agreements between the owner and tenant, a copy signed by both parties must be attached to this Form.

The tenant must return to the owner all copies of this Form, completed and signed by the tenant in PART B on the reverse side of this Form.

The owner must furnish the tenant with a fully executed copy of this Renewal Lease Form bearing the tenant's and owner's signatures in PART B, and a copy of the DHCR New York City Lease Rider, within 30 days of the owner's receipt of this Form signed by the tenant. Service of this fully executed Form, upon the tenant, constitutes a binding renewal lease. If the owner fails to furnish the tenant with a fully executed copy of this Form within 30 days of receipt of the Form signed by the tenant, the tenant shall continue to have all rights afforded by the Rent Stabilization Law and Code, and the owner will be barred from commencing any action or proceeding against the tenant based upon non-renewal of lease.

## INSTRUCTIONS TO TENANT
### (Read Owner's and Tenant's Instructions carefully before completing this Renewal Lease Form)

If you wish to accept this offer to renew your lease, you must complete and sign this Renewal Lease Form in the space provided in PART B on the reverse side of this Form, and you must return all copies of the signed Lease Form to the owner in person or by regular mail within 60 days of the date this Form was served upon you. You may wish to make a copy for your own records. If you do not sign and return this Renewal Lease Form within the prescribed 60-day period, the owner may have grounds to start proceedings to evict you from your apartment.

Before you complete and sign PART B and return this Renewal Lease Form, be sure to check that all lawful provisions and written agreements have been attached by the owner to this Form. Please read all attachments carefully. If such other lawful provisions appear, they are part of this lease renewal offer and renewal lease. If there are any lawful agreements between you and the owner, attached copies must be signed by both parties.

If the owner agrees to a rent which is lower than the legal regulated rent, this lower amount should be entered in item 5 on the reverse side of this Form, and a signed copy of the agreement should be attached. You may not change the content of this Renewal Lease Form without the owner's written consent. If a "lower rent" amount is listed in item 5 and such rent is a "preferential rent," upon renewal the owner may **not** increase the rent to the legal rent listed in item 2F. Tenants that were paying a preferential rent as of June 14, 2019, retain the preferential rent for the life of the tenancy. Rent Guidelines Board increases and other increases allowed by the Rent Stabilization Law are to be applied to the preferential rent.

Your acceptance of this offer to renew shall constitute a renewal of the present lease for the term of years and rent accepted, subject to any other lawful changes which appear in writing on the attachments to this Form, and subject also to payment of the new rent and additional security, if any. Such additional security shall be deposited by the owner in the manner provided for on initial occupancy. However, pursuant to the Housing Stability and Tenant Protection Act of 2019, an owner can hold no more than one month security deposit. Anything in excess of one month must be refunded to the tenant.

Please refer to the New York City Lease Rider for a summary of tenants' rights and owners' responsibilities.

State of New York
Division of Housing and Community Renewal
Office of Rent Administration/Gertz Plaza
92-31 Union Hall Street
Jamaica, New York 11433
**Web Site: www.hcr.ny.gov**

RTP-8 (6/21)

# HPD PERMANENTLY AFFORDABLE

# INCLUSIONARY HOUSING PROGRAM

# RIDER TO LEASE AGGREEMENT

## (Affordable Units Only)


This Rider shall be attached to and form a part of the lease or lease renewal ("Lease"), dated
_____ between _____ ("Owner") and _____
as tenant(s) of apartment # ____ in building at _____.

Tenant(s) has/have signed and delivered to Owner the Lease referenced above.  Owner and Tenant(s)
acknowledge and agree that:

A. THIS RIDER IS SUBJECT TO THE TERMS OF THE VOLUNTARY  INCLUSIONARY HOUSING ("VIH ')
REGULATORY AGREEMENT ENTERED INTO BY THE NEW YORK CITY DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT ("HPD") AND SIGNED BY THE OWNER, AND, TO THE TERMS
OF THE  421-a RESTRICTIVE DECLARATION APPROVED BY HPD AND SIGNED BY THE OWNER

B. IF THERE IS ANY CONFLICT BETWEEN THE TERMS OF THIS RIDER AND THE TERMS OF THE
VIH REGULATORY AGREEMENT    AND THE TERMS OF ANY ADDITIONAL RESTRICTIVE
DECLARATION, AND, ANY ADDITIONAL REGULATORY AGREEMENTS, THEN THE MORE
RESTRICTIVE REQUIREMENTS WILL APPLY.

C. PURSUANT TO THE HPD VIH REGULATORY AGREEMENT    ,ALL INCLUSIONARY HOUSING UNITS
SHALL BE PERMANENTLY AFFORDABLE, RENT STABILIZED UNITS. THE RENT STABILIZED RENTS
FOR SUCH UNIT SHALL NOT EXCEED 30% OF THE QUALIFYING INCOME LEVEL.

D. TENANT ACKNOWLEDGES THAT HE OR SHE HAS BEEN INFORMED OF OWNER'S RIGHT TO
INCLUDE THIS RIDER IN THE LEASE.

*Form Updated September 2018*

II. CONFIRMATION

By signing below, the parties confirm that they have read, understand and agree to all of the Rider terms and requirements.  If more than one person is a tenant under the Lease, each tenant shall sign below.

TENANT(S)

BY:

NAME:

TITLE:

OWNER: _____

BY: _____

## ATTACHMENT N-1

## PRE-LEASE ACKNOWLEDGEMENT AND CERTIFICATION

PROJECT NAME/ADDRESS:_____

TENANT NAME: _____    Unit Number: _____

I fully understand and comprehend that the lease I am about to sign is for the unit referenced above and that this unit participates in a governmentally assisted affordable housing program.

I fully understand and comprehend that this unit must be my only primary residence and that I may not simultaneously maintain another primary residential lease in my name or otherwise maintain another primary residence.

I understand that this restriction applies to any other primary residence.  I further understand that to simultaneously maintain multiple leases for, or to otherwise simultaneously reside in, more than one governmentally assisted unit is an especially egregious violation of this requirement.

I fully understand that any form of subletting or assignment of my lease in this affordable housing program is strictly prohibited and unlawful.

I understand that violating the above requirement will have consequences which may include the loss of the apartment(s) and lease(s) in question, in addition to potential criminal charges.

In addition to certifying my acceptance of the above requirements, and in further addition to the statements included in the governing lease documents I am about to sign for this apartment, I again hereby certify that all information I have provided during the application and verification process to qualify for this program has been complete and accurate.  This includes, without limitation, all information pertaining to the members of the household who will reside in the unit and the employment income and all other income and assets for each such household member.  I have not withheld, falsified or otherwise misrepresented any information.  I fully understand that my file in its entirety is subject to both review by The New York City Department of Housing Preservation and Development (HPD) and audit by The New York City Department of Investigation (DOI). DOI is a fully empowered law enforcement agency of The City of New York, which investigates potential fraud in HDC and HPD-financed housing developments and other governmentally sponsored programs.  I understand that the consequences for providing false or incomplete information to qualify for this program may include the termination of my lease in addition to potential criminal charges.

I hereby certify that I fully understand and agree to all of the above.

Signed by All Adult Household Members:

_____        _____        _____
Name                                                      Signature                                               Date


_____        _____        _____
Name                                                      Signature                                               Date

ATTACHMENT N: PRE-LEASE ACKNOWLEDGEMENT AND CERTIFICATION

_____    _____    _____

Name                                    Signature                               Date

_____    _____    _____

Name                                    Signature                               Date



## Amenities Membership Terms and Conditions

**NATURE OF MEMBERSHIP:**

- Membership is a non-transferable right, offered to residents of Denizen bshwk only.
- Membership can only be terminated by tenant after 6 months.
- Tenants must have a zero dollar rental balance in order to participate in any of the membership packages offered.
- Guests' use of any amenities, are only permitted with prior written consent from management.
- If a member allows anyone to use the facility without prior permission, management reserves the right to deactivate the key and there will be a $100 reactivation fee.

**CONDUCT/DAMAGES:**

- Denizen bshwk is committed to the health, safety, and welfare of each of its residents/members and will not tolerate unreasonable, threatening, obscene, harassing, indecent or illegal behavior.

- Members who do not observe Denizen bshwk' rules and regulations or who abuse equipment in any fashion will be asked to leave.

- Denizen bshwk has the right to judge behavior and respond accordingly. This right includes, but is not limited to termination of a membership without refund to any member engaging in unacceptable behavior. The member shall pay for any damages Denizen bshwk property which results from the willful or negligent conduct of any member, member's guest, or member's dependent child.

- Not all rules and regulations are listed in this agreement. Denizen bshwk reserves the right to add, change or remove rules, conditions of membership, opening and closing hours, and all services and facilities offered by Denizen bshwk.

### Pricing: $100 per person

**Building Y:**

- Outdoor Games
- Game Room
- Zen Gardens
- Waterfall
- Courtyards
- Library

- Mini Golf
- Beer Brewery
- Wine Storage
- Tenant Lounge
- Kids Room Featuring rock climbing
- Kids Outdoor Playground
- Chef Kitchen
- Conference Room
- Art Gallery in Common Area
- Co-working space
- Green Market Area
- Dog park
- Rooftop
- Grills

**Building X:**

- Seven different Gyms (Cross-fit, Boxing, Cardio, Yoga, Spin/Cycling, Rock Climbing, & Weight lifting).
- Golf Simulator Room
- Indoor Pool
- Indoor/Outdoor Jacuzzi
- Resident Bar and Lounge
- Arcade Room
- Rooftop
- Grills
- Card Game Room
- Courtyards
- Bowling Alley
- Movie Theater

**Please initial if purchasing amenities membership:**

Building X & Y for a monthly fee of $100 per person   Initial: _____     Initials: _____     Initials: _____

**Tenant agrees that they have read and agree to all terms and conditions listed above.**


_____                    _____

Signature                                             Date


_____                    _____

Signature                                             Date


_____                    _____

Signature                                             Date

## §421-A RIDER TO LEASE AGREEMENT
## (25 YEAR 421-A BENEFITS)
## AFFORDABLE UNITS

| | |
|---|---|
| **LEASE DATED:** _____ | **OWNER:** _____ |
| **APARTMENT:** _____ in BUILDING at **54 Noll Street, Brooklyn, NY** _____ | |
| **TENANT:** _____ | |

Tenant ("You") are about to sign and deliver to Owner a Lease or a Lease Renewal (the "Lease") for the Apartment in the Building indicated above, dated as of the date shown above. In order to induce Owner to sign the Lease and rent the Apartment to You, You acknowledge and agree that:

**I.      NOTICE REGARDING EXPIRATION OF RENT STABILIZATION & § 421-A TAX BENEFITS**

**THE LEASE IS SUBORDINATE TO THE TERMS OF A CERTAIN § 421-A RESTRICTIVE DECLARATION EXECUTED OR TO BE EXECUTED BY OWNER (THE "§ 421-A RESTRICTIVE DECLARATION").  THE § 421-A RESTRICTIVE DECLARATION IMPOSES CERTAIN CONDITIONS ON OWNER UNTIL IT TERMINATES ON A DATE WHICH IS [THIRTY-FIVE (35) YEARS] FROM THE DATE OF COMPLETION OF CONSTRUCTION (COMMENCING ON THE ISSUANCE OF THE EARLIER OF (A) THE FIRST TEMPORARY CERTIFICATE OF OCCUPANCY FOR ALL RESIDENTIAL AREAS IN THE BUILDING OR (B) A PERMANENT CERTIFICATE OF OCCUPANCY FOR THE ENTIRE BUILDING). THIS PERIOD IS CALLED THE "RESTRICTION PERIOD."  OWNER IN GOOD FAITH BELIEVES THAT THE RESTRICTION PERIOD WILL END ON OR ABOUT AUGUST 16, 2053.**

**PURSUANT TO THE § 421-A RESTRICTIVE DECLARATION, THE APARTMENT IS SUBJECT TO THE RENT STABILIZATION LAW ("RSL") AND CODE ("CODE"). THE COLLECTIBLE RENTS FOR THIS AFFORDABLE UNIT SHALL NOT EXCEED 30% OF 60% OF AREA MEDIAN INCOME ("AMI") DURING THE RESTRICTION PERIOD ("PERMITTED RENT").  TENANTS HOLDING A LEASE AND IN OCCUPANCY AT THE EXPIRATION OF THE RESTRICTION PERIOD SHALL HAVE A RIGHT TO REMAIN AS RENT STABILIZED TENANTS FOR THE DURATION OF THEIR OCCUPANCY.  FOLLOWING THE EXPIRATION OF THE RESTRICTIVE PERIOD, TENANTS IN OCCUPANCY MAY BE CHARGED A RENT IN EXCESS OF THE PERMITTED RENT, UP TO AND INCLUDING THE LEGAL REGULATED RENT, AS PERMITTED BY THE RSL AND CODE.  ONCE A LAWFUL TENANT IN OCCUPANCY OF THE APARTMENT VOLUNTARILY VACATES AFTER THE EXPIRATION OF THE RESTRICTION PERIOD, THE APARTMENT**

WILL NO LONGER BE SUBJECT TO RENT STABILIZATION.

FURTHER, OWNER HAS OBTAINED OR EXPECTS TO OBTAIN REAL ESTATE TAX EXEMPTION BENEFITS PURSUANT TO REAL PROPERTY TAX LAW SECTION 421-A ("§ 421-A") FOR A TERM OF 25 YEARS.  OWNER IN GOOD FAITH BELIEVES THAT THE § 421-A TAX BENEFITS WILL EXPIRE ON OR ABOUT JUNE 30, YEAR.  UPON THE EXPIRATION OF THE LEASE IN EFFECT WHEN THE § 421-A TAX BENEFITS END, THE APARTMENT WILL REMAIN RENT STABILIZED, FOR SO LONG AS REQUIRED BY THE § 421-A RESTRICTIVE DECLARATION.  AS SET FORTH IN THE § 421-A RESTRICTIVE DECLARATION, THE APARTMENT WILL REMAIN SUBJECT TO THE RSL AND CODE UNTIL THE LAWFUL TENANT VOLUNTARILY VACATES THE APARTMENT AFTER THE EXPIRATION OF THE RESTRICTIVE PERIOD.

THE LEGAL REGULATED RENT OF THE APARTMENT WILL BE SUBJECT TO PERIODIC RENT INCREASES, AS PERMITTED BY THE RSL AND CODE AND AS APPROVED BY THE RENT GUIDELINES BOARD ("RGB").  HOWEVER, THE ACTUAL RENT CHARGED DURING THE RESTRICTIVE PERIOD WILL BE SUBJECT TO THE PERMITTED RENT.  ANY INCREASES IN THE LEGAL REGULATED RENT GRANTED BY THE RSL, CODE, AND RGB SHALL BE MADE TO THE LEGAL REGULATED RENT SHOWN IN THE ORIGINAL LEASE OR THE MOST RECENT LEASE RENEWAL NOTICE AS APPLICABLE.

TENANT ACKNOWLEDGES THAT HE OR SHE HAS BEEN INFORMED OF OWNER'S RIGHT TO INCLUDE THIS PROVISION IN THE LEASE.

TENANT UNDERSTANDS AND AGREES THAT LANDLORD'S DETERMINATION THAT TENANT QUALIFIES AS AN ELIGIBLE TENANT (AS MORE SPECIFICALLY SET FORTH IN PARAGRAPH 3(C) HEREOF)  IS BASED SOLELY UPON THE STATEMENTS, REPRESENTATIONS, CERTIFICATIONS, AND VERIFICATION DOCUMENTATION GIVEN TO LANDLORD BY OR ON BEHALF OF  TENANT, INCLUDING BUT NOT LIMITED TO A COPY OF TENANT'S MOST RECENTLY FILED FEDERAL INCOME TAX RETURN AND SUCH THIRD-PARTY INCOME VERIFICATION OR OTHER PROOF AND DOCUMENTATION REASONABLY REQUIRED BY LANDLORD UNDER APPLICABLE LAW AND PROGRAM RULES PURSUANT TO PARAGRAPHS 3(B) AND 5 HEREOF.  TENANT HEREBY AFFIRMS THAT THE STATEMENTS, REPRESENTATIONS, CERTIFICATIONS, AND VERIFICATION DOCUMENTATION PROVIDED TO LANDLORD BY OR ON BEHALF OF TENANT ARE TRUTHFUL AND ACCURATE.  TENANT ACKNOWLEDGES AND AGREES THAT ANY FALSE, FRAUDULENT, MISLEADING, OR INCOMPLETE STATEMENT, REPRESENTATION, CERTIFICATION, DOCUMENTATION, OR OTHER INFORMATION MADE OR FURNISHED BY OR ON BEHALF OF TENANT IN CONNECTION WITH TENANT'S APPLICATION FOR THE APARTMENT, TENANT'S INITIAL CERTIFICATION OF ELIGIBILITY, OR ANY RECERTIFICATION OF ELIGIBILITY, SHALL CONSTITUTE MATERIAL NONCOMPLIANCE UNDER THE LEASE, IN WHICH

EVENT THE LEASE SHALL BE SUBJECT TO RESCISSION OR TERMINATION BY LANDLORD AND TENANT SHALL BE SUBJECT TO EVICTION.

SUBLETTING OR ASSIGNMENT OF THE LEASE OR TENANT'S RIGHTS UNDER THE LEASE IS PROHIBITED BY LAW, SINCE OCCUPANCY OF THE APARTMENT IS GOVERNED BY THE REQUIREMENTS OF THE CODE AND RELATED REGULATIONS AS WELL AS THE PROVISIONS OF THE REGULATORY AGREEMENT AND/OR RESTRICTIVE DECLARATION.  THE PROVISIONS OF THIS RIDER WITH REGARD TO ASSIGNMENT OR SUBLETTING WILL SUPERSEDE, PREVAIL OVER, AND PRE-EMPT ANYTHING TO THE CONTRARY CONTAINED IN THE LEASE, INCLUDING, WITHOUT LIMITATION, THE "RENT STABILIZATION LEASE RIDER" PROVIDED TO TENANT AS PART OF THE LEASE. VIOLATION OF THE PROVISIONS OF THIS PARAGRAPH SHALL CONSTITUTE A MATERIAL BREACH OF THE LEASE WHICH BREACH SHALL BE GROUNDS FOR TERMINATION OF THIS LEASE BY LANDLORD AND EVICTION OF TENANT.

## II.    YOUR CONFIRMATION

By signing this Rider below, You confirm that You have read and understand this Rider, and that you agree to all of its terms and requirements. If more than one person is a tenant under the Lease, each of us signing below, acknowledges, represents and agrees with the foregoing.

TENANT:

By: _____        By: _____
Name: _____        Name: _____


OWNER:

By: _____
Name: _____
Title: _____

# §421-A RIDER TO LEASE AGREEMENT
## (25 YEAR 421-A BENEFITS)
## AFFORDABLE UNITS

| | |
|---|---|
| **LEASE DATED:** _____ | **OWNER:** _____ |
| **APARTMENT:** \_\_\_\_\_ in BUILDING at **123 Melrose Street, Brooklyn, NY** | |
| **TENANT:** _____ | |

Tenant ("You") are about to sign and deliver to Owner a Lease or a Lease Renewal (the "Lease") for the Apartment in the Building indicated above, dated as of the date shown above. In order to induce Owner to sign the Lease and rent the Apartment to You, You acknowledge and agree that:

I.    **NOTICE REGARDING EXPIRATION OF RENT STABILIZATION & § 421-A TAX BENEFITS**

**THE LEASE IS SUBORDINATE TO THE TERMS OF A CERTAIN § 421-A RESTRICTIVE DECLARATION EXECUTED OR TO BE EXECUTED BY OWNER (THE "§ 421-A RESTRICTIVE DECLARATION"). THE § 421-A RESTRICTIVE DECLARATION IMPOSES CERTAIN CONDITIONS ON OWNER UNTIL IT TERMINATES ON A DATE WHICH IS [THIRTY-FIVE (35) YEARS] FROM THE DATE OF COMPLETION OF CONSTRUCTION (COMMENCING ON THE ISSUANCE OF THE EARLIER OF (A) THE FIRST TEMPORARY CERTIFICATE OF OCCUPANCY FOR ALL RESIDENTIAL AREAS IN THE BUILDING OR (B) A PERMANENT CERTIFICATE OF OCCUPANCY FOR THE ENTIRE BUILDING). THIS PERIOD IS CALLED THE "RESTRICTION PERIOD." OWNER IN GOOD FAITH BELIEVES THAT THE RESTRICTION PERIOD WILL END ON OR ABOUT JUNE 18, 2054.**

**PURSUANT TO THE § 421-A RESTRICTIVE DECLARATION, THE APARTMENT IS SUBJECT TO THE RENT STABILIZATION LAW ("RSL") AND CODE ("CODE"). THE COLLECTIBLE RENTS FOR THIS AFFORDABLE UNIT SHALL NOT EXCEED 30% OF 60% OF AREA MEDIAN INCOME ("AMI") DURING THE RESTRICTION PERIOD ("PERMITTED RENT"). TENANTS HOLDING A LEASE AND IN OCCUPANCY AT THE EXPIRATION OF THE RESTRICTION PERIOD SHALL HAVE A RIGHT TO REMAIN AS RENT STABILIZED TENANTS FOR THE DURATION OF THEIR OCCUPANCY. FOLLOWING THE EXPIRATION OF THE RESTRICTIVE PERIOD, TENANTS IN OCCUPANCY MAY BE CHARGED A RENT IN EXCESS OF THE PERMITTED RENT, UP TO AND INCLUDING THE LEGAL REGULATED RENT, AS PERMITTED BY THE RSL AND CODE. ONCE A LAWFUL TENANT IN OCCUPANCY OF THE APARTMENT VOLUNTARILY VACATES AFTER THE EXPIRATION OF THE RESTRICTION PERIOD, THE APARTMENT**

Errorl Unknown op code for conditional.

WILL NO LONGER BE SUBJECT TO RENT STABILIZATION.

FURTHER, OWNER HAS OBTAINED OR EXPECTS TO OBTAIN REAL ESTATE TAX EXEMPTION BENEFITS PURSUANT TO REAL PROPERTY TAX LAW SECTION 421-A ("§ 421-A") FOR A TERM OF 25 YEARS.  OWNER IN GOOD FAITH BELIEVES THAT THE § 421-A TAX BENEFITS WILL EXPIRE ON OR ABOUT JUNE 30, YEAR.  UPON THE EXPIRATION OF THE LEASE IN EFFECT WHEN THE § 421-A TAX BENEFITS END, THE APARTMENT WILL REMAIN RENT STABILIZED, FOR SO LONG AS REQUIRED BY THE § 421-A RESTRICTIVE DECLARATION.  AS SET FORTH IN THE § 421-A RESTRICTIVE DECLARATION, THE APARTMENT WILL REMAIN SUBJECT TO THE RSL AND CODE UNTIL THE LAWFUL TENANT VOLUNTARILY VACATES THE APARTMENT AFTER THE EXPIRATION OF THE RESTRICTIVE PERIOD.

THE LEGAL REGULATED RENT OF THE APARTMENT WILL BE SUBJECT TO PERIODIC RENT INCREASES, AS PERMITTED BY THE RSL AND CODE AND AS APPROVED BY THE RENT GUIDELINES BOARD ("RGB").  HOWEVER, THE ACTUAL RENT CHARGED DURING THE RESTRICTIVE PERIOD WILL BE SUBJECT TO THE PERMITTED RENT.  ANY INCREASES IN THE LEGAL REGULATED RENT GRANTED BY THE RSL, CODE, AND RGB SHALL BE MADE TO THE LEGAL REGULATED RENT SHOWN IN THE ORIGINAL LEASE OR THE MOST RECENT LEASE RENEWAL NOTICE AS APPLICABLE.

TENANT ACKNOWLEDGES THAT HE OR SHE HAS BEEN INFORMED OF OWNER'S RIGHT TO INCLUDE THIS PROVISION IN THE LEASE.

TENANT UNDERSTANDS AND AGREES THAT LANDLORD'S DETERMINATION THAT TENANT QUALIFIES AS AN ELIGIBLE TENANT (AS MORE SPECIFICALLY SET FORTH IN PARAGRAPH 3(C) HEREOF)  IS BASED SOLELY UPON THE STATEMENTS, REPRESENTATIONS, CERTIFICATIONS, AND VERIFICATION DOCUMENTATION GIVEN TO LANDLORD BY OR ON BEHALF OF  TENANT, INCLUDING BUT NOT LIMITED TO A COPY OF TENANT'S MOST RECENTLY FILED FEDERAL INCOME TAX RETURN AND SUCH THIRD-PARTY INCOME VERIFICATION OR OTHER PROOF AND DOCUMENTATION REASONABLY REQUIRED BY LANDLORD UNDER APPLICABLE LAW AND PROGRAM RULES PURSUANT TO PARAGRAPHS 3(B) AND 5 HEREOF.  TENANT HEREBY AFFIRMS THAT THE STATEMENTS, REPRESENTATIONS, CERTIFICATIONS, AND VERIFICATION DOCUMENTATION PROVIDED TO LANDLORD BY OR ON BEHALF OF TENANT ARE TRUTHFUL AND ACCURATE.  TENANT ACKNOWLEDGES AND AGREES THAT ANY FALSE, FRAUDULENT, MISLEADING, OR INCOMPLETE STATEMENT, REPRESENTATION, CERTIFICATION, DOCUMENTATION, OR OTHER INFORMATION MADE OR FURNISHED BY OR ON BEHALF OF TENANT IN CONNECTION WITH TENANT'S APPLICATION FOR THE APARTMENT, TENANT'S INITIAL CERTIFICATION OF ELIGIBILITY, OR ANY RECERTIFICATION OF ELIGIBILITY, SHALL CONSTITUTE MATERIAL NONCOMPLIANCE UNDER THE LEASE, IN WHICH

EVENT THE LEASE SHALL BE SUBJECT TO RESCISSION OR TERMINATION BY
LANDLORD AND TENANT SHALL BE SUBJECT TO EVICTION.

SUBLETTING OR ASSIGNMENT OF THE LEASE OR TENANT'S RIGHTS UNDER
THE LEASE IS PROHIBITED BY LAW, SINCE OCCUPANCY OF THE APARTMENT
IS GOVERNED BY THE REQUIREMENTS OF THE CODE AND RELATED
REGULATIONS AS WELL AS THE PROVISIONS OF THE REGULATORY
AGREEMENT AND/OR RESTRICTIVE DECLARATION.    THE PROVISIONS OF
THIS RIDER WITH REGARD TO ASSIGNMENT OR SUBLETTING WILL
SUPERSEDE, PREVAIL OVER, AND PRE-EMPT ANYTHING TO THE CONTRARY
CONTAINED IN THE LEASE, INCLUDING, WITHOUT LIMITATION, THE "RENT
STABILIZATION LEASE RIDER" PROVIDED TO TENANT AS PART OF THE
LEASE. VIOLATION OF THE PROVISIONS OF THIS PARAGRAPH SHALL
CONSTITUTE A MATERIAL BREACH OF THE LEASE WHICH BREACH SHALL
BE GROUNDS FOR TERMINATION OF THIS LEASE BY LANDLORD AND
EVICTION OF TENANT.

## II.    YOUR CONFIRMATION

By signing this Rider below, You confirm that You have read and understand this Rider, and that
you agree to all of its terms and requirements. If more than one person is a tenant under the
Lease, each of us signing below, acknowledges, represents and agrees with the foregoing.

**TENANT:**

By: _____          By: _____
Name: _____          Name: _____

**OWNER:**

By: _____
Name: _____
Title: _____

Error! Unknown op code for conditional.

I. NOTICE REGARDING EXPIRATION OF RENT STABILIZATION - § 421-A 2.2% RENT INCREASES.

OWNER HAS OBTAINED OR EXPECTS TO OBTAIN REAL ESTATE TAX EXEMPTION BENEFITS PURSUANT TO REAL PROPERTY TAX LAW SECTION 421-A ("§ 421-A"). SOLELY AS A RESULT OF THIS, AS LONG AS OWNER RECEIVES § 421-A BENEFITS, THE APARTMENT WILL BE SUBJECT TO THE RENT STABILIZATION LAW ("RSL") AND CODE ("CODE"). UPON THE EXPIRATION OF THE LEASE IN EFFECT WHEN THE § 421-A TAX BENEFITS END, THE APARTMENT WILL NO LONGER BE RENT STABILIZED.

UNDER THE TERMS OF § 421-A, THE REGULATIONS PROMULGATED BY THE NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT AND THE RSL AND CODE, THERE IS A "GRADUAL DIMINUTION" OF THE § 421-A TAX BENEFITS. EFFECTIVE ON THE ANNIVERSARY DATE OF THE COMMENCEMENT OF THE INITIAL LEASE ISSUED TO YOU FOR THIS APARTMENT DURING THE FIRST YEAR OF SUCH GRADUAL DIMINUTION OF BENEFITS (THE "ANNIVERSARY DATE"), OWNER WILL BEGIN TO CHARGE AND COLLECT FROM YOU EACH MONTH AN AMOUNT EQUAL TO 2.2% OF THE APARTMENT'S ACTUAL MONTHLY RENT IN EFFECT AT THE COMMENCEMENT OF THE GRADUAL DIMINUTION PERIOD ("THE 2.2% RENT INCREASE"). THE FIRST YEAR OF GRADUAL DIMINUTION BEGINS IN THE 22nd YEAR OF PARTIAL TAX EXEMPTION BENEFITS, WHICH IS PROJECTED TO COMMENCE DURING THE CITY'S JULY 1, 2040 THROUGH JUNE 30, 2041 FISCAL YEAR. THUS, THE FIRST 2.2% RENT INCREASE IS PROJECTED TO START ON THE ANNIVERSARY DATE DURING THE JULY 1, 2041 THROUGH JUNE 30, 2042 FISCAL YEAR. THEREAFTER, THERE WILL BE A 2.2% RENT INCREASE ON EACH SUCCESSIVE ANNIVERSARY DATE. THESE 2.2% RENT INCREASES ARE IN ADDITION TO ANY OTHER RENT INCREASES THAT MAY BE PERMITTED UNDER RENT STABILIZATION.

§ 421-A PROVIDES THAT THE BUILDING WILL BE SUBJECT TO THE RENT STABILIZATION LAW FOR 25 YEARS, AND, UNLESS THE PRESENT LAWS ARE CHANGED, THE APARTMENT WILL ALSO BE SUBJECT TO STANDARD RENT INCREASES ON LEASE RENEWALS DURING SAID PERIOD, AS APPROVED BY THE RENT GUIDELINES BOARD. ANY INCREASES GRANTED BY THE RENT GUIDELINES BOARD SHALL BE MADE TO THE RENT SHOWN IN THE ORIGINAL LEASE OR THE MOST RECENT LEASE RENEWAL NOTICE AS APPLICABLE.

OWNER IN GOOD FAITH BELIEVES THAT THE § 421-A TAX BENEFITS WILL EXPIRE ON OR ABOUT JUNE 30, 2044. AFTER SUCH DATE, THE APARTMENT WILL NOT BE REGULATED AS TO THE AMOUNT OF RENT THAT MAY BE CHARGED FOR THE APARTMENT NOR WILL THE OWNER BE LEGALLY OBLIGATED TO RENEW THE LEASE. IF THE OWNER SHOULD ELECT TO RENEW THE LEASE AT THAT TIME, THE OWNER WILL NOT BE LEGALLY BOUND BY ANY GOVERNMENTAL RENT GUIDELINES AND MAY CHARGE AN UNREGULATED RENT.

TENANT ACKNOWLEDGES THAT HE OR SHE HAS BEEN INFORMED OF OWNER'S RIGHT TO INCLUDE THIS PROVISION IN THE LEASE.

## II. YOUR CONFIRMATION.

By signing this Rider below, You confirm that You have read and understand this Rider, and that You agree to all of its terms and requirements. If more than one person is a tenant under the Lease, each of us signing below, acknowledges, represents and agrees with the foregoing.

**TENANT:**

_____          _____

_____

Name:                                                                Name:


**OWNER:**

_____

By: _____

      Name:

## EARLY OCCUPANCY OF APARTMENT & CON ED AGREEMENT

**IN THE EVENT THAT THERE ARE ANY PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE INCONSISTENT WITH THE PROVISIONS CONTAINED IN THE BODY OF THE LEASE BETWEEN THE PARTIES, IT SHALL BE DEEMED TO BE THE INTENT OF THE PARTIES HERETO THAT THE PROVISIONS CONTAINED IN THIS AGREEMENT SUPERSEDE ANY INCONSISTENT PROVISIONS THEREIN SUCH THAT SAID LEASE IS DEEMED MODIFIED HEREBY.**

**AGREEMENT**, made as of _____, 20___, between _____ ("Licensor"), with offices at _____, New York, NY, and _____ ("Licensee").

**WHEREAS**, pursuant to a certain lease dated _____, 20___, (hereinafter "the Lease") Licensee will be the tenant of Apartment _____ (the "Apartment") at _____, New York, NY ("Subject Building") commencing on _____, 20___ ("the commencement date"); and

**WHEREAS**, notwithstanding the commencement date of the Lease and the commencement date of Licensee's tenancy thereunder, in order to facilitate Licensee's move and transition to the Apartment, Licensor has agreed to permit Licensee to enter into occupancy of the Apartment prior to said commencement date solely as an accommodation to Tenant and predicated upon the execution and binding nature of the Lease.

**WHEREAS**, in consideration of the foregoing and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Licensor hereby grants permission to the Licensee to occupy the Apartment effective _____, 20___.

2.    The License shall be for a term commencing _____, 20___ and expiring on the Lease commencement date.

3.    The occupancy of the Licensee at the Apartment prior to the commencement date of the Lease shall be as the Licensee of Licensor.

4.    It is expressly understood that Licensee has entered into this License Agreement with Licensor predicated solely as an incident of the Licensee's having entered into a Lease for the Apartment.  Absent the Licensee's having leased the Apartment, Licensor would not have offered or executed this Licensee agreement with the Licensee.

5.    It is expressly understood and agreed that the occupancy by the Licensee pursuant to this License Agreement is exempt from and is not covered by the Rent Stabilization Law, the Rent Stabilization Code, the City Rent Law or the Rent and Eviction Regulations and that such rights, if any, only come into effect upon the commencement of a landlord/tenant relationship.

6.    Licensee shall use and occupy the apartment for its residential purposes only and for no other purpose and by no other person.  Licensee specifically agrees that only the

Licensee and such other persons, if any, as are authorized to occupy the apartment under the Lease may use the apartment.

7.   Licensee for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this agreement, nor assign, underlet, sublet or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of the of Licensor in each instance.   Said consent of Licensor can be unreasonably withheld.   If the Licensee assigns or sublets, its right to occupancy of the apartment, the license shall end and expire immediately upon such attempted assignment or sublease.

8.   Licensee has examined the Apartment and accepts it in its present condition.

9.   Predicated upon Licensee's representation as to Licensee's intention to honor and proceed with the Lease on its commencement date, Licensor agrees to waive Licensee's payment of a fee for the use and occupancy for of the Apartment during this license period. However, in the event that Licensee fails to honor and proceed with the Lease on its commencement date, then Licensee shall be liable to Licensor Licensee's use and occupancy of the Apartment in the sum equal to the monthly rent under the Lease, and Licensee shall continue to be liable for said sum until Licensor re-lets the Apartment.   The waiver of payment during the license period is solely for said license and does not affect the rent due under the lease or any renewal thereof.

10.   Upon the commencement of the License, Licensee shall open an account for electric service and shall be fully liable for all electric charges incurred.   If the opening of said account is after the date that the license commences, then Licensee shall be fully liable for all electric usage between the commencement of said license and the opening of the electric account by Licensee.

11.   Licensee agrees that Licensee shall be bound, during the term of this license, to all obligations, rules and regulations of the Lease for the Apartment, as if said Lease were applicable to the Apartment during the term of the License. It is hereby acknowledged that the Licensee has read and understands the Lease and this agreement and will not violate either in any way.

12.   Licensor may terminate Licensee's license to occupy the Apartment by giving Licensee a written ten (10) day notice to quit pursuant to RPAPL § 713 for any reason set forth in the Lease as a violation of tenancy or due to Licensee's failure to honor the Lease it has executed.

13.   It is specifically understood and agreed by and between the parties that the within Agreement is the result of extensive negotiations between the parties, such that both parties shall be deemed to have drawn these documents in order to avoid any negative inference by any court as against the preparer of the document.

14.   The parties hereto have caused this AGREEMENT to be executed as of the day and year recited below as the date signed by Licensor.

_____          _____, 20____
Licensee                                                    Date
_____          _____, 20____
Co-Licensee                                                Date

-2-

_____    _____, 20____
_____, Licensor    Date

## RIDER TO LEASE

**IN THE EVENT THAT THERE ARE ANY PROVISIONS CONTAINED IN THIS RIDER WHICH ARE INCONSISTENT WITH THE PROVISIONS CONTAINED IN THE BODY OF THE LEASE, IT SHALL BE DEEMED TO BE THE INTENT OF THE PARTIES HERETO THAT THE PROVISIONS CONTAINED IN THIS RIDER SUPERSEDE ANY INCONSISTENT PROVISIONS THEREIN SUCH THAT SAID LEASE IS DEEMED MODIFIED HEREBY.**

**IT IS HEREBY AGREED** this __ day of ____, 20___ by and between _____, (hereinafter "Owner"), owner of the premises known as and located at _____, New York ("Subject Premises") and _____ (hereinafter "Tenant"), as follows:

        1.     This Rider shall be deemed to be incorporated into and is made a part of the Lease dated _____, 20___, between Tenant and Owner ("the Lease"), regarding the renting of Apartment ____ ("the Apartment") at the Subject Premises.

        2.     As originally executed by the parties, the Lease was for the _____ year term commencing on _____ and expiring on _____ (the "Original Lease Term").

        3.     In lieu of executing the one or two year renewal lease offered by Owner, Tenant has voluntarily requested that it be permitted to remain in occupancy, as a month to month tenant, through _____, 20___ (the "Month to Month Term"). Owner has granted Tenant's request. The rent during this Month to Month Term shall remain at $_____ per month. Other than the modifications to the term described herein, the terms of the Lease shall be deemed to remain in full force and effect so as to govern the month to month tenancy.

        4.     The parties are deemed to have jointly drawn this Rider in order to avoid any negative inference against the preparer of the document. The covenants, agreements, terms, provisions and conditions contained in this Rider shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

        **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

_____
Tenant Signature

_____
Co-Tenant Signature

_____, Owner

BY: _____

## TEMPORARY RENT CONCESSION RIDER

**IT IS HEREBY AGREED** this _____ day of _____, 20____, by and
between _____ ("Owner"), owner of the premises known as and located at
_____ ("subject premises") and _____ ("Tenant"),
tenant of Apartment_____ in the subject premises ("subject apartment") as follows:

      1.    The parties agree that the legal regulated rent for the subject apartment is
$_____ per month, as set forth in the Lease dated _____
(hereinafter the "Lease").

      2.    During the period commencing on _____ and
expiring on _____ (the "Temporary Concession Period"), subject to any lawful
adjustments, the legal regulated rent shall remain the sum set forth in ¶ 1 of this Rider. However,
the parties agree that during said Temporary Concession Period only the Tenant may tender and
the owner will temporarily accept a reduced amount of $_____ , per month, subject to any
lawful adjustments, in full payment and satisfaction of the monthly rent for the Temporary
Concession Period only.

      3.    Said concession is neither intended as a permanent rent reduction, nor is it
intended as a preference to govern throughout Tenant's tenancy.

      4.    It is acknowledged and agreed by the parties that the legal regulated rent for
any subsequent lease renewal may, in the Owner's sole discretion, be based upon the legal
regulated rent set forth in ¶ 1 of this Rider, subject to any lawful adjustments, or such lesser sum
as the Owner may elect, such that the owner's willingness and agreement to accept a temporarily
reduced rent shall have no effect upon the legal regulated rent, as such term is defined in the
Rent Stabilization Law and Code, and that the decision as to whether any temporary concession
is granted on any subsequent renewal lease shall rest solely with the Owner.

      5.    Rent increases and rent adjustments shall be in the amounts permitted by
law and shall, during this tenancy, have the effect of increasing the legal regulated rent by the
applicable percentages, increments or adjustments permitted by law.

      6.    It is understood that, to the extent, if any, that the Owner applies for and is
granted rent adjustments during this tenancy, for the purpose of calculating and implementing
such adjustments, such calculation and adjustment shall be by reference to the legal regulated
rent then in effect.

      7.    The parties shall be deemed to have jointly drawn this Rider in order to
avoid any negative inference against the preparer of the document.

8.    The covenants, agreements, terms, provisions and conditions contained in this Rider shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

9.    If Tenant does not fulfill the terms of the Lease, including, but not limited to, the timely payment of rent, said Temporary Concession Period shall be deemed null and void.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first recited above.

_____            _____
Tenant Signature                                              Date

_____            _____
Co-Tenant (if any) Signature                             Date

_____, Owner


By: _____            _____
                                                                          Date

SBELKIN/999.0001/1706777

## LICENSE AGREEMENT FOR PARKING SPACE

**AGREEMENT**, made and entered into this ___ day of _____, 20___, by and between: Denizen X LLC, having an address at 735 Bedford Ave #4, Brooklyn, NY 11205 (hereinafter "Licensor"), and _____ , residing at 123 Melrose Street, Apartment ____, Brooklyn, NY 11206 (hereinafter "Licensee").

### WITNESSETH:

1. The Licensor shall provide access to a space in the garage/parking lot (hereinafter "parking lot") at the apartment building located at 123 Melrose Street, Brooklyn, NY 11206, for storage of one passenger automobile, subject to the terms of this License Agreement, for the term starting _____ and ending _____, which is coterminous with the Lease for Licensee's renting of Apartment _____ at _____.

2. The automobile to be parked in the location stated in Paragraph 1 is described as follows:
Make: _____ Color: _____
Model: _____ License Plate No.: _____
Year: _____ State: _____

3. In consideration of the rate reserved herein and of the terms, covenants, and conditions and provisions herein contained, the Licensor grants unto the Licensee the parking privilege as hereinafter provided. The licensee agrees to pay to the Licensor a license fee in the sum of $300, on the 1st day of each and every month in advance, during the aforesaid period. The rate may be increased at such time and in such amount as is pursuant to and in compliance with law.

4. It is expressly understood that this License is granted to the Licensee for the storage of one non-commercial passenger automobile, described in Paragraph 2 above, owned and used by the Licensee. Licensee shall not store in the parking lot any automobile other than the automobile described in Paragraph 2 above.

5. Licensee shall pay Licensor a deposit fee of $75 for the cost of one garage door remote. This deposit will be refunded upon termination of this License upon surrender of the garage door remote. If license agreement is terminated before expiration tenant will be charged a $75 termination fee.

6. Licensee agrees to maintain a current vehicle registration and automobile insurance for the automobile.

7. The Licensee agrees that at all times his automobile shall be parked in such space in the parking lot or adjacent parking lot as Licensor may, from time to time, designate and then only in such a position that said automobile shall not interfere with the free movement of any other automobile in said parking lot.

8. The Licensee agrees to abide by and observe all rules and regulations that Licensor shall make from time to time with respect to the conduct of said parking lot. Notice of such rules and regulations shall be deemed to have been given to the Licensee if Licensor posts a copy of such rules and regulations in any part of said parking lot or at, or near any means of ingress or egress to and from the said parking lot.  Licensee understands and agrees that Licensor so long

Error! Unknown op code for conditional.

as Licensor provides a parking space to Licensee, Licensor may modify the manner in which such parking space is provided.

9. The Licensee understands and agrees that the Licensor will not participate in the moving and/or placing of cars in the parking lot and will not furnish or render any parking services whatsoever. No watchman or other representative of the Licensor will be furnished for any purpose. The Licensor is hereby absolved, released and discharged from any and all responsibility or liability by reason of any loss occurring by reason of fire, theft or otherwise in or about the parking lot, or by reason of any personal injuries or property damage resulting in or about the parking lot, by reason of the movement and/or maintaining or storing of cars in the parking lot by the Licensee or by any other person. For the purpose herein expressed, it is distinctly understood and agreed that the Licensor does not reserve unto itself the control or supervision of moving or placing of cars in the parking lot, except for the purpose of repairs to the building and cleaning thereof, or where an unauthorized or illegally parked vehicle is parked in the parking lot.

10. It is expressly understood that Licensor shall not be regarded as, nor shall Licensor have any duties of, a bailee of Licensee's automobile or its contents.

11. The Licensee expressly covenants that he will not keep or store gasoline or any other flammable or explosive substance except the gasoline customarily stored in the gasoline tank of the automobile. The Licensee further covenants that he will not make or permit to be made any repairs to, or other servicing of the automobile in the said parking lot.

12. The Licensor shall not be liable or responsible for any damage to persons or property at any time in said parking lot resulting from any latent defects in the parking lot or in the building of which the parking lot forms a part, or from falling plaster, fire steam, gas, electricity or explosion or from the elements or from heat or cold or from water, rain or snow, issue or flow from any part of said parking lot or from the building in which said parking lot is located or from the pipes, appliances or plumbing works of the same or from street or sub-surface or from any other place, or by dampness or any cause of whatsoever nature. Nor shall Licensor be liable for any damage or injury caused by other Licensee or persons in, or about the said parking lot or the building of which the said parking lot is a part.

13. The Licensor shall have the right to terminate this License predicated upon License's violation of the terms of this Agreement and/or the termination or expiration of License's lease for an apartment in the appurtenant building. If the Licensee fails to remove the automobile, the Licensor may take all steps necessary to remove the automobile at the Licensee's expense and cost.

14. Neither this License nor the privilege to store said automobile in said parking lot is assignable by the Licensee.

15. Neither this agreement nor any part thereof may be waived, changed, modified or discharged, except by an agreement in writing and signed by the party against whom enforcement of waiver, change, modification or discharge is sought.

**THIS SPACE INTENTIONALLY LEFT BLANK**

Error! Unknown op code for conditional.

16. Licensee shall not assign this License or permit the parking space to be used by any other car, except the Licensee's, without the prior written consent of the Licensor in each instance.

**IN WITNESS THEREOF**, this agreement has been executed by the parties hereto, the day and year first above written.

BY: _____

Licensor


_____

Licensee

Error! Unknown op code for conditional.

## Washer Dryer Lease

This agreement is made between the Landlord and Tenant _____
_____ on _____. Owner has offered
Tenant the option of renting the Apartment *without* a washer/dryer or *with*
a washer/dryer; the latter, requires Tenant to pay an additional fee. Tenant
has voluntarily agreed rent to rent the apartment with a washer/dryer
pursuant to the below terms.

- Tenant agrees to lease from Landlord a washer/dryer in the
  apartment for $75 per month. This is due on the first of the month.
- Tenant will pay the monthly fee together with rent payment.
- This lease will commence on _____ and expire on _____.

_____
Tenant's Signature

_____
Date

_____
Landlord's Signature

_____
Date

**EXHIBIT T**

**Form of Notice to Local 713**

DATE

*VIA REGISTERED MAIL WITH RETURN RECEIPT*

President
Local 713 I.B.O.T.U. UMD
400 Garden City Plaza,
Garden City, NY 11530


_____ (Sellers or Sellers' agent) by this letter hereby provides at least sixty (60) days' notice of our intent to terminate the Local 713 collective bargaining agreement upon its expiration on October 31, 2021 as required under Article XXXVI of the Local 713 CBA. I am available to answer any questions and discuss at your convenience and can be reached at PHONE.


Sincerely,



Cc:

**EXHIBIT U**

**Escrow Agent Wiring Instructions**

# NEW YORK CITY COMMERCIAL WIRE INSTRUCTIONS

| | |
|---|---|
| ABA#: | 021000089 |
| SWIFT CODE: | CITIUS33 |
| BANK: | CITIBANK, N.A.<br>750 WASHINGTON BLVD., 7TH FLR<br>STAMFORD, CT 06901 |
| ACCT#: | 4969361182 |
| ACCT NAME: | FIDELITY NATIONAL TITLE<br>INSURANCE COMPANY |
| FNT CONTACT: | 212- 481-5858 |
| FNT TITLE#/REFERENCE: | 57600-K / 54 Noll Street & 123 Melrose Street |
| TITLE OFFICER: | PUPOVIC |

## PLEASE INCLUDE FNT TITLE #/ REFERENCE

## EXHIBIT V

### Fresh Declaration

**[To be attached]**

## DECLARATION OF RESTRICTIONS

**THIS DECLARATION** made this _____ day of _____, 2021, by _____
Evergreen Gardens II LLC ("Declarant"), a New York limited liability company formed and
existing under the laws of the State of New York ("the "Declarant").

## RECITALS

**WHEREAS:**

A.      The Declarant is the owner of certain real property which is designated as Block
3152, Lot 1 (the "Premises"), on the Tax Map of the City of New York, County of Brooklyn, the
Premises being more particularly described in Exhibit A hereto; and

B.      The Premises is located on a single zoning lot as that term is defined in the
definition of a "zoning lot" in Section 12-10 of the Zoning Resolution; and

C. The Premises is improved with an eight-story residential building with ground floor
retail (the "FRESH Building"); and

D.      Pursuant to Section 63-30 of the Zoning Resolution, a certification (a "FRESH
Certification") by the Chairperson of the City Planning Commission ("the "Chairperson") is
required in connection with the use of floor area or cellar space as a "FRESH food store" as that
term is defined in Section 63-01 of the Zoning Resolution ("FRESH Use"); and

E.      Declarant filed application number N210159ZCK, dated November 9, 2020, with
the New York City Department of City Planning ("DCP") for a FRESH Certification to allow for
a FRESH food store on the first story of the FRESH Building, (the "FRESH Application"); and

F.      Declarant intends to provide for a lease of that certain floor area on the first story
of the FRESH Building as shown on the plans listed in Section 2 of this Declaration (the
"FRESH Floor Area") to a supermarket operator (the "Tenant"), for use as a supermarket, which
will qualify as a "FRESH food store"; and

1

**G.**      In order to grant the FRESH Certification, the Chairperson must be satisfied that there is compliance with the provisions of Section 63-30 of the Zoning Resolution; and

**H.**      The provisions of Section 63-30(c) require the execution of a Declaration of Restrictions providing for the continuance of FRESH Use; and

**I.**      Declarant represents and warrants that except as set forth in the certification of parties-in-interest by Madison Title Agency, LLC as agent for Old Republic National Title Insurance Company, dated July 22, 2021, annexed hereto as Exhibit B and made a part hereof, has no knowledge of any other party-in-interest, as that term is defined in the definition of a zoning lot in Section 12-10 of the Zoning Resolution, with respect to the Premises; and

**J.**      All parties-in-interest to the Premises have waived their right to execute this Declaration and have subordinated their interests to this Declaration by written instrument annexed hereto as Exhibit B-1 and made a part hereof; and

**K.**      Declarant represents and warrants that there are no restrictions of record on the use of the Premises nor any existing or future estate or interest in the Premises, nor any lien, covenant, easement, limitation or encumbrance of any kind, the requirements of which have not been waived or subordinated, which would prevent or preclude, presently or potentially, the imposition of the restrictions, covenants, obligations, easements and agreements of this Declaration,

**NOW, THEREFORE**, Declarant declares and agrees that the Premises shall be held, sold, transferred, conveyed and occupied subject to the following restrictions, covenants, obligations, easements and agreements:

<u>**AGREEMENT**</u>

**1.**      <u>**USE OF FRESH FLOOR AREA.**</u>  In order to comply with the requirements of Section 63-30(c) of the Zoning Resolution, Declarant covenants and agrees that:

(a)      <u>Continuous Use of FRESH Floor Area for FRESH Use</u>

2

Except as provided herein, Declarant shall continually lease or operate the FRESH Floor Area for FRESH Use.

    (b)    <u>Commencement of FRESH Use</u>

    (i)    Tenant's possession, pursuant to a signed lease, of the FRESH Floor Area for FRESH Use shall commence within ninety (90) days following the issuance of the first temporary certificate of occupancy by the New York City Department of Buildings for the FRESH Floor Area to be used for FRESH Use (the "<u>First TCO</u>").

    (ii)    If Tenant's possession, pursuant to a signed lease, of the FRESH Floor Area for FRESH Use has failed to commence by the sixtieth (60) day following the issuance of the First TCO, despite Declarant's good faith efforts to lease the FRESH Floor Area at commercially reasonable terms, Declarant may apply for an extension of the 90 day deadline for commencement of FRESH Use, which application shall be made in writing to the Chairperson (the "<u>Extension Request</u>").

    (iii)    The Extension Request shall include documentation of Declarant's good faith efforts, which shall include, but not be limited to, advertising in publications targeted at food wholesalers or grocery store operators and contacting trade organizations whose members are food wholesalers or grocery store operators.  In addition, an affidavit, in a form satisfactory to DCP Counsel shall be provided, attesting to the fact that Declarant has made such efforts to publicize the availability of the FRESH Floor Area for FRESH Use at commercially reasonable terms, which shall be disclosed.

    (iv)    The Extension Request shall be submitted to the Chairperson no later than seventy (70) days following the issuance of the First TCO.   The Chairperson may, within twenty (20) days of receipt of the Extension Request, either (a) grant Declarant the Extension Request for a period of forty-five (45) days (the "<u>Extension Term</u>") or (b) deny the Extension Request.

    (v)    Following the end of the Extension Term, if one has been granted, or if no Extension Term has been granted, Declarant shall lease or operate the FRESH Floor Area for FRESH Use.  However, if an Extension Term has been granted, the Chairperson may

further extend the Extension Term if, in the Chairperson's discretion, a further extension is warranted. In making this determination, the Chairperson may ask for further evidence from Declarant that good faith efforts have been undertaken during the Extension Term.

(c)    Discontinuance of FRESH Use

The requirements of Section (1)(a) above shall not apply (A) during any six (6) month period (1) from the date the FRESH Floor Area has been vacated by Tenant or any successor supermarket operator, provided that (x) Declarant notifies the DCP of such vacancy within ten (10) calendar days of such vacancy and in accordance with Section 14 of this Declaration, and (y) Declarant makes good faith efforts upon each occurrence of a vacancy in the FRESH Floor Area to lease the FRESH Floor Area to a supermarket operator for continued FRESH Use at commercially reasonable rates or (2) following a Force Majeure Event (as defined in Section 8 of this Declaration and subject to the reasonable determination of the existence of such an event by the Chairperson) or (B) following a change in permitted use of the FRESH Floor Area pursuant to Section 5(b) below.

2.    **DEVELOPMENT OF FRESH FLOOR AREA.**  Declarant covenants and agrees that the FRESH Floor Area and the 13,896 square feet of increased floor area generated thereby shall be developed on the Premises in substantial conformity with the following plans, prepared by ODA, annexed hereto as Exhibit C and made a part hereof (the "FRESH Plans"). Minor changes in store layout consistent with the definition of a FRESH food store shall not warrant a further Certification.

| Number | Title | Last Date Revised |
|--------|-------|-------------------|
| FFA-001 | D.C.P. FRESH FOOD APPLICATION COVER | 7/22/2021 |
| FFA-010 | SITE PLAN | 7/22/2021 |
| FFA-100 | 1st (GROUND) FLOOR PLAN | 7/22/2021 |
| FFA-101 | 8th FLOOR PLAN | 7/22/2021 |
| FFA-202 | TRANSPARENCY REQUIREMENT & SIGNAGE | 7/22/2021 |

3.    **EFFECTIVE DATE; RECORDATION.**  This Declaration and the provisions hereof shall become effective immediately upon the date the FRESH Certification is granted by

4

the Chairperson.  Immediately prior thereto an executed original of this Declaration shall be delivered for filing and recording in the Office of the Register of the City of New York, New York County (the "Register's Office"), indexing it against the Premises and, following recordation, true copies of this Declaration, as recorded, shall be delivered to the office of DCP counsel.  Receipt of proof of recordation of this Declaration, in a form acceptable to DCP counsel, shall be a precondition to the issuance of any building permit, including any foundation or alteration permit, for any building or enlargement pursuant to Article 6, Chapter 3 of the Zoning Resolution.  If Declarant fails to so record this Declaration, the City may record it and Declarant shall immediately pay the costs of such recordation to the City, together with fees for purchase of a reasonable number of certified copies of the recorded Declaration.

4.   **BINDING EFFECT.**  The rights and obligations of Declarant under this Declaration, including to continually lease or operate the FRESH Floor Area for FRESH Use, shall be considered covenants running with the land, and shall be binding upon and inure to the benefit of the successors and assigns of Declarant.  However, the obligation to continually lease or operate the FRESH Floor Area for FRESH Use shall be binding only upon successors and assigns of Declarant's interest in the FRESH Floor Area, and as of the date a party no longer holds such interest in the FRESH Floor Area, it shall have no further obligation under this Declaration, except as to any liability which shall have accrued during the time the party had an interest in or obligation with respect to the FRESH Floor Area.  References in this Declaration to agencies or instrumentalities of the City shall be deemed to include agencies or instrumentalities succeeding to the jurisdiction thereof pursuant to the laws of the State of New York and the New York City Charter.

5.   **AMENDMENT; MODIFICATION; CANCELLATION.**

(a)   This Declaration may be amended, modified or cancelled only with the consent and approval of the Chairperson.

(b)   Certification for Change of Use of a Fresh Food Store

(i)   Declarant may apply to change the FRESH Floor Area to any use permitted by the underlying zoning district applicable to the Premises upon the

5

ministerial, non-discretionary certification by the Chairperson (the "Change of Use Certification") that such change of use would not create a new non-compliance, increase the degree of non-compliance of buildings on the zoning lot, or result in a reduction in the number of required accessory off-street parking spaces under the applicable district regulations.

(ii)    If a Change of Use Certification is granted, a Notice of Cancellation of this Declaration, in a form acceptable to DCP and all mortgagees of record, shall be delivered for filing and recording in the City Register's Office, indexing it against the Premises and, following recordation, true copies of such Notice of Cancellation, as recorded, shall be delivered to the Chairperson, any Party-in-Interest other than Declarant and all mortgagees, in accordance with Section 12 of this Declaration.

(iii)    The Change of Use Certification shall be issued by the Chairperson in a timely manner after the date of submission of a complete application by Declarant to the City Planning Commission (the "Commission").

(c)    Authorization for Bulk and Parking Modifications

(i)    Pursuant to Section 63-50 of the Zoning Resolution, Declarant may apply to the Commission for an authorization to permit modifications to the bulk and accessory off-street parking requirements of the zoning district applicable to the zoning lot when a change of use of the FRESH Floor Area from Fresh Use would create a new non-compliance, increase the degree of non-compliance of buildings on the zoning lot, or result in a reduction in the number of required accessory off-street parking spaces under the district regulations applicable to the zoning lot, provided that such use is permitted by the district regulations applicable to the zoning lot (an "Authorization").  In order for such Authorization to be granted, the Commission must determine that Declarant's application meets the findings of Section 63-50(a) – 63-50(e) of the Zoning Resolution.

(ii)    If an Authorization is granted, a Notice of Cancellation of this Declaration, in a form acceptable to DCP counsel, shall be delivered for filing and recording in the City Register's Office, indexing it against the Premises and, following recordation, true copies of such Notice of Cancellation, as recorded, shall be delivered to the Commission, any

6

Party-in-Interest other than Declarant and all mortgagees, in accordance with <u>Section 12</u> of this Declaration.

6.    **COMPLIANCE.**

(a)    No later than June 30th, beginning in the first calendar year following the calendar year in which the FRESH Certification was made, and at three year intervals thereafter, Declarant shall provide the Chairperson with an affidavit, in a form acceptable to DCP, regarding compliance with the requirements of this Declaration and Article 6, Chapter 3 of the Zoning Resolution, as of a date of inspection which shall be no earlier than June 1st of the year in which the affidavit is filed.  Such affidavit shall include, without limitation:

(i)    a copy of the FRESH Certification letter;

(ii)    a statement that the FRESH Floor Area continues to be operated for Fresh Use in accordance with this Declaration; and

(iii)    photographs documenting the condition of the FRESH Floor Area at the time of inspection, sufficient to clearly show all floor area operated for Fresh Use.

7.    **ENFORCEMENT; REMEDIES.**    Declarant acknowledges that the restrictions, covenants, obligations, easements and agreements of this Declaration will protect the value and desirability of the Premises, as well as benefit the City and all property owners within a one-half mile radius of the Premises.  Declarant consents to enforcement solely by the City, administratively, at law or at equity, of the restrictions, covenants, obligations, easements and agreements contained herein, and nothing contained herein shall be deemed to vest any rights in a third party.  Declarant also acknowledges that the remedies set forth in this Declaration are not exclusive, and that the City and any agency thereof, may pursue other remedies not specifically set forth herein including, but not limited to, a mandatory injunction compelling Declarant to comply with the terms of this Declaration.

8.    **FORCE MAJEURE.**    A "<u>Force Majeure Event</u>" shall mean occurrences beyond the reasonable control of Declarant which delay the performance of Declarant's obligations hereunder, provided that Declarant has taken all reasonable steps reasonably necessary to control

7

or to minimize such delay, and which occurrences shall include, but not be limited to: (i) a strike, lockout or labor dispute; (ii) the inability to obtain labor or materials or reasonable substitutes therefor; (iii) acts of God; (iv) restrictions, regulations, orders, controls or judgments of any governmental authority; (v) undue material delay in the issuance of approvals by any governmental authority, provided that such delay is not caused by any act or omission of s; (vi) enemy or hostile government action, civil commotion, insurrection, terrorism, revolution or sabotage; (vii) fire or other casualty; (viii) a taking of the whole or any portion of the Premises by condemnation or eminent domain; (ix) failure or inability of a public utility to provide adequate power, heat or light or any other utility service; or (x) orders of any court of competent jurisdiction, including, without limitation, any litigation which challenges the FRESH Applications or results in an injunction or restraining order prohibiting or otherwise delaying the construction or occupancy of any portion of the Premises.  Declarant shall notify the Chairperson of a Force Majeure Event promptly following the occurrence of the same and, in any event not later than thirty (30) days following Declarant's knowledge of the occurrence thereof.

9. **INCORPORATION**.  All exhibits referred to in this Declaration are hereby incorporated herein and made an integral part of this Declaration.

10. **GOVERNING LAW**.  This Declaration shall be governed by and construed in accordance with the law of the State of New York.

11. **SEVERABILITY**.  In the event that any provision of this Declaration shall be determined to be invalid or unlawful by a court of competent jurisdiction, such provision shall be severable and the remainder of this Declaration shall continue to be of full force and effect.

12. **NOTICE**.  All notices, demands, requests, consents, approvals, and other communications (each, a "Notice") which may be or are permitted, desirable, or required to be given under this Declaration shall be in writing and shall be sent or delivered as follows:

(a)     if to Declarant:

Yoel Goldman
199 Lee Avenue #693
Brooklyn, NY 11211

8

with a copy to:

Ellen Hay
Herrick, Feinstein LLP
2 Park Avenue, 14th Floor
New York, NY 10016

(b)    if to the Chairperson or the Commission:

New York City Planning Commission
120 Broadway, 31st Floor
New York, New York 10271
Attention: Chairperson

with a copy to:

the General Counsel of CPC at the same address.

(c)    if to a Party in Interest other than Declarant:

at the address provided in writing to the Commission in accordance with this Section 12

(d)    if to a Mortgagee:

at the address provided in writing to the Commission in accordance with this Section 12

Declarant, the Commission, any Party in Interest, and any Mortgagee may, by notice provided in accordance with this Section 12, change any name or address for purposes of this Declaration. In order to be deemed effective, any Notice shall be sent or delivered in at least one of the following manners: (i) sent by registered or certified mail, postage pre-paid, return receipt requested, in which case the Notice shall he deemed delivered for all purposes hereunder five days after being actually mailed; (ii) sent by overnight courier service, in which case the Notice shall be deemed delivered for all purposes hereunder on the date the Notice was actually received or was refused; or (iii) delivered by hand, in which case the Notice will be deemed delivered for all purposes hereunder on the date the Notice was actually received. All Notices from the Commission to Declarant shall also be sent to every Mortgagee of whom the Commission has notice, and no Notice shall be deemed properly given to Declarant without such notice to such Mortgagee(s). In the event that there is more than one Declarant at any time, any

Notice from the Commission shall be provided to all Declarant of whom the Commission has notice.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Declarant has executed this Declaration as of the day and year first set forth above.

**Declarant**

By:  EVERGREEN GARDENS II LLC

Name: _____

Title: _____

<u>ACKNOWLEDGMENTS</u>

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

      On the _____ day of _____ in the year 2021, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                      _____
                                          Notary Public

EXHIBIT A

<u>Metes and Bounds Description of the Premises</u>

Brooklyn Block 3152, Lot 1

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being bounded and described as follows:

BEGINNING at a point on the easterly side of Stanwix Street, distant 267.81 feet northwesterly, as measured along the easterly side of Stanwix Street, from the corner formed by the intersection of the easterly side of Stanwix Street, with the northwesterly side of Melrose Street;

RUNNING THENCE northeasterly along a line forming an angle of 90 degrees 00 minutes 09 seconds with the easterly side of Stanwix Street, a distance of 349.99 feet to the westerly side of Evergreen Avenue;

THENCE northwesterly along the westerly side of Evergreen Avenue, 200.95 feet;

THENCE southwesterly along a line forming an angle of 88 degrees 43 minutes 56 seconds with the last mentioned course, a distance of 350.08 feet to the easterly side of Stanwix Street;

THENCE southeasterly along the easterly side of Stanwix Street, 193.22 feet to the point or place of BEGINNING.

EXHIBIT B

<u>Title Company Certification of Parties In Interest</u>

N.B. # _____
Or
ALT # _____

## EXHIBIT II

### Old Republic National Title Insurance Company

**CERTIFICATION PURSUANT TO ZONING LOT SUBDIVISION (D) OF SECTION 12-10 OF THE ZONING RESOLUTION OF DECEMBER 15, 1961 OF THE CITY OF NEW YORK – AS AMENDED EFFECTIVE AUGUST 18, 1977.**

Old Republic National Title Insurance Company, a title insurance company licensed to do business in the State of New York and having an office at 400 Post Avenue, Suite 310, Westbury, NY 11590, hereby certifies that as to the land hereinafter described being a tract of land, either un-subdivided or consisting of two or more lots of record, contiguous for a minimum of ten linear feet, located within a single block, that all the parties in interest constituting a "party in interest" as defined in Section 12-10, Subdivision (D) of the Zoning Resolution of the City of New York, effective December 15, 1961, as amended, are the following:

| NAME | ADDRESS | NATURE OF INTEREST |
|---|---|---|
| Evergreen Gardens I LLC | 199 Lee Avenue, Suite 693 Brooklyn, NY 11211 | Fee Owner, as to Lot 48 |
| JPMorgan Chase Bank, National Association | 383 Madison Avenue New York, NY 10179 | Mortgage Holder, as to Lot 48 |
| Evergreen Gardens II LLC | 199 Lee Avenue, Suite 693 Brooklyn, NY 11211 | Fee Owner, as to Lot 1 |
| Mishmeret Trust Company, Ltd., as Trustee for the Holders of Debentures (Series E) | C/O Jeffrey Zwick & Associates, P.C. 266 Broadway, Suite 403 Brooklyn, NY 11211 | Mortgage Holder, as to Lot 1 |
| Melrose Noll Brooklyn LLC | 301 Mill Road, Suite U5 Hewlett, NY 11557 | Contract Vendee as to Lots 48 and 1 |

**The subject tract of land with respect to which the foregoing parties are the parties in interest as aforesaid is known as Lots 48 and 1 Block 3152 as shown on the Tax Map of the City of New York, Kings County, and more particularly described as follows:**

Lot(s) 48

All that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Stanwix Street, with the northwesterly side of Melrose Street;

RUNNING THENCE northwesterly along the northeasterly side of Stanwix Street, 187.27 feet to an angle point;

166714

THENCE continuing northwesterly along the northeasterly side of Stanwix Street, a distance of 80.54 feet;

THENCE northwesterly along a line forming an angle of 90 degrees 00 minutes 09 seconds with the northeasterly side of Stanwix Street, a distance of 349.99 feet to the southwesterly side of Evergreen Avenue;

THENCE southeasterly along the southwesterly side of Evergreen Avenue, 80.94 feet to an angle point;

THENCE continuing easterly along the southerly side of Evergreen Avenue, 125.73 feet to the corner formed by the southerly side of Evergreen Avenue, with the northwesterly side of Melrose Street;

THENCE southwesterly along the northwesterly side of Melrose Street, 446.92 feet to the corner formed by the intersection of the northeasterly side of Stanwix Street, with the northwesterly side of Melrose Street, the point or place of BEGINNING.


Lot(s) 1


ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, being bounded and described as follows:

BEGINNING at a point on the easterly side of Stanwix Street, distant 267.81 feet northwesterly, as measured along the easterly side of Stanwix Street, from the corner formed by the intersection of the easterly side of Stanwix Street, with the northwesterly side of Melrose Street;

RUNNING THENCE northeasterly along a line forming an angle of 90 degrees 00 minutes 09 seconds with the easterly side of Stanwix Street, a distance of 349.99 feet to the westerly side of Evergreen Avenue;

THENCE northwesterly along the westerly side of Evergreen Avenue, 200.95 feet;

THENCE southwesterly along a line forming an angle of 88 degrees 43 minutes 56 seconds with the last mentioned course, a distance of 350.08 feet to the easterly side of Stanwix Street;

THENCE southeasterly along the easterly side of Stanwix Street, 193.22 feet to the point or place of BEGINNING.

**That the said premises are known as and by the street addresses of:**
Address: 123 Melrose Street, Brooklyn, NY 11206  (Block 3152,  Lot(s) 48), as shown on the following diagram

Address: 54 Noll Street a/k/a 28 Stanwix Street, Brooklyn, NY 11206  (Block 3152,  Lot(s) 1), as shown on the following diagram

1.    Show Distance from corner                                              )

2.    Show Block and Lot Numbers                                          )
      and dimensions of each lot                                             )
      The north point of the diagram must agree with the arrow.

      SEE ATTACHED DIAGRAM



**NOTE: A Zoning Lot may or may not coincide with a lot as shown on the Official Tax Map of the City of New York, or on any recorded subdivision plot or deed.   A Zoning Lot may be subdivided into two or more zoning lots provided all the resulting zoning lots and all the buildings thereon shall comply with the applicable provisions of the Zoning Lot Resolution.**

THIS CERTIFICATE IS MADE AND ACCEPTED BY THE APPLICANT UPON THE EXPRESS UNDERSTANDING THAT LIABILITY HEREUNDER IS LIMITED TO ONE THOUSAND ($1,000.00) DOLLARS.

DATED:

BY:    Old Republic National Title Insurance Company

BY:    _____

James H. Lee Esq., Counsel
Madison Title Agency, LLC, agent for
Old Republic National Title Insurance Company

STATE OF NEW YORK ) : SS.:

COUNTY OF  _____ )

On _____ 20__ , before me, the undersigned, personally appeared_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument and that such individual made such appearance before the undersigned in the _____, State of New York

_____
Notary Public

EXHIBIT B-1

<u>Waiver and Subordination</u>

EXHIBIT C

<u>FRESH Plans</u>

(1,1) -I- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 1 of 15



(2,1) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 2 of 15



(3,1) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 3 of 15

# H FOOD STORE CERTIFI

Exhibit C, FAA-001, page 4 of 15



# FICATION

(5,1) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 5 of 15



250 Park Avenue South, Third Floor
New York, New York 10003
646-478-7455

| REVISION DATE | ISSUE |
|---------------|-------------------|
| 05.27.2021 | Fresh Food Filing |
| 07.22.2021 | Fresh Food Filing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(1,2) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 6 of 15



Exhibit C, FAA-001, page 7 of 15



(3,2) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

H FOOD STORE CERTIFI

Exhibit C, FAA-001, page 8 of 15

# 54 NOLL STREET

## 54 NOLL STREET, BROOKLYN, 11206



(4,2) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

FICATION

Exhibit C, FAA-001, page 9 of 15



| DRAWING L | |
|---|---|
| DRAWING NO. | SHEE |
| FFA-001 | D.C.P. FRESH |
| FFA-010 | SITE PLAN |
| FFA-100 | 1ST (GROUND) |
| FFA-101 | 8TH FLOOR PL |
| FFA-202 | TRANSPAREN |

Exhibit C, FAA-001, page 10 of 15

## CONSULTANTS

CLIENT:
**ALL YEAR MANAGEMENT**
277 CLASSON AVENUE BROOKLYN, NY 11238
(718)-673-9430

STRUCTURAL ENGINEER:
**MCNAMARA/SALVA**
64 WEST 45TH STREET, NEW YORK, NY 10036
(212)-245-9800

MEP ENGINEER:
**MGE ENGINEERING D.P.C.**
116 WEST 32ND STREET, NEW YORK NY 10001
(212)-643-5955

| 'ING LIST | |
|---|---|
| SHEET TITLE | |
| FRESH FOOD APPLICATION COVER | |
| AN | |
| ROUND) FLOOR PLAN | |
| OOR PLAN | |
| PARENCY REQUIREMENT & SIGNAGE | |

## KEY PLAN

Project Address

54 NOLL STREET
BROOKLYN, NEW YORK 11206
BLOCK: 3152
LOT: 1 & 46
ZONING MAP: 13B



TRUE
NORTH

(1,3) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 11 of 15

(2,3) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 12 of 15

Exhibit C, FAA-001, page 13 of 15

(4,3) -1- 21_0722-FFA.pdf 7/28/2021 3:44:07 PM

Exhibit C, FAA-001, page 14 of 15



(5,3) -T- 21_0722-FFA.pdf 7/18/2021 3:44:07 PM

Exhibit C, FAA-001, page 15 of 15



## 54 NOLL ST.

PROJ. **FRESH FOOD**
TITLE: **54 NOLL STREET**
**NEW MIXED DEVELOPMENT**

SEAL



| SCALE:  N/A | DWG DATE:  11/14/2019 |
|---|---|

DRAWING NAME:

# D.C.P. FRESH FOOD
# APPLICATION COVER

DRAWING NO.:

# FFA-001

PAGE: 1    OF:  5        PROJECT NO.: 1588.02

Exhibit C, FAA-010, page 1 of 15



Exhibit C, FAA-010, page 2 of 15



Exhibit C, FAA-010, page 3 of 15



Exhibit C, FAA-010, page 4 of 15





250 Park Avenue South, Third Floor
New York, New York 10003
646-478-7455

| REVISION DATE | ISSUE |
|---|---|
| 05.27.2021 | Fresh Food Filing |
| 07.22.2021 | Fresh Food Filing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# CONSULTANTS

CLIENT:

BLOCK 3153
LOT 1 1-STORY

(3,5) -2-21_0722-FFA.pdf 7/28/2021 2:56:50 PM

Exhibit C, FAA-010, page 6 of 15



Exhibit C, FAA-010, page 7 of 15

STANWIX STREET
50' NARROW STREET

BLOCK
3151
LOT 141
3-STORY

19'-6"

121' - 4 1/2"

26'-5 1/4"

145'

30'-6"

121' - 4 1/2"

1'-6"

19'-0"

PARKING RAMP
DOWN

15'-0"

1'-6"

60'-0 1/2"

4'-0"
1'-8"
1'-8"

BLOCK 3152 LOT 4
R6A 8 STORIES

20'-6"

TERRACE @
LEVEL 7

MECH.
AREA

128' - 6"

TERRACE @
LEVEL 8

TERR
LE

138' - 7 1/2"

TERRACE @
LEVEL 8

138' - 7 1/2"

50'-0"

10'-1"    29'-9"    10'-0"

TERRACE @
LEVEL 7

COURT/
LANDSCAPE

(2,2) -2-21_0722-FFA.pdf 7/28/2021 2:56:50 PM

Exhibit C, FAA-010, page 8 of 15



LOT 48
IES



R6A & R7A W/ C2-4 page 9 of 15
OVERLAY

2'-5"

'E/

40'-2 1/2"

29'-4 1/4"

17'-1 1/4"

10'-1"

146'    36'-8"

67'-6 1/4"    131'-9 1/2"

143'-4"

41'-10 1/2"

49'-2 1/2"

BLO
LOT

BLO
LOT

100'-0"

84'-5 1/2"    14'-0 1/4"

R6A & R7A W/ C2-4
OVERLAY

PUBLICLY
ACCESSIBLE
AREA (PAA)

60'-0"

60' NARROW STREET

EVERGREEN AVE

TERRACE
@
LEVEL 8

138'
1/2"

20'-11"

STAIR
BULKHEAD
&
MECHANICAL
AREA

160'-3"

L.G. 65.6

RESIDENTIAL
EGRESS EXIT

125'-9"

TERRACE @
2ND FLOOR
BELOW

ELEVATOR
BULKHEAD

STAIR
BULKHEAD

'/
CAPE/
E

R6A    R7A W/ C2-4
OVERLAY

60'-

16'-0"

TERRACE @
LEVEL 8

Exhibit C, FAA-010, page 10 of 15

BLOCK 3153
LOT 1 1-STORY

BLOCK 3153
LOT 1 3-STORY

60' NARROW STREET

GEORGE STREET

60'-2"

29'-6"

14'-6"

(2.5) -2- 21_0722-FFA.pdf 7/28/2021 2:56:59 PM

CONSULTANTS

CLIENT:
ALL YEAR MANAGEMENT
277 CLASSON AVENUE BROOKLYN, NY 11238
(718)-623-9430

STRUCTURAL ENGINEER:
MCNAMARA/SALVA
64 WEST 45TH STREET, NEW YORK, NY 10036
(212)-245-5800

MEP ENGINEER:
MGE ENGINEERING D.P.C.
116 WEST 32ND STREET, NEW YORK NY 10001
(212)-643-0355

# KEY PLAN

Project Address

54 NOLL STREET
BROOKLYN, NEW YORK 11206
BLOCK: 3152
LOT: 1 & 48
ZONING MAP: 13B



TRUE
NORTH

# 54 NOLL ST.

PROJ.    FRESH FOOD
TITLE:    54 NOLL STREET

Exhibit C, FAA-010, page 11 of 15



Exhibit C, FAA-010, page 12 of 15

Exhibit C, FAA-010, page 14 of 15



R6A 8
STORIES

TERRACE @
LEVEL 8

161' - 2 1/2"

138' - 7 1/2"

138' - 7 1/2"

150' - 0"

R7A W/ C2-4
OVERLAY

R6A

EXIST FIRE
HYDRANT

Exhibit C, FAA-010, page 15 of 15



7 1/2"

L.G. 62.7



54 NOLL ST.

| PROJ. | FRESH FOOD |
| TITLE: | 54 NOLL STREET |
| | NEW MIXED DEVELOPMENT |

SEAL

REGISTERED ARCHITECT
ERAN CHEN
036207
STATE OF NEW YORK

| SCALE:  3/ 64" = 1'-0" | DWG DATE:  11/14/2019 |

DRAWING NAME:

SITE PLAN

DRAWING NO.:

# FFA-010

PAGE: 2    OF:  5        PROJECT NO.: 1588.02

(1.5) -2- 21_0722-FFA.pdf 7/28/2021 2:56:50 PM

Exhibit C, FAA-100, page 1 of 15





# EVERGREEN AVE

## 60' NARROW STREET

Exhibit C, FAA-100, page 3 of 15





Exhibit C, FAA-100, page 4 of 15



PROPOSED CURB CUT - 7" CONC.
SIDEWALK ON 6" GRANULAR BASE
PER NYCDOT STD. DETAIL H-1045

1'-6"

16'-0"

LOADING
ENTRANCE

3'-0"    3'-0"

OCK

A

NON RETAIL
SPACE

1343 SF

39'-1"

7'-1"

(3,4) -3- 21_0723-FFA.pdf 7/28/2021 2:57:02 PM



250 Park Avenue South, Third Floor
New York, New York 10003
646-478-7455

| REVISION DATE | ISSUE |
|---|---|
| 05.27.2021 | Fresh Food Filing |
| 07.22.2021 | Fresh Food Filing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**CONSULTANTS**

CLIENT:

39'-11"

PERISHABLE
FOOD 1873 SF

Exhibit C, FAA-100, page 6 of 15

## NOLL STREET

### 50' NARROW STREET

(2,1) -3-21_0722-FFA.pdf 7/28/2021 2:57:02 PM

Exhibit C, FAA-100, page 7 of 15



FRESH PROD
1575 SF

40'-0"

PERISHABLE
FOOD
55 SF

NON
RETAIL
SPACE
48 SF

NON-RETAIL
SPACE
257 SF

NON-
RETAI
SPACE
81 SF

93'-7"

7'-10"

C2-4 OVERLAY

7'-5"

3'-0"

(2.2) -3.-21_0722-FFA.pdf 7/28/2021 2:57:02 PM

Exhibit C, FAA-100, page 8 of 15



FOOD
1,068 SF

6'-7"

51'-2"

PRODUCE

9'-3"

40'-0"

11'-3"

4'-6"

4'-9"

3'-7 1/2"

+ 3'-3"

NON RETAIL
SPACE  797 sf

17'-4"

29'-6"

12'-7 1/2"

5'-3 1/2"    3'-5"    5'-4 1/2"    3'-5"    5'-3 1/2"    3'-5"    5'-4 1/2"    3'-5"

4'-5"

5'-0"

3'-5"

10'-1 1/2"

5'-3 1/2"

NON-
RETAIL
SPACE
81 SF

4'-5"

2'-6"

6'-0"

NON ACCESSIBLE                              NON RETAIL

3'-0"

100' 4"

(2,3)  -3-_072-FFA.pdf 7/28/2021 2:57:02 PM

Exhibit C, FAA-100, page 9 of 15



NON - PERISHABLE FOOD SPACE 5,185 SF

ETAIL SPACE   391 sf

ACCESSIBLE

NON ACCESSIBLE

R6A

Exhibit G FAA 100, page 10 of 15



PERISHABLE
FOOD  1873 SF

PUBLICLY ACCESSIBLE AREA (PAA)

95'-2"

24'-3 1/2"

3'-4 1/2"

5'-0"

3'-5"

5'-4 1/2"

5'-0"

5'-0"

5'-5"

28'-0"

3'-5"

5'-4"

5'-0"

44'-4"

ACCESSIBLE

BLE

(2,5) -3- 21 _0722-FFA.pdf 7/28/2021 2:57:02 PM

CLIENT:
ALL YEAR MANAGEMENT
277 CLASSON AVENUE BROOKLYN, NY 11238
(718)-623-9430

STRUCTURAL ENGINEER:
MCNAMARA/SALVA
54 WEST 45TH STREET, NEW YORK, NY 10036
(212)-246-9800

MEP ENGINEER:
MGE ENGINEERING D.P.C.
116 WEST 32ND STREET, NEW YORK NY 10001
(212)-643-9055

# KEY PLAN

Project Address

54 NOLL STREET
BROOKLYN, NEW YORK 11206
BLOCK: 3152
LOT: 1 & 48
ZONING MAP: 13B

NOLL STREET

STANWIX STREET

EVERGREEN AVENUE

PUBLICLY ACCESSIBLE AREA

MELROSE STREET

TRUE NORTH

# 54 NOLL ST.

PROJ.    FRESH FOOD
TITLE:   54 NOLL STREET

Exhibit C, FAA-100, page 11 of 15

Exhibit C, FAA-100, page 12 of 15



Exhibit C, FAA-100, page 13 of 15

189'-4"



**LEGEND**

| | |
|---|---|
| – – – | OUTLINE OF FRESH FOOD STORE ON THE 1ST FLOOR |
| ▬ ▪ ▬ | DEVELOPMENT SITE BOUNDARY (ZONING LOT LINE) |
| | PROPOSED BUILDING FOOT PRINT |
| | ADJACENT BUILDING FOOT PRINT |
| ▼ | FRESH FOOD ENTRY / EXIT |
| ▼ | RESIDENTIAL ENTRY |
| ▼ | LOADING DOCK |
| ◉ | ELEVATION ABOVE BASE PLANE |
| | TREE |
| ◀ | DIRECTION OF TRAFFIC |
| | FIRE HYDRANT |
| �֎ | STREET LIGHT |

**LEGEND**

| | |
|---|---|
| ▬ – – | OUTLINE OF FRESH FOOD RETAIL SPACE |
| | NON-PERISHABLE FOOD SPACE |
| | PERISHABLE FOOD SPACE |
| | FRESH PRODUCE SPACE |
| | NON-FOOD GROCERY SPACE |
| | NON-RETAIL SPACE |

| ZR SECTION | REGULATION | ZONE | |
|---|---|---|---|
| 63-211 | FRESH FOOD STORES | R7A W/ C2-4 | Wher<br>permi<br>a pen<br>permi |
| 63-01 | FRESH-RETAIL AREA | R7A W/ C2-4 | A "FF<br>cellar<br>froze<br>utiliza |
| 63-01 (a) | | | At lea<br>produ |
| 63-01 (b) | | | At lea<br>includ<br>sale |
| | | | Non-<br>Non-<br>**Total** |

Exhibit C, FAA-100, page 14 of 15



| | REQUIRED / PERMITTED | | PROPOSED |
|---|---|---|---|
| 2-4 | Where a fresh food store is provided on zoning lot, the provisions of section 35-31 (maximum floor area ratio for mixed building) relating to the maximum permitted floor area ratio on a zoning lot for each permitted use shall apply is modified in this sections, where all non-residential uses on a zoning lot have a permitted floor area ratio equal to or less than that permitted for residential and for zoning lots containing quality housing buildings, the total floor area permitted for such zoning lot may be increased by one SF of a residential floor area for each SF of fresh food store floor area, up to 20,000 SF | | Total Fresh Store : 13,89( |
| 2-4 | A "FRESH food store" is a food store use as listed in Section 32-15 (Use Group 6), where at least 6,000 square feet of the floor area, or cellar space utilized for retailing, is utilized for the sale of a general line of food and non-food grocery products, such as dairy, canned and frozen foods, fresh fruits and vegetable, fresh and prepared meats, fish and poultry, intended for home preparation, consumption and utilization. Such retail space utilized for the sale of a general line of food and non-food grocery products shall be distributed as follows: | 6,000 SF | 10,979 SF |
| | At least 3,000 square feet or 50 percent of such retail space, whichever is greater, shall be utilized for the sale of a general line of food products intended for home preparation, consumption and utilization; and | 5,489.5 SF | 5,185 + 583 = 5,768 SF (52.4 |
| | At least 2,000 square feet or 30 percent of such retail space, whichever is greater, shall be utilized for the sale of perishable goods that shall include dairy, fresh produce,frozen foods and fresh meats, of which at least 500 square feet of such retail space shall be designated for the sale of fresh produce. | 3,293.7 SF | 1873 + 48 + 797 + 1575 + 55  = 4 |
| | Non-food grocery retail space | | 640 SF (5.8%) |
| | Non-retail space | | 257 + 48 + 797 + 1343 + 391 |
| | **Total Fresh Store** | | 13,896 SF |

Exhibit C, FAA-100, page 15 of 15

| SED | | NOTES |
|---|---|---|
| tore : 13,896 SF | | |
| SF | | Complies |
| 68 SF (52.4 %) | | |
| 75 + 55  = 4,571 SF (42.3%) | | |
| | | Complies |
| 1343 + 391 + 81 = 2,917 SF | | |



**PROJ. TITLE:** FRESH FOOD
54 NOLL STREET
NEW MIXED DEVELOPMENT

**SEAL**

REGISTERED ARCHITECT
ERAN CHEN
036207
STATE OF NEW YORK

**SCALE:** 1/ 8" = 1'-0"    **DWG DATE:** 11/14/2019

**DRAWING NAME:**

# 1ST (GROUND) FLOOR PLAN

**DRAWING NO.:**

# FFA-100

PAGE: 3    OF: 5    PROJECT NO.: 1588.02

(1.1) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM
Exhibit C, FAA-101, page 1 of 15

(3.1) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM
Exhibit C, FAA-101, page 3 of 15

(4,1) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM

C2-4 OVERLAY



250 Park Avenue South, Third Floor
New York, New York 10003
646-478-7455

| REVISION DATE | ISSUE |
|---|---|
| 05.27.2021 | Fresh Food Filing |
| 07.22.2021 | Fresh Food Filing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(1.2) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM

Exhibit C, FAA-101, page 6 of 15



21-11609-mg    Doc 3    Filed 09/14/21    Entered 09/14/21 14:14:42    Main Document
(3.2) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM    Pg 433 of 474

Exhibit C  FAA-101, page 8 of 15



Exhibit C, FAA-101, page 9 of 15



21-11609-mg    Doc 3    Filed 09/14/21    Entered 09/14/21 14:14:42    Main Document
(5.2) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM    Pg 435 of 474
Exhibit C, FAA-101, page 10 of 15



TERRACE

15'-0"

# CONSULTANTS

CLIENT:
ALL YEAR MANAGEMENT
277 CLASSON AVENUE BROOKLYN, NY 11238
(718)-623-8438

STRUCTURAL ENGINEER:
MCNAMARA/SALVA
64 WEST 45TH STREET, NEW YORK, NY 10036
(212)-246-5800

MEP ENGINEER:
MGE ENGINEERING D.P.C.
116 WEST 32ND STREET, NEW YORK NY 10001
(212)-643-9655

# KEY PLAN

Project Address

54 NOLL STREET
BROOKLYN, NEW YORK 11206
BLOCK: 3152
LOT: 1 & 48
ZONING MAP: 13B

NOLL STREET



TRUE
NORTH

Exhibit C, FAA-101, page 11 of 15

(1.3) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM

(2.3) -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM

Exhibit C, FAA-101, page 12 of 15



(3,3) -4- 21_0722-FFA.pdf 7/28/2021 2:57:20 PM

Exhibit C, FAA-101, page 13 of 15



(4.3)  -4- 21  0722-FFA.pdf 7/28/2021 2:57:20 PM

Exhibit C, FAA-100, page 14 of 15



 LOCATION AND SIZE OF REALLOCATED FLOOR AREA PURSUANT
TO SECTION 63-30 OF ZR FOR A FRESH FOOD STORE

8TH FLOOR :  13,896 ZSF
TOTAL        13,896 ZSF

(5.3) -4- 21_0722-FFA.pdf 7/28/2021 2:57:20 PM

14'-9"

9'-6"

14'-9"

SUANT

STANWIX STREET

EVERGREEN AVENUE

PUBLICLY ACCESSIBLE AREA

MELROSE STREET

TRUE NORTH

## 54 NOLL ST.

PROJ. TITLE: FRESH FOOD
54 NOLL STREET
NEW MIXED DEVELOPMENT

SEAL



REGISTERED ARCHITECT
ERAN CHEN
036207
STATE OF NEW YORK

SCALE:  1/ 16" = 1'-0"     DWG DATE:  11/14/2019

DRAWING NAME:

8TH FLOOR PLAN

DRAWING NO.:

# FFA-101

PAGE: 4    OF: 5     PROJECT NO.: 1588.02



12' OFFSET LINE FROM ----------
SIDEWALK LEVEL

CEILING HEIGHT
70' - 0"

2' OFFSET LINE FROM SIDEWALK LE

SIDEWALK LEVEL

13'-9 1/2"

LOT1 - RETAIL LEVEL 1 T.O.S.
56' - 2 1/2"

3  Evergreen Avenue FRESH Frontag
1/8" = 1'-0"



e



EGRESS DOORS,        36'-10" NOT INCLUDED        LOADING
HOLLOW METAL                                     BERTH





250 Park Avenue South, Third Floor
New York, New York 10003
646-478-7455

| REVISION DATE | ISSUE |
|---|---|
| 05.27.2021 | Fresh Food Filing |
| 07.22.2021 | Fresh Food Filing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CE



7'–5"
Principal  FRESH  En

① ENLARGED ELEVATION - FRESH FOOD @
   3/8" = 1'-0"

ZR SECTION



EVERGREEN AVENUE



OPAQUE, NON REFLECTIVE AND DUR

SIGN TO BE A FACSIMILE OF THE IMA

(2) FRESH SIGN DETAIL
1-1/2" = 1'-0"

REQUIRED / PERMITTED                    PROPOSED

| ZR SECTION | TITLE | |
|---|---|---|
| 63-23, 37-34 | Special Transparency Requirements | |
| | | Transparent materials shall level street wall between a floor ceiling, whichever is hi materials provided to satisfy feet, 6 inches, above the le windows, or portions of win shall have a minimum widtf floor level street wall withou |
| | | However, such transparenc level occupied by entrances parking garages, where per permitted, entryways to sub egress stairwells and passa |



RABLE SIGN BOARD

GE ABOVE

COMPLIANCE

AREA OF TRANSPARENT GLAZING OF STOREFRO
AND WINDOWS BETWEEN TWO FEET AND 12 FEE
HEIGHT OF THE GROUND FLOOR CEILING, WHICH
HIGHER, AS MEASURED FROM ADJOINING SIDEW

| REQUIRED / PERMITTED | PROPOSED | COMPLIA |
|---|---|---|
| Evergreen Avenue Frontage (Primary Street Frontage)<br>Noll Street Frontage (Secondary Street Frontage) | | |
| occupy at least 50% of the surface area of such ground floor height of two feet and twelve feet, or the height of the ground igher, as measured from the adjoining sidewalk. Transparent y such 50 percent requirement shall not begin higher than 2 vel of the adjoining sidewalk, with the exception of transom dows separated by mullions or other structural dividers, and n of two feet. The maximum width of a portion of the ground it transparency shall not exceed 10 feet.<br><br>y requirements shall not apply to portions of the ground floor s or exits to accessory off-street parking facilities and public mitted, entryways to required loading berths, where way stations, as applicable, or doors accessing emergency ageways. | * Evergreen Ave. total surface area between a height of two feet and the height of the ground floor ceiling and 12 feet as measured from the adjoining sidewalk = 1535 SF<br><br>* Total transparent material area  between a height of two feet and the height of the ground floor ceiling and 12 feet as measured from the adjoining sidewalk = 1089 SF<br><br>* Proposed Transparency = 71 % | Complies |



KEY PLAN

INT DOORS
T OR THE
IEVER IS
ALK

NCE

PUBLIC PARK

# CONSULTANTS

CLIENT:
ALL YEAR MANAGEMENT
277 CLASSON AVENUE BROOKLYN, NY 11238
(718)-523-9430

STRUCTURAL ENGINEER:
MCNAMARA/SALVA
64 WEST 45TH STREET, NEW YORK, NY 10036
(212)-246-9800

MEP ENGINEER:
MGE ENGINEERING D.P.C.
116 WEST 32ND STREET, NEW YORK NY 10001
(212)-643-9655

# KEY PLAN

Project Address

54 NOLL STREET
BROOKLYN, NEW YORK 11206
BLOCK: 3152
LOT: 1 & 48
ZONING MAP: 13B



63-12
Special Sign Regulations

Sign Loca
Mounted
FRESH F

Mounting
No less th

Sign Dime
FRESH F

Sign Mate
Fully opaq

| | |
|---|---|
| ...on<br>on an exterior building wall adjacent to and no more than five feet from the principal entrance of the<br>OOD store and directly visible without any obstruction to customer entering the FRESH FOOD store | 1'-3" |
| Height<br>an three feet and no more than five feet above the adjoining grade | 4'-0" |
| nsion<br>OOD store symbol shall be no less than 12 inches by 12 inches and no more than 16 inches by 16 | 16" x 16" |
| rial<br>jue, non reflective and constructed of permanent, highly durable materials | Painted Aluminum |

| | Complies |
| --- | --- |
| | Complies |
| | Complies |
| | Complies |

Exhibit B, FAA-202, page 14 of 15

Exhibit B, FAA-202, page 15 of 15



# 54 NOLL ST.

| PROJ. TITLE: | FRESH FOOD<br>54 NOLL STREET<br>NEW MIXED DEVELOPMENT |
|---|---|

SEAL



| SCALE: SEE DWG. | DWG DATE: 11/14/2019 |
|---|---|

DRAWING NAME:

## TRANSPARENCY REQUIREMENT & SIGNAGE

DRAWING NO.:

# FFA-202

| PAGE: 5 OF: 5 | PROJECT NO.: 1588.02 |
|---|---|

**EXHIBIT W**

**Assignment Agreement**

Attached

**ASSIGNMENT AGREEMENT BY AND AMONG ACI VI DENIZEN LLC, MREF REIT LENDER 9 LLC AND MISHMERET TRUST SERVICES LIMITED, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THOSE CERTAIN HOLDERS OF SERIES E BONDS**

This Assignment Agreement is entered into by and among ACI VI Denizen LLC ("ACI"), MREF REIT Lender 9 LLC ("Mezz Lender") Mishmeret Trust Services Limited, solely in its capacity as Trustee for those certain and Holders of Series E Bonds ("Series E Bondholders", hereinafter collectively referred to as the "Parties") on _____, 2021 ("Assignment Agreement"), and shall be effective upon the Series E Bondholder Approval and Mezz Lender Approval as documented in the Executed RSA in accordance with section 9.1.7 of the Purchase Agreement.[1]

WHEREAS, prior to the execution of this Assignment Agreement, ACI has executed the Agreement of Purchase and Sale (the "Purchase Agreement") with Evergreen Gardens I LLC ("Seller I") and Evergreen Gardens II LLC ("Seller II", together with Seller I, the "Sellers") for the purchase of the land and building located at 123 Melrose Street, in the Borough of Brooklyn, Count of Kings, City and State of New York, and for the purchase of the land and building located at 54 Noll Street, in the Borough of Brooklyn, County of Kings, City and State of New York (together, the "Properties") for the purchase price of $506 million (the "Purchase Price");

WHEREAS, pursuant to the Purchase Agreement, ACI's obligations to perform are conditioned upon the Effective Date (defined below) occurring;

WHEREAS, pursuant to the Purchase Agreement, the Sellers are required to commence cases under chapter 11, title 11, of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to consummate the sale of the Properties to ACI through one or more confirmed chapter 11 plan(s) under the Bankruptcy Code;

WHEREAS, each of the Mezz Lender and Series E Bondholders (each, an "Assignor" and together, the "Assignors") will benefit financially either directly or as a fiduciary if the sale of the Properties to ACI is consummated and have a financial interest in providing an incentive to ACI to consummate the transactions contemplated in the Purchase Agreement;

WHEREAS, as an incentive for ACI to enter into the Purchase Agreement, the Mezz Lender and Series E Bondholders agreed to support a motion to be filed in the Bankruptcy Court to provide the Purchaser the right to receive the Break-Up Fee, Expense Reimbursement and other protections (the "Bid Protections Order") should the Sellers engage in a Sellers-Prohibited Act;

WHEREAS, during the Gap Period (as defined below), ACI will not have the protections offered under the Bid Protections Order in the event of a Sellers-Prohibited Act;

WHEREAS, the protections provided by this Assignment Agreement are intended to reduce the risks to ACI of Sellers-Prohibited Acts occurring during the Gap Period;

---

[1] Defined terms herein not otherwise defined shall have the same meanings ascribed to them in the Purchase Agreement.

1

NOW, THEREFORE, in consideration of the foregoing, the Parties hereby agree as follows:

1.    <u>Effective Date</u>.  This Assignment Agreement shall become effective upon the Series E Bondholder Approval and Mezz Lender Approval as documented in the Executed RSA as such shall be obtained in accordance with the requirements and deadlines set forth in Section 9.1.7 of the Purchase Agreement (the "Effective Date").  For purposes hereof, the "Gap Period" shall be the period between the Effective Date and the date of the first Termination Event (defined below).

2.    <u>Non-Solicitation</u>.  During the Gap Period, each Assignor agrees that it shall not market, solicit or respond to offers for or provide due diligence information with respect to the Properties, or negotiate with any party other than ACI with respect to the possible sale of all or any part of the Properties (subject in each case to applicable fiduciary duties of Mezz Lender and the Series E Bondholders with respect to unsolicited expressions of interest, offers or bids and any Bankruptcy Court order that might be entered providing for or requiring a marketing and auction process).  Assignors' duties under this Section 2 shall expire upon the earlier to occur of the termination of the Purchase Agreement in accordance with its terms and the termination of the Executed RSA in accordance with its terms.

3.    <u>Assignment of Assigned Proceeds</u>.  In the event of a Sellers-Prohibited Act during the Gap Period, the sale proceeds, up to the amount of the Break-up Fee, in excess of what the Assignors (or any of their respective heirs, assignees, designees, creditors, or affiliates) would have received upon consummation of the transactions contemplated under the Purchase Agreement, are hereby irrevocably assigned to ACI, and such assigned proceeds shall be the sole, absolute and permanent property of ACI (such amount, in the aggregate, is the "Assigned Proceeds").  Each Assignor's several (but not joint) obligation for payment to ACI of its share of the Assigned Proceeds shall be proportionate to such Assignor's agreed share of the total amount of the sale proceeds (as agreed by and among Mezz Lender and Series E Bondholders prior to the date hereof) in excess of what the Assignors (or any of their respective heirs, assignees, designees, creditors, or affiliates) would have received upon consummation of the transactions contemplated under the Purchase Agreement.

4.    <u>Obligation Absolute</u>.  The obligation of each Assignor to pay its applicable share of the Assigned Proceeds to ACI shall be unconditional and absolute and shall be paid to ACI upon the receipt of proceeds from closing of any transaction(s) associated with a Sellers-Prohibited Act during the Gap Period.

5.    <u>Termination</u>.  Provided the obligation to pay ACI the Assigned Proceeds has not already accrued, the obligation herein to pay the Assigned Proceeds to ACI shall expire and terminate upon the earliest of (i) termination of the Purchase Agreement; (ii) entry of the Bid Protections Order; (iii) entry of a modified Bid Protections Order; (iv) entry of an order by the Bankruptcy Court denying Sellers' motion for entry of the Bid Protections Order; and (v) thirty-five (35) days from the Effective Date (each, a "Termination Event").

6.    <u>Severability</u>.  The provisions of this Assignment Agreement are severable, and, if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Assignment Agreement in any jurisdiction.

7.    <u>Amendments</u>.  This Assignment Agreement may only be modified, supplemented or amended by written agreement signed by all the Parties.

8.    <u>Entire Agreement</u>.  This Assignment Agreement integrates all of the terms and conditions with respect to the Properties and supersedes all oral representations and negotiations and prior writings, if any, with respect to the subject matter hereof.

9.    <u>Headings; Execution</u>.  The headings and subheadings used herein are for convenience of reference only and shall be ignored in interpreting the provisions of this Assignment Agreement.  This Assignment Agreement may be executed in counterparts by facsimile or other electronic signature, which, when so executed and delivered, shall be deemed to be an original.

10.    <u>Governing Law and Jurisdiction</u>.  This Assignment Agreement will be governed by and construed in accordance with New York law, without regard to conflict-of-laws principles, and each Party submits to the personal jurisdiction of the Courts of the State of New York.

11.    <u>Waiver of Jury Trial</u>.  PARTIES HERETO WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR RELATING TO OR ARISING FROM THE RELATIONSHIP WHICH IS THE SUBJECT OF THIS ASSIGNMENT AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

12.    <u>Legal Counsel; Negotiated Documents</u>. Each Party hereby represents and warrants to the others Party that they have had the opportunity to consult with, and receive advice from, legal counsel of their choice with respect to this Assignment Agreement (and all documents related hereto), or they have had an opportunity to consult with legal counsel of their choice and have made the decision not to consult with legal counsel. Without limiting the forgoing, each of the Parties hereby acknowledges and agrees that: (a) the terms of this Assignment Agreement (and all documents related hereto, if any) were negotiated by and among the Parties at arm's-length; and (b) such Party has legal and business options available to it other than the execution and delivery of this Assignment Agreement but has nonetheless decided to execute this Assignment Agreement and has done so voluntarily and without duress.

13.     <u>Time of Essence</u>. Time is of the essence with respect to this Assignment Agreement.

In witness whereof, this Assignment Agreement has been executed by the Parties hereof.

ACI VI Denizen LLC

By:_____

MREF REIT Lender 9 LLC

By:_____

MISHMERET TRUST SERVICES LIMITED,

In its capacity as Trustee for the Series E Bondholders

By:_____

By:_____

**ASSIGNMENT AGREEMENT BY AND AMONG ACI VI DENIZEN LLC, MREF REIT
LENDER 9 LLC AND MISHMERET TRUST SERVICES LIMITED, SOLELY IN ITS
CAPACITY AS TRUSTEE FOR THOSE CERTAIN HOLDERS OF SERIES E BONDS**

This Assignment Agreement is entered into by and among ACI VI Denizen LLC ("ACI"), MREF REIT Lender 9 LLC ("Mezz Lender") Mishmeret Trust Services Limited, solely in its capacity as Trustee for those certain and Holders of Series E Bonds (the "Series E Trustee", hereinafter collectively referred to as the "Parties") on August 31, 2021 ("Assignment Agreement"), and shall be effective upon the Series E Trustee and Mezz Lender executing a restructuring support agreement (the "RSA") supporting the transactions contemplated under the Purchase Agreement (defined below).[1]  This Assignment Agreement supersedes all prior agreements relating to the subject matter of this Assignment Agreement, and any such prior agreement shall be deemed null and void and unenforceable.

WHEREAS, prior to the execution of this Assignment Agreement, ACI has executed the Agreement of Purchase and Sale (the "Purchase Agreement") with Evergreen Gardens I LLC ("Seller I") and Evergreen Gardens II LLC ("Seller II", together with Seller I, the "Sellers") for the purchase of the land and building located at 123 Melrose Street, in the Borough of Brooklyn, Count of Kings, City and State of New York, and for the purchase of the land and building located at 54 Noll Street, in the Borough of Brooklyn, County of Kings, City and State of New York (together, the "Properties") for the purchase price of $506 million (the "Purchase Price");

WHEREAS, pursuant to the Purchase Agreement, ACI's obligations to perform are conditioned upon the Effective Date (defined below) occurring;

WHEREAS, pursuant to the Purchase Agreement, the Sellers are required to commence cases under chapter 11, title 11, of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to consummate the sale of the Properties to ACI through one or more confirmed chapter 11 plan(s) under the Bankruptcy Code;

WHEREAS, each of the Mezz Lender and Series E Trustee (each, an "Assignor" and together, the "Assignors") will benefit financially either directly or as a fiduciary if the sale of the Properties to ACI is consummated and have a financial interest in providing an incentive to ACI to consummate the transactions contemplated in the Purchase Agreement;

WHEREAS, as an incentive for ACI to enter into the Purchase Agreement, the Mezz Lender and Series E Trustee agreed to support a motion to be filed in the Bankruptcy Court to provide the Purchaser the right to receive the Break-Up Fee, Expense Reimbursement and other protections (the "Bid Protections Order") should the Sellers engage in a Sellers-Prohibited Act;

WHEREAS, during the Gap Period (as defined below), ACI will not have the protections offered under the Bid Protections Order in the event of a Sellers-Prohibited Act;

---

[1] Defined terms herein not otherwise defined shall have the same meanings ascribed to them in the Purchase Agreement.

WHEREAS, the protections provided by this Assignment Agreement are intended to reduce the risks to ACI of Sellers-Prohibited Acts occurring during the Gap Period;

NOW, THEREFORE, in consideration of the foregoing, the Parties hereby agree as follows:

1.    Effective Date.  This Assignment Agreement shall become effective upon the Series E Trustee and Mezz Lender executing the RSA (the "Effective Date").  For purposes hereof, the "Gap Period" shall be the period between the Effective Date and the date of the first Termination Event (defined below).

2.    Non-Solicitation.  During the Gap Period, each Assignor agrees that it shall not market, solicit or respond to offers for or provide due diligence information with respect to the Properties, or negotiate with any party other than ACI with respect to the possible sale of all or any part of the Properties (subject in each case to applicable fiduciary duties of Mezz Lender and the Series E Trustee with respect to unsolicited expressions of interest, offers or bids and any Bankruptcy Court order that might be entered providing for or requiring a marketing and auction process).  Assignors' duties under this Section 2 shall expire upon the earlier to occur of the termination of the Purchase Agreement in accordance with its terms and the termination of the Executed RSA in accordance with its terms.

3.    Assignment of Assigned Proceeds.  In the event of a Sellers-Prohibited Act during the Gap Period, the sale proceeds, up to the amount of the Break-up Fee, in excess of what the Assignors (or any of their respective heirs, assignees, designees, creditors, or affiliates) would have received upon consummation of the transactions contemplated under the Purchase Agreement, are hereby irrevocably assigned to ACI, and such assigned proceeds shall be the sole, absolute and permanent property of ACI (such amount, in the aggregate, is the "Assigned Proceeds").  Each Assignor's several (but not joint) obligation for payment to ACI of its share of the Assigned Proceeds shall be proportionate to such Assignor's Agreed Proportion (as defined in the RSA) of the total amount of the sale proceeds in excess of what the Assignors (or any of their respective heirs, assignees, designees, creditors, or affiliates) would have received upon consummation of the transactions contemplated under the Purchase Agreement.

4.    Obligation Absolute.  The obligation of each Assignor to pay its Agreed Portion of the Assigned Proceeds to ACI shall be unconditional and absolute and shall be paid to ACI upon the receipt of proceeds from closing of any transaction(s) associated with a Sellers-Prohibited Act during the Gap Period.

5.    Termination.  Provided the obligation to pay ACI the Assigned Proceeds has not already accrued, the obligation herein to pay the Assigned Proceeds to ACI shall expire and terminate upon the earliest of (i) termination of the Purchase Agreement; (ii) entry of the Interim Bid Protections Order; (iii) entry of the Interim Bid Protections Order is denied with prejudice; (iv) entry of Bid Protections Order; (v) entry of a modified Bid Protections Order; (vi) entry of an

order by the Bankruptcy Court denying Sellers' motion for entry of the Bid Protections Order; and (vii) thirty-five (35) days from the Effective Date (each, a "Termination Event").

6.    Severability.  The provisions of this Assignment Agreement are severable, and, if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Assignment Agreement in any jurisdiction.

7.    Amendments.  This Assignment Agreement may only be modified, supplemented or amended by written agreement signed by all the Parties.

8.    Entire Agreement.  This Assignment Agreement integrates all of the terms and conditions with respect to the Properties and supersedes all oral representations and negotiations and prior writings, if any, with respect to the subject matter hereof.

9.    Headings; Execution.  The headings and subheadings used herein are for convenience of reference only and shall be ignored in interpreting the provisions of this Assignment Agreement.  This Assignment Agreement may be executed in counterparts by facsimile or other electronic signature, which, when so executed and delivered, shall be deemed to be an original.

10.    Governing Law and Jurisdiction.  This Assignment Agreement will be governed by and construed in accordance with New York law, without regard to conflict-of-laws principles, and each Party submits to the personal jurisdiction of the Courts of the State of New York.

11.    Waiver of Jury Trial.  PARTIES HERETO WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR RELATING TO OR ARISING FROM THE RELATIONSHIP WHICH IS THE SUBJECT OF THIS ASSIGNMENT AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

12.    Legal Counsel; Negotiated Documents. Each Party hereby represents and warrants to the others Party that they have had the opportunity to consult with, and receive advice from, legal counsel of their choice with respect to this Assignment Agreement (and all documents related hereto), or they have had an opportunity to consult with legal counsel of their choice and have made the decision not to consult with legal counsel. Without limiting the forgoing, each of the Parties hereby acknowledges and agrees that: (a) the terms of this Assignment Agreement (and all documents related hereto, if any) were negotiated by and among the Parties at arm's-length; and (b) such Party has legal and business options available to it other than the execution and delivery

of this Assignment Agreement but has nonetheless decided to execute this Assignment Agreement and has done so voluntarily and without duress.

13.    <u>Time of Essence</u>. Time is of the essence with respect to this Assignment Agreement.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

In witness whereof, this Assignment Agreement has been executed by the Parties hereof.

MREF REIT Lender 9 LLC

By:_____

Kevin Culliinan
Authorized Representative

MISHMERET TRUST SERVICES LIMITED,

In its capacity as Trustee for the Series E Bondholders

By:_____

By:_____

In witness whereof, this Assignment Agreement has been executed by the Parties hereof.

MREF REIT Lender 9 LLC

By:_____

MISHMERET TRUST SERVICES LIMITED,

In its capacity as Trustee for the Series E Bondholders

By: _Ram Sebty-partner_

By: _Romy Ketzer - partner_

5

ACI VI DENIZEN LLC

By: _____
Name:  Jeffrey A. Goldberger
Title:   Authorized Signatory


By: _____
Name:  Andrew B. Cohen
Title:   Authorized Signatory

6

GWFG DRAFT 9/1/2021 v2

## SECOND AMENDMENT TO AGREEMENT
## OF PURCHASE AND SALE

THIS SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "**Amendment**") is dated as of September 1, 2021 (the "**Amendment Date**") by and between EVERGREEN GARDENS I LLC, a limited liability company ("**Seller 1**") and EVERGREEN GARDENS II LLC, a limited liability company ("**Seller 2**"; and together with Seller 1, each a "**Seller**"; and collectively, "**Sellers**"), each having an address c/o All Year Holdings Limited, 199 Lee Avenue, Suite #693, Brooklyn, New York 11233 and ACI VI DENIZEN LLC, a Delaware limited liability company, having an address c/o Atlas Capital Group, LLC, 40 West 57th Street, 29th Floor, New York, New York 10019 ("**Purchaser**").

## RECITALS

A.      Pursuant to that certain Agreement of Purchase and Sale dated as of August 2, 2021 (the "**Original Agreement**"), as amended by amendment dated August 19, 2021 (the "**First Amendment**", and together, the "**Agreement**"), Sellers agreed to sell and Purchaser agreed to purchase the real property with improvements thereupon commonly known as (i) 123 Melrose Street, Brooklyn, New York and (ii) 54 Noll Street, Brooklyn, New York, each as described more fully in the Agreement.

B.      Pursuant to the First Amendment, Sellers have obtained the Series E Bondholder Approval and the Assignment Agreement has been executed and delivered.

C.      Sellers have obtained (i) the Series E Bondholder Approval (as such term is defined in the Agreement) and Mezz Lender Approval (as such term is defined in the Original Agreement), and documented in the Executed RSA, and (ii) the Assignment Agreement, as defined in the Agreement, executed by the Series E Bondholder and Mezz Lender (as such term is defined in the Original Agreement).

D.      Sellers and Purchaser hereto desire to further amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree as follows:

## AGREEMENT

1.      Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings given to such terms in the Agreement.  In the event of any conflict between the terms of this Amendment and the terms of the original Agreement, the terms of this Amendment shall control.

2.      Section 9.1.7 of the Agreement, as amended, shall be deleted in its entirety, and replaced with the following:

"On or before the Amendment Date, each of the Sellers has obtained the Series E Bondholder Approval and Mezz Lender Approval (each defined below), evidenced by delivery to Purchaser of the Executed RSA (defined below), consenting to the sale to Purchaser pursuant to the terms of this Agreement and to the execution by MREF REIT Lender 9 LLC and Mishmeret Trust Services, Limited, in its capacity as Trustee on behalf of the holders of the Series E Bonds, to that certain assignment agreement among such parties and Purchaser, substantially in the form attached hereto as **Exhibit W** (it being understood that each of MREF REIT Lender 9 LLC and Mishmeret Trust Services, Limited, in its capacity as Trustee on behalf of the holders of the Series E Bonds may execute separate agreements; collectively, the "Assignment Agreement").    On or before September 14, 2021, each of the Sellers shall commence the Seller Bankruptcy Proceedings.    On or before September 14, 2021, the Sellers shall file a motion (the "Bid Protections Motion") with the Bankruptcy Court seeking entry of interim and final orders approving the payment of the Break-Up Fee and the Expense Reimbursement (as hereinafter defined), in a form of final order substantially similar to **Exhibit R** attached hereto (the "Final Bid Protections Order").    The Bid Protections Motion will request, among other thing, that the Court approve the Bid Protections on an interim basis (such interim order, the "Interim Bid Protections Order") pending a hearing to consider entry of the Final Bid Protections Order.    Within two (2) Business Days of written notice to Purchaser of the earlier of (i) entry of the Interim Bid Protections Order and (ii) entry of the Final Bid Protections Order, Purchaser shall cause to be deposited with Escrow Agent the Second Additional Downpayment as set forth at Section 3.2.3.    If (A) the Sellers fail to commence the Seller Bankruptcy Proceedings on or before September 14, 2021, (B) the Interim Bid Protections Order is not entered on or before September 21, 2021 or (C) the Final Bid Protections Order is not entered on or before October 5, 2021, Purchaser may terminate this Agreement, whereupon the Initial Downpayment, the First Additional Downpayment and/or the Second Additional Downpayment as the case may be shall promptly be refunded by Escrow Agent to Purchaser, Sellers shall pay to Purchaser the Expense Reimbursement, and the parties shall have no further obligation to each other except for those obligations intended to survive the termination of this Agreement. If Purchaser elects to not terminate, it will retain the right to terminate until such time as the Interim Bid Protections Order or the Final Bid Protections Order is entered, (provided that upon entry of the Final Bid Protections Order Purchaser shall have no further right to terminate this Agreement in accordance with this Section 9.1.7, notwithstanding if or when the Interim Bid Protections Order was entered (if at all)), and the Outside Date shall be extended by the number of days in addition to the number of days needed to obtain Bankruptcy Court approval of the Final Bid Protections Order (but in no event later than the Extended Outside Date (as hereinafter defined)).    If Purchaser elects to no longer wait for the Bankruptcy Court to enter the Interim Bid Protections Order from and after September 22, 2021 (provided the Final Bid Protections Order has not been issued prior to such termination) Purchaser may terminate this Agreement in accordance with this Section 9.1.7 upon two (2) Business Days' notice to Sellers provided such termination notice is delivered on or prior to September 23, 2021, time being of the essence.    If Purchaser elects to no longer wait for the Bankruptcy Court to enter the Final Bid Protections Order from and after October 6, 2021, Purchaser may terminate this Agreement in accordance with this Section 9.1.7 upon five (5) Business Days' notice to Sellers, time being of the essence. If the Final Bid Protections Order is rejected by the Bankruptcy Court, then Purchaser shall make its election to terminate this Agreement in accordance with this Section 9.1.7 within five (5)

Business Days after notice of the issuance of such order rejecting the Final Bid Protections Order, time being of the essence.

3.     A new Sections 9.1.12 is hereby added to the Agreement and shall read in its entirety as follows:

"On or before September 14, 2021, Sellers shall commence solicitation for acceptance of the Chapter 11 Plan from all of the Sellers' known secured and unsecured creditors that are impaired and entitled to vote to accept or reject the Chapter 11 Plan."

4.     The first sentence of Section 3.2.3 of the Original Agreement is hereby deleted and replaced with:

"TEN MILLION AND 00/100 ($10,000,000.00) DOLLARS (the "Second Additional Downpayment") within two (2) Business Days of notice of entry of the earlier of (i) the Interim Bid Protections Order (as defined herein) and (ii) the Final Bid Protections Order (as defined herein) by federal funds wire transfer to an escrow account of Escrow Agent."

5.     The Original Agreement is hereby amended, *mutatis mutandi*, by replacing the words "Bid Protections Order" (i) in each of Sections 7.1.1, 7.1.3, 8.2, 35.1(d), 35.2(d) and 36.1 with "Final Bid Protections Order", and (ii) in Section 35.2(c) with "Interim Bid Protections Order or Final Bid Protections Order".

6.     Section 2 of the First Amendment is hereby deleted in its entirety.

7.     Reaffirmation of Agreement.  Except as expressly amended by this Amendment, the Agreement remains in full force and effect and is hereby ratified and reaffirmed in its entirety.

7.     Counterparts.  This Amendment may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  This Amendment may be executed electronically, including facsimile transmission and by way of email (i.e., TIF, JPG, PDF), and all such signatures shall be deemed originals for all purposes.

8.     Successors and Assigns.  This Amendment shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

3

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the Amendment Date.

SELLERS:

Evergreen Gardens I LLC
By: Evergreen Gardens Mezz LLC, its manager
By: All Year Holdings LLC, its manager
By: All Year Holdings Limited, its manager

By: _____
Name: Asaf Ravid
Title: Authorized Signatory

By: _____
Name: Ephraim Diamond
Title: Authorized Signatory

Evergreen Gardens II LLC
By: Evergreen Gardens Holdings II LLC, its manager
By: All Year Holdings LLC, its manager
By: All Year Holdings Limited, its manager

By: _____
Name: Asaf Ravid
Title: Authorized Signatory

By: _____
Name: Ephraim Diamond
Title: Authorized Signatory

4

**PURCHASER:**

ACI VI DENIZEN LLC

By: _____
     Name: Jeffrey A. Goldberger
     Title:  Authorized Signatory

By: _____
     Name: Andrew B. Cohen
     Title:  Authorized Signatory

**<u>Exhibit C</u>**

**Organization Chart**

